**No. 26-1104**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

PARENT AA, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

On Appeal from the United States District Court
for the District of Maryland

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  (202) 514-3180

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION................................................................ 4

STATEMENT OF THE ISSUES.................................................................... 5

PERTINENT STATUTES AND REGULATIONS ........................................ 5

STATEMENT OF THE CASE ...................................................................... 6

 A. Statutory Background.................................................... 6

 B. Factual Background....................................................... 12

  1. Off-Label Provision of Puberty Blockers and Cross-Sex Hormones to Treat Gender Dysphoria .................... 12

  2. The Department of Justice's FDCA Investigation............15

  3. The Subpoena to Children's National Hospital.............. 19

 C. Prior Proceedings ....................................................... 21

SUMMARY OF ARGUMENT...................................................................23

STANDARD OF REVIEW ....................................................................... 27

ARGUMENT........................................................................................... 27

I. Plaintiffs lack statutory authorization to challenge a subpoena they did not receive.................................................... 27

II. The Children's National subpoena is valid and was validly issued. ...................................................................................34

III. The district court erred in quashing the subpoena based on its evaluation of the Department's purpose...........................40

 A. The district court misunderstood the legal standard and largely ignored the government's explanation of relevance............................................................... 41

 B. The district court erred in relying on its assessment of the "policy objective" of the administration. .................52

CONCLUSION...................................................................................... 61

CERTIFICATE OF COMPLIANCE.......................................................62

CERTIFICATE OF SERVICE..................................................................63

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Alphin v. United States,*
  809 F.2d 236 (4th Cir. 1987)....................................................................54

*Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.,*
  559 U.S. 393 (2010) ..............................................................................34

*Barnhart v. Peabody Coal Co.,*
  537 U.S. 149 (2003)...............................................................................28

*Church of Scientology of Cal. v. United States,*
  506 U.S. 9 (1992) ...................................................................................55

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ................................................................................56

*Cmty. for Creative Non-Violence v. Pierce,*
  786 F.2d 1199 (D.C. Cir. 1986) ..............................................................60

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019)................................................................................56

*Doe v. United States,*
  253 F.3d 256 (6th Cir. 2001)..................................................................40

*Donaldson v. United States,*
  400 U.S. 517 (1971).........................................................................44, 54

*E.E.O.C. v. Lockheed Martin Corp.,*
  116 F.3d 110 (4th Cir. 1997)...................................................................37

*E.E.O.C. v. Md. Cup Corp.,*
  785 F.2d 471 (4th Cir. 1986)..................................................................35

*E.E.O.C. v. Shell Oil Co.,*
  466 U.S. 54 (1983)..................................................................................37

*Endicott Johnson Corp. v. Perkins,*
  317 U.S. 501 (1943).........................................................................34, 40

*F.T.C. v. Texaco, Inc.,*
555 F.2d 862 (D.C. Cir. 1977) ....................................................49

*Hintze v. IRS,*
879 F.2d 121 (4th Cir. 1989) ....................................................55

*In re Antitrust Grand Jury Investigation (Under Seal),*
714 F.2d 347 (4th Cir. 1983) ....................................................55

*In re Grand Jury 2021 Subpoenas,*
87 F.4th 229 (4th Cir. 2023) ....................................................27

*In re Subpoena Duces Tecum,*
228 F.3d 341 (4th Cir. 2000) ........................................ *passim*

*Kordel v. United States,*
335 U.S. 345 (1948) ....................................................................8

*McLane Co. v. E.E.O.C.,*
581 U.S. 72 (2017) ....................................................................27

*Okla. Press Pub. Co. v. Walling,*
327 U.S. 186 (1946) .................................................... 36, 37, 44

*Polselli v. Internal Revenue Serv.,*
598 U.S. 432 (2023) ..................................................................29

*Rotkiske v. Klemm,*
589 U.S. 8 (2019) ...............................................29, 38, 43, 50

*Solis v. Food Emps. Lab. Rels. Ass'n,*
644 F.3d 221 (4th Cir. 2011)................................. 35, 36, 40, 41

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...........................................................56, 60

*Trump v. United States,*
603 U.S. 593 (2024) ...........................................................59, 60

*U.S. E.E.O.C. v. Maritime Autowash, Inc.,*
820 F.3d 662 (4th Cir. 2016) ...................................................45

*United States v. 47 Bottles,*
320 F.2d 564 (3d Cir. 1963) ......................................................8

*United States v. Am. Target Advert., Inc.,*
257 F.3d 348 (4th Cir. 2001) ............................................................. *passim*

*United States v. Armstrong,*
517 U.S. 456 (1996) ...................................................................... 56

*United States v. Article of Drug,*
394 U.S. 784 (1969) ........................................................................ 6

*United States v. Davis,*
75 F.4th 428 (4th Cir. 2023) ........................................................... 27

*United States v. Dotterweich,*
320 U.S. 277 (1943) ........................................................................ 6

*United States v. Equitable Tr. Co.,*
611 F.2d 492 (4th Cir. 1979) .......................................................... 54

*United States v. LaSalle Nat'l Bank,*
437 U.S. 298 (1978) ....................................................................... 54

*United States v. Markwood,*
48 F.3d 969 (6th Cir. 1995) ............................................................ 56

*United States v. Marschall,*
82 F.4th 774 (9th Cir. 2023) ............................................................. 9

*United States v. Morton Salt Co.,*
338 U.S. 632 (1950) ...................................................................... *passim*

*United States v. Norwood,*
420 F.3d 888 (8th Cir. 2005) .......................................................... 49

*United States v. Park,*
421 U.S. 658 (1975) ..................................................................... 6, 8

*United States v. Powell,*
379 U.S. 48 (1964) .............................................................. 1, 34, 44, 53

*United States v. Simmons,*
999 F.3d 199 (4th Cir. 2021) .......................................................... 27

*United States v. Skrmetti,*
605 U.S. 495 (2025) .............................................................. 1, 3, 12, 13

*United States v. Storm, Ruger, & Co.,*
84 F.3d 1 (1st Cir. 1996) .................................................................. 35

*United States v. Texas,*
599 U.S. 670 (2023) ........................................................................59

*United States v. Urbuteit,*
335 U.S. 355 (1948) ..........................................................................8

*United States v. Whispering Oaks Residential Care Facility, LLC,*
673 F.3d 813 (8th Cir. 2012) ......................................................... 55

*United States v. Wiesenfeld Warehouse Co.,*
376 U.S. 86 (1964).............................................................................8

*Usery v. Whitin Mach. Works, Inc.,*
554 F.2d 498 (1st Cir. 1977) ......................................................... 49

*Va. Dep't of Corr. v. Jordan,*
921 F.3d 180 (4th Cir. 2019) ........................................................ 49

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ........................................................................ 56

*Wayte v. United States,*
470 U.S. 598 (1985) ....................................................................... 60

**Statutes**

12 U.S.C. § 3405(2).......................................................................... 31

12 U.S.C. § 3410(a) .........................................................................29

18 U.S.C. § 24(a).......................................................................11, 35

18 U.S.C. § 24(b)...............................................................................11

18 U.S.C. § 2704(a)......................................................................... 31

18 U.S.C. § 2704(b)........................................................................29

18 U.S.C. § 3486 .........................................................................5, 30

18 U.S.C. § 3486(a).................................................................. *passim*

iv

18 U.S.C. § 3486(d) ....................................................................32

18 U.S.C. § 3486(e)(1) ........................................................ 28, 51

21 U.S.C. § 321(m) ...................................................................8

21 U.S.C. § 331 ..................................................................8, 11

21 U.S.C. § 331(a) ............................................................... 7, 9

21 U.S.C. § 331(b) ............................................................... 7, 9

21 U.S.C. § 331(c) ............................................................... 7, 9

21 U.S.C. § 331(d) ............................................................... 6, 7

21 U.S.C. § 331(k) ............................................................... 7, 9

21 U.S.C. § 333(a) ...........................................................8, 9, 38

21 U.S.C. § 352 .........................................................................7

21 U.S.C. § 352(a) ....................................................................7

21 U.S.C. § 352(f) ................................................................ 7, 9

21 U.S.C. § 355 .........................................................................7

21 U.S.C. § 355(a) ....................................................................7

21 U.S.C. § 355(d) ....................................................................7

26 U.S.C. § 7609(a) ............................................................... 31

26 U.S.C. § 7609(b) ............................................................... 29

28 U.S.C. § 2072(b) ...............................................................34

47 U.S.C. § 551(h) ........................................................... 29, 31

Wash. Rev. Code § 70.02.020(2) ...........................................32

## Rules

Fed. R. App. P. 4(a)(1)(B) ........................................................... 4

Fed. R. Civ. P. 45(e)(1)(D) ........................................................ 33

Fed. R. Civ. P. 45(e)(2) ............................................................ 33

Fed. R. Civ. P. 81(a)(5) ........................................................... 33

## Regulations

21 C.F.R. § 1.3(a) .................................................................... 8

21 C.F.R. § 201.5 ..................................................................... 7

21 C.F.R. § 201.55 ................................................................... 7

21 C.F.R. § 201.57 ................................................................... 7

21 C.F.R. § 201.100 .................................................................. 7

21 C.F.R. § 201.128 .................................................................. 9

21 C.F.R. § 801.4 ................................................................. 7, 8

## Other Authorities

Executive Order 14,168, 90 Fed. Reg. 8615 .............................. 13

Executive Order 14,187, 90 Fed. Reg. 8771 .......................... 13, 16

Restatement (Second) of Torts § 682 cmt. B (1977) ................... 54

**INTRODUCTION**

Congress routinely authorizes federal agencies to issue subpoenas to investigate potential violations of federal law. An agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). With broad agency discretion comes limited judicial intervention. Judicial review of a subpoena is "summary in nature," *United States v. Am. Target Advert., Inc.*, 257 F.3d 348, 353 (4th Cir. 2001). A showing of probable cause is not required. *See United States v. Powell*, 379 U.S. 48, 57 (1964).

Every administration is also free to set enforcement priorities. Under this administration, the Department of Justice has made it a priority to investigate potential violations of the Food, Drug, and Cosmetic Act and other federal health care offenses in connection with pediatric gender medicine. The Department has a substantial basis to believe that various actors in the industry, from hospitals to pharmaceutical companies, have violated federal law. Given that the practices at issue are "associated with harmful—and sometimes irreversible—risks," *United States v. Skrmetti*, 605 U.S. 495, 517 (2025), the Department of Justice has made ensuring compliance with federal law in this area a particular focus.

As part of this investigation, the Department issued an administrative subpoena to Children's National Hospital, which prescribed drugs in connection with pediatric gender-related interventions until a few months before the subpoena issued. The Department suspects that Children's National has in its possession records relevant to potential federal offenses and therefore issued a subpoena like those it ordinarily issues in the health care space. Yet the district court concluded that the subpoena had no lawful purpose and instead appeared to be motivated only by a desire to eliminate gender-related medical interventions for minors—reasoning that would effectively shield the entire industry from federal due diligence.

The district court concluded that there was no lawful purpose for the subpoena because the court could perceive no way in which the subpoena could be relevant to an investigation of federal healthcare offenses committed by Children's National. But that reasoning largely ignored the Department's explanation that Children's National could be either a witness or a party to violations of the Food, Drug, and Cosmetic Act, which regulates the distribution of drugs to consumers. A subpoena is thus justified whether or not Children's National itself committed FDCA violations.  But even if more were required, the court did not acknowledge or grapple with the substantial evidence the Department provided

2

regarding Children's National. The district court compounded these errors by ignoring the Department's specific explanation of the need for the challenged categories of documents, which are directly relevant to the potential violations of federal law the government is investigating, which have been obtained from other pediatric hospitals as part of the investigation, and which are routinely sought and used in similar investigations, including with this Court's express approval. *See In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000). The district court also demanded that the Department provide more evidence that Children's National may be violating the law, but that both overlooked the substantial evidence the Department provided and ignored that Children's National may simply be a witness to others' misconduct.

The safety and propriety of gender-related interventions for minors is a topic of "fierce scientific and policy debates," one that the President and his administration have not hesitated to address. *Skrmetti,* 605 U.S. at 525. But that political backdrop does not excuse participants in this industry from complying with the same federal health care laws as everyone else. And it certainly should not shield them from ordinary criminal investigations or duly authorized subpoenas. This Court should reverse the order below.

## STATEMENT OF JURISDICTION

The district court granted plaintiffs' motion to quash on January 21, 2026. JA582-JA599. The government filed a notice of appeal on January 28, 2026. JA603; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

**1.** Whether plaintiffs have statutory standing to challenge a subpoena issued to a third party.

**2.** Whether the district court erred in quashing a subpoena to Children's National Hospital expressly authorized by 18 U.S.C. § 3486 on the basis that the Department of Justice did not issue the subpoena for a proper purpose.

**PERTINENT STATUTES AND REGULATIONS**

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

### 1. The Federal Food, Drug, and Cosmetic Act

In 1938, Congress passed, and President Franklin D. Roosevelt signed into law, the Federal Food, Drug, and Cosmetic Act ("FDCA"). The FDCA's "overriding purpose [is] to protect the public health." *United States v. Article of Drug*, 394 U.S. 784, 798 (1969). Because the FDCA's purpose should "infuse construction of the" FDCA, *United States v. Dotterweich*, 320 U.S. 277, 280 (1943), courts give the FDCA a "liberal construction" that furthers protection of the public health, including criminal enforcement, *Article of Drug*, 394 U.S. at 798; *see also United States v. Park*, 421 U.S. 658, 672 (1975) (explaining the FDCA imposes a "positive duty to seek out and remedy violations when they occur").

The FDCA regulates the development, manufacturing, and distribution of drugs in the United States. Before any "new drug" may enter interstate commerce, the manufacturer must demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction of an unapproved new drug into interstate commerce violates the FDCA. 21 U.S.C. § 331(d).

A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). When FDA approves a drug, it approves it as safe and effective for particular use(s) in the NDA. *See* 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. In addition, for prescription drugs, FDA must also approve the drug's labeling, which specifies, among other things, FDA-approved uses and adequate directions for those uses. 21 U.S.C. §§ 352(f)(1), 355; *see* 21 C.F.R. §§ 201.5, 201.55-201.57, 201.100. Because a drug that is safe and effective for one use may be neither safe nor effective for others, FDA approval extends only to the uses specified in a drug's approved application and labeling. 21 U.S.C. § 355(d).

The FDCA generally prohibits "misbranding" a drug. *See* 21 U.S.C. § 352; *id.* §§ 331(a), (b), (c), (k). A drug may be misbranded if, among other things, its labeling is false or misleading, *id.* § 352(a), or if its labeling does not bear adequate directions for its intended use, *id.* § 352(f)(1). "[I]ntended use[]" means the "objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 801.4. Such intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.* And the "intended uses of an article may change after

7

it has been introduced into interstate commerce by its manufacturer." *Id.*
If, for example, a seller "intends an article for different uses than those intended by the person from whom he or she received the article," then the seller is "required to supply adequate labeling in accordance with the new intended uses." *Id.*

Under the FDCA, drug labeling is broadly defined to include any "written, printed, or graphic matter . . . accompanying" the drug. 21 U.S.C. § 321(m). The term "accompanying" includes materials that are separate from but related to the drug and any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles*, 320 F.2d 564, 569 (3d Cir. 1963). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

Given the FDCA's protective purpose, misdemeanor violations of the FDCA are punishable on a strict liability basis, without any proof of criminal intent. *See* 21 U.S.C. §§ 331, 333(a)(1); *Park*, 421 U.S. at 672-73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). For example, if a drug manufacturer or other person causes the distribution an

approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a drug with labeling that lacks adequate directions for its intended uses. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). Where a violator has an intent to defraud or mislead, an FDCA violation may be punishable as a felony. 21 U.S.C. § 333(a)(2).

Misbranding, via false or misleading "written, printed, or graphic matter" on a drug, container, or wrapper or that supplements, explains, or is designed for use with a drug, is a classic FDCA violation. *See, e.g.*, *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (quotation omitted) (upholding misbranding conviction of the defendant who shipped drugs with false informational sheets). Drug manufacturers and distributors also can be convicted of FDCA violations, for example, for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g.*, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008),

Dkt. 11 (conviction of manufacturer for promoting three drugs for off-label uses). Thus, in such prosecutions, the government may rely on evidence of communications between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses. *See, e.g.*, *Cephalon*, Dkt. 1, ¶¶ 12-18 (criminal information); Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving illegal off-label promotion, highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . . to send unsolicited medical letters to promote the drug for an unapproved use to doctors").[1]

---

[1] There are many similar examples. *See, e.g.*, Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *United States v. Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses

*Continued on next page.*

### 2. The Health Insurance Portability & Accountability Act of 1996 and HIPAA Subpoenas

In 1996, Congress passed, and President Clinton signed into law, the Health Insurance Portability and Accountability Act ("HIPAA"). As relevant here, the statute permits the Attorney General to issue a subpoena—often referred to as a "HIPAA subpoena"—to investigate federal health care offenses. 18 U.S.C. § 3486(a)(1)(A)(i)(I). A federal health care offense includes a "violation of, or a criminal conspiracy to violate" specified statutes, including the misbranding under the FDCA "if the violation or conspiracy relates to a health care benefit program." 18 U.S.C. § 24(a) (cross-referencing 21 U.S.C. § 331). And a "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* § 24(b). The Department of Justice is therefore expressly empowered to use a HIPAA subpoena to investigate violations of the FDCA and related conspiracies, if the violation or conspiracy relates to products or services

---

(highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

that might ultimately be paid for by a private or public health insurance program.

## B. Factual Background

### 1. Off-Label Provision of Puberty Blockers and Cross-Sex Hormones to Treat Gender Dysphoria

This case involves a HIPAA subpoena that the Department of Justice issued in connection with an investigation into the provision of certain prescription drugs to minors with gender dysphoria. These include prescription drugs that suppress the production of sex hormones to delay puberty (commonly referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. *See Skrmetti*, 605 U.S. at 503-04 (describing use of these drugs). Although these drugs are approved by FDA for some uses, FDA has not determined that any of these drugs are safe or effective for the treatment of gender dysphoria, nor has FDA approved any of these prescription drugs for the treatment of gender dysphoria or any other psychiatric disorder.

The use of these drugs in the treatment of gender dysphoria in minors is highly controversial—the subject of "fierce scientific and political debates." *Skrmetti*, 605 U.S. at 525. As the Supreme Court recently

explained, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors," and "more than 20 States have enacted laws banning the provision of sex transition treatments to minors." *Id.* at 504-05; *see also id.* at 533-35 (Thomas, J., concurring).

Shortly after entering office, President Trump issued several Executive Orders weighing in on these and related issues. Executive Order 14,168 establishes a policy "to recognize two sexes, male and female," and states that a contrary "gender ideology" is harmful and that the two "sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, § 2 (Jan. 20, 2025). Executive Order 14,187 establishes a federal policy not to "fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025).

Since issuing those orders, the White House has praised certain hospitals' decisions to "downsize or eliminate their so-called 'gender-affirming care' programs," explaining that the latter executive order was

"already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex." Article, *President Trump is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://perma.cc/Q5Q3-AHA3; *see* Article, *The White House, President Trump Promised to End Child Sexual Mutilation – and He Delivered*, (July 25, 2025), https://perma.cc/V3ZB-SULP (similar).

Children's National provided gender-related medical interventions to minors for decades, including through a team of providers referred to as the Gender Development Program. JA21. On January 30, 2025, Children's National announced that it was pausing prescription of "puberty blockers and hormone therapy" for "transgender youth patients," "per the guidelines in the Executive Order issued by the White House this week."[2] Children's National announced on July 18, 2025, that it was making that pause permanent effective August 30, 2025, "[i]n light of escalating legal and regulatory risks."[3]

---

[2] Children's Nat'l Hosp., *Children's National Hospital Statement on Executive Order* (Jan. 30, 2025), https://perma.cc/54HH-ANTB (cited at JA22).

[3] JA22; JA299-300; Children's Nat'l Hosp., *Gender Development Program*, https://perma.cc/T2KR-FMTU.

On July 21, 2025, then-Attorney General Bondi tweeted, "At President Trump's direction, @TheJusticeDept will continue enforcing the law against institutions like Children's National that mutilate children under the guise of medical care. History will remember @POTUS as a champion on this crucial issue."[4]

### 2. The Department of Justice's FDCA Investigation

The Department of Justice has taken steps to investigate potential violations of the FDCA in connection with the provision of puberty blockers and cross-sex hormones to minors. In April, Attorney General Bondi directed the Department "[to] investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations." Memorandum, *Preventing the Mutilation of American Children* at 4, (Apr. 22, 2025), https://perma.cc/2E68-DR4X ("Bondi Memo"). Attorney General Bondi did not purport to declare any conduct unlawful, or to change the laws that apply to this industry. Rather, the Bondi Memo directed the Department to "undertake appropriate investigations of any violations of the Food, Drug

---

[4] Attorney General Pam Bondi (@AGPamBondi), X (July 21, 2025), https://perma.cc/M66D-M8YP.
.

and Cosmetic Act by manufacturers and distributors engaged in misbranding by making" purported "false claims about the on- or off-label use of puberty blockers, sex hormones," and similar drugs. *Id.*

In June, Assistant Attorney General for the Civil Division Brett Shumate issued a memorandum stating that "[t]he Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities . . . [including] possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs." Memorandum, *Civil Division Enforcement Priorities* at 2-3 (June 11, 2025), https://perma.cc/6MNM-ZBD8 ("Shumate Memo"). This memo too simply expressed an intention to investigate potential violations of existing federal statutes.

Based on information from whistleblowers and medical experts, "the Government is aware of potential violations of federal law in connection with the provision of gender-related treatments for minors occurring at healthcare providers across the country." JA506. In particular, the Department is aware of evidence and allegations that providers are engaged in "fraudulent billing practices to secure insurance coverage/payment,"

16

such as using the incorrect diagnosis or billing code to mask off-label use of a drug that an insurer would not cover; misrepresenting a patient's sex in medical records; and fraudulently making a gender dysphoria diagnosis when the provider knows that the insurer will cover off-label prescription of cross-sex hormones or puberty blockers to treat gender dysphoria. JA506-07. That evidence includes medical records the Department has obtained from other pediatric hospitals as part of this investigation. JA508.

The Department is also aware of evidence and allegations of "many cases" where providers actively deceived patients and parents "with false claims and statements regarding the drugs' effectiveness or alternatives" and "the risks associated with" puberty blockers and cross-sex hormones. JA507.

The Department has used multiple investigative tools, including HIPAA subpoenas, in its ongoing investigation regarding the provision of gender-related medical interventions, including possible FDCA violations by drug manufacturers, distributors, and prescribers. JA508. The investigation is being handled by career prosecutors with decades of experience in healthcare fraud and FDCA enforcement, supported by a team of document analysts and other forensic specialists, as well as FBI and FDA agents and analysts. JA511. Analysts are employing data analytics to

identify prescribing patterns, potential unlawful promotion of off-label drug use, and patterns in reimbursement.

The investigation seeks to determine whether manufacturers or distributors of puberty blockers or cross-sex hormones, and/or providers of gender-related medical interventions, are violating federal healthcare laws. For example, the marketing or promotion of puberty blockers and cross-sex hormones (the drugs at the center of the investigation) for treating gender dysphoria in minors—an unapproved used—could constitute illegal misbranding under the FDCA. Misleading or deceiving minors and their parents about the risks of gender-related treatments could similarly violate the FDCA.

These are not mere technical violations. Bypassing the drug approval process carries real health consequences for children. After surveying the evidence, the United States Department of Health and Human Services ("HHS") has identified harms associated with these drugs—including infertility and sterility, impaired bone density development, cardiovascular and metabolic disease, psychiatric conditions, and others—and determined that "[a]vailable evidence cannot support determinations regarding effectiveness of these medical interventions for improving mental health or alleviating gender dysphoria symptoms in children and adolescents."

JA537. And the HHS Secretary, after conducting a comprehensive evidence review, concluded that "[s]ex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care." JA533.

### 3. The Subpoena to Children's National Hospital

The Department developed information about Children's National "through multiple channels, including the analysis of insurance claims data, billing records," and other information sources. JA508. That information "has raised questions concerning whether puberty blockers and cross-sex hormones have been fraudulently distributed for unapproved uses involving [Children's National] patients." JA508. For example, between 2020 and 2024, more than 60 patients were diagnosed with precocious puberty at age 10 or older, even though "[p]recocious puberty happens before age 8 in girls and before age 9 in boys." JA508 (quoting Children's Nat'l Hosp., *Precocious Puberty*, https://perma.cc/6HGA-CH53). Those patients diagnosed with precocious puberty included several teenagers who were between ages 14 and 17. JA508.

In July 2025, the Civil Division of the Department of Justice issued a HIPAA subpoena to Children's National Hospital seeking certain documents to assist the Department's investigation. Plaintiffs did not obtain or file a copy of the subpoena issued to Children's National, but the district court analyzed a subpoena issued to a different hospital, Boston Children's Hospital, on the undisputed understanding that it was "substantively identical" to the subpoena issued to Children's National. *See* JA46, JA308, JA 586. The subpoena specified a return date of August 7, 2025.

The subpoena included fifteen document requests and sought information to investigate "[f]ederal health care offenses as defined in 18 U.S.C. § 24(a)." JA46. The subpoena sought documents and data relating to Children's National's provision of gender-related medical treatment, including medical records for patients prescribed puberty blockers or hormone therapy and documents relating to billing or coding practices, or insurance claims, for gender-related care. JA52-54. In particular, requests 11 through 13 sought the following:

> 11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks.

JA53-54. The subpoena also sought "documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care" and "contracts, sponsorships, speaking arrangements, consulting agreements, grants, or financial or promotional arrangements between" Children's National and "any manufacturer or compounder of puberty blockers or hormones." JA53.

## C.    Prior Proceedings

On November 17, 2025, plaintiffs—eight families of patients who received gender-related medical interventions at Children's National between 2020 and 2025—moved to quash requests 11 through 13 of the subpoena, as well as any other requests to the extent the requests call for production of their identities or medical records. JA23, JA44. They argued that the subpoena was issued for an improper purpose because it was "motivated by animus towards transgender individuals," JA28, so it

violated their Fourth Amendment rights, and their Fifth Amendment expectation of privacy in their medical records outweighed the government's interest in obtaining the records. *See* JA586-87.

The district court granted plaintiffs' motion. JA582-97; *see* JA598-99. The district court concluded that plaintiffs could challenge the subpoena even though it was not issued to them, JA587-91, and declined to find plaintiffs' motion untimely under the HIPAA statute even though it was filed after the statutory deadline, JA591. On the merits, the district court concluded that the government had not "articulated" any "basis to suspect the Hospital of violations of the FDCA," such as an "affidavit (or complaint or whistleblower statement) attesting to grounds for an investigation of the Hospital for FDCA or False Claims Act violation." JA593; *see* JA596 ("The subpoena bears no credible connection to an investigation of any statutory violation by the Hospital."). The district court thought that the subpoena sought "to investigate how the Hospital treats its patients," while "the FDCA regulates commerce, not patient care." JA595. The court thus concluded that "the Subpoena was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth," given "the patent disassociation of the scope of the Subpoena from purported investigations of Hospital FDCA violations" and

the "backdrop" of the executive order and the Bondi and Shumate memos. JA595-96. In sum, the district court thought that "the Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare." JA596.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order quashing the subpoena.

As a threshold matter, the district court erred in disregarding HIPAA's limits on who may challenge a subpoena. Section 3486 permits challenges only by "the person or entity summoned"—that is, the subpoena recipient. That plainly indicates that Congress intentionally excluded the possibility of challenges by third parties. Congress discussed and accounted for patients' privacy interests elsewhere in § 3486, demonstrating that it did not thoughtlessly overlook patients in the provisions for challenging subpoenas. Section 3486 also stands in marked contrast to other administrative subpoena regimes, which are express when they permit nonrecipients to challenge subpoenas and facilitate those challenges through notice and timing requirements that are entirely absent in § 3486. Indeed, § 3486 permits courts to forbid disclosure of the existence of the subpoena in some circumstances, entirely foreclosing the possibility of

challenges by nonrecipients in those cases, and it preempts state laws that could otherwise require notice to patients. Permitting challenges by patients would also fit poorly with the venue requirement in § 3486, which ties venue to the subpoena recipient.

Turning to the merits, the Department of Justice has statutory authority to investigate potential FDCA violations by those who distribute or cause the distribution of misbranded drugs. The sought-after records are relevant to the Department's FDCA investigation. For example, communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion by manufacturers and distributors, which goes directly to possible misbranding liability. And patient medical records can reveal the scope of potential violations, permit identification of billing patterns, provide powerful evidence of intent to misbrand and to conceal violations of federal law by falsely coding diagnoses, and identify adverse health outcomes that are directly relevant to prosecutions for healthcare offenses. That is not hypothetical: The Department has obtained medical records from other pediatric hospitals as part of this very investigation and obtained directly relevant evidence from those records. And no one otherwise questions the

subpoena's procedural validity. As a result, Department's subpoena is valid and properly issued.

The district court's contrary conclusion ignored the Department's explanation of the investigation it is conducting and the subpoena's relevance to the investigation. The Department explained that it seeks the subpoenaed records both to determine whether Children's National has *itself* violated federal law and to determine whether Children's National has *witnessed* violations of federal law by drug manufacturers or distributors. The district court entirely ignored the second possibility, concluding only that the Department had not explained how Children's National could have violated the Food, Drug, and Cosmetic Act or how the subpoena would be relevant to any such violations.

That conclusion ignored an independently sufficient basis for the subpoena and was wrong on its own terms. The Department had explained that Children's National could violate the FDCA by misbranding drugs itself or by conspiring with manufacturers and distributors who were misbranding drugs, and the district court never engaged with that explanation. The district court likewise largely ignored the Department's explanation of the relevance of each category of evidence to its ongoing investigation of potential misbranding liability. And the district court

attempted to require the Department to provide evidence that Children's national was violating the FDCA, but it ignored both the evidence the Department provided and the well-established rule that administrative subpoenas permit an agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642-43.

The district court also referred to statements by the President and other Executive Branch officials opposing pediatric gender-related medical interventions. Those statements provided no support for the district court's conclusion. The government's opposition to certain medical interventions for minors with gender dysphoria does not render pretextual and improper any investigation into those practices. The Court has already recognized that the government is not limited to investigating "only those potential wrongdoers who support its policies." *Am. Target Advert.*, 257 F.3d at 356. Any contrary conclusion would immunize whole industries from federal law enforcement, endangering consumers and undermining core Executive Branch prerogatives to develop and implement enforcement priorities.

The Court should reverse.

## STANDARD OF REVIEW

An order quashing an administrative subpoena is reviewed for abuse of discretion. *McLane Co. v. E.E.O.C.*, 581 U.S. 72, 75 (2017). The Court reviews "factual conclusions for clear error" and "legal conclusions *de novo*." *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 250 (4th Cir. 2023).

"[A]n error of law . . . is by definition an abuse of discretion." *United States v. Davis*, 75 F.4th 428, 435 (4th Cir. 2023) (citation omitted). A district court also abuses its discretion "if its decision rests upon a clearly erroneous factual finding" or if it "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Simmons*, 999 F.3d 199, 219 (4th Cir. 2021).

## ARGUMENT

### I. Plaintiffs lack statutory authorization to challenge a subpoena they did not receive.

**A.** The district court first erred by entertaining plaintiffs' motion to quash at all. Plaintiffs are patients of Children's National and their families, not recipients of the subpoena. Section 3486 provides precise directions for challenging subpoenas issued under its authority, and they exclude challenges by non-recipients. The relevant provision specifies:

> At any time before the return date specified in the summons, the person or entity summoned may, in the United States

district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons[.]

18 U.S.C. § 3486(a)(5).

The text makes clear who can challenge the subpoena: "the person or entity summoned." *Id.* This precise identification of who *can* challenge the subpoena is best read to exclude challenges by anyone else. Because plaintiffs are not "the person or entity summoned," 18 U.S.C. § 3486(a)(5), they lack statutory standing to challenge the subpoena.

That conclusion straightforwardly follows because "it is fair to suppose that Congress considered the unnamed possibility" that patients would want to challenge subpoenas to their medical providers, "and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Three features of the statute make clear that Congress intentionally limited challenges only to subpoena recipients.

*First*, Congress referred elsewhere in § 3486 to individuals like plaintiffs whose medical records are obtained from providers through HIPAA subpoenas. Subsection (e) limits use of "[h]ealth information about an individual that is disclosed under this section," and it refers to such a patient as "the individual who is the subject of the information." *Id.* § 3486(e)(1). That provision makes inescapable the fact that Congress

anticipated that patients' health records would be disclosed through HIPAA subpoenas and that Congress knew how to refer to such individuals and to provide for their privacy interests. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when . . . Congress has shown that it knows how to adopt the omitted language or provision."). And Congress's choice to refer specifically to patients in subsection (e) strongly indicates that it intentionally chose to omit patients from subsection (a). *See Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("We assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'" (citation omitted)).

It is further telling that Congress expressly *permitted* non-recipients to challenge subpoenas seeking their records in other comparable statutes. *See, e.g.*, 12 U.S.C. § 3410(a) (Right to Financial Privacy Act providing that "a customer may file a motion to quash"); 18 U.S.C. § 2704(b) (Electronic Communications Privacy Act providing that a "subscriber or customer may file a motion to quash such subpoena"); 26 U.S.C. § 7609(b) (permitting taxpayer who is under investigation to move to quash or intervene in proceedings regarding enforcement of a subpoena); 47 U.S.C. § 551(h) (permitting a court to order disclosure of "personally identifiable

information concerning a cable subscriber" only if "the subject of the information is afforded the opportunity to appear and contest" the disclosure).

*Second*, Congress's timing requirement for challenges to HIPAA subpoenas indicates that it intentionally limited such challenges to subpoena recipients. Section 3486 requires any challenge to a HIPAA subpoena to be filed "before the return date specified in the summons." 18 U.S.C. § 3486. That requirement is inconsistent with challenges by non-recipients, who may not learn of a subpoena at all, much less before the compliance date. Indeed, in this case, plaintiffs apparently never obtained a copy of the subpoena issued to Children's National, and have instead cited a subpoena served on a different hospital that became public when that hospital challenged the subpoena. JA586.

The district court declined to apply the statute's deadline for challenges to plaintiffs because it concluded that there was insufficient evidence that plaintiffs "were notified (constructively or in fact) of the Subpoena . . . in advance of the response deadline." JA591. But that merely underscores the point: nothing in the statute indicates that the timing requirement is optional, or that the lack of a requirement to notify patients

is an unintentional omission by Congress, but instead that Congress permitted only subpoena recipients to challenge HIPAA subpoenas.

Indeed, HIPAA is distinct from other administrative subpoena statutes in this respect. Many such statutes include a requirement to notify the interested non-recipient, thus facilitating the non-recipient's challenge. *See* 12 U.S.C. § 3405(2) (Right to Financial Privacy Act, requiring service of "a copy of the subpena or summons . . . upon the customer"); 18 U.S.C. § 2704(a)(2) (Electronic Communications Privacy Act, requiring "[n]otice to the subscriber or customer . . . within three days"); 26 U.S.C. § 7609(a) (IRS subpoena statute, requiring "notice" and "a copy of the summons" to be timely served on "any person (other than the person summoned) who is identified in the summons"); 47 U.S.C. § 551(h) (requiring that the cable subscriber have "the opportunity to appear and contest" the disclosure).

By contrast, § 3486 not only *omits* a requirement to tell patients when records are being disclosed, but affirmatively allows courts to *forbid* a subpoena recipient from "disclos[ing] to any other person or entity" the "existence" of the subpoena. 18 U.S.C. § 3486(a)(6)(A). When a judge orders nondisclosure of the existence of a HIPAA subpoena, non-recipients will, by definition, have no opportunity to learn of and challenge the subpoena. And § 3486 further preempts state laws that could otherwise

31

require a recipient of a HIPAA subpoena to notify patients that their medical records will be or have been produced in compliance with the subpoena, while likewise controlling over any potentially applicable similar federal requirements. *Id.* § 3486(d); *see, e.g.*, Wash. Rev. Code § 70.02.020(2). That, too, weakens the likelihood that a non-recipient will even learn of the subpoena and reinforces the conclusion that Congress permitted only subpoena recipients to challenge HIPAA subpoenas.

*Third*, reading § 3486 to permit challenges by non-recipients would make a hash of its venue provision. Section 3486(a)(5) specifies that challenges are to be brought "in the United States district court for the district in which" the "person or entity summoned" "does business or resides." That is a perfectly sensible venue provision if the "person or entity summoned" is challenging the subpoena, but it is an odd choice if challenges can also be brought by non-recipients, who may not know or be readily able to determine where the subpoena recipient does business or lives, or may be required to litigate in a distant forum.

**B.** The district court reached the opposite conclusion by relying on subsection (a)(7), which it thought "expressly incorporates the standards applicable to judicial subpoenas" in Civil Rule 45 and thus permits challenges by non-recipients. JA588. The district court also thought that

32

Civil Rule 81 renders Rule 45 applicable. JA589. That was erroneous in all respects.

Subsection (a)(7) provides only that "[a] summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States." 18 U.S.C. § 3486(a)(7). That provision incorporates the substantive limitations in Rule 45 on material that can be sought in a subpoena, such as limitations on producing privileged information or electronically stored information that is not reasonably accessible. *See* Fed. R. Civ. P. 45(e)(1)(D), (e)(2). A provision that adopts "the standards" of Rule 45 for "production" of documents in no way imports the *procedural* strictures of Rule 45, which would conflict with many provisions of § 3486.

Rule 81 is of even less relevance. It provides only that the Civil Rules apply to "proceedings to compel . . . the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5). Rule 81 thus expressly provides that a statute controls to the extent the statute's dictates are inconsistent with the Rule. Rule 81 thus does not, and cannot, create a right

inconsistent with § 3486. Indeed, any contrary reading of Rule 81 (or Rule 45) to create an "entitlement[] to relief" that § 3486 does not create would raise serious questions under the Rules Enabling Act. *Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality); *see* 28 U.S.C. § 2072(b) (permitting rules only if they do not "abridge, enlarge or modify any substantive right").

## II. The Children's National subpoena is valid and was validly issued.

Congress has authorized the Department to investigate and prosecute federal healthcare offenses. Accordingly, the Department "may take steps to inform itself as to whether there is probable violation of the law." *Morton Salt*, 338 U.S. at 643. Indeed, the Department "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642-43. No showing of probable cause is necessary. *See Powell*, 379 U.S. at 57. And in its investigation, the Department is entitled to any evidence unless it is "plainly incompetent or irrelevant to any lawful purpose" of the Department in investigating federal healthcare offenses. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943).

In accord with these principles, an administrative subpoena is enforced if "(1) the agency is authorized to make such an investigation;

(2) the agency has complied with statutory requirements of due process; and (3) the materials requested are relevant." *Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011). "If the agency can make such a showing, 'the court must enforce the subpoena unless the party being investigated demonstrates that the subpoena is unduly burdensome.'" *Id.* (quoting *E.E.O.C. v. Md. Cup Corp.*, 785 F.2d 471, 475-76 (4th Cir. 1986)); *see In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (addressing HIPAA subpoena).

The Children's National subpoena clears this threshold with ease. At the outset, the subpoena plainly falls within the Department's statutory authority. This Court has explained that this requirement is "met" so long as the Department's "assertion of authority is not 'obviously apocryphal[.]'" *Am. Target Advert.*, 257 F.3d at 351 (quoting *United States v. Storm, Ruger, & Co.*, 84 F.3d 1, 354 (1st Cir. 1996)). Here, 18 U.S.C. § 3486(a)(1)(A)(i)(I) expressly authorizes the Attorney General to issue subpoenas to investigate potential "Federal health care offense[s]," which is defined to include violations of the FDCA, *id.* § 24(a)(2). Attorney General Bondi directed the Civil Division's Enforcement and Affirmative Litigation Branch "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by

making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Bondi Memo at 4. In the Shumate Memo, the Assistant Attorney General stated that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Bondi Memo's] directives," which would include investigations into "possible violations of the [FDCA]." Shumate Memo at 2-3. And the subpoenas themselves make clear that they seek information to "investigate Federal health care offenses." JA46. Whatever else may be said of the Department's authority, its ability to investigate potential misbranding of drugs in violation of the FDCA cannot be described as "apocryphal," and so the requirement of agency authorization is "met." *Am. Target Advert.*, 257 F.3d at 351.

The subpoena also seeks information "relevant" to the investigation. *Food Emps.*, 644 F.3d at 226. "The question of the permissible scope is generally 'variable in relation to the nature, purposes and scope of the inquiry.'" *In re Subpoena Duces Tecum*, 228 F.3d at 350 (quoting *Okla. Press Pub. Co. v. Walling,* 327 U.S. 186, 209 (1946)).  The relevancy requirement is "not especially constraining[,]" *E.E.O.C. v. Shell Oil Co.*, 466

U.S. 54, 68 (1983), and it is determined "in terms of the investigation rather than in terms of evidentiary relevance," *E.E.O.C. v. Lockheed Martin Corp.*, 116 F.3d 110, 113 (4th Cir. 1997) (citation omitted). In other words, evidence is relevant if it furthers the investigation, even if it does not pertain to an element of the violation under investigation. *See, e.g.*, *id.* at 113-14 (permitting requests that allowed agency "to better focus its investigation").

The subpoena easily satisfies that standard by seeking information relevant to the Department's investigation in two different ways. First, the Department seeks records to determine whether Children's National itself may have engaged in conduct that implicates the FDCA. Second, the Department seeks records from Children's National to determine whether manufacturers and distributors of the drugs at issue may have violated the FDCA.

There are four groups of requests, all of which extend from January 1, 2020, to the present. Request 1 seeks personnel files to identify who had authority to direct prescribing, billing, or marketing practices and to determine which actors may have liability. JA52. Requests 2 through 6— which seek documents related to billing, insurance claims, and diagnosis coding practices—are informative as to the existence of false billing and the presence of an "intent to defraud or mislead." 21 U.S.C. § 333(a)(2). *See*

JA52-53. Requests 7 through 10 seek documents related to the relationship between Children's National and drug manufacturers, which can provide evidence of misbranding and fraudulent intent. JA53. For example, communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion, which would be relevant to an FDCA prosecution. *See supra* pp. 9-11 (collecting examples of FDCA prosecutions relying on such evidence).

Finally, Requests 11 through 15 seek patient records, which will allow the Department to assess the scope of the potential violations at issue, identify patterns of misbranding or false billing, and assess fraudulent intent. JA53. For example, identifying an instance of false coding typically requires evaluating a patient's medical records to ascertain the patient's actual diagnosis and the patient's billing records to ascertain a mismatch between the patient's diagnosis and the bill submitted to the patient's insurer. *See* JA510. That is not a hypothetical: In this investigation, the Department has obtained medical records from other pediatric hospitals that have used pharmaceuticals for gender-related medical interventions, and review of those records has revealed evidence that treatments have been coded as treatment for disorders other than the actual diagnosis,

suggesting concealment of off-label use of puberty blockers and hormones. JA508.

Patient records may also be necessary to identify patients' adverse health outcomes, which are often significant in FDCA and other health care offenses. *See* JA510.[5] Obtaining patient records also permits investigators to determine the scale of potential FDCA violations, to compare records to distinguish between one-off billing errors and institutionalized practices suggesting intentional miscoding of treatments, and to generate future investigative leads such as identifying relevant records to request from health benefit programs. JA510-11. Investigations of FDCA and other health care offenses thus regularly involve use of patient records. JA499 (HIPAA subpoenas "are routinely used to obtain . . . medical, billing, and related information in federal healthcare offense investigations"); *see, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d at 350; *Doe v. United States*, 253 F.3d

---

[5] *See also, e.g.*, Dep't of Justice, *Founder and Chief Executive Officer of Injectable Stem Cell Product Manufacturer Sentenced for Distributing Unapproved Drug* (Sept. 30, 2024), https://perma.cc/JWH4-23UA (highlighting evidence that defendant's conduct was linked to patients' hospitalization); Dep't of Justice, *Owners and CEO of Wholesale Pharmaceutical Company Sentenced for Distributing More Than $92M of Black-Market HIV Drugs* (March 16, 2026), https://perma.cc/X2TR-8JBJ (highlighting trial testimony from patient who was harmed by defendants' conduct).

256, 265 (6th Cir. 2001) (enforcing subpoena that included "requests for the files of patients").

For these reasons, the documents the Department seeks are far from "irrelevant to any lawful" FDCA investigation, *Endicott Johnson Corp.*, 317 U.S. at 509, and the relevance requirement is satisfied.

Finally, there is no dispute that the Department "has complied with statutory requirements of due process." *Food Emps.*, 644 F.3d at 226. Petitioners have advanced no argument that the subpoena failed to comply with any of the relevant statutory requirements for issuance.

$$* \quad * \quad *$$

Congress authorized the subpoena, which seeks relevant information as part of an investigation into potential violations of federal healthcare law. Because the subpoena meets this Court's requirements, the district court should have denied the motion to quash.

## III. The district court erred in quashing the subpoena based on its evaluation of the Department's purpose.

The district court's rationale for quashing the challenged portions of the subpoena rested on multiple fundamental misunderstandings of the standards applicable to administrative subpoenas and disregard of multiple aspects of the Department's explanation of the relevance of the material sought by the subpoena. The court concluded that "the Subpoena was not

issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth," JA595, and thus that the subpoena must be "a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare" and must "have no purpose other than to intimidate and harass" Children's National and plaintiffs. JA596.

Those conclusions are mistaken in every respect. Under any proper application of the governing law, the district court erred in quashing the subpoena.

A. **The district court misunderstood the legal standard and largely ignored the government's explanation of relevance.**

The district court's conclusion that the Department lacked "a legitimate governmental purpose" for the subpoena, JA595, cannot be reconciled with the standard this Court has articulated. As noted above, an agency need only demonstrate that the subpoena is issued within its statutory authority. *Food Emps.*, 644 F.3d at 226; *Am. Target Advert.*, 257 F.3d at 351; *In re Subpoena Duces Tecum*, 228 F.3d at 349. The district court properly did not dispute that the Department has statutory authority to investigate potential FDCA violations or to issue subpoenas in aid of those investigations, and that is sufficient to establish that the first element

41

for a valid subpoena is "met." *Am. Target Advert.*, 257 F.3d at 351; *see*

*Morton Salt*, 338 U.S. at 652  (noting subpoena is sufficient "if the inquiry

is within the authority of the agency").

The district court's view that the subpoena was invalid because it "is

not limited in scope to any legitimate purpose, and is oppressive in its

breadth," JA595, likewise rests on an obvious misapplication of the

governing standards. The court stated that the Department had "set[] forth

no basis on which it suspects the Hospital of misbranding or distributing

drugs, or any other conduct, as proscribed by the FDCA." JA595.

That was incorrect. To begin, the subpoena is proper whether or not

Children's National is itself under investigation for potential FDCA

offenses. The district court ignored entirely the Department's explanation

that Children's National could be a mere witness to possible FDCA

violations by drug manufacturers and distributors. The Department

explained that it was investigating not just whether Children's National

itself violated the FDCA, *see* JA485, JA506-08, but also whether "third

parties" are violating the FDCA "independent of the hospital." JA485; *see*

JA497 (explaining that the Department is investigating whether

"manufacturers and distributors" of puberty blockers and cross-sex

hormones have violated the FDCA). Indeed, the investigation has publicly

42

stated, since its earliest stages, that it is pursuing possible FDCA violations by manufacturers and distributors. JA584 (Bondi memo), JA586 (Shumate memo). Investigative subpoenas, including HIPAA subpoenas, are commonly served not only on the target or subject of an investigation but also on those who may have information relevant to the investigation.

The district court cited and quoted the Bondi and Shumate memos' disclosure that the Department is investigating FDCA violations by drug manufacturers and distributors. JA584 (Bondi memo), JA586 (Shumate memo). But it entirely ignored that Children's National could be a witness to violations of the FDCA by manufacturers or distributors of puberty blockers and cross-sex hormones. And there is no serious dispute that manufacturers and distributors can violate the FDCA by misbranding drugs, including by promoting drugs for off-label uses. Misbranding is a classic FDCA violation, and the Department has repeatedly obtained convictions of manufacturers and distributors for engaging in misbranding via off-label promotion. *See supra* pp. 9-11. And no one has disputed that many of the subpoena's requests seek information that is plainly relevant to that investigation, or that Children's National has information responsive to those requests and thus relevant to the investigation.

That alone demonstrates the error of the district court's decision. But the court also erred in its assessment of the possibility that the subpoena might produce information relevant to potential FDCA violations by Children's National itself.

At the outset, the Supreme Court and this Court have been clear that an administrative agency need not provide evidence of wrongdoing to issue a subpoena. After all, "[t]he very purpose of the subpoena . . . is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the [agency's] judgment, the facts thus discovered should justify doing so." *Okla. Press,* 327 U.S. at 201. That is why it is long established that administrative subpoenas permit an agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," in a role "analogous to the Grand Jury." *Morton Salt*, 338 U.S. at 642-43. And it is equally well established that an agency need not have probable cause to issue a subpoena. *See, e.g.*, *Powell*, 379 U.S. at 57; *In re Subpoena Duces Tecum*, 228 F.3d at 348-49. Any other rule "would thwart and defeat the appropriate investigatory powers that the Congress has placed in" the Department. *Donaldson v. United States*, 400 U.S. 517, 533 (1971); *accord Subpoena Duces Tecum*, 228 F.3d at 348 (noting that requiring probable

cause to issue an administrative subpoena "would be the virtual end to any investigatory efforts by governmental agencies" by making "the object" of investigations into "a condition precedent for undertaking the investigation").

The district court compounded its error on this score by suggesting that the Department could not pursue a potential FDCA enforcement action against Children's National because the government "seeks to investigate how the Hospital treats its patients . . . in the context of gender-affirming patient care," but "the FDCA regulates commerce, not patient care." JA595. As discussed, the FDCA regulates misbranding, and to the extent the district court intended to suggest that Children's National is categorically incapable of engaging in misbranding, that is both mistaken and beyond the scope of a subpoena proceeding. This Court has explained that subpoena enforcement proceedings "are designed to be summary in nature," and that evaluating the underlying merits of a potential future enforcement action "places the cart before the horse" and falls outside the "scope of inquiry" in subpoena-stage proceedings. *Am. Target Advert.*, 257 F.3d at 353; *accord E.E.O.C. v. Maritime Autowash, Inc.*, 820 F.3d 662, 665 (4th Cir. 2016).

Moreover, even if such an inquiry were appropriate—and even if the Department were required to provide some evidence supporting a subpoena—the district court simply ignored the evidence the Department in fact provided here. First, the district court ignored the Department's explanation that Children's National could face liability for misbranding puberty blockers and hormones. The Department explained that the FDCA forbids both distribution and "causing" the distribution of misbranded drugs, JA473, JA501, and that Children's National or its providers could violate the FDCA by conspiring with pharmaceutical companies to misbrand puberty blockers and cross-sex hormones, JA485, JA509-10. The district court never so much as considered this explanation, instead erroneously concluding that the Department had not provided any explanation of how Children's National could have violated the FDCA. JA595.

Second, the district court's conclusion that the Department "set[] forth no basis on which it suspects" Children's National of violating the FDCA ignored the evidence the Department provided. JA595. The Department provided a declaration explaining that it is aware, based on public whistleblowers, medical experts, and evidence uncovered in this investigation, of "potential violations of federal law in connection with the

46

provision of gender-related treatments for minors occurring at healthcare providers across the country." JA506. Specific concerns based on evidence the Department has reviewed include, among other things, "many cases where providers failed to supply adequate labeling," "actively deceived patients and parents with false claims and statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor patients and their parents the risks associated with . . . taking the drugs"; and "fraudulent billing practices to secure insurance coverage/payment," including "using the incorrect diagnosis and/or billing code" and fraudulently making a diagnosis to obtain insurance coverage for cross-sex hormones or puberty blockers. JA 506-08. For many years, Children's National provided pharmaceutical gender-related medical interventions of this kind. And the Department has obtained evidence "rais[ing] questions concerning whether puberty blockers and cross-sex hormones have been fraudulently distributed for unapproved uses involving [Children's National] patients," such as dozens of diagnoses of precocious puberty at ages "well beyond the age at which children are typically diagnosed with precocious puberty." JA508. The district court addressed none of this evidence.

Those errors also infected the district court's treatment of the breadth of the subpoena and the relevance of the information sought to the investigation. The court stated that the government had failed to "plausibly explain[] the purported connection between the documents it demands and suspected Hospital FDCA violations," and that it was "utterly unclear . . . why the Government demands production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms." JA595. But here, too, the subpoena is not—and need not be— confined to seeking evidence of "suspected Hospital FDCA violations," JA595, as Children's National may simply be a witness to violations by others.

The same error undergirded the district court's disregard for this Court's precedent governing subpoena challenges based on overbreadth. This Court has explained that "as a condition to maintaining the argument that an investigative subpoena is overly broad and oppressive, [a recipient] would have to be able to point to reasonable efforts on his behalf to reach accommodation with the government." *In re Subpoena Duces Tecum*, 228 F.3d at 351; *see Morton Salt*, 338 U.S. at 653 ("Before the courts will hold an order seeking information reports to be arbitrarily excessive, they may

expect the supplicant to have made reasonable efforts . . . to obtain

reasonable conditions"). Yet the record reflects no efforts whatsoever, by

Children's National or plaintiffs, to narrow any requests or otherwise

reduce the subpoena's breadth. The record does, by contrast, reflect the

Department's willingness to narrow the subpoena to require anonymized

patient records. JA494. Absent efforts by plaintiffs or Children's National to

reach an accommodation with the government, and particularly when the

government has "proffered [an] accommodation" and the plaintiff has

rejected it, quashal based on breadth is impermissible.[6]

The district court excused compliance with this requirement based on

its view that "the scope and breadth of the subpoena" were "so

mismatched" with the government's purpose as to preclude seeking

conditions, but again described the "Government's articulated purpose" as

"to investigate potential FDCA violations by the Hospital." JA595 n.17.

Thus, even accepting the dubious proposition that a party can be excused

---

[6] Even if the district court were correct that the requests were
overbroad, the right remedy would have been modification, particularly in
light of the government's offer to accept anonymized medical records.
JA494; *see Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 190 n.4 (4th Cir.
2019) ("Mere overbreadth, of course, usually warrants modifying a
subpoena to narrow its scope, not quashing it."); *In re Subpoena Duces
Tecum*, 228 F.3d at 350-51; *accord Usery v. Whitin Mach. Works, Inc.*, 554
F.2d 498, 503 (1st Cir. 1977); *United States v. Norwood*, 420 F.3d 888, 896
(8th Cir. 2005); *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).

from seeking to narrow the requests through negotiation before seeking judicial relief—a qualification this Court has rejected—the district court's persistent misunderstanding of the subpoena's purpose and scope demonstrates error on this score.

More generally, the district court also ignored the Department's explanations for seeking the information at issue and did not analyze the standard for relevance in the subpoena enforcement context. As noted, relevance is construed broadly in the subpoena context, and the Department explained in detail the relevance of the requests for patient records to potential FDCA violations. *See supra* pp. 35-40. The district court did not acknowledge, much less engage with, these explanations aside from its repeated and mistaken insistence that the Department had not provided evidence to support an investigation of potential misconduct by Children's National. And the district court articulated no basis for treating the requests for patient records any differently from the other requests in the subpoena; on the district court's mistaken view, it is unclear whether the Department could engage in any investigation at all.

Moreover, the district court's offhand dismissal of the relevance of patient records and related materials is all the more remarkable in the context of a HIPAA subpoena. HIPAA contemplates that patient records

may be sought by a subpoena, providing special protections governing the use and disclosure of "[h]ealth information about an individual" collected through a subpoena. 18 U.S.C. § 3486(e)(1). The Department explained that "it is not uncommon" for an investigation of a federal healthcare offense to "require the collection of tens of thousands of patient records for review and analysis." JA477; *see* JA509-11. And this Court has previously recognized in the HIPAA context that broad requests for patient information are not unusual, rejecting a challenge to a HIPAA subpoena that sought thousands of patient records and explaining that "[e]ven though these documents might be numerous, they would reasonably relate to and further the government's legitimate inquiry." *In re Subpoena Duces Tecum*, 228 F.3d at 350.

For the same reasons, the district court erred in briefly stating that plaintiffs' "interest in maintaining the privacy of their sensitive medical records outweighs any interest of the Government in calling for their production." JA596. That reasoning explicitly depended on the district court's holding that "the Government lack[ed] a proper investigative purpose" in obtaining plaintiffs' medical records, JA596—a conclusion reached, as discussed, only by ignoring altogether the Department's stated explanations for the subpoena. As the Court has previously concluded,

"[t]he government has a compelling interest in identifying illegal activity and in deterring future misconduct," and that interest "outweighs the privacy rights of those whose records" are sought via a properly issued HIPAA subpoena, "particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

B.     **The district court erred in relying on its assessment of the "policy objective" of the administration.**

As the foregoing illustrates, the district court erred in multiple respects in concluding that the subpoena here "was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth." JA595. That alone suffices for reversal. But based on its flawed view that the Department had failed to demonstrate any valid basis for the subpoena, the district court further inferred that the subpoena was "a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare" and reflected a bare intent "to intimidate and harass [Children's National] and Movants," relying on the "backdrop" of an Executive Order and various statements by Executive Branch officials expressing opposition to the provision of certain interventions to minors. JA596.

That conclusion likewise makes a hash of the relevant standards. As discussed above, the requisites for a valid subpoena are all met here, and the general "backdrop" of Executive policy statements or preferences (JA596) does not alter that reality. And the only circumstance in which the Supreme Court has contemplated quashal of a facially valid subpoena is to prevent "abuse[]" of the district court's "process," which "would take place if the summons had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. The district court here did not purport to apply the *Powell* standard or to quash the subpoena based on an improper purpose. It instead drew an inference of pretext based on its view—mistaken for the reasons already discussed—that there was a "patent disassociation of the scope of the Subpoena from purported investigation of Hospital FDCA violations." JA595. Insofar as the district court's assertions of pretext, intimidation, and harassment flowed directly from its erroneous conclusions about the legitimacy of the subpoena, they fail for the reasons already discussed.

Moreover, even if the district court had premised quashal on the *Powell* standard, that would plainly be mistaken for two independent

reasons. First, a subpoena can be quashed for improper purpose only upon firm evidence that the sole purpose behind a subpoena is improper. And second, policy opposition to a controversial industry in no way taints investigations or enforcement of existing laws within that industry.

**1.** Given that the improper purpose inquiry asks whether an otherwise valid subpoena seeking evidence relevant to an investigation should nevertheless be quashed or denied enforcement, the Supreme Court has recognized that the subpoena recipient bears a "heavy" burden in proving the subpoena was issued pursuant to an improper purpose. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978); *see Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987). Quashal is only warranted when the sole purpose is an improper one. *See Alphin*, 809 F.2d at 238 ("The party challenging the summons bears the heavy burden of disproving the actual existence of a valid civil tax determination or collection purpose."); *United States v. Equitable Tr. Co.*, 611 F.2d 492, 500 (4th Cir. 1979) (rejecting improper purpose argument that failed to allege that the IRS was "not interested in the civil aspects of the tax liability of" the individuals it had subpoenaed); *Donaldson*, 400 U.S. at 533 (inquiring whether "the sole objective of the investigation is to" impermissibly use a civil subpoena to "obtain evidence for use in a criminal prosecution"); *cf.* Restatement

(Second) of Torts § 682 cmt. b (1977) (explaining that tort of abuse of process will not lie where there is both a legitimate motive and "an incidental motive of spite or an ulterior purpose of benefit to the defendant"). This Court has applied a similar principle in the context of a grand jury subpoena, holding that even if the subpoena was issued in an "effort . . . to coerce a plea bargain from a relative of the [subpoenaed] witness," the subpoena was permissible so long as "the witness had relevant evidence to give to the grand jury" in a legitimate investigation. *In re Antitrust Grand Jury Investigation (Under Seal)*, 714 F.2d 347, 351 (4th Cir. 1983).

Given this heavy burden, this Court and others have regularly rejected claims of improper purpose. For example, a company "demonstrated a fair degree of hostility" toward it by a senator, but this Court rejected its challenge because it had not shown that "the party actually responsible for initiating the investigation"—there, the Postal Service—had "done so in bad faith." *Am. Target Advert.*, 257 F.3d at 355. Likewise, the Court concluded that a taxpayer who was "being investigated because she [was] a tax protestor" failed to prove improper purpose. *Hintze v. IRS*, 879 F.2d 121, 129 (4th Cir. 1989), disapproved on other grounds, *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 17 & n.8 (1992); *see also United States*

*v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 819 (8th Cir. 2012) (rejecting improper purpose argument as to HIPAA subpoena); *United States v. Markwood*, 48 F.3d 969, 983-84 (6th Cir. 1995) (same).

Requiring searching inquiries into and weighing of the relative strength of motives of Executive Branch decisionmakers would also be inconsistent with basic tenets of administrative law, which recognize that "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see, e.g., Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977). A contrary rule would also contravene the principle that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," including being "prompted by an Administration's priorities." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). And it would threaten to "unnecessarily impair the performance of a core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465 (1996), namely choosing "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Thus, once the Court has corrected the district court's error in concluding that the subpoena here was invalid from the start, it follows that a claim of improper purpose would fail: even assuming the coexistence of other improper motivations alongside the valid desire to investigate potential FDCA violations, that coexistence would not support quashal.

**2.** In addition, an Administration's policy views about a particular industry or practice cannot amount to an "improper purpose" immunizing entities from investigations into compliance with federal law. There is no dispute that the President, Attorney General Bondi, and others in the administration have expressed strong moral, ethical, and policy opposition to the practice of irreversibly altering minors' bodies as a way to address diagnoses of gender dysphoria. The administration believes these interventions are untested, unsafe, unnecessary, and unethical—concerns that are gaining traction within the medical community in the United States and abroad. *See* HHS Statement at 1-3; HHS Secretary Declaration at 1-9; *Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices*, DEPARTMENT OF HEALTH AND HUMAN SERVICES (Nov. 19, 2025), https://perma.cc/KR3U-C35S. At the same time, the President's actions, Bondi Memo, and Shumate Memo do not purport to declare those interventions categorically unlawful, or to change federal law in any

respect. They merely direct investigations (and, if appropriate, enforcement actions) designed to enforce existing federal health care laws against entities in this industry.

The public statements from the Executive Branch the district court identified could at most support an inference that the Department is focusing on misconduct by drug companies, insurers, and medical clinics engaged in providing "gender-affirming care" to minors because of the administration's broader policy concerns with that activity. Even if so, that is entirely permissible, and certainly not an "improper purpose" sufficient to quash a subpoena. Nothing in *Powell* or this Court's cases suggests otherwise. There is no inconsistency between an administration's desire for a disfavored practice to end and an administration's desire to ensure that current federal law is enforced. The Department is permitted to prioritize enforcement of federal law in an industry of special concern for policy reasons.

Indeed, adopting a contrary rule would immunize from investigation any industry or practice that an administration is opposed to as a policy matter. This Court has already rejected that premise, explaining that "the Government is not bound to investigate only those potential wrongdoers who support its policies." *Am. Target Advert.*, 257 F.3d at 356. Consider an

administration that publicly advocated for a federal ban on sports gambling, while simultaneously seeking to ensure that the industry, where lawful, carried out its activities in a manner consistent with existing federal law. Could tax or other investigatory subpoenas to sports gambling operations and related businesses be quashed based on the administration's "well-publicized policy objective to terminate and block" sports gambling? JA596. Or consider an administration that pursued or supported new legislation that would ban or limit practices of large technology or social media companies, or one that advocated for new gun control measures, while also heightening its enforcement of existing regulations governing those industries. By the same token, actors engaged in the sorts of activities at issue here are not immunized from compliance with existing federal law—or from a response to an otherwise-lawful subpoena designed to ascertain if violations of existing federal law have occurred.

Any other rule would be impossible to square with the core executive power to exercise enforcement discretion in prioritizing what misconduct to investigate. "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 678-79 (2023). Indeed, under Article II, the Executive Branch

possesses the "exclusive authority and absolute discretion," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotation omitted)), to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion*, 594 U.S. at 429. "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws," *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), and "the Government's enforcement priorities" are a legitimate consideration in decisions about whether to prosecute, *Wayte v. United States*, 470 U.S. 598, 607 (1985). It is axiomatic that government resources are limited, that different administrations have different priorities, and accordingly, that administrations allocate resources differently to align with their policy priorities.

Finally, the district court's suggestion that the subpoena sought to "terminate and block gender affirming healthcare" makes little sense on its own terms. JA596. The subpoenas do not and cannot "terminate" or "block" the interventions the administration opposes—nor, plainly, did the Children's National subpoena do so here, given that Children's National halted pharmaceutical prescriptions through its Gender Development Program months before this investigation was launched or the subpoena

was served on it. The subpoenas merely seek information so the Department can investigate—and, if appropriate, prosecute—federal criminal offenses that nobody disputes may occur in connection with puberty blockers and cross-sex hormones. It is beyond question that such drugs may be misbranded in violation of federal law, or that a hospital could engage in fraudulent billing practices related to such drugs.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
*/s/ Sarah Welch*
SARAH WELCH
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  (202) 514-3180

April 29, 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,119 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

<span style="padding-left:50%">*s/ Sarah Welch*</span>
<span style="padding-left:50%">Sarah Welch</span>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ Sarah Welch*
Sarah Welch

# ADDENDUM

# TABLE OF CONTENTS

18 U.S.C. § 3486 .................................................................................... A1

**18 U.S.C. § 3486**

**(a)** Authorization.—

    **(1)**

        **(A)** In any investigation of—

            **(i)**

                **(I)** a Federal health care offense; or **(II)** a Federal offense involving the sexual exploitation or abuse of children, the Attorney General;

            **(ii)** an unregistered sex offender conducted by the United States Marshals Service, the Director of the United States Marshals Service; or

            **(iii)** an offense under section 871 or 879, or a threat against a person protected by the United States Secret Service under paragraph (5) or (6) of section 3056, if the Director of the Secret Service determines that the threat constituting the offense or the threat against the person protected is imminent, the Secretary of the Treasury,

        may issue in writing and cause to be served a subpoena requiring the production and testimony described in subparagraph (B).

        **(B)** Except as provided in subparagraph (C), a subpoena issued under subparagraph (A) may require—

            **(i)** the production of any records or other things relevant to the investigation; and

            **(ii)** testimony by the custodian of the things required to be produced concerning the production and authenticity of those things.

        **(C)** A subpoena issued under subparagraph (A) with respect to a provider of electronic communication service or remote computing service, in an investigation of a Federal offense involving the sexual exploitation or abuse of children shall not extend beyond—

            **(i)** requiring that provider to disclose the information specified in section 2703(c)(2), which may be relevant to an authorized law enforcement inquiry; or

**(ii)** requiring a custodian of the records of that provider to give testimony concerning the production and authentication of such records or information.

**(D)** As used in this paragraph—

**(i)** the term "Federal offense involving the sexual exploitation or abuse of children" means an offense under section 1201, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423, in which the victim is an individual who has not attained the age of 18 years; and

**(ii)** the term "sex offender" means an individual required to register under the Sex Offender Registration and Notification Act (42 U.S.C. 16901 et seq.).

**(2)** A subpoena under this subsection shall describe the objects required to be produced and prescribe a return date within a reasonable period of time within which the objects can be assembled and made available.

**(3)** The production of records relating to a Federal health care offense shall not be required under this section at any place more than 500 miles distant from the place where the subpoena for the production of such records is served. The production of things in any other case may be required from any place within the United States or subject to the laws or jurisdiction of the United States.

**(4)** Witnesses subpoenaed under this section shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

**(5)** At any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons, or a prohibition of disclosure ordered by a court under paragraph (6).

**(6)**

**(A)** A United States district court for the district in which the summons is or will be served, upon application of the United States, may issue an ex parte order that no person or entity disclose to any other person or entity (other than to an attorney

in order to obtain legal advice) the existence of such summons for a period of up to 90 days.

**(B)** Such order may be issued on a showing that the things being sought may be relevant to the investigation and there is reason to believe that such disclosure may result in—

**(i)** endangerment to the life or physical safety of any person;

**(ii)** flight to avoid prosecution;

**(iii)** destruction of or tampering with evidence; or

**(iv)** intimidation of potential witnesses.

**(C)** An order under this paragraph may be renewed for additional periods of up to 90 days upon a showing that the circumstances described in subparagraph (B) continue to exist.

**(7)** A summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States.

**(8)** If no case or proceeding arises from the production of records or other things pursuant to this section within a reasonable time after those records or things are produced, the agency to which those records or things were delivered shall, upon written demand made by the person producing those records or things, return them to that person, except where the production required was only of copies rather than originals.

**(9)** A subpoena issued under paragraph (1)(A)(i)(II) or (1)(A)(iii) may require production as soon as possible, but in no event less than 24 hours after service of the subpoena.

**(10)** As soon as practicable following the issuance of a subpoena under paragraph (1)(A)(iii), the Secretary of the Treasury shall notify the Attorney General of its issuance.

**(b)** Service.—

A subpoena issued under this section may be served by any person who is at least 18 years of age and is designated in the subpoena to serve it. Service upon a natural person may be made by personal delivery of the subpoena to him. Service may be made upon a domestic or foreign corporation or upon

a partnership or other unincorporated association which is subject to suit under a common name, by delivering the subpoena to an officer, to a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. The affidavit of the person serving the subpoena entered on a true copy thereof by the person serving it shall be proof of service.

**(c)** Enforcement.—

In the case of contumacy by or refusal to obey a subpoena issued to any person, the Attorney General may invoke the aid of any court of the United States within the jurisdiction of which the investigation is carried on or of which the subpoenaed person is an inhabitant, or in which he carries on business or may be found, to compel compliance with the subpoena. The court may issue an order requiring the subpoenaed person to appear before the Attorney General to produce records, if so ordered, or to give testimony concerning the production and authentication of such records. Any failure to obey the order of the court may be punished by the court as a contempt thereof. All process in any such case may be served in any judicial district in which such person may be found.

**(d)** Immunity From Civil Liability.—

Notwithstanding any Federal, State, or local law, any person, including officers, agents, and employees, receiving a subpoena under this section, who complies in good faith with the subpoena and thus produces the materials sought, shall not be liable in any court of any State or the United States to any customer or other person for such production or for nondisclosure of that production to the customer.

**(e)** Limitation on Use.—

> **(1)** Health information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information unless the action or investigation arises out of and is directly related to receipt of health care or payment for health care or action involving a fraudulent claim related to health; or if authorized by an appropriate order of a court of competent jurisdiction, granted after application showing good cause therefor.

**(2)** In assessing good cause, the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services.

**(3)** Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.