## No. 26-1104

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PARENT AA, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

On Appeal from the United States District Court
for the District of Maryland

## CORRECTED JOINT APPENDIX

EVE L. HILL
 *Brown, Goldstein & Levy LLP*
 *120 E. Baltimore St., Suite 2500*
 *Baltimore, MD 21202*
 (410) 962-1030

Counsel for Appellees

BRETT A. SHUMATE
 *Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
 *Attorneys, Civil Division*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 (202) 514-3180

Counsel for Appellants

# TABLE OF CONTENTS

|  | Docket Report | JA1 |
|---|---|---|
| ECF 23 | Memorandum Opinion (Jan. 21, 2026) | JA9 |
| ECF 24 | Order (Jan. 21, 2026) | JA25 |
| ECF 1 | Motion to Quash (Nov. 17, 2025) | JA27 |
| ECF 2 | Motion for Leave to Proceed Under Pseudonyms (Nov. 17, 2025) | JA336 |
| ECF 6 | Consent Request for Status Conference (Nov. 23, 2025) | JA355 |
| ECF 7 | Notice of Supplemental Authority (Nov. 24, 2025) | JA358 |
| ECF 13 | Notice (Nov. 26, 2025) | JA440 |
| ECF 14 | Notice of Supplemental Authority (Dec. 15, 2025) | JA456 |
| ECF 15 | Opposition to Motion to Quash (Dec. 15, 2025) | JA490 |
| ECF 16 | Notice of Supplemental Authority (Dec. 19, 2025) | JA547 |
| ECF 17 | Reply in Support of Motion to Quash (Jan. 5, 2026) | JA567 |
| ECF 22 | Notice of Supplemental Authority (Jan. 6, 2026) | JA583 |
| ECF 25 | Parties' Joint Report (Jan. 28, 2026) | JA608 |
| ECF 26 | Notice of Appeal (Jan. 28, 2026) | JA611 |
| ECF 28 | Order (Jan. 29, 2026) | JA613 |
| ECF 30 | Government's Response to the Court's Jan. 29 Order (Feb. 3, 2026) | JA614 |

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:25-cv-03780-JRR

In Re: 2025 Subpoena to Children's National Hospital
Assigned to: Judge Julie Rebecca Rubin
Case in other court: Fourth Circuit Court of Appeals, 26-01104
Cause: Motion to Quash

Date Filed: 11/17/2025
Date Terminated: 02/03/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**In Re**

| | | |
|---|---|---|
| **2025 Subpoena to Children's National Hospital** | represented by | **Donovan C. Bendana** |

**Donovan C. Bendana**
18 Tremont Street
Boston, MA 02108
617-426-1350
Email: dbendana@gladlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eve Lynne Hill**
Brown Goldstein & Levy LLP
120 E. Baltimore St.
Suite 2500
Baltimore, MD 21202
410-962-1030
Fax: 410-385-0869
Email: ehill@browngold.com
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
GLBTQ Advocates & Defenders
19 Tremont Street, Suite 950
Boston, MA 02108
617-426-1350
Email: jlevi@gladlaw.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Respondent**

**U.S. Department of Justice**   represented by   **Ross S Goldstein**
DOJ-Civ
U.S. Department of Justice
Enforcement & Affirmative Litigation
Branch
P.O. Box 386
Washington, DC 20044
202-353-4218

JA1

Fax: 202-514-8742
Email: ross.goldstein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott B. Dahlquist**
DOJ-Civ
Enforcement and Affirmative Litigation
Branch
450 5th St NW
Washington, DC 20001
202-532-4602
Email: scott.b.dahlquist@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**<u>Movant</u>**

| | | |
|---|---|---|
| **Parent A.A.** | represented by | **Eve Lynne Hill**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Donovan C. Bendana**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Jennifer Levi**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**<u>Movant</u>**

| | | |
|---|---|---|
| **Parent B.B.** | represented by | **Eve Lynne Hill**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Donovan C. Bendana**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Jennifer Levi**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**<u>Movant</u>**

| | | |
|---|---|---|
| **Parent C.C.** | represented by | **Eve Lynne Hill**<br>(See above for address)<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**Youth C.C.**                                    represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**Parent D.D.**                                   represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**
**Parent E.E.**                                   represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

JA3

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**Youth E.E.**                     represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**Parent F.F.**                     represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**Youth F.F.**                     represented by **Eve Lynne Hill**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donovan C. Bendana**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

| | | |
|---|---|---|
| **Parent G.G.** | represented by | **Eve Lynne Hill** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Donovan C. Bendana** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Jennifer Levi** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Parent H.H.** | represented by | **Eve Lynne Hill** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Donovan C. Bendana** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Jennifer Levi** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2025 | 1 | MOTION to Quash Subpoena Duces Tecum by Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E. (Filing Fee: $52.00, Receipt #14461) (Attachments: # 1 Memorandum in Support, # 2 Exhibit Index, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit A, # 17 Exhibit B, # 18 Exhibit C, # 19 Exhibit D, # 20 Exhibit E, # 21 Exhibit F, # 22 Exhibit G, # 23 Exhibit H, # 24 Exhibit I, # 25 Exhibit J, # 26 Exhibit K, # 27 Exhibit L, # 28 Exhibit M, # 29 Exhibit N, # 30 Exhibit O, # 31 Exhibit P, # 32 Exhibit Q, # 33 Exhibit R, # 34 Exhibit S, # 35 Exhibit T, # 36 Exhibit U, # 37 Exhibit V, # 38 Exhibit W, # 39 Text of Proposed Order)(ybs, Deputy Clerk) Modified on 11/18/2025 (ybs). (Entered: 11/18/2025) |
| 11/17/2025 | 2 | MOTION for Leave to Proceed Under Pseudonyms, to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption, and for Protective Order by Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(ybs, Deputy Clerk) (Entered: 11/18/2025) |

JA5

| | | |
|---|---|---|
| 11/18/2025 | 3 | NOTICE of Appearance by Ross S Goldstein on behalf of U.S. Department of Justice (Goldstein, Ross) (Entered: 11/18/2025) |
| 11/19/2025 | 4 | MOTION to Appear Pro Hac Vice for Jennifer Levi (Filing fee $100, receipt number AMDDC-12364155.) by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. (Hill, Eve) (Entered: 11/19/2025) |
| 11/20/2025 | 5 | PAPERLESS ORDER granting 4 Motion to Appear Pro Hac Vice on behalf of Jennifer Levi. Directing attorney Jennifer Levi to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 11/20/2025. (mh4s, Deputy Clerk) (Entered: 11/20/2025) |
| 11/23/2025 | 6 | Consent Request for Conference (Goldstein, Ross) (Entered: 11/23/2025) |
| 11/24/2025 | 7 | NOTICE by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. *Movants' Notice of Supplemental Authority* (Attachments: # 1 Exhibit 1 - EDPA ECF 043 Memorandum (2025-11-21), # 2 Exhibit 2 - EDPA ECF 044 ORDER (2025-11-21))(Hill, Eve) (Entered: 11/24/2025) |
| 11/24/2025 | 8 | PAPERLESS ORDER: An on-the-record Telephone Status Conference has been set for Tuesday, November 25, 2025, at 9:30 a.m. Signed by Judge Julie Rebecca Rubin on 11/24/2025. (bas, Deputy Clerk) Modified on 11/24/2025 (bas). (Entered: 11/24/2025) |
| 11/24/2025 | 9 | PAPERLESS ORDER: A public access line for the Status Conference on November 25, 2025 will be provided and published on the court's website. Signed by Judge Julie Rebecca Rubin on 11/24/2025. (kns, Deputy Clerk) (Entered: 11/24/2025) |
| 11/25/2025 | 10 | NOTICE of Appearance by Scott B. Dahlquist on behalf of U.S. Department of Justice (Dahlquist, Scott) (Entered: 11/25/2025) |
| 11/25/2025 | 11 | Telephone Status Conference held on 11/25/2025 before Judge Julie Rebecca Rubin.(Court Reporter: Amanda Longmore) (jks, Deputy Clerk) (Entered: 11/25/2025) |
| 11/25/2025 | 12 | PAPERLESS ORDER As set forth at the Telephone Status Conference convened this 25th day of November 2025, and by the consent of the parties, Respondent shall file its response to the Motions at ECF Nos. 1 and 2 on or before December 15, 2025, and Movants shall file their reply in support of the Motions at ECF Nos. 1 and 2 on or before January 5, 2026. Signed by Judge Julie Rebecca Rubin on 11/25/2025. (bas, Deputy Clerk) (Entered: 11/25/2025) |
| 11/26/2025 | 13 | NOTICE by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. re 1 MOTION to Quash - *Declaration of Youth F.F.* (Attachments: # 1 Declaration of Parent A.A., # 2 Declaration of Parent D.D., # 3 Declaration of Parent H.H.)(Hill, Eve) (Entered: 11/26/2025) |
| 12/15/2025 | 14 | NOTICE by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. - *Movants' Notice of Supplemental Authority* (Attachments: # 1 Exhibit 1 - Seattle Children's Order)(Hill, Eve) (Entered: 12/15/2025) |
| 12/15/2025 | 15 | RESPONSE in Opposition re 1 MOTION to Quash filed by U.S. Department of Justice. (Attachments: # 1 Affidavit Declaration of Lisa K. Hsiao, # 2 Exhibit Children's National Notice of Privacy Practices, # 3 Text of Proposed Order)(Goldstein, Ross) (Entered: 12/15/2025) |

| | | |
|---|---|---|
| 12/19/2025 | 16 | NOTICE by U.S. Department of Justice re 15 Response in Opposition to Motion, *Notice of Supplemental Authority* (Attachments: # 1 Exhibit Ex. A: Declaration of the HHS Secretary, # 2 Exhibit Ex. B: Public Health Message from the Asst. Sec'y for Health) (Goldstein, Ross) (Entered: 12/19/2025) |
| 01/05/2026 | 17 | REPLY to Response re 1 MOTION to Quash filed by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F..(Hill, Eve) Modified on 1/5/2026 (dass). (Entered: 01/05/2026) |
| 01/06/2026 | 18 | MOTION to Appear Pro Hac Vice for Donovan C. Bendana (Filing fee $100, receipt number AMDDC-12449273.) by 2025 Subpoena to Children's National Hospital (Hill, Eve) (Entered: 01/06/2026) |
| 01/06/2026 | 19 | QC NOTICE: 18 Motion to Appear Pro Hac Vice filed by 2025 Subpoena to Children's National Hospital needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 01/06/2026) |
| 01/06/2026 | 20 | CORRECTED MOTION to Appear Pro Hac Vice for Donovan C. Bendana by 2025 Subpoena to Children's National Hospital. The fee has already been paid.(Hill, Eve) (Entered: 01/06/2026) |
| 01/06/2026 | 21 | PAPERLESS ORDER granting 20 Corrected Motion to Appear Pro Hac Vice on behalf of Donovan C. Bendana. Directing attorney Donovan C. Bendana to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/6/2025. (mh4s, Deputy Clerk) (Entered: 01/06/2026) |
| 01/06/2026 | 22 | NOTICE by 2025 Subpoena to Children's National Hospital, Parent A.A., Parent B.B., Parent C.C., Parent D.D., Parent E.E., Parent F.F., Parent G.G., Parent H.H., Youth C.C., Youth E.E., Youth F.F. *Movants' Notice of Supplemental Authority* (Attachments: # 1 Exhibit 1 - Children's Hospital Colorado Recommendation)(Hill, Eve) (Entered: 01/06/2026) |
| 01/21/2026 | 23 | MEMORANDUM OPINION. Signed by Judge Julie Rebecca Rubin on 1/21/2026. (bas, Deputy Clerk) (Entered: 01/21/2026) |
| 01/21/2026 | 24 | ORDER Granting 1 Motion to Quash Subpoena Duces Tecum; Granting 2 Motion for Leave to Proceed Under Pseudonyms, to Waive Requirement Under Local Rule 102.2(a) to Provide Addresses in Complaint Caption, and for Protective Order. Signed by Judge Julie Rebecca Rubin on 1/21/2026. (bas, Deputy Clerk) (Entered: 01/21/2026) |
| 01/28/2026 | 25 | NOTICE by 2025 Subpoena to Children's National Hospital - *Parties Joint Report* (Hill, Eve) (Entered: 01/28/2026) |
| 01/28/2026 | 26 | INTERLOCUTORY NOTICE OF APPEAL as to 24 Order on Motion to Quash, Order on Motion for Leave to File, Order on Motion for Protective Order, Order on Motion for Miscellaneous Relief, by U.S. Department of Justice. (Goldstein, Ross) (Entered: 01/28/2026) |
| 01/29/2026 | 27 | Transmission of Interlocutory Notice of Appeal and Docket Sheet to US Court of Appeals re 26 Interlocutory Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) Modified on 1/29/2026 (slss). (Entered: 01/29/2026) |

| | | |
|---|---|---|
| 01/29/2026 | 28 | ORDER Directing the Government to advise by written filing by Tuesday, February 3, 2026. Signed by Judge Julie Rebecca Rubin on 1/29/2026. (bas, Deputy Clerk) (Entered: 01/29/2026) |
| 02/02/2026 | 29 | USCA Case Number 26-1104 for 26 Notice of Appeal filed by U.S. Department of Justice - Case Manager - R. Phillips. (slss, Deputy Clerk) (Entered: 02/02/2026) |
| 02/03/2026 | 30 | RESPONSE re 28 Order filed by U.S. Department of Justice.(Goldstein, Ross) (Entered: 02/03/2026) |
| 02/03/2026 | 31 | PAPERLESS ORDER In the event the Government takes action to enforce the Subpoena, it shall provide counsel for Movants contemporaneous notice of same. The court considers this action closed. Madam Clerk shall close the case. Signed by Judge Julie Rebecca Rubin on 2/3/2026. (bas, Deputy Clerk) (Entered: 02/03/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/07/2026 12:38:46 | | | |
| **PACER Login:** | swelchcja | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-03780-JRR |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

JA8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL</td><td>Civil No.: 1:25-cv-03780-JRR</td></tr>
</table>

## MEMORANDUM OPINION

Pending before the court is Movants' Motion to Quash Subpoena Duces Tecum.[1]  (ECF No. 1; the "Motion.")  The court has reviewed all submissions.[2]  No hearing is necessary.  Local Rule 105.6 (D. Md. 2025).

## I.   BACKGROUND

### A.   Executive Order 14187:
### President Trump Orders Gender Affirming Care "Must End."

On January 28, 2025, President Donald J. Trump issued Executive Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation."  Exec. Order No. 14187, *Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025).  In it, *inter alia*,

---

[1] Movants simultaneously file their unopposed Motion to Proceed Under Pseudonym, to Waive Requirement under Local Rule 102.2(a) to Provide Addresses, and for Protective Order at ECF No. 2 (the "Pseudonym Motion").  Because the court is satisfied that pseudonym use is warranted based on consideration of the factors set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), the Pseudonym Motion will be granted.  This case undoubtedly concerns information of an incredibly sensitive and personal nature—information regarding individuals' transgender status and related medical treatment.  *See Hersom v. Crouch*, No. 2:21-CV-00450, 2022 WL 908503, at *2 (S.D.W. Va. Mar. 28, 2022) (regarding transgender status); *A.P.G. by Jones v. Fisher-Price, Inc.*, No. 3:22CV112 (DJN), 2023 WL 4406023, at *4 (E.D. Va. July 7, 2023) (regarding minor's medical information).  Such information, if revealed, would undoubtedly risk exposure of these minors and their families to harm, including harassment and discrimination.  *See Hersom*, 2022 WL 908503, at *2; *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 549 n.14 (D. Md. 2025).  Further, here, pseudonym use is to protect the privacy interest of minors, against a government party, where the government neither asserts prejudice nor opposes the Motion.  *James*, 6 F.3d at 238.  The court will therefore grant the Pseudonym Motion.
[2] In addition to the parties' motions papers, the court has considered their submissions of supplemental authority at ECF Nos. 14, 16, and 22.

President Trump describes gender affirming care as a "stain on our Nation's history" and declares: "it must end." *Id.* § 1. The Executive Order issues several "Directives to the Department of Justice," including that "[t]he Attorney General shall . . . prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act[3] by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8. The Executive Order defines "chemical and surgical mutilation" as follows:

> [T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as 'gender affirming care.'

*Id.* § 2.

### B. Attorney General Bondi Announces Plan to Effectuate Executive Order 14187.

In furtherance of the President's Directives, in April 2025, Attorney General Pamela Bondi issued a Memorandum for Select Component Heads with the subject: "Preventing the Mutilation of American Children."[4] Therein, Attorney General Bondi describes gender affirming care as a "radical ideological agenda" rooted in "junk science" and "Hollywood" celebrities; she characterizes administration of such care as "barbaric" and "ruining . . . children's lives."[5]

---

[3] The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.* ("FDCA"). Relevant here, *inter alia,* the FDCA prohibits the "adulteration or misbranding of any . . . drug . . . in interstate commerce" and the "delivery or proffered delivery thereof for pay or otherwise." *Id.* §§ 331(a), (e).

[4] U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[5] *Id.* at p. 1.

Attorney General Bondi announces that the purpose of her memorandum is to outline how the U.S. Department of Justice ("DOJ") will effectuate President Trump's Executive Order 14187 that gender affirming care "must end":

> President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies. Pursuant to the President's directive, I am issuing the following guidance to all [DOJ] employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents.[6]

Attorney General Bondi's memorandum goes on to announce a multi-faceted plan to fulfill President Trump's policy mandate:

> [DOJ] will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations. To that end:
>
> > • I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." Even if otherwise truthful, the promotion of off-label uses of hormones-including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses-run afoul of the FDA's prohibitions on misbranding and mislabeling.
> >
> > • I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act[7] of false claims submitted to federal health care programs for any noncovered services related to radical gender experimentation. Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.,* gender dysphoria) but reporting a legitimate purpose (*i.e.,* early onset puberty) to the Centers

---

[6] *Id.* at p. 3.
[7] *See* 31 U.S.C. § 3729 regarding prohibition of submission to the Government of false or fraudulent claims for payment.

JA11

for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure. Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

• I am also notifying the public that the Department is eager to work with *qui tam* whistleblowers with knowledge of any such violations. The False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government. In meritorious cases, [DOJ] can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery. In 2024 alone, qui tam relators received a $344 million share of victories won by the Department. For more information about initiating a *qui tam* action, please visit the Department's website https://www.justice.gov/archives/jm/criminal-resource-manual-932-provisions-handlingqui-tam-suits-filed-under-false-claims-act.[8]

Also relevant is Bondi's announcement of a "coalition" described as follows:

Federal law enforcement must stand ready to assist states that prioritize children's health over ideology. Accordingly, the Department is launching the Attorney General's Coalition Against Child Mutilation. Through this Coalition, I will partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices. The Department will support the state-level prosecution of medical professionals who violate state laws that protect children, such as Alabama's Vulnerable Child Compassion and Protection Act, which makes it a felony for doctors to treat children with puberty blockers or hormones to affirm a gender identity inconsistent with biological sex.[9]

On June 11, 2025, Assistant Attorney General Brett Shumate issued a memorandum titled

"Civil Division Enforcement Priorities" to "All Civil Division Employees."[10]   In the memo,

---

[8] *Id.* at pp. 4–5 (footnote omitted).
[9] *Id.* at p. 5 (footnote omitted).
[10] U.S. OFF. OF THE ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

Shumate describes the action DOJ's Civil Division will take in furtherance of Attorney General Bondi's April 2025 memorandum to comply with Executive Order 14187. Assistant Attorney General Shumate's memorandum provides in part:

> The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.* In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.[11]

### C. DOJ Subpoenas Children's National Hospital for Adolescent Patient Records.

Further to President Trump's mandate, and the Bondi and Shumate compliance memos, in June 2025, DOJ issued a subpoena (ECF No. 1-3, the "Subpoena")[12] to Children's National Hospital (the "Hospital") demanding disclosure of Movants' identities and production of their medical records pertaining to transgender healthcare received at the Hospital.

Movants are eight families, members of which received transgender healthcare through the Hospital's Gender Development Program from January 1, 2020, through (at least) the date of the Motion (November 17, 2025). (ECF No. 1.) In the Motion, Movants assert the Subpoena lacks a proper investigatory basis and was issued, instead, to pursue the Executive's aim to end and block access to gender affirming healthcare for transgender adolescent patients. Movants urge that the

---

[11] *Id.* at p. 1.

[12] ECF No. 1-3 is DOJ's subpoena issued to Boston Children's Hospital, which DOJ confirmed to Movants' counsel is "substantively identical" to that served on the Hospital. (ECF No. 1-38, e-mail of Nov. 11, 2025, from Ross S. Goldstein, Assistant Director, DOJ Enforcement & Affirmative Litigation Branch, to co-counsel for Movants, Eve Hill.)

Subpoena violates their Fourth Amendment right to be free from unreasonable search and seizure, and their Fifth Amendment right to privacy in their medical records. Specifically, Movants seek to quash Subpoena Requests 11 through 13, as well as the balance of the Subpoena to the extent such Requests call for production of their identities and medical records.

Subpoena Requests 11, 12, and 13 read as follows:

> Request 11: Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

> Request 12: For each patient identified in Subpoena [Request 11], documents relating to clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

> Request 13: All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks.

(ECF No. 1-1 at p. 6; ECF No. 1-3 at p. 8.) [13]

In opposition to the Motion (ECF No. 15), the United States (the "Government") argues: 1) Movants lack standing; 2) the Motion is "foreclosed" by sovereign immunity; 3) the Motion is time-barred; 4) the Subpoena was issued in furtherance of ferreting out violations of the FDCA, and therefore is not a Fourth Amendment violation; and 5) under Fourth Circuit law, Movants' Fifth Amendment privacy claim "collapses."

## II.    ANALYSIS

The court first addresses the Government's jurisdictional and procedural grounds of opposition to the Motion.

---

[13] Unless otherwise specified, the court's references are to CM/ECF pagination.

JA14

### A. *Movants Have Standing.*

Relying on 18 U.S.C. § 3486, the Government argues that Movants lack statutory standing to move to quash (or otherwise challenge) the Subpoena because none of them was a recipient of the Subpoena. Section 3486 empowers DOJ to issue administrative subpoenas to investigate federal healthcare offenses and provides as follows in relevant part: "At any time before the return date specified in the summons, the person or entity summoned may" move to quash or modify the subpoena. 18 U.S.C. § 3486(a)(5).

The Government erroneously reads into the statute a prohibition that does not exist, which is to say nothing in the language of the statute prohibits a non-recipient from moving to quash a § 3486 subpoena; further, the Government ignores subsection (a)(7), which expressly incorporates the standards applicable to judicial subpoenas.[14] And that is important. Federal Rule of Civil Procedure 45 provides in relevant part:

> (d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.
>
> .            .            .
>
> (3) *Quashing or Modifying a Subpoena*
>
>> (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
>>
>>> (i) fails to allow a reasonable time to comply;
>>>
>>> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
>>> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

---

[14] "A summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States." 18 U.S.C. § 3486(a)(7)

(iv) subjects a person to undue burden.

FED. R. CIV. P. 45(d)(3)(A)(iv).

Further, Rule 81 regarding "Applicability of the Rules in General" provides at subsection (a)(5): "These rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." FED. R. CIV. P. 81.

"Ordinarily, a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena." *U.S. v. Idema*, 118 F. App'x. 740, 744 (4th Cir. 2005). Obviously, production by a hospital of one's private medical records containing highly sensitive treatment and care information rises to the level of potential undue burden as well as disclosure of protected materials contemplated by Rule 45; this appears particularly acute where the records to be disclosed are of a minor who relies on a parent or guardian to protect her interests because she lacks capacity to act in self-protection. *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180 (4th Cir. 2019); *c.f. Mezu v. Morgan State Univ.,* Civ. No. WMN-09-2855, 2011 WL 5110269, at *2 (D. Md. Oct. 25, 2011), *aff'd*, 495 F. App'x 286 (4th Cir. 2012) (describing as "questionable" whether a party may object to subpoena for third party's medical records, and citing *Idema, supra,* for applicable standard). For the reasons set forth above, the court concludes that Movants meet the statutory/rule-based standard for entitlement to move to quash the Subpoena.

So, too, is the court satisfied that Movants have Article III standing. "The 'irreducible constitutional minimum of standing' requires a plaintiff to show (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to

JA16

the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  First, the subpoena plainly threatens to cause immediate injury to Movants' default and concrete right to maintain the privacy of their medical records. Second, were the hospital to comply with the Subpoena, or were the Government to disclose or use those medical records for purposes of an investigation of purported FDCA and False Claims Act violations by the Hospital, Movants' privacy interests would be directly and proximately injured; similarly, if the Government had not issued the Subpoena, Movants' would not face the imminent injury about which they complain.  Third, Movants' complained of injury to their right to privacy in their medical records is directly redressable by this civil action to quash the Subpoena. Movants, therefore, have both statutory and Article III standing.

### B.  The Government Is Not Protected by Sovereign Immunity.

Next, the Government argues the Motion is barred by sovereign immunity.  The court disagrees.

A "waiver of sovereign immunity must be unequivocally expressed in statutory text" and be "clearly evident from the language of the statute." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) (providing waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied").  Here, importantly, Movants seek only equitable relief from Government agency action, which falls squarely within the Administrative Procedure Act's ("APA") waiver of sovereign immunity for suit brought by an individual "suffering legal wrong because of agency action" where the requested relief is "other than money damages."  5 U.S.C. § 702, *Amador v. Mnuchin,* 476 F. Supp. 3d 125, 142 (D. Md. 2020) (citing collection of cases set

forth in *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011)).

The court notes further that the APA authorizes judicial review of agency action only if "there is no other adequate remedy in a court." 5 U.S.C. § 704; *Amador*, 476 F. Supp. 3d at 142 (citing *U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016), and *Bowen v. Massachusetts*, 487 U.S. 879 (1988)). Section 704 embodies the congressional limit on judicial review of agency action such that "the general grant of review in the APA" should not "duplicate existing procedures for review of agency action" or "'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Bowen*, 487 U.S. at 903 (citation omitted). The Government does not contend the instant action duplicates an existing procedure for review of the challenged agency action taken by DOJ here; nor is the court aware of any other means by which Movants could move to quash or otherwise challenge the Subpoena.

Accordingly, the court is satisfied sovereign immunity does not shield the Government from the Motion.

### C.  The Motion Is Not Time-Barred.

The Government also argues the Motion is untimely because 18 U.S.C. § 3486 authorizes the recipient of an administrative subpoena to move to quash (or modify) prior to the deadline for response, and the Motion was not filed prior to the Subpoena response date. Here, again, the court disagrees with the Government.

Unlike the cases on which the Government relies, Movants were not the recipients of the Subpoena and the Government cites no plausible basis on which to conclude Movants were notified (constructively or in fact) of the Subpoena demanding disclosure of their medical records in advance of the response deadline. "The timeliness argument is disingenuous, given the patients'

JA18

initial lack of awareness of, and uncertainty regarding, the subpoena." *In re 2025 UPMC Subpoena*, 2:25-mc-01069-CB, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025); *see also In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999) (holding that "failure to act timely will not bar consideration of [certain] objections" to subpoenas on grounds of facial overbreadth)*; Olszewski v. Bloomberg L.P.*, No. 96 Civ. 3393, 2000 WL 1843236, at *4 (S.D.N.Y. Dec. 13, 2000) (considering motion to quash outside of response date because movant was "entitled to protection from discovery of his confidential health . . . records"). The court declines to deny the Motion on grounds of untimeliness.

Having satisfied itself that the Motion is properly before the court, the court moves now to the substantive grounds of the Motion. For the reasons set forth below, this court joins the district courts around the country in finding that the Government's Subpoena lacks a proper investigatory purpose under law; serves only to bolster the Executive's policy objective of terminating access to gender affirming healthcare for adolescents; and has no plausible or coherent tether to its stated purpose.

### D. The Subpoena Lacks a Proper Investigative Purpose.

The Government urges that its power under the Health Insurance Portability and Accountability Act ("HIPAA") to issue § 3486 administrative subpoenas renders the Motion a dead letter. In support of this assertion, the Government cites legislative history of § 3486 that confirms its purpose was to establish a procedure for the Government to "'make investigative demands' for 'health information about an individual' in health care offense investigations." (ECF No. 15 at p. 19.) To be sure, the Government's administrative subpoena power is broad, but it is not without limit.

In 1950, the Supreme Court made clear that the judicial review hurdle of an administrative

agency is not onerous; but neither is an agency's investigatory power boundless. "Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." *U.S. v. Morton Salt Co.,* 338 U.S. 632, 652-53 (1950) (citations omitted)

In 2000, in reviewing a district court's order on a motion to quash an administrative subpoena, the Fourth Circuit held

> In short, an investigative subpoena, to be reasonable under the Fourth Amendment, must be (1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive, a requirement that may support a motion to quash a subpoena only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth. But a subpoena need not be supported by probable cause . . . .

*In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000)

The Government fails to place before the court any information, record, or evidence supporting or pertaining to investigation of the Hospital for any "health care offense." There is no articulated basis to suspect the Hospital of violations of the FDCA or the False Claims Act;[15] and surely none that would call for disclosure of Movant's records. The Government offers no affidavit (or complaint or whistleblower statement) attesting to grounds for an investigation of the Hospital for FDCA or False Claims Act violation. Instead, the Government offers the Declaration of Lisa

---

[15] The Government mounts no argument that the Subpoena was issued in furtherance of an investigation of the Hospital for suspected violation of the False Claims Act, and instead limits its argument to DOJ's interest in purported violations of the FDCA.

Hsiao, Acting Director of DOJ's Enforcement and Affirmative Litigation Branch.  Instead of information based on her personal knowledge pertaining to a proper investigation of the Hospital for FDCA violations, Hsiao's Declaration consumes 15 pages of her assertions of what the law is—including assertions of the "overriding purpose of the FDCA," the proper scope of § 3486 affidavits, recitation of how the FDCA is applied, legal definitions of statutory terms, and citation to statutes and case law in support of her description of drug mislabeling and misbranding, and associated harms.[16]

At paragraph 21 of her Declaration, Hsiao describes the focus of DOJ's investigation as follows: "This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents . . . ."  Hsiao further attests:

> The Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of this practice.
>
> .    .    .
>
> The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak.
>
> .    .    .
>
> The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria.

(Hsiao Decl., ECF No. 15-1 ¶¶ 22, 24–25)

Nothing in the Government's papers provides even a bare foundation on which to issue the

---

[16] Indeed, it seems to the court Ms. Hsiao's Declaration is used to exceed the page limit set forth by Local Rule 105.3 without leave of court.

Subpoena requiring adolescent patient medical records.  The Government sets forth no basis on which it suspects the Hospital of misbranding or distributing drugs, or any other conduct, as proscribed by the FDCA.  The Government's attestation of its general awareness that (or how) certain drugs are applied to patient care across the national healthcare spectrum is "too indefinite" to demand the Hospital produce the medical records described in the Subpoena.  *See Morton Salt Co.,* 338 U.S. at 652–53, *supra*.  The Government seeks to investigate how the Hospital treats its patients; specifically, in the context of gender-affirming patient care.  But the FDCA regulates commerce, not patient care.  *In re Subpoena No. 25-1431-014*, Misc Action No. 25-39, 2025 WL 3252648, at *17 (E.D. Pa. Nov. 21, 2025).

The court concludes the Subpoena was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth.  *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000).  Even crediting the Government's stated FDCA investigatory purpose, such a purpose is at odds with the Subpoena.  If the Government is pursuing FDCA violations, it is utterly unclear to this court why the Government demands production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms.[17]  Nothing the Government submits plausibly explains the purported connection between the documents it demands and suspected Hospital FDCA violations.  Considering the patent disassociation of the scope of the Subpoena from purported investigation of Hospital FDCA violations—against the

_____

[17] Because the scope and breadth of the Subpoena is so mismatched with the Government's articulated purpose, the court strains to imagine how Movants might have comported with the Fourth Circuit's admonition that an overbreadth challenge may be brought "only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth." *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000).  In other words, even if the Subpoena sought only adolescent patient names and social security numbers, or was limited to patient "diagnoses" and physician "assessments," the court strains to see how such a limitation would bring the Subpoena into an appropriate purpose or constitutional scope to investigate potential FDCA violations by the Hospital.

JA22

backdrop of Executive Order 14187, the April 2025 DOJ memorandum, and the June 2025 DOJ memorandum—the court finds the Subpoena is a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare.

### E.  Movants Have a Constitutional Right to Expect Privacy of the Medical Records.

There can be no question that Movants have a constitutionally reasonable expectation of privacy in the highly sensitive medical records subject to the Subpoena.  *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000).   In view of the court's determination that the Government lacks a proper investigative purpose, and, specifically, that the Subpoena demands production of information disconnected from a proper § 3486 subpoena related to investigation of suspected FDCA violations by the Hospital, Movants' interest in maintaining the privacy of their sensitive medical records outweighs any interest of the Government in calling for their production.  No proper (never mind compelling) governmental purpose has been demonstrated.  *Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021).

## III.  CONCLUSION

The Government has made improper use of a § 3486 administrative subpoena to out Movants for receiving, and their Hospital for providing, healthcare the Executive characterizes as a "stain on our Nation's history."  The Subpoena bears no credible connection to an investigation of any statutory violation by the Hospital.  Rather, the Subpoena appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated.  The Government seeks to fulfill its policy agenda through compliance born of fear.  Moreover, in the view of the court, the Subpoena is the classic impermissible fishing expedition.

The court rejects the Government's suggestions that anonymizing Movants' patient records cures the Subpoena's defects.  The Subpoena lacks a legitimate purpose.  That cannot be

ameliorated by providing patient records in redacted form.  The court declines, however, to quash

the Subpoena for persons other than Movants.  Although the Subpoena is an overreach untethered

to any lawful purpose no matter who seeks protection from the court, Movants have not persuaded

the court that they have standing to raise the matter for persons not parties before the court.

For the reasons set forth herein, the Motion is **GRANTED**.  A separate order follows.

/S/

_____

Julie R. Rubin
United States District Judge

January 21, 2026

JA24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL** | **Civil No.: 1:25-cv-03780-JRR** |

## ORDER

Pending before the court are Movants' Motion to Quash Subpoena Duces Tecum (ECF No. 1; the "Motion to Quash") and Motion to Proceed Under Pseudonym, to Waive Requirement under Local Rule 102.2(a) to Provide Addresses, and for Protective Order (ECF No. 2; the "Pseudonym Motion"). The court has reviewed all submissions. No hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth in the accompanying memorandum opinion, it is this 21st day of January 2026:

**ORDERED** that the Motion to Quash (ECF No. 1) shall be, and is hereby, **GRANTED**; and further it is

**ORDERED** that the administrative subpoena described in the memorandum as the Subpoena shall be, and is hereby, **QUASHED** as to Requests 11, 12, and 13, and as to any other Subpoena Request to the extent it seeks or requires production of Children's National Hospital patient medical records, patient identities, or identification of parents or guardians of patients; and further it is

**ORDERED** that to the extent documents subject to this order have been produced by Children's National Hospital to the Government, the United States Department of Justice shall no longer have access to same unless obtained through lawful, proper means, and not the Subpoena;

JA25

and within seven (7) days of entry of this order, the parties shall meet and confer regarding appropriate prophylactic measures to be taken and submit a joint proposal to the court re same; and further

**ORDERED** that the Pseudonym Motion (ECF No. 2) shall be, is hereby, **GRANTED**; and further it is

**ORDERED** that Movants shall be identified in all public filings only as their chosen pseudonyms as set forth in the Motion to Quash; any document containing Movants' identifying information shall be filed under seal; and Movants are not required to disclose their addresses.

/S/

_____
Julie R. Rubin
United States District Judge

JA26

JA27

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

Case No.: JRR 2 5 MC 0 0 7 0 9

In Re. 2025 Subpoena to Children's National
Hospital

**MOVANTS' MOTION TO QUASH
SUBPOENA DUCES TECUM**

USDC- BALTIMORE
'25 NOV 17 PM3:51

1.    Movants, eight families who received transgender healthcare, for either themselves or their children, through Children's National Hospital's Gender Development Program from January 1, 2020 to the present, respectfully move to quash the subpoena duces tecum (Subpoena) issued by the U.S. Department of Justice (DOJ) to Children's National Hospital (CNH or Respondent) pursuant to 18 U.S.C. § 3486.

2.    At least two Movants reside in Maryland and most received services from CNH in Maryland.

3.    Upon information and belief, DOJ issued the Subpoena to CNH in or around June 2025. *See* Aff. of Eve Hill, Esq., in Supp. of Mot. to Quash Subpoena Duces Tecum ¶¶ 2–21.

4.    Upon information and belief, the Subpoena is identical or substantially similar to the subpoenas issued to Boston Children's Hospital and Children's Hospital of Philadelphia[1] These two subpoenas are publicly available and include the same 15 requests for documents. *See* Aff. of Eve Hill ¶ 17

---

[1] *See In Re: Administrative Subpoena No. 25-1431-019*, 1:25-mc-91324 (D. Mass. July 8, 2025) (ECF Dkt 5-1); *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025) (ECF Dkt. 1, Ex. F).

HD

Rcv'd by: _____

5.      Upon information and belief, the Subpoena demands the disclosure of Movants' identities and confidential medical and family information related to their receipt of transgender healthcare, including highly sensitive records regarding diagnoses, clinical assessments, and informed consent. *See id.* These Requests violate Movants' privacy rights and seek extremely personal medical records of minors and other patients, risking nonconsensual disclosure and undermining the trust essential to the provider-patient relationship. Such disclosures could deter Movants from seeking necessary care.[2]

6.      Further, the Subpoena appears to have been issued for an improper purpose. The current administration has publicly stated its intention to end transgender healthcare.[3] Aff. of Eve Hill ¶¶ 3-4, 6. It has boasted that healthcare providers had paused treatment for transgender minors, achieving the "intended effect" of its efforts.[4] The sweeping nature of these Requests appears to be for the purpose of advancing the administration's goal of singling out and harming a small group of vulnerable patients who are seeking medically necessary healthcare.[5]

7.      Movants specifically seek to quash the following Requests in the Subpoena:

a.   Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

---

[2] *See Northwestern Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004).

[3] Exec. Order 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025), https://www.govinfo.gov/content/pkg/FR-2025-02-03/pdf/2025-02194.pdf.

[4] The White House, *President Trump Is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

[5] *See* Amicus Br. of Massachusetts, et al., *In re Administrative Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. Oct. 21, 2025) (ECF 39-1).

JA28

   b.  Request 12: "For each such patient identified in Subpoena [Request 11], *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

   c.  Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], *supra*, including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."[6]

   d.  All other requests (Request 1 through Request 15) to the extent such requests or sub-requests call for the production of the identities or personal health information of patients and their parents or guardians.

8.     Movants incorporate by reference the accompanying memorandum of law and supporting declarations.

**WHEREFORE**, Movants respectfully request that this Court quash the Subpoena as requested in this motion.

Dated: November 17, 2025               Respectfully submitted,

Eve L. Hill (Bar No. 19938)
BROWN GOLDSTEIN & LEVY, LLP
120 East Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

---

[6] *See In Re: Administrative Subpoena No. 25-1431-019*, 1:25-mc-91324 (D. Mass. July 8, 2025) (Dkt 5-1); *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025) (Dkt. 1, Ex. F).

JA29

Jennifer L. Levi (Pro Hac Vice to be submitted)
GLBTQ Legal Advocates & Defenders
18 Tremont, Suite 950
Boston, MA 02108
Tel: (617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Movants' Motion to Quash Subpoena Duces Tecum, Memorandum of Law in Support of Motion to Quash Subpoena Duces Tecum, and Proposed Order were served via first-class mail and email by agreement of the Requestor, on November 17, 2025, to Requester U.S. Department of Justice as follows:

Kelly O. Hayes
**U.S. Attorney for the District of Maryland**
36 S. Charles Street
4th Floor
Baltimore, MD 21201

Jolene Anne Lauria
**U.S. Department of Justice**
**Justice Management Division**
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

Ross S. Goldstein
Patrick Runkle
Scott B. Dahlquist
**U.S. Department of Justice**
Ross.Goldstein@usdoj.gov
Patrick.R.Runkle@usdoj.gov
Scott.B.Dahlquist@usdoj.gov

Eve L. Hill

JA30



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.:  JRR 2 5 MC 0 0 7 0 9 |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO QUASH SUBPOENA DUCES TECUM**

JA31

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

I.    The Federal Government's Campaign to End Transgender Healthcare .................. 2

II.   The June 11 Subpoenas ................................................................................. 5

III.  Related Rulings on Identical Subpoenas ......................................................... 7

IV.   CNH's Provision of Transgender Healthcare ................................................... 10

V.    Movants are Current and Former CNH Patients and Their Parents Who Seek to Protect Their Identities and Confidential Medical Records from Government Disclosure ................................................................................................... 12

LEGAL STANDARD ............................................................................................... 15

ARGUMENT .......................................................................................................... 16

I.    Patients and Their Parents Have a Fourth Amendment Right to Be Free from Unreasonable Search and Seizure of Their Private Medical Records .................... 16

      1.  The Subpoena was Issued for an Improper Purpose .................................. 17

      2.  The Sweeping and Virtually Unlimited Scope of the Subpoena Does Not Reasonably Relate to or Further its Supposed Purpose of Investigating Healthcare Fraud ............................................................................... 20

II.   Patients and Their Parents Have a Fifth Amendment Right to Privacy in Their Medical Records That Outweighs the Government's Interests ............................. 21

      1.  Patients and Their Parents Have a Reasonable Expectation of Privacy in Their Medical Records ........................................................................... 22

      2.  Patients and Their Parents' Interests in Protecting the Confidentiality of Their Medical Records Outweighs the Government's Interest in Compelling the Information ..................................................................... 23

          A.  *Westinghouse* Factors One, Two and Three ....................................... 24

          B.  *Westinghouse* Factor Four ............................................................ 27

JA32

       C.     *Westinghouse* Factor Five ...............................................................29

       D.     *Westinghouse* Factors Six and Seven..............................................31

CONCLUSION ...............................................................................................33

JA33

# TABLE OF AUTHORITIES

**Cases**

*A. et al,*
2:25-mc-01067 (W.D. Pa. Sept. 24, 2025)..................................................24

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
771 F.Supp.3d 717 (D. Md. 2025) ..........................................................22

*Carpenter v. United States,*
585 U.S. 296 (2018) ..............................................................................16

*City of Ontario, Cal. v. Quon,*
560 U.S. 746 (2010) ..............................................................................16

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) ..............................................................................22

*Doe v. Broderick,*
225 F.3d 440 (4th Cir. 2000).................................................................22

*Doe v. City of New York,*
15 F.3d 264 (2d Cir. 1994)....................................................................23

*Donovan v. Lone Steer, Inc.,*
464 U.S. 408 (1984)..............................................................................17

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
264 U.S. 298 (1924)..............................................................................16

*Gilmore v. Jones,*
339 F.R.D. 111 (W.D. Va. 2021)...........................................................21

*Grimm v. Gloucester Cty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020).................................................................29

*Hale v. Henkel,*
201 U.S. 43 (1906) ................................................................................16

*In Re: Subpoena No. 25-1431-014,*
No. 2:25-mc-00039 (E.D. Pa. July 8, 2025) ...................................*passim*

*In Re: Admin. Subpoena No. 25-1431-019,*
No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025)..................*passim*

iii

JA34

*In re Grand Jury Subpoena John Doe No. A01-209,*
 197 F. Supp. 2d 512 (E.D. Va. 2002)..............................................................22

*In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004,*
 51 F. Supp. 2d 726 (W.D. Va. 1999) ..............................................................23

*In re: Grand Jury 2021 Subpoenas,*
 87 F.4th 229 (4th Cir. 2023)...........................................................................15

*In Re: Sealed Case (Admin. Subpoena,*
 42 F.3d 1412 (D.C. Cir. 1994) ........................................................................21

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992).........................................................................................15

*N.L.R.B. v. Interbake Foods, LLC,*
 637 F.3d 492 (4th Cir. 2011)...........................................................................15

*Nw. Mem'l Hosp. v. Ashcroft,*
 362 F.3d 923 (7th Cir. 2004)............................................................26, 27, 28, 29

*Patients of Dr. Solomon v. Board of Physician Quality Assur.,*
 85 F. Supp. 2d 545 (D. Md. 1999) ..................................................................24

*Payne v. Taslimi,*
 998 F.3d 648 (4th Cir. 2021)...........................................................................22

*Powell v. Schriver,*
 175 F.3d 107 (2d Cir. 1999)............................................................................16

*Queerdoc, PLLC v. U.S. Department of Justice,*
 No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).........*passim*

*Skinner v. Railway Labor Executives' Assn.,*
 489 U.S. 602 (1989).........................................................................................16

*Tankersley v. Almand,*
 837 F.3d 390 (4th Cir. 2016)...........................................................................27

*U.S. v. Bailey (In Re: Subpoena Duces Tecum),*
 228 F.3d 341 (4th Cir. 2000)...............................................................15, 16, 17, 20

*U.S. v. Morton Salt Co.,*
 338 U.S. 632 (1950).........................................................................................15

JA35

*U.S. v. Westinghouse Elec. Corp.,*
    638 F.2d 570 (3d Cir. 1980)................................................................23, 24, 25

*United States v. Harrington,*
    388 F.2d 520 (2d Cir. 1968)................................................................20

*United States v. Idema,*
    118 F. App'x 740 (4th Cir. 2005) ........................................................15

*United States v. Powell,*
    379 U.S. 48 (1964)................................................................................17

*United States v. R. Enters.,*
    498 U.S. 292 (1991)..........................................................................1, 17

*United States v. Theodore,*
    479 F.2d 749 (4th Cir. 1973)...............................................................20

*Walls v. City of Petersburg,*
    895 F.2d 188 (4th Cir. 1990)................................................21, 22, 23, 33

*Watson v. Lowcountry Red Cross,*
    974 F.2d 482 (4th Cir. 1992).............................................................23

*Webster v. Doe,*
    486 U.S. 592 (1988)..........................................................................16

*Whalen v. Roe,*
    429 U.S. 589 (1977)......................................................................16, 21

**Statutes**

18 U.S.C. § 3486(a)(1) .............................................................................20

18 U.S.C. § 3486(e)...........................................................................30, 31

5 U.S.C. § 552a(b)(7) ..............................................................................31

Pub. L. No. 93-579, 88 Stat. 1896 .........................................................27

**Other Authorities**

*AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting,* AM. MED.
    ASS'N (June 10, 2019),
    https://www.ama-assn.org/press-center/ama-press-releases/ama-adopts-new-
    policies-first-day-voting-2019-annual-meeting ....................................29

JA36

*Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical ...................................................................... 5

Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J.ADOLESC. HEALTH 691, 696 (2020) ........................................................................ 28

Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888, 888 (April 19, 2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf ....................................................................................... 27

*National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/ ........................................................................................ 4

President Trump Executive Order 14187 ("Healthcare Order") ........................................ 2

*President Trump Is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/ .......................................................................... 2

U.S. OFF. OF THE ASSISTANT ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline ................................................. 5

U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ................................................. 3, 7, 18, 30

JA37

## INTRODUCTION

For decades, parents have sought well-established medical treatments for their transgender children from Children's National Hospital ("CNH"). But this summer, the Department of Justice ("DOJ"), acting in pursuance of the overall policy objectives of the Trump Administration (the "Administration"), served broad and sweeping administrative subpoenas on hospitals across the country, including CNH. This subpoena, issued in bad faith and without any proper purpose, seeks years' worth of highly sensitive and confidential records of every patient under the age of eighteen who received medical care from CNH's Gender Development Program. As the Supreme Court has explained, a subpoena is not a license for the federal government to go on a "fishing expedition[]" for any evidence of wrongdoing. *United States v. R. Enters.*, 498 U.S. 292, 299 (1991). The medical records sought are of the most intimate kind, detailing information regarding patients' mental health and adolescent physical development. The motivation for this intrusion is clear: the Administration seeks to use the immense power of DOJ to threaten providers, intimidate patients and their families, and end transgender medical care. Transgender medical treatments are legal in this state, as well as in the District of Columbia, and endorsed by every reputable medical association as a critical medical intervention. The Administration has no legitimate purpose or compelling reason to violate CNH patients' constitutional rights to privacy in their medical records and freedom from unreasonable government intrusion. The subpoena should be quashed.

1

**STATEMENT OF FACTS**

I.    **The Federal Government's Campaign to End Transgender Healthcare**

On January 28, 2025, President Trump issued Executive Order 14187 ("Healthcare Order"),[1] beginning this Administration's nationwide campaign to prevent transgender adolescents from obtaining established medical care that is known to be safe and effective. The Healthcare Order alleged that medical professionals across the country were performing harmful and irreversible medical treatments on minors under, what it described as, "the radical and false claim that adults can change a child's sex."[2] The Healthcare Order equated transgender medical treatments with severe physical harm, directed the Attorney General to conduct investigations related to such care, and made clear that its purpose was to "end" transgender healthcare in the United States.[3]

In early February, the White House issued a press release about the Healthcare Order, stating, "[i]t's already having its intended effect" of restricting the availability of transgender healthcare for minors.[4] The press release announced that "[h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming

---

[1] *Protecting Children From Chemical and Surgical Mutilation*, THE WHITE HOUSE (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/.

[2] *Id.*

[3] *Id.*

[4] *President Trump Is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

2

JA39

care' programs," including "Children's National Hospital," which "has 'paused' prescribing puberty blockers and hormone therapies for minors."[5]

Pursuant to the Healthcare Order, in April 2025, the Attorney General issued a Memorandum for Select Component Heads ("Prosecution Memo"), escalating the Administration's threats against medical providers and hospitals providing transgender healthcare to adolescents.[6] The Prosecution Memo declared that "the Department [of Justice] will act decisively to protect our children and hold accountable those" who provide this medically necessary healthcare and "put[] medical practitioners, hospitals, and clinics on notice: In the United States, it is a felony to perform, attempt to perform, or conspire to perform" transgender medical treatments "on a person under the age of 18."[7] The Attorney General directed "all U.S. Attorneys to investigate all suspected cases of" such care and to prosecute all "offenses to the fullest extent possible."[8]

The Prosecution Memo also directed DOJ "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition'" and "investigations under the False Claims Act of false claims submitted to

---

[5] *Id.*

[6] U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[7] *Id.* at 3.

[8] *Id.* at 3-4.

3

JA40

federal health care programs for any noncovered services" related to transgender healthcare.[9]

The Prosecution Memo clearly articulates the purpose of those investigations:

> Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will *bring these practices to an end*.[10]

The Prosecution Memo also announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws" banning transgender adolescent healthcare and "other, related practices."[11]

In addition to falsely portraying transgender healthcare as physical harm, the Administration began falsely equating this care with child abuse. In April, the Administration issued a Proclamation in connection with National Child Abuse Prevention Month stating that "the sinister threat of gender ideology" is "one of the most prevalent forms of child abuse facing our country today," specifically naming "hormone therapy [and] puberty blockers."[12] The Administration "pledge[d] to stop the atrocity of

---

[9] *Id.* at 4.

[10] *Id.* at 6 (emphasis added).

[11] *Id.* at 5.

[12] *National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/.

JA41

child abuse in all its forms" and threatened that those who facilitate access to transgender healthcare "will be punished to the fullest extent of the law."[13]

These pronouncements make clear that the Attorney General and DOJ are using investigations to end transgender healthcare by intimidating providers and patients.

## II.   The June 11 Subpoenas

On June 11, 2025, the Assistant Attorney General of the DOJ Civil Division wrote that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing transgender medical treatments through the Food, Drug, and Cosmetic Act ("FDCA") and the False Claims Act.[14] That same day, DOJ took action, issuing "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children."[15] Again, the Attorney General made the Administration's intent clear, stating that "[m]edical professionals and organizations" that provide transgender healthcare to adolescents "will be held accountable by this Department of Justice."[16] This concerted campaign and the unprecedented public announcements demonstrate an improper purpose to intimidate and deter the provision of lawful transgender healthcare.

---

[13] *Id.*

[14] U.S. OFF. OF THE ASSISTANT ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

[15] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[16] *Id.*

5

CNH was among the hospitals subpoenaed by DOJ.[17] While the subpoena has never been released, DOJ confirmed to Movants' counsel that it is "substantially identical"[18] to the publicly available June 11 subpoenas issued to Children's Hospital of Philadelphia,[19] Boston Children's Hospital,[20] and Queerdoc, PLLC.[21] The subpoenas all contain the same 15 requests that seek practically every document related to transgender healthcare at these entities for the past five and a half years.[22] The subpoenas request a staggering amount of sensitive patient information, including:

- Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."[23]

---

[17] *See* Aff. of Eve Hill, Esq., in Supp. of Mot. to Quash Subpoena Duces Tecum.

[18] *Id.* at ¶ 20.

[19] *See In Re: Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 (Mot. to Limit Subpoena).

[20] *See In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. July 8, 2025), Dkt. No. 5-1 (Strachan Decl. Ex. 1).

[21] *See Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).

[22] *See, e.g., In Re: Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 at 35, Definitions ¶ 4.

[23] *See, e.g., Id.* at 40, ¶¶ 11-13.

6

The compliance date is July 9, 2025.[24]

Neither DOJ nor CNH has sought the consent of any family with regards to the subpoena nor otherwise communicated with them about it.[25] Regardless, DOJ now seeks unfettered access to everything from their social security numbers and addresses to the intimate details they shared with their healthcare providers about their gender dysphoria diagnoses and the course of treatment they chose with their physician and parents. And DOJ has stated that it will not just scrutinize that information, but that it will share that information with other law enforcement authorities to facilitate prosecution of the same hospitals and healthcare providers under state and local laws.[26]

## III.    Related Rulings on Identical Subpoenas

As of this filing, the only two federal district courts to rule on substantively identical subpoenas have granted the resulting motions to quash, filed on behalf of the subpoenaed party, in their entirety. In Massachusetts, Judge Myong Joun quashed DOJ's administrative subpoena issued against Boston Children's Hospital ("BCH"), determining that DOJ had "failed to show proper purpose," noting "the Government has not submitted

---

[24] *Id.* at 1.

[25] Aff. of Eve Hill at ¶ 21; *see also, e.g.,* Decl. of Parent F.F. at ¶ 11 ("We have not been contacted by federal officials about my child's care, and we have never been told that any part of my child's medical treatment is the subject of a federal government inquiry.").

[26] U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ("I will partner with state attorneys general to identify leads, share intelligence, and build cases.").

JA44

any affidavits or other evidence" to justify the investigation.[27] The Court emphasized the sweeping scope of the requested documents all "while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion."[28] Judge Joun concluded that, instead, "the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect [transgender healthcare] within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."[29] Finding that DOJ's subpoena was "motivated only by bad faith," the court granted BCH's motion to quash in full.[30]

Judge Jamal Whitehead in Washington State reached a similar conclusion regarding the identical subpoena DOJ issued to QueerDoc, a small telehealth provider that offers transgender healthcare services in ten states.[31] Judge Whitehead held that while the government's authority to issue administrative subpoenas is broad, it is not boundless, and that "when a federal agency issues a subpoena *not* to investigate legal violations but to intimidate and coerce providers into abandoning lawful medical care, it exceeds its legitimate authority and abuses the judicial process."[32] The court rejected

---

[27] *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784, at *5 (D. Mass. Sept. 9, 2025).

[28] *Id.* at *6.

[29] *Id.* at *7.

[30] *Id.*

[31] *Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).

[32] *Id.* at *3 (emphasis in original).

8

JA46

DOJ's claim that its investigation was aimed at uncovering fraud, concluding, instead, that the record demonstrated "DOJ has abandoned good faith investigation in favor of policy enforcement through prosecutorial coercion."[33]

The Court found that "[t]he timeline tells the story," noting the Healthcare Order declaring transgender healthcare "'a stain on our Nation's history' that 'must end,'" and the Attorney General's Prosecution Memo pledging to go after those who provide such care, directly preceded the subpoenas.[34] Judge Whitehead wrote that "[t]his is not speculation about hidden motives—it is the Administration's explicit agenda," and that "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating."[35] Finding that DOJ "issued the subpoena first and searched for a justification second,"[36] the court concluded that the subpoena was issued to "pressure providers to cease offering [transgender healthcare] rather than to investigate specific unlawful conduct."[37] Thus, as in Massachusetts, the Court granted QueerDoc's motion to quash in full.

---

[33] *Id.* at *5.

[34] *Id.*

[35] *Id.*

[36] *Id.* at *6.

[37] *Id.* at *7.

9

## IV.    CNH's Provision of Transgender Healthcare

CNH opened in 1870 as one of the nation's first children's hospitals and remains the "leading pediatric health system in the Washington, D.C., area,"[38] including the Maryland and Northern Virginia suburbs. CNH's mission includes "[p]roviding a quality healthcare experience for our patients and families," "[i]mproving health outcomes for children regionally, nationally and internationally," and "[l]eading the creation of innovative solutions to pediatric health challenges."[39]

As part of this foundational mission, CNH has provided transgender health care to its patients for the past 20 years through its Gender Development Program, with primary locations in Washington, D.C., and Rockville, Maryland.[40] "As one of the earliest founded youth gender programs," CNH's Gender Development Program consists of a "multidisciplinary team of specialists" who provide critical healthcare to transgender youth and "conduct[s] cutting-edge research to move forward [the] understanding of youth gender development and ways to best support" this vulnerable patient population.[41] Such care was informed by research findings and included behavioral

---

[38] *About Us*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us (last visited Nov. 14, 2025).

[39] *Our Mission Vision and Values*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us/mission-and-vision (last visited Nov. 14, 2025).

[40] *Gender Development Program*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/gender-development-program (last visited Nov. 14, 2025).

[41] *Id.*

JA47

healthcare, resources for social transition, puberty-blocking medicine, and hormone therapy. That care required patient medical evaluations, treatment recommendations, and treatment plans in the most sensitive areas, including mental health, physical development, and socialization.[42] In providing transgender healthcare to its adolescent patients, CNH followed widely accepted and well-established guidelines for the treatment of gender dysphoria,[43] all while complying with all applicable and relevant local, state, and federal laws.

On January 30, 2025, CNH issued a public statement announcing it was "pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients," citing guidelines in the Healthcare Order issued by the White House two days earlier.[44] Later that summer, and five weeks after DOJ issued its sweeping subpoenas, CNH announced that it would end transgender medical treatments for all patients effective August 30, 2025 because of "escalating legal and regulatory risks" from this Administration.[45] Three days later, the Attorney General took to the social media

---

[42] *See, e.g.*, Decl. of Parent G.G. at ¶ 5 ("[M]y child and I disclosed private sensitive information [to CNH] about my child's mental and physical health, emotional state, development, school experiences, relationships with peers and family members, and more. All of this information was shared with medical providers so they could provide diagnoses, treatment recommendations, and treatment plans for my child.").

[43] *See Youth Pride Clinic*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/youth-pride-clinic (last visited Nov. 14, 2025).

[44] *Children's National Hospital Statement on Executive Order*, CHILDREN'S NATIONAL HOSPITAL (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order.

[45] Jenna Portnoy, Kyle Swenson & Karina Elwood, *Children's National Hospital to End Gender-Transition Care*, Washington Post (Jul. 18, 2025),

11

JA48

platform "X," taking credit for CNH's cessation of gender-transition medical care,

stating: "At President Trump's direction, [DOJ] will continue enforcing the law against

institutions like Children's National."[46] Hospitals around the nation followed suit;

developments this White House applauded.[47]

## V. Movants are Current and Former CNH Patients and Their Parents Who Seek to Protect Their Identities and Confidential Medical Records from Government Disclosure

Movants are eight families who received gender transition medical care, for either

themselves or their children, through CNH's Gender Development Program from January

1, 2020 to the present.[48] Throughout this time period, Movants engaged with CNH

providers and medical professionals, both in-person and through electronic

communications.[49] These interactions involved the disclosure of highly sensitive and

personal information relating to their children's physical development, mental health,

family relationships, and social environment, all for the purpose of obtaining medical

diagnoses, treatment recommendations, and healthcare for gender dysphoria.[50]

---

https://www.washingtonpost.com/dc-md-va/2025/07/18/children-national-ends-gender-transition-care/.

[46] Attorney General Pamela Bondi (@AGPamBondi), X (July 21, 2025), https://x.com/AGPamBondi/status/1947362978526814579.

[47] *President Trump Promised to End Child Sexual Mutilation—and He Delivered,* THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

[48] *See* Movants' Decls. at ¶¶ 1.

[49] *See* Decl. of Parent A.A. at ¶ 5; Decl. of Parent B.B. at ¶ 3; Decl. of Parent C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 2; Decl. of Parent E.E. at ¶ 2; Decl. of Parent F.F. at ¶ 5; Decl. of Youth F.F. at ¶ 2; Decl. of Parent G.G. at ¶ 4; Decl. of Parent H.H. at ¶ 2.

[50] *See* Decl. of Parent A.A. at ¶ 6; Decl. of Parent B.B. at ¶ 4; Decl. of Parent C.C. at ¶ 5;

JA49

As part of this care, the minor patients underwent mental health assessments conducted by licensed providers, participated in consultations with physicians regarding treatment options alongside their parents, and received puberty blockers and hormone therapy under medical supervision.[51] Follow-up appointments addressed the children's emotional well-being, response to prescribed medications, and the overall effectiveness of treatment.[52] At all times, Movants understood that these communications and records were strictly confidential and would be protected from disclosure.[53]

Movants placed deep trust in CNH to safeguard their most sensitive personal information.[54] They understood that the hospital's professional obligations—and federal and state privacy protections—ensured that the details of the medical care they were

---

Decl. of Youth C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 3; Decl. of Parent E.E. at ¶ 3; Decl. of Youth E.E. at ¶ 12; Decl. of Parent F.F. at ¶ 6; Decl. of Youth F.F. at ¶ 4; Decl. of Parent G.G. at ¶ 5; Decl. of Parent H.H. at ¶ 4.

[51] *See* Decl. of Parent A.A. at ¶¶ 7-9; Decl. of Parent B.B. at ¶¶ 5-7; Decl. of Parent C.C. at ¶¶ 6-7; Decl. of Youth C.C. at ¶¶ 4-5; Decl. of Parent D.D. at ¶¶ 4-5; Decl. of Parent E.E. at ¶¶ 4-5; Decl. of Youth E.E. at ¶ 8; Decl. of Parent F.F. at ¶¶ 7, 10; Decl. of Parent G.G. at ¶¶ 5-6; Decl. of Parent H.H. at ¶¶ 5-6.

[52] *See* Decl. of Parent A.A. at ¶¶ 10; Decl. of Parent B.B. at ¶ 8; Decl. of Parent C.C. at ¶ 9; Decl. of Youth C.C. at ¶¶ 6; Decl. of Parent D.D. at ¶ 6; Decl. of Youth E.E. at ¶ 6; Decl. of Parent F.F. at ¶ 6; Decl. of Youth F.F. at ¶ 5; Decl. of Parent G.G. at ¶ 8; Decl. of Parent H.H. at ¶ 7.

[53] *See* Decl. of Parent A.A. at ¶ 3; Decl. of Parent B.B. at ¶ 2; Decl. of Parent C.C. at ¶¶ 10, 20; Decl. of Youth C.C. at ¶ 8; Decl. of Parent D.D. at ¶ 7; Decl. of Parent E.E. at ¶ 6; Decl. of Youth E.E. at ¶ 5; Decl. of Parent F.F. at ¶ 15; Decl. of Youth F.F. at ¶ 7; Decl. of Parent G.G. at ¶¶ 2-3; Decl. of Parent H.H. at ¶ 8.

[54] *See* Decl. of Parent A.A. at ¶ 4; Decl. of Parent B.B. at ¶¶ 11, 20; Decl. of Parent C.C. at ¶ 11; Decl. of Youth C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 10; Decl. of Parent E.E. at ¶ 7; Decl. of Youth E.E. at ¶ 1; Decl. of Parent F.F. at ¶ 4; Decl. of Youth F.F. at ¶ 3; Decl. of Parent G.G. at ¶ 15; Decl. of Parent H.H. at ¶ 17.

13

JA50

receiving would not be shared beyond the healthcare setting.[55] Disclosure of these families' medical information to the government would constitute a profound breach of that trust and would expose these families to serious risks of emotional distress, harassment, discrimination, and even potential prosecution.[56] It would also severely undermine Movants' willingness to seek necessary medical care in the future,[57] with potentially devastating consequences for long-term health and well-being. Even the release of redacted or partially anonymized records would fail to protect their privacy, as unique personal details—such as school environment, family circumstances, and community connections—could easily render them identifiable.[58]

For these reasons, Movants, who currently reside in Maryland and throughout the Washington, D.C. metropolitan area, now come to this Court seeking to protect the

---

[55] *See* Decl. of Parent A.A. at ¶ 12; Decl. of Parent B.B. at ¶ 10; Decl. of Parent C.C. at ¶ 11; Decl. of Youth C.C. at ¶ 14; Decl. of Parent D.D. at ¶ 7; Decl. of Parent E.E. at ¶ 13; Decl. of Youth E.E. at ¶¶ 7, 12; Decl. of Parent F.F. at ¶ 4; Decl. of Youth F.F. at ¶ 7; Decl. of Parent G.G. at ¶ 10; Decl. of Parent H.H. at ¶ 9.

[56] *See* Decl. of Parent A.A. at ¶¶ 13-15; Decl. of Parent B.B. at ¶¶ 12-14, 20; Decl. of Parent C.C. at ¶¶ 12-13; Decl. of Youth C.C. at ¶ 10; Decl. of Parent D.D. at ¶¶ 11-14; Decl. of Parent E.E. at ¶¶ 8-9; Decl. of Youth E.E. at ¶ 9; Decl. of Parent F.F. at ¶¶ 12-13; Decl. of Youth F.F. at ¶ 8; Decl. of Parent G.G. at ¶¶ 11-12; Decl. of Parent H.H. at ¶¶ 10-11.

[57] *See* Decl. of Parent A.A. at ¶¶ 16-17; Decl. of Parent B.B. at ¶¶ 15-16; Decl. of Parent C.C. at ¶¶ 13-14, 16; Decl. of Youth C.C. at ¶¶ 11-12; Decl. of Parent D.D. at ¶ 13; Decl. of Parent E.E. at ¶ 10; Decl. of Youth E.E. at ¶ 3, 10; Decl. of Parent F.F. at ¶ 14; Decl. of Youth F.F. at ¶ 10; Decl. of Parent G.G. at ¶ 13; Decl. of Parent H.H. at ¶¶ 12, 15.

[58] *See* Decl. of Parent A.A. at ¶ 18; Decl. of Parent B.B. at ¶ 19; Decl. of Parent C.C. at ¶ 18; Decl. of Youth C.C. at ¶ 13; Decl. of Parent D.D. at ¶ 15; Decl. of Parent E.E. at ¶ 12; Decl. of Youth E.E. at ¶ 13; Decl. of Parent F.F. at ¶ 16; Decl. of Youth F.F. at ¶ 11; Decl. of Parent G.G. at ¶ 14; Decl. of Parent H.H. at ¶ 16.

14

JA51

privacy of their medical information and identities and to prevent the disclosure of any medical records or identifying details to the government.

## LEGAL STANDARD

In determining whether to enforce an administrative subpoena, courts typically consider three factors: first, whether "the inquiry is within the authority of the agency," second, whether "the demand is not too indefinite," and third, whether "the information sought is reasonably relevant." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Courts must also ensure that any administrative subpoena complies with dictates of the U.S. Constitution, including the Fourth and Fifth Amendments. *See U.S. v. Bailey (In Re: Subpoena Duces Tecum)*, 228 F.3d 341 (4th Cir. 2000). "While judicial scrutiny of administrative subpoenas is, to be sure, limited . . . courts do not simply order the enforcement of subpoenas as a matter of course, and certainly not blindly." *N.L.R.B. v. Interbake Foods, LLC*, 637 F.3d 492, 498-99 (4th Cir. 2011) (internal citations omitted). "Article III courts protect[] against abuse of the subpoena power" by determining "whether to enforce the subpoena and, in making that determination, evaluat[ing] the claims of privilege" brought by movants. *Id.* at 498.[59]

---

[59] Movants have Article III standing because compelled disclosure of their identities, sensitive medical and mental health records, and parental consent materials constitutes a concrete and imminent injury traceable to the subpoena and redressable by quashing it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Nonparties may challenge subpoenas that implicate personal rights or constitutional interests. *See In re: Grand Jury 2021 Subpoenas*, 87 F.4th 229, 249 (4th Cir. 2023); *United States v. Idema*, 118 F. App'x 740, 744 (4th Cir. 2005). Congress must speak clearly to preclude judicial review of constitutional claims, and § 3486 contains no such bar. *See Webster v. Doe*, 486 U.S. 592, 603–04 (1988). The subpoenaed materials implicate well-established informational-privacy interests in intimate medical and mental health data, including transgender

15

## ARGUMENT

### I.    Patients and Their Parents Have a Fourth Amendment Right to Be Free from Unreasonable Search and Seizure of Their Private Medical Records

The Fourth Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755–56 (2010) (quoting *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613–14 (1989)). The Fourth Amendment's protection applies to administrative subpoenas. *See Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305-06 (1924) ("Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime.") (citation omitted). "Because a subpoena . . . leads to 'the *compulsory* production of private papers,'" Movants are "entitled to the Fourth Amendment's protection against unreasonableness." *In Re: Subpoena Duces Tecum*, 228 F.3d 341, 347 (4th Cir. 2000) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)) (emphasis in original). To satisfy the Fourth Amendment's reasonableness standard, an administrative subpoena must be "(1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does

---

status. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *Carpenter v. United States*, 585 U.S. 296, 306 (2018); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). Section 3486(a)(7) further ties these subpoenas to judicial-subpoena standards, which allow assertion of personal rights and privileges.

JA54

not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive." *Id.* at 349; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984). Here, the subpoena lacks a legitimate purpose and is not limited in scope to reasonably relate to or further its supposed purpose, thus violating the Fourth Amendment.

### 1.    The Subpoena was Issued for an Improper Purpose

While courts generally will enforce an administrative subpoena that seeks information reasonably relevant to an inquiry within its statutory authority, the court's process is abused when a subpoena is "issued for an improper purpose, such as to harass" the recipient or "to put pressure on him to settle a collateral dispute." *United States v. Powell*, 379 U.S. 48, 58 (1964). This "requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from 'engag[ing] in arbitrary fishing expeditions' and from 'select[ing] targets of investigation out of malice or an intent to harass.'" *In Re: Subpoena Duces Tecum*, 228 F.3d at 349 (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)).

Here, the court need only look to the explicit and official policy of this Administration to determine that the subpoena issued to CNH is motivated by animus towards transgender individuals and not for a legitimate purpose. The Administration has asserted that transgender citizens cannot lead an "honorable, truthful, and disciplined lifestyle,"[60] and that their medical treatment is part of a "warped ideology" and "evil and

---

[60] *Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-

17

backwards lies" that cause physical harm.[61] As a result of that animus, the Administration

has taken numerous actions to put an "end" to transgender medical treatments by seeking

to "investigate and hold accountable medical providers" of such care.[62] The Attorney

General has made abundantly clear the true, improper purpose behind these subpoenas.

Using a criminal investigation to end medically necessary transgender healthcare by

intimidating providers and patients is improper and evidence of bad faith.

The only two courts to publicly rule on substantively identical subpoenas have

already found they were issued in bad faith. *See In Re: Admin. Subpoena No. 25-1431-*

*019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025); *Queerdoc,*

*PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D.

Wash. Oct. 27, 2025). In Massachusetts, the court considered the "astonishingly broad[,]

virtually unlimited . . . scope" of the subpoena, and held that it "was issued for an

improper purpose, motivated only by bad faith." *In Re: Admin. Subpoena No. 25-1431-*

*019*, 2025 WL 2607784, at *6-*7.[63] In concluding that there was no proper purpose for

---

excellenceand-readiness/.

[61] *National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-preventionmonth-2025/; *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinicsinvolved-performing-transgender-medical.

[62] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN at 4 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[63] The government filed both a motion to alter the district court's order quashing the subpoena issued to Boston Children's Hospital, as well as a notice of appeal. Mot. to Alter Judgment, *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ (D.

18

the subpoena, the court explained that "the Administration has been explicit about its disapproval of the transgender community and its aim to end [transgender medical treatments]," and "the true purpose of issuing the subpoena is to interfere with the Commonwealth['s] right to protect [transgender medical treatments] within its borders, to harass and intimidate [the hospital] to stop providing such care, and to dissuade patients from seeking such care." *Id.* at *7. A Washington district court reached the same conclusion, stating "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating," *Queerdoc, PLLC*, 2025 WL 3013568, at *5, and that the Administration's subpoena amounts to nothing more than a fishing expedition, "as it seeks to rifle through thousands of patient records hoping to find something—*anything*—to justify its predetermined goal of ending [transgender medical treatments]." *Id.* at *6 (emphasis in original).

As in Massachusetts and Washington, DOJ has not, and cannot, set forth a legitimate enforcement purpose for the subpoena against CNH. Transgender medical treatments remain legal in Maryland as well as in the District of Columbia. And CNH provided its patients with care that was informed by research findings and in accordance with all applicable federal and state laws. Any allegation or conclusion otherwise is clear pretext for animus-based attempts to end transgender medical treatments nationwide. *See In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784, at *7. The subpoena,

---

Mass. Oct. 7, 2025) (Dkt. No. 35); Notice of Appeal, *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ (D. Mass. Nov. 7, 2025) (Dkt. No. 46).

19

therefore, was issued in bad faith and without any proper purpose, *In Re: Subpoena Duces Tecum*, 228 F.3d at 349, and its sweeping requests for the medical records and personal information of patients and their parents should be quashed.

**2.    The Sweeping and Virtually Unlimited Scope of the Subpoena Does Not Reasonably Relate to or Further its Supposed Purpose of Investigating Healthcare Fraud**

If the scope of a subpoena is "not relevant to a legitimate investigation, and overly broad . . . [that] can support a claim of unconstitutionality under the Fourth Amendment." *Id.* at 350. This "judicial protection" against a "sweeping or irrelevant order is *particularly* appropriate in matters where the demand for records is directed not to the [subpoenaed party] but to a third-party who may have had some dealing with the person under investigation." *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (quoting *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir. 1968)) (emphasis in original).

"A § 3486 subpoena must be issued in connection with an investigation of a federal healthcare offense and is limited to the production and authentication of documents and things that may be relevant to that investigation." *In Re: Subpoena Duces Tecum*, 228 F.3d at 350; *see also* 18 U.S.C. § 3486(a)(1). But here, the Administration is "seek[ing] an astonishingly broad array of documents and information that are virtually unlimited in scope." *In Re: Administrative Subpoena No. 25-1431-09*, 2025 WL 2607784, at *6; *see Gilmore v. Jones*, 339 F.R.D. 111, 124 (W.D. Va. 2021) ("The sheer breadth of the subpoenas shows that [the requestor] has embarked on a fishing expedition[.]").

20

The Administration's requests go far beyond what would be necessary for DOJ to investigate alleged violations of the FDCA, the False Claims Act, or any other conceivably legitimate investigative goal, insofar as the subpoena seeks "a staggering amount of personal health data related to [CNH's] patients, including their names, dates of birth, social security number, address, medical diagnoses, and patient intake documents." *Queerdoc, PLLC*, 2025 WL 3013568, at *6; *see also In Re: Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (administrative subpoena does not give issuer "unfettered authority to cast about for potential wrongdoing"). Compelling disclosure of vast amounts of intensely personal medical information bears no relationship to any legitimate effort to investigate healthcare fraud and instead functions as an impermissible intrusion into protected patient privacy. The Administration's subpoena should therefore be quashed.

## II.    Patients and Their Parents Have a Fifth Amendment Right to Privacy in Their Medical Records That Outweighs the Government's Interests

"The constitutional right to privacy extends to . . . 'the individual interest in avoiding disclosure of personal matters.'" *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)).[64] The Fourth Circuit has adopted a two-part inquiry to determine whether personal information sought

---

[64] The Supreme Court, in *Dobbs v. Jackson Women's Health Organization*, distinguished between the right to shield information from disclosure, such as personal medical information, from "the right to make and implement important personal decisions without governmental interference," such as deciding to terminate a pregnancy. 597 U.S. 215, 273 (2022). In so holding, the Court did not question the right to informational privacy, tacitly affirming its validity. *Id.* at 273–92.

JA58

by the government is entitled to privacy protections. Courts "must . . . ask (1) whether a 'reasonable expectation of privacy' in the information exists as to entitle it to privacy protection and, if so, (2) whether 'a compelling governmental interest in disclosure outweighs the individual's privacy interest.'" *Payne v. Taslimi*, 998 F.3d 648, 657 (4th Cir. 2021) (quoting *Walls*, 895 F.2d at 192). Patients and their parents have a reasonable expectation of privacy in their medical records and the government's purported public interest in combating health care fraud does not outweigh patient interests in protecting the confidentiality of these records.

### 1.    Patients and Their Parents Have a Reasonable Expectation of Privacy in Their Medical Records

Patients and their parents undoubtedly have a reasonable expectation of privacy in their medical records, and the "reason . . . is apparent: medical treatment records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000); *see also Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F.Supp.3d 717, 781 (D. Md. 2025) ("It is almost self-evident that, in our society, PII, such as SSNs, medical information, and certain financial records, are regarded as private, sensitive, and confidential information."); *In re Grand Jury Subpoena John Doe No. A01-209*, 197 F. Supp. 2d 512, 514 (E.D. Va. 2002) ("[D]isclosure of a person's medical records implicates. . . the [constitutional] interest in avoiding disclosure of a patient's personal matters[.]").

22

JA59

Moreover, these privacy interests are heightened when they involve medical treatment and records relating to stigmatized health conditions, particularly when disclosure could subject patients to "discrimination and intolerance." *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994); *see also Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487 (4th Cir. 1992) ("The stigma attached to AIDS lends even more weight to the argument that the medical records of its victims should receive scrupulously confidential treatment."). Simply put, patients' medical records relating to the diagnosis and treatment of their gender dysphoria contain precisely the sort of information the Constitution is intended to protect.

> **2.    Patients and Their Parents' Interests in Protecting the Confidentiality of Their Medical Records Outweighs the Government's Interest in Compelling the Information**

Once a movant establishes that a government subpoena intrudes into private matters that are constitutionally protected, "then the defendant has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192. In engaging in this balancing test with respect to medical records, district courts in this Circuit regularly deploy a list of seven factors first laid out in *U.S. v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980), in which the Third Circuit considered a similar privacy-based challenge to an administrative subpoena seeking employees' medical records. *See, e.g., In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004*, 51 F. Supp. 2d 726, 738 (W.D. Va. 1999) (applying the *Westinghouse* factors in a § 3486 subpoena proceeding); *Patients of Dr. Solomon v. Board of Physician Quality Assur.*, 85 F. Supp. 2d 545, 547 (D. Md. 1999)

23

JA60

(applying the *Westinghouse* factors in a subpoena duces tecum proceeding). These factors consist of: (1) "the type of record requested," (2) "the information it does or might contain," (3) "the potential for harm in any subsequent nonconsensual disclosure," (4) "the injury from disclosure to the relationship in which the record was generated," (5) "the adequacy of safeguards to prevent unauthorized disclosure," (6) "the degree of need for access," and (7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest." *Westinghouse*, 638 F.2d at 578. Here, the *Westinghouse* factors weigh decisively in Movants' favor to quash the subpoena.[65]

### A.    *Westinghouse* Factors One, Two and Three

The first three *Westinghouse* factors consider the type of record requested, the information it does or might contain, and the potential for harm in any subsequent disclosure. All weigh strongly in favor of quashing the subpoena as it relates to patient records. In fact, in related litigation concerning an identical subpoena issued to Children's Hospital of Philadelphia ("CHOP"), DOJ has already agreed the "subpoena requests sensitive health information about children, gender, and sexuality (factor 1), the records do in fact likely contain sensitive information (factor 2), and—because the information is sensitive—disclosures could cause embarrassment or harm (factor 3)."[66] The

---

[65] *See also A. et al*, 2:25-mc-01067 (W.D. Pa. Sept. 24, 2025), Dkt. No. 2 at 12-18 (brief in support of motion to quash identical subpoena issued to University of Pittsburgh Medical Center brought by transgender patients and their parents analyzing *Westinghouse* factors).

[66] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 9-10.

24

JA61

government's own admissions make clear: the risk to privacy here is not hypothetical – it is real, immediate, and grave.

While all medical records are entitled to constitutional protection, the specific records at issue here – and the sensitive information they contain – merit even greater protection than is typically afforded to records of routine medical care. *See Westinghouse*, 638 F.2d at 581-82 (distinguishing routine x-rays from records "of a more personal nature" where "more intimate data is involved" which would require greater protection). Here, the subpoena seeks a shocking and exceptionally broad array of sensitive information. In the CHOP litigation, DOJ conceded that "[t]he Government does not quibble with the sensitivity of the patient information involved in this subpoena."[67] The subpoena requests the identities of patients, specifically minors (including those who were minors at the time of treatment) and their parents. This is information DOJ has demanded yet admits it does not currently need.[68] That alone weighs strongly against disclosure.

Beyond just seeking to uncover Movants' identities, DOJ also seeks unfettered access to a vast trove of information in patients' medical records concerning their gender dysphoria diagnoses and courses of treatment. This information includes sensitive details regarding patients' mental health, emotional states, physical health and development,

---

[67] *See In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 10.

[68] *Id.* at 11 ("[T]he government is willing to work with CHOP to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise.").

25

school experiences, friendships and family relationships, their parents' occupations, descriptions of their communities, and much more.[69] Any anonymization of these records would be insufficient to protect Movants' identities, as specific details contained therein – such as age, timeline of visits, type of treatment, and life circumstances – when put together, can easily render Movants identifiable. *See, e.g.*, Decl. of Parent C.C. at ¶ 18 ("I do not believe that redacting our names from my child's chart would meaningfully protect our privacy. During the course of my child's care, we shared numerous details that, when combined . . . could identify our family."); *see also Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (holding redaction of medical records would not be sufficient to protect patients' privacy interests). Moreover, the information sought is so deeply personal that "[e]ven if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy." *Id.*

These records and their contents are worthy of the utmost protection, as their disclosure poses the risk of serious harm. *See, e.g.*, Decl. of Youth F.F. at ¶ 8 ("As a transgender person, I do not feel safe in public due to harassment I have experienced in public using public transportation, walking around, at my job, and at school. I have experienced unfair treatment as a transgender person, and private medical information regarding my medical transition being shared with anyone would put me at more risk for harassment and discrimination for being transgender in the aforementioned public

---

[69] *See supra* note 50.

26

spaces."). This is especially true "in light of the government's 'increasing use of computers and sophisticated information technology,' which 'greatly magnif[y] the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information.'" *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896). The Court should not allow such an intrusion.

B.    *Westinghouse* Factor Four

The fourth *Westinghouse* factor, the injury from disclosure to the relationship in which the record was generated, also weighs in favor of quashing the subpoena as to patient records. The records the subpoena demands are a product of the crucial trust relationship between healthcare providers and their patients. Confidentiality is a touchstone of these relationships, because it "preserves individual dignity, prevents information misuse, and protects autonomous decision making by the patient."[70] Disclosure of the requested medical records would breach, and irreparably harm, the sanctity of that relationship. *See, e.g.*, Decl. of Parent H.H. at ¶ 14 ("As a parent, the idea of my child's confidential medical information being shared with the government would represent a profound violation of trust in the healthcare system."); *see also Nw. Mem'l Hosp.*, 362 F.3d at 929 ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients' records from disclosure in judicial proceedings, . . . the hospital will lose the confidence of its patients, and persons with sensitive medical

---

[70] Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888, 888 (April 19, 2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf.

JA64

conditions may be inclined to turn elsewhere for medical treatment."). Any such undermining of confidentiality risks destroying patients' trust in their healthcare providers and "might prevent people from seeking help when needed."[71]

Research demonstrates that youth are often reluctant to disclose information about being transgender and related medical concerns to healthcare providers, even when such disclosure is important for their care, due to fears about privacy and the potential for negative consequences.[72] The breach of confidentiality in this context would not only irreparably damage the trust that is foundational to the patient-provider relationship, but could also deter transgender individuals from seeking necessary medical care, thereby exacerbating existing health disparities and putting their physical and mental well-being at risk. *See, e.g.*, Decl. of Youth E.E. at ¶ 3 ("I believed when I was receiving treatment that the conversations and information I provided about my medical condition and treatment were confidential. I already have some mistrust of the medical system. And disclosing my confidential patient records, including information about medical care relating to me being transgender would invade my privacy. It would also make me even more hesitant in the future to seek and obtain care."); *see also Nw. Mem'l Hosp.*, 362 F.3d at 929.

---

[71] *Id.*

[72] Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J.ADOLESC. HEALTH 691, 696 (2020).

C.    *Westinghouse* Factor Five

Under the fifth *Westinghouse* factor, courts must also consider how likely the information is to be subject to unauthorized disclosure. The risk of harm from breaching confidentiality is especially acute for transgender patients, who already face pervasive stigma, discrimination, and even violence in many aspects of their lives, including healthcare settings. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020) ("Transgender people frequently experience harassment in places such as schools . . . medical settings . . . and retail stores . . . and they also experience physical assault in places such as schools . . . and places of public accommodation . . . .[and] are more likely to be the victim of violent crimes.") (internal citations omitted). Transgender individuals are at a significantly higher risk of being targeted for harassment, social exclusion, and physical harm simply because of their transgender status. Disclosure of their medical records– particularly those containing sensitive information relating to gender transition medical treatment, mental health, and other relevant healthcare decisions – could result in involuntary public disclosure of transgender status, subjecting patients and their families to further discrimination, bullying, or violence. *Id.*

In fact, the American Medical Association has recognized an "epidemic of violence against the transgender community" and noted that "[a]ccording to available tracking, fatal anti-transgender violence in the U.S. is on the rise."[73] Given the heightened

---

[73] *AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting*, AM. MED. ASS'N (June 10, 2019), https://www.ama-assn.org/press-center/ama-press-releases/ama-adopts-new-policies-first-day-voting-2019-annual-meeting.

29

JA66

risk of violence faced by transgender individuals, any public disclosure of Movants' identities would pose a serious threat to their safety and that of their families. This danger would be significantly increased by any further disclosure of their medical records or other deeply personal information, especially in light of the Administration's characterization of this medically necessary care as child abuse. *See, e.g.*, Decl. of Parent A.A. at ¶ 15 ("I am aware of the government's current public hostility toward transgender people and its efforts to eliminate rights and protections for transgender individuals, and this dangerous climate adds to my fear about the release of our identities.").

Despite these risks, no meaningful statutory safeguards exist on how DOJ might use or share the information it seeks. While DOJ may not use or disclose information it receives through the subpoena in "any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information," 18 U.S.C. § 3486(e), that limitation is extremely narrow and, thus, mitigates very little with respect to Movants' fears of further disclosure. It merely prohibits the Administration from using the information against the patients themselves and can be overcome with a court order. 18 U.S.C. § 3486(e)(1).

Moreover, DOJ announced its intention to "partner with state attorneys general to *identify leads, share intelligence*, and build cases against hospitals and practitioners."[74] In addition, the Attorney General "direct[ed] all U.S. Attorneys to investigate all suspected

---

[74] U.S. OFF. OF THE ATT'Y GEN., *Memorandum For Select Component Heads: Preventing the Mutilation of American Children* at 3-5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl (emphasis added).

30

JA67

cases" of transgender medical treatments and to "prosecute all . . . offenses to the fullest extent possible."[75] Since there is no explicit prohibition on the sharing of information received through a subpoena issued under 18 U.S.C. § 3486, identifying leads and sharing intelligence may mean providing patient information and data to state law enforcement officials. *See* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (Privacy Act provision permitting disclosure to state law enforcement officials). Such information sharing is particularly concerning to any parent who sought medically-approved and legal care for their child, especially now that the Administration is characterizing this care as child abuse. *See, e.g.*, Decl. of Parent B.B. at ¶ 17 ("Once my child's records leave the health-care system and enter government files, I have no way to control how they are used, who will be able to read them, or how long they will be kept. I am deeply concerned that this loss of control will have long-term consequences for my child's privacy and sense of safety.").

D.    *Westinghouse* Factors Six and Seven

The sixth and seventh *Westinghouse* factors—the degree of need for access and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access—do not outweigh the first five factors.

DOJ cannot articulate a legitimate need for comprehensive medical records for every patient who received either puberty blockers or hormone therapy during the

---

[75] *Id.*

31

relevant time period, which spans over five and a half years. For example, in the CHOP litigation, DOJ failed to identify a particularized need for patient and parent information. Instead, it made only general assertions that "the acts being investigated here are, at base, statutory violations commonly investigated by the Government in many contexts over many decades" and that "[t]he document requests here are common in such investigations."[76] Crucially, DOJ offered no facts even suggesting that these statutory violations are occurring at that hospital, undermining any claim of a legitimate investigatory purpose and revealing the subpoena as a tool for an improper political agenda.

DOJ's simultaneous issuance of extremely broad subpoenas lodged against twenty medical institutions—each demanding highly sensitive and confidential documents pertaining to patients and their families—reflects an overt political agenda rather than a genuine investigation into healthcare fraud. And DOJ has yet to articulate anything to the contrary. DOJ is seeking to "use its subpoena power to go on a fishing expedition" through "an astonishingly broad array of documents and information that are virtually unlimited in scope" that will undoubtedly disrupt care to patients. *In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784, at *6. Factors six and seven favor quashing the subpoena rather than enforcing it.

*** 

---

[76] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 7.

32

JA69

DOJ seeks to invade a deeply private and constitutionally protected sphere of Movants' lives. To do so it must "prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192. It fails to do so, and therefore the subpoena must be quashed.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court quash subpoena Requests 11, 12, and 13, and all other Requests to the extent such Requests or sub-Requests call for the production of the identities or personal health information of CNH patients and their parents or guardians.

Dated:  November 17, 2025

_____
Eve L. Hill (Bar No. 11938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com


Jennifer L. Levi (Pro hac vice to be submitted)
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*

33

JA70

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National Hospital

Case No.: __JRR 2 5 MC 0 0 7 0 9__

**EXHIBIT INDEX**
**MOTION TO QUASH SUBPOENA DUCES TECUM**

**EXHIBIT INDEX**

1. Subpoena Duces Tecum from the Department of Justice to The Children's Hospital Corporation, d/b/a Boston Children's Hospital, No. 25-1431-019

2. Declaration of Parent A.A.

3. Declaration of Parent B.B.

4. Declaration of Parent C.C.

5. Declaration of Youth C.C.

6. Declaration of Parent D.D.

7. Declaration of Parent E.E.

8. Declaration of Youth E.E.

9. Declaration of Parent F.F.

10. Declaration of Youth F.F.

11. Declaration of Parent G.G.

12. Declaration of Parent H.H.

JA71

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

No. 25-1431-019

**To:**   The Children's Hospital Corporation d/b/a Boston Children's Hospital
300 Longwood Avenue
Boston, Massachusetts 02115

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C., on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

**BRETT SHUMATE**

Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:04:06 -04'00'

*(signature)*

JA72

## RETURN OF SERVICE

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1. *Personal delivery to an individual, to wit:*

_____
*(name)*

_____
*(title)*

_____
*(address)*

2. *Personal delivery to an address, to wit:*

_____
*(description of premises)*

_____
*(address)*

3. *Registered or certified mailing to:*

_____
*(name)*

_____
*(address)*

At _____ a.m. | p.m. on

_____
*(date)*

_____
*(signature)*

_____
*(title)*

# UNITED STATES OF AMERICA
# DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

# ATTACHMENT A TO SUBPOENA TO:

THE CHILDREN'S HOSPITAL CORPORATION d/b/a BOSTON CHILDREN'S HOSPITAL
300 LONGWOOD AVENUE
BOSTON, MASSACHUSETTS 02115

## I. DEFINITIONS

1. "You," "Your Company," and "the Company," means:

   a. The Children's Hospital Corporation d/b/a Boston Children's Hospital, a Massachusetts corporation, whose principal place of business is located at 300 Longwood Avenue, Boston, Massachusetts, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Gender Multispecialty Service at Boston Children's Hospital; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

JA74

b.    Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.    Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.    Any electronic files saved as a backup, including metadata;

e.    Any deleted but recoverable electronic files, including metadata;

f.    Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.    Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.    All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.    "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.    "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.    "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.    "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

2

JA75

8.  "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.  "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.  You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

    a.  If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

    b.  If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

JA76

2. **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3. Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a. Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b. The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c. The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4. The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5. If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6. The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7. All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

4

JA77

8.  If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

   a.  The name and title of the author (and if different, the preparer and signatory);

   b.  The name(s) and title(s) of the individual(s) to whom the document was addressed;

   c.  The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

   d.  The date of the document;

   e.  The number of pages;

   f.  A brief description of the subject matter;

   g.  A statement of the specific basis on which privilege is claimed; and

   h.  The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.  Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.  All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.  All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

JA78

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

6

JA79

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

7

JA80

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1. **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2. **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a. **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

JA81

Case 1:25-mc-91324-MJJ    Document 3-1    Filed 07/08/25    Page 12 of 28

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

    ii. All TIFF image files shall be stored with the ".tif" extension.

    iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

JA82

*July 2022*

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

\\*CaseName*\\**LoadFiles**

\\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

\\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder) \\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "√" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13).  Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

JA84

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

5

JA85

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

JA86

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

JA87

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

### 4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

8

*July 2022*

    i.   The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

    ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

    iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

    iv. No customization of hashing may occur without prior express approval by the Government.

    v.  De-duplication must be done by document family, not by individual document.

    vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

JA89

*July 2022*

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.

    b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

    a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

    b.  The first document in the collection represents the parent document and all other documents will represent the children.

    c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number.  *See* section 22 below.

10

JA90

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

JA91

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Chats** | **MMS** | **SMS** | **Email** | **Instant Message** | **Voicemail** | **Recordings** | **Notes** | **Calendar** |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

JA92

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

JA94

*July 2022*

### 14.   Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts.  Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering.  Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements.  If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.   Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database.  Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format.  The information contained in any such report must be thoroughly explained to the government before production.

### 16.   Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created.  All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

JA95

*July 2022*

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

JA96

*July 2022*

   c. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.  Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.  Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

   a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
   b. External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
   c. Government approved File Transfer Protocol (FTP) technologies.
   d. Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
   e. Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.  Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

17

JA97

### 25.    Privilege Logs

a.    The name and title of the author (and if different, the preparer and signatory);
b.    The name(s) and title(s) of the individual(s) to whom the document was addressed;
c.    The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d.    The date of the document;
e.    The number of pages;
f.    A brief description of the subject matter;
g.    A statement of the specific basis on which privilege is claimed; and
h.    The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

JA98

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

**DECLARATION OF PARENT A.A.**

1. I am the parent of Child A.A., a minor who received medical care at Maryland and Washington D.C. locations of Children's National Hospital ("CNH") between 2023 and 2025. That care included general pediatric and adolescent care, specialty care, and transgender health care.

2. I live in Montgomery County, Maryland.

3. When we decided to seek care at CNH, I believed that my child's medical information would be treated as confidential and used only by health-care professionals involved in my child's treatment and would not be viewed by government officials or anyone else who are not part of their medical team.

4. We chose CNH because of its reputation for high-quality pediatric and adolescent medicine and because we believed the providers would handle sensitive issues with care and respect.

5. During my child's care at CNH, my child and I, along with others in my family, visited many times with CNH medical professionals in person, by telephone and by electronic communication.

6. Throughout those visits and communications, we disclosed private sensitive information about my child's mental and physical health, emotional state, school experiences,

JA99

friendships and family relationships. We believed this information was necessary for medical providers to understand my child's health care needs, make treatment recommendations, and monitor the results.

7. My child met separately with a licensed mental health professional at CNH for an in-depth assessment and follow-up sessions. My child spoke with that provider about matters that were extremely personal and that my child has not shared with people outside our immediate family and the medical team.

8. My child and I also met with CNH physicians to discuss different treatment options, to ask questions, and to talk through concerns. These were in-depth private conversations in which we relied on the providers' expertise and on the confidentiality of the setting. During these meetings, we shared private personal and medical information.

9. My child received medications recommended by their healthcare providers at CNH. These medications required regular follow-up visits, lab tests, and physical examinations.

10. At follow-up appointments, my child's doctors asked for updates about how my child was feeling—physically, mentally, and emotionally. They asked about school, friendships, and family life, and about how my child was handling day-to-day stresses. I believe that these discussions were documented in detailed notes in my child's medical record.

11. Neither my child nor I have made my child's diagnoses or treatment known to the federal government or anyone outside our family and health care providers. We have not been informed by the federal government that my child's care is the subject of any government investigation.

12. I believed that medical information gathered would be used only by CNH and other medical professionals to diagnose and treat my child. I did not expect, and did not agree, that my child's medical records could be turned over to government investigators or prosecutors who have no role in my child's treatment.

13. The idea that my child's medical records could be disclosed to the government is upsetting to me. Those records contain intimate information about my child's body, emotions, family situation, and private thoughts. I do not want anyone other than treating medical professionals, including government officials, reading and interpreting those details.

14. My child is transgender and already feels exposed and at risk in many public settings. If my child's records are turned over to government officials, my child would feel that their most personal information is being taken out of the confidential space of the doctor's office and placed in the hands of others who have no relationship with my child and no obligation of medical confidentiality. That would cause serious emotional distress for my child and me. My child previously was harassed and cursed at in a public restroom based on their appearance, leaving them hesitant to use sex-segregated facilities because of the persecution and stigma often faced by transgender individuals.

15. I am aware of the government's current public hostility toward transgender people and its efforts to eliminate rights and protections for transgender individuals, and this dangerous climate adds to my fear about the release of our identities.

16. Forcing my child's medical providers to release medical information will have a chilling effect on our willingness to seek medical care in the future and on the willingness of other transgender individuals to seek medical care. If my child does not feel able to be

JA101

fully honest with providers, it will undermine the quality of care my child receives and may lead them to delay or avoid seeking care in the future.

17. Once my child's records leave the health-care system and enter government files, I will have no control over how they are used, who will read them, how long they will be kept, how they are disseminated or released, legally or through a data breach, and whether they will be used to dox or otherwise harass us or others. I am deeply concerned that this loss of control will have serious long-term consequences for my child's privacy and sense of safety.

18. Simply redacting our names from documentation turned over to the government would not prevent our family from being identified. In our meetings with CNH medical professionals, we disclosed innumerable details to CNH medical providers that could identify our family and my child. This includes information about my child's relationships in school, parents' occupations, neighborhood, family and friends, and more.

19. Apart from other Movants, I have not disclosed, nor will I disclose, my involvement or my child's involvement in this litigation.

20. Given the current climate, public disclosure of my name, which would necessarily identify my child, or the disclosure of the name of my child, would also expose my child and our family to bullying, harassment, and discrimination.

21. If we are not permitted to proceed under pseudonyms, we may have to withdraw from this case to protect the safety of our child and our family.

22. For all the reasons above, I object to my child's medical records being shared outside of their medical treatment team.

JA102

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Parent A.A._

**Parent A.A.**

Dated: 11/13/25

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

## DECLARATION OF PARENT B.B.

1. I am the parent of Child B.B., a minor who received medical care at a the Washington D.C. and Maryland locations of Children's National Hospital ("CNH") between 2022 and 2025. That care included general pediatric and adolescent care, autism treatment, as well as transgender health care.

2. When we decided to seek care at CNH, I understood that my child's medical information would be confidential and used only by health-care providers involved in my child's treatment. I did not understand that my child's medical records could later be requested by federal government officials who are not part of their medical team.

3. During the course of my child's care at CNH, my child and I, along with others in my family, visited with CNH doctors, nurses, mental health professionals, and other providers in person, by telephone and through electronic communication.

4. During those visits and communications, my child and I disclosed private sensitive information with CNH providers, including details about my child's mental health, emotional state, physical health and development, school experiences, friendships and family relationship, and more. These communications were provided to help the medical providers understand my child as a whole person so they could recommend and adjust treatment.

5. During the course of my child's care at CNH, my child met separately with a mental health provider for an in-depth assessment and follow-up sessions. My child spoke with that provider about matters that were extremely personal and that my child has not shared with people outside our immediate family and the medical team.

6. My child and I also met with CNH physicians to discuss different treatment options, to ask questions about possible side effects and long-term impacts, and to talk through our

JA104

concerns. These were private conversations in which we relied on the providers' expertise and on the confidentiality of the setting.

7. As part of my child's treatment, between 2022 and 2025, CNH prescribed my child puberty blocking medication and hormone replacement therapy. Those medications required regular monitoring, including follow-up visits, lab tests, and physical examinations.

8. At follow-up appointments, my child's providers asked for updates about how my child was feeling—physically, mentally, and emotionally. They asked about school, friendships, and family life, and about how my child was handling day-to-day stresses. These discussions were documented in detailed notes in my child's medical record.

9. Neither my child nor I have provided my child's diagnoses and treatments to the federal government. We have not been informed by the federal government that my child's medical treatment is the subject of a federal inquiry.

10. Throughout my child's care, I understood that medical records might be used within the health-care system—for example, by other clinicians at CNH or our local doctors— to coordinate care and handle routine matters like billing. I did not expect, and did not agree, that my child's medical records could be turned over to federal government investigators or prosecutors who have no role in my child's treatment.

11. We chose CNH because of its reputation for high-quality pediatric and adolescent medicine, its coordinated programs for multiple conditions, and because we believed the providers would handle sensitive and complex issues with care and respect. I relied on the understanding that my child's medical information would stay within the health-care system and remain private.

12. The possibility that my child's entire medical record could be disclosed to the government is extremely upsetting to me. Those records contain intimate information about my child's body, emotions, family situation, and private thoughts. I do not want people in government offices, who have never met my child, reading and interpreting those details.

13. My child is transgender and already feels exposed and at risk in many public settings. Disclosure of my child's medical records to the government would mean my child's most personal information is being taken out of the safe space of the doctor's office and placed in the hands of strangers. It would cause my child severe emotional

distress.

14. Revealing my child's medical records would also expose myself and my child to the risk of mistreatment, harassment, discrimination, and even improper prosecution. My child has already been repeatedly bullied and physically assaulted in school and online related to their transgender status, which has increased their stress and anxiety.

15. My child has told me that the possibility of government officials reviewing their medical chart makes them less willing to speak frankly with doctors and therapists. My child worries about who might eventually see those notes. If my child does not feel able to be fully honest with providers, it will undermine the quality of care my child receives and may lead them to delay or avoid seeking care in the future.

16. As a parent, I view the confidentiality of medical records as a basic part of the relationship between families and health-care providers. Like any parent, if I know that our private conversations with doctors might be taken out of that context and provided to the government, I will become more cautious about what we share and where we seek treatment.

17. Once my child's records leave the health-care system and enter government files, I have no way to control how they are used, who will be able to read them, or how long they will be kept. I am deeply concerned that this loss of control will have long-term consequences for my child's privacy and sense of safety.

18. I am aware of the government's current public antipathy toward transgender people, and it adds to my fear regarding the release of the identity of myself and my child.

19. Our privacy would not be protected by redacting our names from any medical documentation that is provided to the government. My child's records contain many details— such as age, timing and type of treatment, family structure, school circumstances, and other specific facts—that, taken together, could easily point to my child and our family even without names attached.

20. We shared very personal information with CNH because we understood it was necessary for my child's care and because we believed it would remain within the medical system. Having that same information turned over to the government would contradict the expectations under which we sought treatment and would seriously damage our trust in the health-care system.

JA106

21. With the exception of a small group of trusted members of my community, I have not disclosed, nor will I disclose, my involvement or my child's involvement in this litigation.

22. If our names were made public in this litigation, that would effectively identify my child as the patient whose records are at issue. Given the current climate and my child's experience as a transgender young person, I fear that public identification would expose my child and our family to bullying, harassment, and discrimination, and would cause my child significant emotional harm.

23. If we are not permitted to proceed under pseudonyms, we will likely feel compelled to withdraw from this case for the safety of our child and our family.

24. For all the reasons above, I strongly object to my child's medical records being shared with the government.

25. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____11/13/25_____

**Parent B.B.**

JA107

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

### DECLARATION OF PARENT C.C.

1. I am the parent of Youth C.C., who was a minor at the time they received medical care at Children's National Hospital ("CNH") approximately between August/September 2019 – May 2020. That care included a range of medical care, as well as transgender healthcare.

2. My child was seen for care at both the Washington, DC and Maryland locations of CNH.

3. During the course of my child's care at CNH, my child and I, along with other members of our family, met with CNH physicians, nurses, mental health professionals, and other staff. We also communicated with CNH by telephone and through electronic messages.

4. I believe there are extensive medical records relating to my child's care held by CNH.

5. In those visits and communications, my child and I shared private information about my child's physical health, mental and emotional well-being, development and maturation, school life, relationships with peers and family members, and concerns about safety and stress. We understood that this information was being collected so that CNH providers could evaluate my child's health, make treatment recommendations, and monitor how my child was doing over time.

6. As part of my child's care at CNH, my child met with a licensed mental health provider for a detailed assessment and follow-up conversations. Those discussions included

JA108

sensitive topics that, to my knowledge, my child would not likely have shared beyond our immediate family and healthcare team.

7. My child and I also met with physicians to discuss possible treatment options, the risks and benefits of those options, and our questions and concerns. These were careful, in-depth conversations about my child's health and well-being.

8. At various points, we were given the opportunity to ask questions and raise concerns privately with CNH providers. We relied on those private conversations to decide how best to support our child.

9. Follow-up appointments included updates about my child's mental health, daily functioning, and school and family life. These visits likely generated detailed notes in my child's medical record.

10. Throughout my child's care, both my child and I understood that the information we shared with CNH was private medical information. We believed that it would be used by clinicians within the healthcare system to provide and coordinate care, and that it would not be disclosed to people outside that system, including government investigators or prosecutors who are not involved in my child's treatment.

11. We chose CNH at the recommendation of my child's pediatrician and because of its reputation for high-quality pediatric and adolescent care and because we trusted its providers to treat sensitive issues with discretion and professionalism. Our decision to seek care there was based in part on our understanding that my child's medical information would be kept confidential. I was given written assurances of confidentiality of my child's records at the beginning of my child's care and at other times during my child's treatment.

JA109

12. The possibility that my child's complete medical records could be turned over to the government is extremely troubling to me. Those records contain deeply personal information about my child's body, mental health, family circumstances, and private thoughts, including that my child is transgender. I do not want strangers in the government, who have never met my child, reading and analyzing those details. I also fear for my safety and my child's safety if the current administration has those records because of what I have seen this administration do to target and harm transgender people.

13. Disclosure of my child's medical records to the government would cause my child significant emotional distress. My child already feels vulnerable and is aware of potential risks to their safety because my child is transgender. Knowing that government investigators and lawyers might review the most personal aspects of their life would make my child feel exposed and targeted. It would also make me worry for my child's safety and well-being.

14. I am concerned that if my child's records are disclosed in this case, it will affect how my child approaches health care in the future. My child has conveyed to me that the idea of government officials reading their medical chart makes them less willing to speak openly with doctors and therapists. If they do not feel they can be honest, they may delay or avoid seeking care they need. That makes me concerned as a parent about my child's ability to get the health care they need going forward.

15. I am also concerned that disclosing my child's medical documents would disclose information relating to my child that is not available from any other sources and that has been important for ensuring that my child's historical information cannot be obtained.

JA110

16. For me as a parent, having my child's private medical information shared with the government would be a serious breach of trust in the medical system. As any parent would, I would be more hesitant about what we disclose in future visits and where we seek care. I am also a federal employee and worry that this information could lead to retaliation at my work.

17. The harm from disclosing my child's medical records would not be limited to the present moment. Once this information leaves the healthcare system and enters government files, my child will have no control over who reads it, how it is interpreted, or how long it is retained. I fear that could have long-lasting negative consequences for their privacy and well-being.

18. I do not believe that redacting our names from my child's chart would meaningfully protect our privacy. During the course of my child's care, we shared numerous details that, when combined—such as age, timing of visits, family structure, school circumstances, and other life events—could identify our family.

19. Turning over my child's full medical records to the government would contradict the expectations of confidentiality on which we relied when we sought care. We shared very sensitive information with CNH providers because we believed it would remain within their healthcare system and be used only to care for my child.

20. Public disclosure of my name, which would necessarily identify my child, or the disclosure of my child's name in the context of a legal challenge about their medical records, would cause my child serious emotional distress and would expose us to a real risk of bullying, harassment, and discrimination.

21. If we are not permitted to proceed under pseudonyms, we will likely have to withdraw from this litigation in order to protect our child's safety and privacy.

JA111

22. For all the reasons above, I strongly object to my child's medical records being shared with the government.

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*X.X*

_____

**Parent C.C.**

Dated: 11/14/2025

JA112

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National
Hospital

Case No.: _____

**DECLARATION OF YOUTH C.C.**

1. My name is Youth C.C. From about August/September 2019 – May 2020, I was a patient at Children's National Hospital ("CNH"). I visited both the DC and Maryland clinics. I received general medical care there, as well as transgender healthcare.

2. During that time, I had many appointments with doctors, nurses, and a mental health provider at CNH.

3. In those visits, my providers asked me about my physical health, my mood, my stress, how things were going at school, and what my relationships with friends and family were like. They also asked whether there were situations where I felt unsafe or under a lot of pressure. I tried to answer honestly because I always do and because I understood that they needed that information to take care of me.

4. I met separately with a mental health professional at CNH. In those sessions, I talked about very personal subjects, including my feelings about myself and what I was dealing with as a teenager. These were things I have not shared with people outside my family and my health-care team.

5. My doctors talked with me and my parent about different treatment paths, what they recommended, possible side effects, and how each option might affect me over time.

JA113

These conversations were private and helped us decide how to move forward with my care.

6. At follow-up appointments, my providers checked in on how I was doing day-to-day—emotionally, at school, and in my relationships. These conversations were written down in my medical chart and I believe are very detailed.

7. I have never given my medical records to a government agency. I did not expect that anyone from the Department of Justice would ever see my medical records.

8. When I shared information with my doctors and therapist, I understood that it would be used by them and by other healthcare professionals involved in my treatment. I did not think that what I said in those appointments would leave the CNH healthcare system and be handed over to the government.

9. Being straightforward with my providers was important so they could understand what was really going on with me and recommend the right care. I relied on the idea that my medical information was confidential in order to talk about difficult subjects.

10. The thought that my entire medical record could now be given to government investigators or lawyers makes me very uncomfortable. I do not want people I have never met reading detailed notes about my body, my mental health, my family, and my experiences as a transgender young person. I am very mistrustful of this administration receiving my medical records because of the hostile policies they have adopted that harm transgender people.

11. If, at the start, I had been told that my medical records might later be requested by the government, I would have been much more cautious about what I said in my

appointments. There are topics I would have avoided discussing. That would have made it harder for my providers to understand my situation and to treat me effectively.

12. Knowing that my records could be shared outside the CNH healthcare system also affects how I feel about seeking care in the future. It makes me hesitant to bring up sensitive issues with my doctors, even when I know that being open with doctors is important for my health.

13. I do not think that taking my name off the records would protect my identity. My medical records likely include specific details about my age, timeline of visits, type of treatment, and life circumstances that, put together, could point back to me.

14. I went to CNH because I needed medical help and believed it was a private place to talk about very personal issues. Having my records turned over to the government would feel like a serious loss of that privacy and of the trust I placed in the medical system.

15. For these reasons, I believe that turning over my medical records to the government would seriously harm me.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____     Dated: 11 / 14 / 2025

**Youth C.C.**

JA115

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

### DECLARATION OF PARENT D.D.

1. I am the parent of Child D.D., a minor who received medical care at Children's National Hospital ("CNH") between March 2022 and December 2024.

2. Throughout my child's care at CNH, my child, other family members, and I met with CNH providers and medical professionals. We also communicated with CNH by phone and through electronic messages.

3. In the course of these visits and communications, my child and I revealed sensitive information concerning my child's mental health, physical development, and their relationships in school, with peers, and with other family members. All of these disclosures were made to CNH medical providers for the purposes of diagnosis, formulation of treatment recommendations, and development of an appropriate treatment plan.

4. During the course of my child's care at CNH, my child participated in a mental health assessment conducted by a licensed mental health provider and received social and psychological support, all of which included sensitive and confidential conversations.

5. During the course of my child's care, my child received puberty blocking medication and hormone replacement therapy as recommended by their healthcare providers at CNH.

JA116

6. Follow-up appointments regularly included updates about my child's mental health, response to medications, on-going monitoring, and discussions about the effectiveness of the medical treatment my child was undergoing.

7. During my child's care, we trusted that the information we shared would stay strictly within CNH. I was reassured by CNH that our disclosures would remain confidential.

8. Disclosure of my child's medical records to government investigators would cause my child deep distress and intensify my anxiety and fears about their safety and well-being.

9. Information in my child's medical records is private and not available anywhere else. Disclosing it would undermine the safeguards we have carefully put in place to protect my child's future.

10. We chose CNH for its stellar reputation as a premier provider of pediatric healthcare and have always trusted that CNH would ensure the privacy of patient records.

11. Disclosure of my child's medical records to the government could cause them deep emotional harm and leave both my child and me vulnerable to the possibility of discrimination, harassment, or even unjust legal consequences.

12. Watching the government's present antagonism toward transgender people and their families only deepens my fear about my identity—and my child's—being exposed.

13. If my child's confidential medical information were shared with the government, it would represent a profound breach of trust in the healthcare system. My child would likely become fearful or unwilling to seek medical help in the future, severely affecting their access to essential care over the course of their life.

14. The release of my child's private medical information would result in significant and lasting harm.

JA117

15. Redacting our names from my child's medical records would not meaningfully protect our privacy once those records are shared with the government. Throughout my child's treatment, we provided CNH medical providers with countless sensitive details that could easily reveal our identities, including information about my child's school relationships, my occupation, our neighborhood, our family, friends, and more.

16. Revealing my name, and by extension my child's identity, in the context of litigation over safeguarding the privacy of our family's medical records, would cause my child serious emotional harm. It would also open our family up to potential harassment, bullying, and discrimination.

17. If we are not permitted to proceed under pseudonyms, we might have to withdraw this motion and abandon litigation for the safety of our child and our family.

18. For all the reasons above, I object to my child's medical records being shared with the government.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

JA118

JA119

*D.D.*
_____

**Parent D.D.**

Dated: 11/15/2025

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

**DECLARATION OF PARENT E.E.**

1. I am the parent of E.E. My child received medical care at Children's National Hospital ("CNH") from 2016 through some time in 2024. My child was seen by CNH physicians at both the Washington, D.C. and two Maryland CNH locations.

2. During this period, my child and I met with a range of CNH providers—physicians, nurses, mental health clinicians, and other staff. We also exchanged information with CNH through phone calls and electronic portal messages. I understand that CNH maintains comprehensive records of these visits and communications.

3. In the course of my child's care, we provided CNH with highly personal information about my child's physical health, emotional state, development, school life, family circumstances, friendships, and matters affecting their safety and stress levels. We shared this information for the purpose of receiving accurate medical evaluation and guidance.

4. My child also spoke with a licensed mental health provider at CNH for an assessment and follow-up. Those conversations involved sensitive subjects.

5. My child and I met with CNH physicians to discuss treatment options, the reasoning behind those options, and the risks and benefits involved. These discussions were private and central to decisions we made about my child's care.

JA120

6. Throughout my child's treatment, we understood that the information we disclosed would remain within the CNH medical system. We relied on assurances that my child's medical records would be kept confidential and used only to provide care and coordinate services.

7. My decision to seek treatment at CNH was based on its reputation for high-quality adolescent care and its ability to handle sensitive issues responsibly. Confidentiality was an essential part of that decision.

8. I am deeply concerned by the possibility that my child's full medical records could be given to the government. These records contain intensely personal information, including the fact that my child is transgender, along with details about their physical and mental health, family life, and private experiences. I do not believe government personnel should have access to this level of detail.

9. Disclosure of these records would be harmful to my child. My child already feels vulnerable because they are transgender, and learning that government investigators or lawyers might read their medical records would cause significant emotional distress. It would also raise fears about their safety and well-being.

10. My child is hesitant to speak openly with doctors. As a parent, I worry that disclosure of my child's medical records to government officials would compound my child's hesitancy to speak candidly with clinicians, which is essential to their health.

11. My child's medical records also contain historical and identifying information that is not publicly available elsewhere. Disclosure would undermine steps our family has taken to safeguard my child's future.

JA121

12. I do not believe removing our names from the records would protect my child's identity. Details such as age, timing of visits, school circumstances, and family structure could identify our family.

13. Allowing these records to be disclosed would break the trust on which our relationship with CNH was built. We shared sensitive information for the sole purpose of obtaining medical care, not for government review.

14. If our names were publicly linked to this case, it could identify my child and expose them to risk of harassment or discrimination. For that reason, if pseudonyms are not permitted, we would likely be forced to withdraw from this litigation to protect our child.

15. For all these reasons, I strongly object to the disclosure of my child's medical records to the government.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_E. E._
_____
**Parent E.E.**

Dated: _11/13/25_
_____

JA122

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

### DECLARATION OF YOUTH E.E.

1. My name is E.E. I sought care at Children's National Hospital ("CNH") because I required medical attention and trusted it would provide a confidential environment for discussing highly personal health matters. The disclosure of my records to the government would constitute a substantial violation of that privacy and would damage the trust I placed in the medical system and in CNH.

2. Between approximately 2016 and 2024, I received medical treatment at CNH, both in D.C. and at 2 Maryland facilities.

3. The knowledge that my records might be disclosed beyond the CNH healthcare system to government lawyers is deeply distressing. I believed when I was receiving treatment that the conversations and information I provided about my medical condition and treatment were confidential. I already have some mistrust of the medical system. And disclosing my confidential patient records, including information about medical care relating to me being transgender would invade my privacy. It would also make me even more hesitant in the future to seek and obtain care.

4. My healthcare providers at CNH routinely inquired about various aspects of my life, including my physical symptoms, emotional well-being, academic performance, and family dynamics. They asked about situations that caused me anxiety or made me feel

JA123

vulnerable. I provided truthful responses because I knew they needed accurate information to provide me appropriate medical care.

5. I am a transgender person. My CNH medical records likely contain information about intimate aspects of my physical development, and my experiences navigating the world as a transgender person. They also document private concerns and life experiences that I never intended for outsiders to access.

6. During follow-up visits, my providers evaluated not just my physical response to medication, but also my overall functioning—my emotional state, my performance at school, and my interpersonal relationships. These assessments were likely documented in detail in my medical records.

7. I have never voluntarily provided my medical records to a government entity nor did I ever anticipate that the Department of Justice would have access to my private medical information.

8. My CNH physicians prescribed medication as part of my treatment plan. This required ongoing monitoring through regular clinic visits, laboratory work, and physical examinations to assess my response to treatment and make any necessary modifications.

9. The possibility that my medical record might now be disclosed to government investigators or attorneys causes me significant distress. I do not want unfamiliar individuals examining detailed documentation about my physical development, my psychological state, my family relationships, and my personal experiences. I am particularly alarmed by the prospect of my medical information being given to the Department of Justice because of the hostility this administration has shown to transgender people.

JA124

10. Had I known at the beginning of my treatment that my medical records might subsequently be requested by the government, I would have been more guarded in my communications with providers. I might even have withheld certain information or discussed sensitive topics only in general terms.

11. During individual therapy sessions with mental and physical health providers, I discussed deeply personal matters about my identity, my struggles, and my experiences navigating adolescence. Much of what I shared I have disclosed only to either my immediate family or my medical providers.

12. When I disclosed personal information to my physicians and therapist, I understood it would be shared among healthcare professionals directly involved in my treatment. I did not believe that information shared in a medical setting would be transferred outside the healthcare context to a government agency.

13. I do not believe that redacting my name from the records would adequately protect my identity. My medical records likely contain identifying information such as my specific age, the dates and sequence of my appointments, the particular treatments I received, and details about my personal circumstances that, when considered together, would make me identifiable.

14. For the foregoing reasons, I believe that the disclosure of my medical records to the government would cause me serious harm. And that if I cannot proceed in this case under a pseudonym, I may face bullying, harassment, or discrimination.

15. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

E.E. *E.E.*  _____     Dated: 11/13/2025 11/13/2025
**Youth E.E.**

3

JA125

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

**DECLARATION OF PARENT F.F.**

1. I am the parent of Youth F.F., a young adult who, as a minor and young adult, received gender transition medical care at a Washington D.C location of Children's National Hospital ("CNH") and via telehealth from Maryland between 2020 and 2022.

2. I reside in Montgomery County, Maryland.

3. We selected CNH due to its reputation for high-quality gender transition care and because we believed the providers would handle sensitive issues with care and respect. We also relied on its strong reputation for having experienced national clinical experts who are up to date on the latest research in the field. CNH also offered an integrated experience for our child, inclusive of physicians and social workers and including integration of social-emotional factors.

4. The time when we sought treatment at CNH was one of the most challenging periods of my child's and my family's life. When we decided to seek care at CNH, my child and I believed that the private patient information we were disclosing would receive the highest level of privacy protections and would never be shared outside of CNH. We did not understand that my child's medical records could later be requested by federal government officials who are not part of their medical team. In fact, we took

JA126

extraordinary steps in treatment and in outside life, to keep my child's gender transition and treatment extremely private and within their exclusive control.

5. During the course of my child's care at CNH, my child and I, along with others in my family, had numerous visits with CNH physicians, nurses, mental health clinicians, and other providers. We additionally communicated with CNH through phone calls, electronic messages, and telehealth about my child's care.

6. Throughout those visits and communications, my child and I disclosed private sensitive information with CNH providers about my child's mental and emotional health, physical health and development, school experiences, friendships and family relationships, and times when my child felt stressed or unsafe. These discussions were part of helping CNH providers understand my child as a whole person so they could recommend and adjust treatment.

7. During my child's care at CNH, my child met separately with a mental health provider for an in-depth assessment and follow-up sessions. I also met with a mental health professional myself. My child spoke with that provider about matters that were extremely personal and that my child has not shared with people outside our immediate family and medical professionals.

8. My child's treatment at CNH was integrated with their psychiatric care at an outside facility and their records at CNH will reflect much of their mental health treatment.

9. While working with CNH, both my child and I discussed different treatment options, asked questions about possible side effects and long-term impacts, and talked through our concerns and adjusted treatment as needed. These were private, thoughtful conversations in which we relied on the providers' expertise and the confidentiality of the setting.

JA127

10. As part of the treatment plan, CNH prescribed medications for my child to address their medical issues. My child received puberty blocking medication and hormone replacement therapy as recommended by the healthcare providers at CNH. Those medications required regular monitoring, including follow-up visits, lab tests, and physical examinations.

11. Neither my child nor I have made my child's diagnoses or treatment history known to the federal government, nor would we ever willingly do so. We have not been contacted by federal officials about my child's care, and we have never been told that any part of my child's medical treatment is the subject of a federal government inquiry.

12. The idea that my child's medical record could be disclosed to the federal government is extremely upsetting to me and I am worried that such disclosure could affect my child's health and safety. Those records contain intimate information about my child's body, emotions, family situation, and private thoughts. I do not want government officials, who have never met my child, reading and interpreting those details.

13. I am aware of the government's current public animus toward transgender people, and it adds to my fear regarding the release of the identities of myself and my child.

14. As a parent, I view the confidentiality of medical records as an important part of the relationship between families and health-care providers. Like any parent, if we had known there was a possibility our information would be shared with the government, we would have avoided, as much as possible, revealing sensitive information to my child's doctors, potentially delaying what was life-saving treatment and leaving their doctors without full information. If I know that our private conversations with doctors might be

JA128

taken out of context and provided to the government, I will be more cautious about what I share and where I seek treatment.

15. We shared very personal private medical information with CNH because we understood it was necessary for my child's care and because we believed it would remain within the medical system. Disclosing that information to the government would be a serious violation of our expectations and our trust in the medical system.

16. Merely redacting our names from any medical documentation relating to my child's care that is provided to the government would not prevent our family from being identified. During the course of my child's care, we disclosed innumerable sensitive facts to CNH medical providers that could be used to identify me and my child. This includes information about my child's relationships in school, my occupation, our neighborhood, family and friends, and more.

17. Public disclosure of my name, which would necessarily identify my child, or the disclosure of the name of my child, would also cause us severe emotional strain and expose my child and our family to bullying and harassment, discrimination, and even violence. My child has already experienced bullying and harassment because of being transgender, which has affected their life and mental health.

18. With the exception of a small group of trusted members of my community, I have not disclosed, nor will I disclose, my involvement or my child's involvement in this litigation.

19. If we are not permitted to proceed under pseudonyms, we may have to withdraw this motion and abandon litigation for the safety of our child and our family.

20. For all the reasons above, I strongly object to my child's medical records being shared with the government.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Parent F.F.

Parent F.F.

Dated: 11/17/25

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

## DECLARATION OF YOUTH F.F.

1. I am Youth F.F., a young adult who as a minor and young adult received gender transition medical care at: the Washington D.C. location of Children's National Hospital ("CNH"), and via telehealth from Maryland between 2020 and 2022.

2. During my care at CNH, I, along with others in my family, visited with CNH physicians, nurses, mental health clinicians, and other health-care professionals in person, by telephone, and via electronic communication.

3. Throughout these visits, we shared details about my life, mental and physical health, and other personal information that I only shared because of the privacy I knew I was afforded. I disclosed this in confidence because it was necessary for my care. If this information was to be shared with anyone without my consent, I would feel distrustful of the health-care system, and feel fearful of continuing to seek medical treatment in the future.

4. During my care, me and my family discussed treatment options privately, making decisions together about which treatment options to pursue based on: the side effects, long term effects, risks, and benefits.

5. Follow up appointments included updates about my health, feedback on the medication I was receiving, and how I thought the treatment was going.

JA131

6. I have never been contacted by the federal government regarding my medical care. Nobody from the federal government has informed me that my medical history has been requested. Me and my family would never tell the federal government any medical information.

7. Me and my family understood that the information I shared would be protected with the highest level of privacy, and would not be shared with anyone outside of CNH without explicit consent. I have not provided any consent, and I do not want to provide any consent.

8. As a transgender person, I do not feel safe in public due to harassment I have experienced in public using public transportation, walking around, at my job, and at school. I have experienced unfair treatment as a transgender person, and private medical information regarding my medical transition being shared with anyone would put me at more risk for harassment and discrimination for being transgender in the aforementioned public spaces.

9. I am aware that at this time, the federal government is acting viciously towards transgender individuals, which makes me more fearful of sharing this information with the federal government out of fear for more discrimination.

10. I went through the process of receiving this care with the understanding that the information I shared was confidential. For that trust to be violated, would mean I would be less likely to seek out any form of medical care in the future, and/or less likely to share sensitive information with any professionals I may meet with. This would compromise my ability to get proper medical care ever again.

11. My family's privacy and security would not be protected by redacting our names. This is because the information I reported to CNH healthcare providers—such as my personal

relationships, where I went to school, where I lived, and more— could identify me and my family regardless of whether or not my name was submitted alongside my most sensitive and identifiable information.

12. I have not shared my family's involvement in this litigation with anyone outside of my family or legal counsel.

13. My name being shared publicly would put me at risk for harm, and would cause severe emotional distress to me and my family. Releasing any medical information to the federal government would put us at the risk of harassment, discrimination, and violence.

14. For my privacy and security to remain protected throughout the duration of this process, I must proceed under a pseudonym in an effort to protect my most sensitive and identifiable information.

15. For all of the reasons above, I object to my medical records being obtained by the federal government.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Youth F.F.

Dated: 11/15/2025

JA133

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

**DECLARATION OF PARENT G.G.**

1. I am the parent of Child G.G., a minor who received medical care at Washington D.C./Maryland locations of Children's National Hospital ("CNH") between 2023 and 2025. That care included transgender health care.

2. We chose CNH because of its reputation for high-quality pediatric and adolescent medicine and because we believed the providers would handle sensitive issues with care and respect. I relied on the understanding that my child's medical information would stay within the health-care system and remain private.

3. When we decided to seek care at CNH, I understood that my child's medical information would be treated as confidential and used only by health-care professionals involved in my child's treatment. I did not understand that my child's medical records could later be requested by government officials who are not part of their medical team.

4. During the course of my child's care at CNH, my child and I, along with others in my family, visited with CNH medical professionals in person, by telephone and by electronic messages.

5. During those visits and communications, my child and I disclosed private sensitive information about my child's mental and physical health, emotional state, development, school experiences, relationships with peers and family members, and more. All of this

JA134

information was shared with medical providers so they could provide diagnoses, treatment recommendations, and treatment plans for my child.

6. My child met separately with a licensed mental health professional at CNH for an in-depth assessment and follow-up sessions. My child spoke with that provider about matters that were extremely personal and that my child has not shared with people outside our immediate family and the medical team.

7. My child and I also met with CNH physicians to discuss different treatment options, to ask questions, and to talk through concerns. These were private in-depth conversations in which we relied on the providers' expertise and on the confidentiality of the setting.

8. We had follow-up appointments with CNH providers, which included updates about my child's health and mental health. At these follow up visits, health care providers regularly asked for updates about how my child was feeling—physically, mentally, and emotionally. They asked about school, friendships, and family life, and about how my child was handling day-to-day stresses. These discussions were documented in detailed notes in my child's medical record.

9. Neither my child nor I have made my child's diagnoses and treatments known to the federal government. We have not been contacted by federal officials about my child's care and we have not been informed that any part of my child's treatment is the subject of a government investigation.

10. Both my child and I understood that our medical records might be used within the health-care system—for example, by other clinicians at CNH or our local doctors—to coordinate care and handle routine matters like billing. I did not expect, and did not

agree, that my child's medical record could be turned over to government investigators or prosecutors who have no role in my child's treatment.

11. Disclosure of my child's medical records to the government would be extremely upsetting to me and my child. Those records contain intimate information about my child's body, emotions, family situation, and private thoughts that should not be read and interpreted by government officials, who have never met my child and lack all context.

12. My child is transgender and already feels exposed and at risk in many public settings. Revelation of my child's records would take their most personal information out of the safe space of the doctor's office and place it in the hands of strangers, which would cause serious emotional distress for my child.

13. Taking my child's records out of the medical context and giving them to the government will also make me more cautious in what we share with doctors and where we seek treatment. Disclosure would mean I have no control over how my child's information is used, who can read it, and how long it will be kept.

14. Our privacy would not be protected by merely redacting our names from any medical documentation that is provided to the government. During the course of my child's care, we disclosed innumerable details to CNH medical providers, such as age, timing and type of treatment, family structure, school circumstances, and other specific facts, that could be used to identify me and my child.

15. We needed to disclose very personal information to CNH because it was necessary for my child's care and because we believed it would remain within the medical system. Turning that same information over to the government would be contrary to the

JA136

expectations and understanding under which we sought treatment and would seriously undermine our trust in the health care system.

16. Given the current climate and my child's experience as a transgender young person, I fear that public identification would expose my child and our family to bullying, harassment, and discrimination, and would cause my child significant emotional harm.

17. If we are not permitted to proceed under pseudonyms, we may have to withdraw this motion and abandon litigation for the safety of our child and our family.

18. For all the reasons above, I object to my child's medical records being shared with the government.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
**Parent G.G.**

Dated: __11/13/2025__

JA137

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

**DECLARATION OF PARENT H.H.**

1. I am the parent of Child H.H., a minor who received medical care at Children's National Hospital ("CNH") between approximately December 2022 and June 2025. That care encompassed a range of medical care, including transgender-specific healthcare.

2. During the course of my child's care at CNH, my child and I, along with other members of our family, met with CNH physicians, nurses, and other staff. We also stayed in contact with CNH through phone calls and electronic messages.

3. I believe there are extensive medical records relating to my child's care held by CNH.

4. In those visits and communications, my child and I shared private information about my child's physical health, mental and emotional well-being, development and maturation, school life, relationships with peers and family members, and concerns about safety and stress. We understood that this information was gathered so CNH providers could assess my child's health, offer treatment recommendations, and track my child's progress over time.

5. My child and I met with physicians to discuss possible treatment options, the risks and benefits of those options, and our questions and concerns. These were careful, in-depth conversations about my child's health and well-being.

JA138

6. At various times, we spoke privately with CNH providers to ask questions and share concerns. We depended on those confidential discussions to determine how to best support our child.

7. Follow-up appointments included updates about my child's mental health, daily functioning, response to medications, and school and family life. These visits likely generated detailed notes in my child's medical record.

8. We consistently viewed the details we shared with CNH as sensitive medical information. It was our understanding that this information would be accessed only by healthcare professionals involved in my child's treatment and used solely to provide and coordinate care. We did not expect it to be released to anyone outside the healthcare system.

9. We chose CNH because of the providers' careful and thoughtful approach to transgender adolescent healthcare and the extensive processes and protocols in place. Our decision to seek care there was also based in part on our understanding that my child's medical information would be kept confidential, and CNH assured us that my child's records would remain confidential.

10. The possibility that my child's medical records could be handed over to the government is deeply distressing to me. These records contain highly personal information about my child's body, mental health, family situation, and private thoughts. I do not want government personnel to have access to or review these details. I am also concerned for my child's safety if the current administration were to obtain these records, given what I have seen it do to target and harm transgender individuals.

JA139

11. Releasing my child's medical records to the government would be extremely upsetting for them. My child already experiences a sense of vulnerability and understands the risks they face as a transgender person. The thought that government officials could scrutinize the most private aspects of their life would make my child feel exposed and targeted. It would also increase my anxiety about their safety and overall well-being.

12. I am concerned that if my child's records are disclosed in this case, it will affect how my child approaches healthcare in the future. My child has conveyed to me that the idea of government officials reading their medical chart gives them pause about speaking freely with doctors and therapists. If they do not feel they can be honest, they may delay or avoid seeking care they need. That makes me concerned as a parent about my child's ability to get the healthcare they need going forward.

13. I am additionally concerned that releasing my child's medical records would expose unique information about them that cannot be found elsewhere and has been essential in safeguarding their personal history.

14. As a parent, the idea of my child's confidential medical information being shared with the government would represent a profound violation of trust in the healthcare system. Like any parent, it would make me far more cautious about what we share in future appointments and influence where we choose to seek care.

15. The consequences of releasing my child's medical records would be far-reaching. Once these records are in government hands, my child would have no control over who reviews them, how they are used, or how long they are kept. This could result in lasting harm to their privacy and well-being.

JA140

16. I do not think that simply removing our names from my child's records would adequately safeguard our privacy. Throughout my child's care, we shared many details—like age, timing of appointments, family structure, school information, and other life events—that, when taken together, could reveal our family's identity.

17. Providing my child's medical records to the government would go against the expectations of privacy that guided our decision to seek care. We shared deeply personal information with CNH providers, believing it would remain protected within the healthcare system and be used only to care for my child.

18. Making my name public, which would inevitably reveal my child's identity, or releasing my child's name in a legal matter concerning their medical records, would inflict serious emotional distress on my child and expose us to possible threats of bullying, harassment, and discrimination.

19. If I am not allowed to use pseudonyms, I will probably need to withdraw from this case to safeguard my child's privacy and ensure their safety.

20. For all the reasons above, I strongly object to my child's medical records being shared with the government.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Parent H.H._

**Parent H.H.**

Dated: 11/14/2025

JA141

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

**AFFIDAVIT OF EVE L. HILL, ESQ., IN SUPPORT OF**
**MOTION TO QUASH SUBPOENA DUCES TECUM**

I, Eve L. Hill, Esq., state as follows:

1.  I am a partner at the law firm Brown Goldstein and Levy, LLP. I am co-counsel for Movants in this case and an active member of the Maryland bar. I submit this affidavit in support of Movants' Motion to Quash Subpoena Duces Tecum.

2.  I submit this affidavit to set forth facts demonstrating that the U.S. Department of Justice (DOJ) served an administrative subpoena on Children's National Hospital (CNH) that seeks private identifying patient information relating to Movants for the purpose of intimidating medical providers and to shut down access to transgender health care for adolescent patients.

3.  On January 20, 2025, President Trump issued Executive Order 14168, which directs federal agencies to revise policies, guidance, and enforcement practices to define "sex" exclusively as "an individual's immutable classification as either male or female," which "does not include the concept of gender identity." Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Exhibit A). The executive order directs federal agencies to apply that definition throughout their activities. *Id.*

4.  On January 28, 2025, President Trump issued an executive order directing federal agencies to immediately ensure institutions receiving federal research or education grants end transgender healthcare for minors, including prioritizing federal law enforcement actions related

1

JA142

to the provision of such treatment. Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025) (Exhibit B).

5.    On January 30, 2025, CNH issued a public statement announcing it was "pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients," citing "guidelines in the Executive Order issued by the White House" earlier that week. *Children's National Hospital Statement on Executive Order*, CHILD.'S NAT'L HOSP. (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order (Exhibit C).

6.    On February 3 and March 4, 2025, the White House issued articles stating that healthcare providers had paused treatment for transgender minors and describing that result as the "intended effect" of Executive Order 14168. The White House highlighted CNH in its statement. *President Trump Is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/ (Exhibit D); *President Trump Is Protecting America's Children*, THE WHITE HOUSE (Mar. 4, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-is-protecting-americas-children/ (Exhibit E).

7.    On May 28, 2025, the Administrator of the Centers for Medicare and Medicaid Services issued an urgent letter to nine hospitals, including CNH, seeking information about their provision of transgender healthcare for children as part of a "comprehensive review of federal payment policies." Dr. Mehmet Oz, *Urgent Review of Quality Standards and Gender Transition Procedures*, U.S. DEP'T OF HEALTH & HUM. SERVS. (May 28, 2025), https://www.cms.gov/files/document/hospital-oversight-letter-generic.pdf (Exhibit F).

2

JA143

8.      On June 11, 2025, the Assistant Attorney General for the Civil Division issued a memorandum directing DOJ attorneys to prioritize investigations and enforcement related to Executive Orders 14168 and 14187, and associated directives. Brett A. Shumate, *Memorandum to All Civil Division Employees*, U.S. DEP'T OF JUST. (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl (Exhibit G).

9.      On June 30, 2025, *The Wall Street Journal* reported the identities of the nine hospitals receiving the May 28 CMS letter, including CNH, and reported CMS statements regarding potential Medicaid exclusion of transgender healthcare. Liz Essley Whyte, *Trump Administration Weighs Eliminating Funds for Hospitals Offering Gender Care to Minors*, WALL STREET JOURNAL (Jun. 30, 2025), https://www.wsj.com/health/healthcare/gender-surgery-childrens-hospitals-trump-282c4cbb?st=TzqmqA&reflink=article_copyURL_share. (Exhibit H).

10.     On July 9, 2025, DOJ issued a press release stating it had issued "more than 20 subpoenas to doctors and clinics" that provide healthcare to transgender minors. *Press Release: Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical (Exhibit I).

11.     On July 10, 2025, *The New York Times* reported that the DOJ subpoenas demanded significant confidential patient information and were part of a coordinated federal effort to curtail medical treatment for transgender minors. Azeen Ghorayshi & Glenn Thrush, *Justice Dept. Demands Patient Details from Trans Medicine Providers*, N.Y. TIMES (Jul. 10, 2025), https://www.nytimes.com/2025/07/10/health/transgender-medicine-minors-trump-subpoena.html (Exhibit J).

3

12.     On July 18, 2025, The *Washington Post* reported that CNH announced it would stop prescribing medications for transgender adolescents. Jenna Portnoy et al., *Children's National Hospital to End Gender-Transition Care*, WASH. POST (Jul. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/07/18/children-national-ends-gender-transition-care/ (Exhibit K). The *Washington Post* also reported that CNH declined to say whether it had received a DOJ subpoena, and that DOJ declined to comment. *Id.*

13.     On July 21, 2025, the Attorney General posted publicly on X referencing CNH and stating that DOJ "will continue enforcing the law against institutions like Children's National." Attorney General Pamela Bondi (@AGPamBondi), X (July 21, 2025, 2:28 PM), https://x.com/AGPamBondi/status/1947362978526814579 (Exhibit L).

14.     On July 25, 2025, the White House publicly highlighted Children's National's termination of treatment for transgender patients under 19. *President Trump Promised to End Child Sexual Mutilation – And He Delivered*, THE WHITE HOUSE (Jul. 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/ (Exhibit M)

15.     At least five of the nine hospitals receiving the May 28 CMS letter have confirmed or been reported as receiving DOJ subpoenas: Boston Children's Hospital, Children's Hospital Colorado, Children's Hospital Los Angeles, Children's Hospital of Philadelphia, and UPMC Children's Hospital of Pittsburgh. *In Re: Administrative Subpoena No. 25-1431-019*, 1:25-mc-91324 (D. Mass. July 8, 2025) (Dkt. No. 5-1) (Boston Children's Hospital subpoena) (Exhibit N); John Ingold, *Trump Administration Subpoenas Children's Hospital Colorado Over Gender-Affirming Care*, THE COLO. SUN (Jul. 18, 2025), https://coloradosun.com/2025/07/18/childrens-hospital-colorado-subpoena-gender-affirming-

4

care/ (Exhibit O); *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025) (Dkt. No. 1, Ex. F) (Children's Hospital of Philadelphia subpoena) (Exhibit P); Alec Schemmel, *FBI Launches Probe Into 3 Children's Hospitals for Alleged Genital Mutilation of Minors*, FOX NEWS (Jun. 24, 2025), https://www.foxnews.com/politics/fbi-launches-probes-against-3-childrens-hospitals-genital-mutilation-minors (Exhibit Q); *In Re 2025 UPMC Subpoena*, 2:25-mc-01069 (W.D. Pa. Sept. 24, 2025) (Dkt. No. 1) (motion to quash subpoena to UPMC) (Exhibit R).

16.     Additional providers, including QueerDoc, PLLC and University of Michigan Health, have acknowledged receipt of DOJ subpoenas concerning their care for transgender youth. *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-cv-00042, 2025 WL 3013568, *1 (W.D. Wash. Oct. 27, 2025) (Exhibit S); Josh Kovensky & Kate Riga, *Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught*, THE TALKING POINTS MEMO (Aug. 25, 2025), https://talkingpointsmemo.com/news/university-michigan-transgender-health-care-minors (Exhibit T).

17.     All publicly available subpoenas include the same 15 requests for documents, including:

> a.  Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."
>
> b.  Request 12: "For each such patient identified in Subpoena [Request 11], *supra*, documents relating to the clinical indications,

5

JA146

diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

c. Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks."

*In Re: Administrative Subpoena No. 25-1431-019*, 1:25-mc-91324 (D. Mass. July 8, 2025) (Dkt. No. 5-1) (Boston Children's Hospital subpoena); *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025) (Dkt. No. 1, Ex. F) (Children's Hospital of Philadelphia subpoena).

18.     CNH published a notice stating that effective August 30, 2025, it would discontinue prescribing medications for transgender minors due to "escalating legal and regulatory risks." *LGBTQ+ Care and Support: A Message for Existing and New Patients*, CHILD.'S NAT'L HOSP., https://www.childrensnational.org/get-care/departments/lgbtq-care-and-support (last visited Nov. 12, 2025) (Exhibit U)

19.     Prior to the recent cuts to transgender healthcare, CNH was one of the earliest providers of such care in the country and one of the major providers of such care for children and young people in the mid-Atlantic region. *See Gender Development Program*, CHILD.'S NAT'L HOSP., https://www.childrensnational.org/get-care/departments/gender-development-program (last visited Nov. 13, 2025) (Exhibit V).

20.     On November 14, 2025, Counsel for Movants sought confirmation from DOJ that CNH received a subpoena. Ross Goldstein, Assistant Director at DOJ's Consumer Protection

6

Branch, confirmed that CNH received a subpoena and that it is "substantively identical to those served on Boston Children's and CHOP."

21. Neither DOJ nor CNH has sought the consent of Movants to receive or submit their medical information.

22. I affirm that the foregoing is true and correct to the best of my knowledge and belief.


_Eve L. Hill, Esq._

Dated: _November 17, 2025_

JA148

**EXHIBIT A**

JA149

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    8615

## Presidential Documents

Executive Order 14168 of January 20, 2025

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1.** *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2.** *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3. *Recognizing Women Are Biologically Distinct From Men.*** (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4. *Privacy in Intimate Spaces.*** (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

JA151

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

Sec. 6. *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

Sec. 7. *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021);

JA152

**8618**   Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

**EXHIBIT B**

## Presidential Documents

Executive Order 14187 of January 28, 2025

### Protecting Children From Chemical and Surgical Mutilation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Policy and Purpose.* Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

**Sec. 2.** *Definitions.* For the purposes of this order:

(a) The term "child" or "children" means an individual or individuals under 19 years of age.

(b) The term "pediatric" means relating to the medical care of a child.

(c) The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

**Sec. 3.** *Ending Reliance on Junk Science.* (a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's "Standards of Care Version 8"; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation.

**Sec. 4.** *Defunding Chemical and Surgical Mutilation.* The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

**Sec. 5.** *Additional Directives to the Secretary of HHS.* (a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled "HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy" and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

**Sec. 6.** *TRICARE.* The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

**Sec. 7.** *Requirements for Insurance Carriers.* The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

**Sec. 8.** *Directives to the Department of Justice.* The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation;

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

**Sec. 9.** *Enforcing Adequate Progress.* Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

**Sec. 10.** *Severability.* If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 11.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 28, 2025.*

[FR Doc. 2025–02194
Filed 1–31–25; 8:45 am]
Billing code 3395–F4–P

JA157

# EXHIBIT C

JA158

dren's National H... 1/10/25, 3:46 PM    Children's National Hospital Statement on Executive Order | Children's National Hospital    Children's National

 Children's National.

**MENU**

About Us  ›  Newsroom

# Children's National Hospital Statement on Executive Order

January 30, 2025

Children's National is committed to providing compassionate and comprehensive care in accordance with the law. As a result, we are currently pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients, per the guidelines in the Executive Order issued by the White House this week. Children's National already does not perform gender affirming surgery for minors.

We recognize the impact this change will have, and our commitment to creating a better future for children and families remains at the forefront of our mission. We will do everything we can to ensure the same uninterrupted access to mental health counseling, social support, and holistic and respectful care for every patient at Children's National.

We are working directly with patients and providers to ensure every patient has access to the information and support services they need, and we appreciate their continued trust and understanding as we work through these changes.

## Media Contact

Email     Call 202-476-4500

JA159

## About Children's National Hospital



**Children's National.**

Donate          Pay Your Bill

**About Us**                          **Residencies and Fellowships**

**Careers**

**Contact Us**                        **Children's National Hospital Foundation**

**Departments**                       **Español**

**In the Community**                  **International Patients**

**News and Events**                   **Research News** ↗

**Price Transparency**                **Wellness Advice** ↗

📍 111 Michigan Avenue NW, Washington DC 20010

📞 202-476-5000

f          📷          ♪          in          ▶

JA160

Children's National Ho... 11/18/25, 3:46 PM ... Children's National Hospital Statement on Executive Order | Children's National Hospital

 

© Children's National Hospital 2025

Terms of Use | Patient Family Rights | Report a Compliance Concern | Web Accessibility

JA161

# EXHIBIT D

President Trump is Delivering on His Commitment to Protect our Kids – The White House

The Democrat Shutdown is Officially Over After 42 Days, 22 Hours and 25 Minutes.

*The* WHITE HOUSE

ARTICLES

President Trump is Delivering on His Commitment to Protect our Kids

The White House

February 3, 2025

Last week, President Donald J. Trump <u>took executive action</u> to protect American children from irreversible chemical and surgical mutilation.

**It's already having its intended effect — preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex.** Hospitals around the country are taking action to downsize or eliminate their so-called "gender-affirming care" programs:

- **NEW YORK:** NYU Langone Health has <u>started</u> canceling appointments for so-called "gender-affirming care" involving minors. They canceled appointments for "two 12-year-olds who had been scheduled to receive implants that dispense puberty-blocking medication."

- **COLORADO:** Denver Health <u>announced</u> it would stop performing sex change surgeries on minor children, while UCHealth <u>said</u> it is ending so-called "gender-affirming care" for all minors.

- **VIRGINIA:** VCU Health and Children's Hospital of Richmond have <u>"suspended"</u> providing transgender-related medication and surgeries for minors, while UVA Health has <u>"suspended"</u> all transgender-related services for minors.

- **WASHINGTON, D.C.:** Children's National Hospital has <u>"paused"</u> prescribing puberty blockers and hormone therapies for minors, while Northwest Washington Hospital has <u>done the same</u>.

JA163

their transge **ILLINOIS:** Lurie Children's Hospital of Chicago is "reviewing" their transgender-related services for minors.

- **PENNSYLVANIA:** Children's Hospital of Philadelphia is "closely reviewing" the transgender-related services they provide for minors.

President Trump will always protect American children.

**Promises made, promises kept – again.**

 

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

JA164

Kids -- The White14/13/25, 3:48 PM

President Trump is Delivering on His Commitment to Protect our Kids – The White House

FOUNDING FATHERS

THE SIGNERS

Subscribe to The White House newsletter

Your email

**SIGN UP**

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

JA165

# EXHIBIT E

JA166

The Democrat Shutdown is Officially Over After 42 Days, 22 Hours and 25 Minutes.

*The* WHITE HOUSE

ARTICLES

President Trump is Protecting America's Children

The White House

March 4, 2025

President Donald J. Trump knows America's children are our future — and he'll never stop fighting for their right to a healthy, productive upbringing and childhood. That's why President Trump immediately took action to undo the damaging policies of the Biden Administration on indoctrinating America's most vulnerable with dangerous, radical policies.

- President Trump made it the official policy of the U.S. government that there are only two sexes.

- President Trump ended the unfair, demeaning practice of forcing women to compete against men in sports — which resulted in the NCAA changing its rules.
  - The Department of Education launched investigations into the California Interscholastic Federation and the Minnesota State High School League over their failures to comply.

- Health systems across the nation stopped or downsized their sex change programs for minors following President Trump's "Protecting Children from Chemical and Surgical Mutilation" executive order.
  - In Illinois, Chicago's Lurie Children's Hospital paused sex-change surgeries for patients under 19 as it "work[s] to understand the rapidly evolving environment."

  - In Colorado, Denver Health announced it would stop performing sex change surgeries on minor children, while UCHealth said it was ending so-called "gender-affirming care" for all minors.

JA167

- In Washington, D.C., Children's National Hospital "paused" prescribing puberty blockers and hormone therapies for minors, while Northwest Washington Hospital did the same.

  - In Virginia, VCU Health and Children's Hospital of Richmond "suspended" providing transgender-related medication and surgeries for minors, while UVA Health also "suspended" transgender-related services for minors.

- President Trump ended the radical, un-American indoctrination of America's children by eliminating support for divisive, radical "gender ideology" and "equity ideology," and protecting parents' rights.

- President Trump banned COVID-19 vaccine mandates at schools that receive federal funding.



NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

JA168

11/13/25, 3:49 PM    President Trump is Protecting America's Children – The White House

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

Subscribe to The White House newsletter

Your email

SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

JA169

11/13/25, 3:49 PM

President Trump is Protecting America's Children — The White House

Privacy

**EXHIBIT F**

JA171



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

May 28, 2025

**SUBJECT:** Urgent Review of Quality Standards and Gender Transition Procedures

As the Administrator of the Centers for Medicare & Medicaid Services ("CMS" or "the Agency") and as part of CMS's standard healthcare oversight activities, I am writing to address significant issues concerning quality standards and specific procedures affecting children at your institution.

As articulated in recent communications[1] from CMS and a comprehensive review released by the U.S. Department of Health and Human Services ("the Department"), the United States Government has serious concerns with medical interventions for gender dysphoria in children. These interventions include surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt, for purposes of treating gender dysphoria, to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. These interventions also include, but are not limited to, the use of puberty blockers, including GnRH agonists and other procedures, approaches, or modalities, to delay the onset or progression of normally-timed puberty for purposes of treating gender dysphoria, as well as the use of sex hormones, such as estrogen, progesterone, or testosterone, and androgen blockers to align an individual's physical appearance with an identity that differs from his or her sex. Based on the review cited above, CMS believes that these interventions were initiated with an underdeveloped body of evidence, lack reliable evidence of benefits for minors, and are now known to carry serious risks of long-term and irreparable harm.[2]

Consistent with CMS's obligations to ensure baseline quality standards at institutions participating in the Medicare and Medicaid programs, CMS asks for your cooperation in understanding the following issues:

**Quality Standards Adherence**

CMS is obligated to monitor potential adverse outcomes in care across the healthcare market. Consistent with the agency's communications with various healthcare entities outlining concerns with regard to medical interventions for gender dysphoria in children, CMS requests your response within 30 days regarding your institution's policies and procedures on the following:

1. *The adequacy of informed consent protocols for children* with gender dysphoria, including how children are deemed capable of making these potentially life-changing decisions and when parental consent is required;

---

[1] https://www.cms.gov/files/document/letter-stm.pdf
[2] https://www.hhs.gov/press-room/gender-dysphoria-report-release.html

2. *Changes to clinical practice guidelines and protocols* that your institution plans to enact in light of the recent <u>comprehensive review</u>[3] of medical evidence and corresponding guidance released by the Department; and

3. *Any adverse events* related to these procedures, particularly children who later look to de-transition.

**Gender Transition Procedures Financial Review**

CMS has an obligation to be a good steward of taxpayer dollars. When it comes to surgeries, a per-episode cost of surgeries related to gender dysphoria ranges from $53,645 - $133,911 (compared to a typical pediatrician's salary range of $192,000 - $249,300 a year). Accordingly, the Agency is conducting a comprehensive review of federal payment policies related to gender transition procedures for patients under 19 years of age. A non-exhaustive list of potentially relevant diagnosis and procedure codes are included in Appendix A, as a point of reference. Within 30 days, please provide complete financial data for all pediatric sex trait modifications performed at your institution and paid, in whole or in part, by the federal government, including:

1. All billing codes utilized for pediatric sex trait modifications (and that correspond with pediatric sex trait modification procedures not determined to be medically necessary)

2. Facility- and Provider-level revenue – or utilization data – generated, directly or indirectly, from these procedures (2020-present)

3. Facility- and Provider-level operating and profit margins for each procedure type (for your institution as well as directly or indirectly owned and / or affiliated providers)

4. Projected revenue forecasts for these service lines.

CMS takes these matters extremely seriously. Our primary concern is ensuring that vulnerable pediatric populations receive evidence-based care that meets the highest quality standards while ensuring appropriate stewardship of federal healthcare resources.

Sincerely,

/s/

Dr. Mehmet Oz

---

[3] https://www.hhs.gov/press-room/gender-dysphoria-report-release.html

Appendix A

**Diagnosis Codes (ICD-10-CM)**

| Code | Description |
|---|---|
| F64.0 | Transsexualism |
| F64.1 | Dual role transvestism |
| F64.2 | Gender identity disorder of childhood |
| F64.8 | Other gender identity disorders |
| F64.9 | Gender identity disorder, unspecified |
| Z87.890 | Personal history of sex reassignment |

**Procedure Codes**

The following procedure codes may be associated with use in medical interventions for gender dysphoria in children, when included with a corresponding Diagnosis Code listed above and performed on patients under 19 years of age.

| Code | Description |
|---|---|
| 11950 | Subcutaneous injection of filling material; 1 cc or less |
| 11951 | Subcutaneous injection of filling material (e.g., collagen); 1.1 to 5.0 cc |
| 11952 | Subcutaneous injection of filling material (e.g., collagen); 5.1 to 10.0 cc |
| 11954 | Subcutaneous injection of filling material (e.g., collagen); over 10.0 cc |
| 14041 | Adjacent tissue transfer or rearrangement, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet; 10.1 sq cm to 30.0 sq cm |
| 14301 | Adjacent tissue transfer or rearrangement, any area; 30.1 sq cm to 60.0 sq cm |
| 14302 | Adjacent tissue transfer or rearrangement, any area; each additional 30.0 sq cm |
| 15100 | Split-thickness autograft, trunk, arms, legs; first 100 sq cm or less |
| 15101 | Split-thickness autograft, trunk, arms, legs; each additional 100 sq cm |
| 15200 | Full thickness graft, free, including direct closure of donor site, trunk; 20 sq cm or less |
| 15201 | Full thickness graft, free, including direct closure of donor site, trunk; each additional 20 sq cm |
| 15240 | Full thickness graft, free, including direct closure of donor site, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands, and/or feet; 20 sq cm or less |
| 15241 | Full thickness graft, free, including direct closure of donor site, trunk; each additional 20 sq cm |
| 15750 | Neurovascular pedicle flap |
| 15756 | Free muscle or myocutaneous flap with microvascular anastomosis |
| 15757 | Free skin flap with microvascular anastomosis |
| 15758 | Free fascial flap with microvascular anastomosis |
| 15769 | Grafting of autologous soft tissue, other, harvested by direct excision |
| 15771 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; 50 cc or less injectate |
| 15772 | Grafting of autologous fat harvested by liposuction technique to trunk, breasts, scalp, arms, and/or legs; each additional 50 cc injectate |
| 15773 | Grafting of autologous fat harvested by liposuction technique to face, eyelids, mouth, neck, ears, orbits, genitalia, hands, and/or feet; 25 cc or less injectate |

JA174

| 15774 | Grafting of autologous fat harvested by liposuction technique to face, eyelids, mouth, neck, ears, orbits, genitalia, hands, and/or feet; each additional 25 cc injectate |
|---|---|
| 15775 | Punch graft for hair transplant; 1 to 15 punch grafts |
| 15776 | Punch graft for hair transplant; more than 15 punch grafts |
| 15820 | Blepharoplasty, lower eyelid |
| 15821 | Blepharoplasty, lower eyelid; with extensive herniated fat pad |
| 15822 | Blepharoplasty, upper eyelid |
| 15823 | Blepharoplasty, upper eyelid; with excessive skin weighting down lid |
| 15824 | Rhytidectomy; forehead |
| 15825 | Rhytidectomy; neck with platysmal tightening |
| 15826 | Rhytidectomy; glabellar frown lines |
| 15828 | Rhytidectomy; cheek, chin, and neck |
| 15829 | Rhytidectomy; superficial musculoaponeurotic system (SMAS) flap |
| 15830 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); abdomen, infraumbilical panniculectomy |
| 15832 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); thigh |
| 15833 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); leg |
| 15834 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); hip |
| 15835 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); buttock |
| 15836 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); arm |
| 15837 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); forearm or hand |
| 15838 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); submental fat pad |
| 15839 | Excision, excessive skin and subcutaneous tissue (includes lipectomy); other area |
| 15876 | Suction assisted lipectomy; head and neck |
| 15877 | Suction assisted lipectomy; trunk |
| 15878 | Suction assisted lipectomy; upper extremity |
| 15879 | Suction assisted lipectomy; other specified sites |
| 17380 | Electrolysis epilation, each 30 minutes |
| 19303 | Mastectomy, simple, complete |
| 19304 | Mastectomy, subcutaneous |
| 19316 | Mastopexy |
| 19318 | Breast reduction |
| 19324 | Breast augmentation with implant (Mammaplasty, augmentation; without prosthetic implant) |
| 19325 | Breast augmentation with implant |
| 19340 | Insertion of breast implant on same day of mastectomy |
| 19350 | Nipple/areola reconstruction |
| 19357 | Breast reconstruction, immediate or delayed, with tissue expander, including subsequent expansion |
| 20969 | Free osteocutaneous flap with microvascular anastomosis; other than iliac crest, metatarsal, or great toe |
| 20970 | Free osteocutaneous flap with microvascular anastomosis; iliac crest |
| 20972 | Free osteocutaneous flap with microvascular anastomosis; metatarsal |
| 21120 | Genioplasty; augmentation (autograft, allograft, prosthetic material) |

JA175

| 21121 | Genioplasty; sliding osteotomy, single piece |
|---|---|
| 21122 | Genioplasty; sliding osteotomies, 2 or more osteotomies (eg, wedge excision or bone wedge reversal for asymmetrical chin) |
| 21123 | Genioplasty; sliding, augmentation with interpositional bone grafts |
| 21125 | Augmentation, mandibular body or angle; prosthetic material |
| 21127 | Augmentation, mandibular body or angle; with bone graft, onlay or interpositional (includes obtaining autograft) |
| 21208 | Osteoplasty, facial bones; augmentation (autograft, allograft, or prosthetic implant) |
| 21209 | Osteoplasty, facial bones; reduction |
| 21899 | Unlisted procedure, neck or thorax |
| 30400 | Rhinoplasty, primary; lateral and alar cartilages and/or elevation of nasal tip |
| 30410 | Rhinoplasty, primary; complete, external parts including bony pyramid, lateral and alar cartilages, and/or elevation of nasal tip |
| 30420 | Rhinoplasty, primary; including major septal repair |
| 30430 | Rhinoplasty, secondary; minor revision (small amount of nasal tip work) |
| 30435 | Rhinoplasty, secondary; intermediate revision |
| 30450 | Rhinoplasty, secondary; major revision |
| 31580 | Laryngoplasty; for laryngeal web, with indwelling keel or stent |
| 31599 | Unlisted procedure, larynx |
| 31899 | Unlisted procedure, trachea, bronchi |
| 51040 | Cystostomy, cystotomy with drainage |
| 53410 | Urethroplasty, 1-stage reconstruction of male anterior urethra |
| 53420 | Urethroplasty, 2-stage reconstruction or repair of prostatic or membranous urethra; first stage |
| 53425 | Urethroplasty, 2-stage reconstruction or repair of prostatic or membranous urethra; second stage |
| 53430 | Urethroplasty, reconstruction of female urethra |
| 53431 | Urethroplasty with tubularization of posterior urethra and/or lower bladder for incontinence |
| 53450 | Urethromeatoplasty, with mucosal advancement |
| 54125 | Amputation of penis; complete |
| 54520 | Orchiectomy, simple (including subcapsular), with or without testicular prosthesis, scrotal or inguinal approach |
| 54660 | Insertion of testicular prosthesis (separate procedure) |
| 54690 | Laparoscopy, surgical; orchiectomy |
| 55175 | Scrotoplasty; simple |
| 55180 | Scrotoplasty; complicated |
| 55866 | Laparoscopy, surgical prostatectomy, retropubic radical, including nerve sparing, includes robotic assistance, when performed |
| 55899 | Unlisted procedure, male genital system |
| 55970 | Intersex surgery; male to female |
| 55980 | Intersex surgery; female to male |
| 56625 | Vulvectomy simple; complete |
| 56800 | Plastic repair of introitus |
| 56805 | Clitoroplasty for intersex state |
| 57106 | Vaginectomy, partial removal of vaginal wall |

| 57110 | Vaginectomy, complete removal of vaginal wall |
|---|---|
| 57291 | Construction of artificial vagina; without graft |
| 57292 | Construction of artificial vagina; with graft |
| 57295 | Revision (including removal) of prosthetic vaginal graft, vaginal approach |
| 57296 | Revision (including removal) of prosthetic vaginal graft, open abdominal approach |
| 57335 | Vaginoplasty for intersex state |
| 57425 | Laparoscopy, surgical, colpopexy |
| 57426 | Revision (including removal) of prosthetic vaginal graft, laparoscopic approach |
| 58150 | Total abdominal hysterectomy (corpus and cervix), with or without removal of tube(s), with or without removal of ovary(s) |
| 58180 | Supracervical abdominal hysterectomy (subtotal hysterectomy), with or without removal of tube(s), with or without removal of ovary(s) |
| 58260 | Vaginal hysterectomy, for uterus 250 g or less |
| 58262 | Vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s), and/or ovary(s) |
| 58275 | Vaginal hysterectomy, with total or partial vaginectomy |
| 58290 | Vaginal hysterectomy, for uterus greater than 250 g |
| 58291 | Vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58541 | Laparoscopy, surgical, supracervical hysterectomy, for uterus 250 g or less |
| 58542 | Laparoscopy, surgical, supracervical hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58543 | Laparoscopy, surgical, supracervical hysterectomy, for uterus greater than 250 g |
| 58544 | Laparoscopy, surgical, supracervical hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58550 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus 250 g or less |
| 58552 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58553 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus greater than 250 g |
| 58554 | Laparoscopy, surgical, with vaginal hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58570 | Laparoscopy, surgical, with total hysterectomy, for uterus 250 g or less |
| 58571 | Laparoscopy, surgical, with total hysterectomy, for uterus 250 g or less; with removal of tube(s) and/or ovary(s) |
| 58572 | Laparoscopy, surgical, with total hysterectomy, for uterus greater than 250 g |
| 58573 | Laparoscopy, surgical, with total hysterectomy, for uterus greater than 250 g; with removal of tube(s) and/or ovary(s) |
| 58720 | Salpingo-oophorectomy, complete or partial, unilateral or bilateral |
| 58954 | Bilateral salpingo-oophorectomy with omentectomy, total abdominal hysterectomy and radical dissection for debulking |
| 64856 | Suture of major peripheral nerve, arm or leg, except sciatic; including transposition |

**EXHIBIT G**



**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*          *Washington, DC 20044*

June 11, 2025

**MEMORANDUM**

**TO:**          All Civil Division Employees

**FROM:**          Brett A. Shumate
Assistant Attorney General

**BRETT SHUMATE** — Digitally signed by BRETT SHUMATE Date: 2025.06.11 12:27:50 -04'00'

**SUBJECT:**          Civil Division Enforcement Priorities

President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives. This memorandum describes those policy objectives and directs Civil Division attorneys to prioritize investigations and enforcement actions advancing these priorities.

## 1. Combatting Discriminatory Practices and Policies

On January 21, 2025, President Trump issued Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), which established "the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* § 2. To this end, the President "order[ed] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* As part of these efforts, Attorney General Bondi has directed that the Department align its "litigating positions with [the] requirement of equal dignity and respect." Memorandum from Attorney General, *Eliminating Internal Discriminatory Practices*, at 2 (Feb. 5, 2025).

Consistent with these directives, the Civil Division will use all available resources to pursue affirmative litigation combatting unlawful discriminatory practices in the private sector. In particular, the Civil Division is authorized to bring suit under the False Claims Act for treble damages and penalties against any person who knowingly submits or causes the submission of false claims to the government. 31 U.S.C. § 3729 *et seq.* This includes entities that receive federal funds but knowingly violate civil rights laws. In support of these efforts, the Deputy Attorney General recently announced the Civil Rights Fraud Initiative. The Civil Division is committed to advancing the Initiative and will aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws. The Civil Division will work with the Civil Rights Division, relators, other whistleblowers, and federal agencies to advance these efforts.

JA179

### 2. Ending Antisemitism

On January 29, 2025, President Trump issued Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Feb. 3, 2025), which established the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold accountable the perpetrators of unlawful anti-Semitic harassment and violence," *id.* § 2, and encouraged the "Attorney General … to employ appropriate civil-rights enforcement authorities … to combat anti-Semitism," *id.* § 3(c). The Executive Order also reaffirmed Executive Order 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 16, 2019).

The Attorney General has established Joint Task Force October 7 ("JTF 10-7") and directed components to "prioritize seeking justice for victims of the October 7, 2023 terrorist attack in Israel" as well as "combatting antisemitic acts of terrorism and civil rights violations in the homeland." Memorandum from Attorney General, *Establishment of Joint Task Force October 7*, at 1 (Feb. 5, 2025). To assist these enforcement efforts, the Civil Division will prioritize investigations and enforcement actions against entities that make claims for federal funds but knowingly violate federal civil rights laws by participating in or allowing antisemitism.

### 3. Protecting Women and Children

The President has issued several Executive Orders protecting women and children. On January 20, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025), which established the "policy of the United States to recognize two sexes, male and female." *Id.* §.2. On February 3, President Trump issued Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025), which directed the Attorney General to, among other things, "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8(c).

Following these directives, Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, *Preventing the Mutilation of American Children*, at 3-4 (April 22, 2025). The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." *Id.* at 4.

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food,

2

Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq.* In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

### 4. Ending Sanctuary Jurisdictions

On President Trump's first day in office, he issued multiple directives to secure the southern border. *See* Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). To ensure that States and local governments promote the enforcement of our nation's immigration laws, he also issued Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). This built on the President's previous Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (January 25, 2017). Moreover, Attorney General Bondi has directed the Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices," where appropriate. Memorandum from Attorney General, *Sanctuary Jurisdiction Directive*, at 3 (Feb. 5, 2025). Consistent with this directive, the Civil Division shall prioritize affirmative litigation to invalidate any State or local laws preempted by Federal law.

### 5. Prioritizing Denaturalization

The Department of Justice may institute civil proceedings to revoke a person's United States citizenship if an individual either "illegally procured" naturalization or procured naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The benefits of civil denaturalization include the government's ability to revoke the citizenship of individuals who engaged in the commission of war crimes, extrajudicial killings, or other serious human rights abuses; to remove naturalized criminals, gang members, or, indeed, any individuals convicted of crimes who pose an ongoing threat to the United States; and to prevent convicted terrorists from returning to U.S. soil or traveling internationally on a U.S. passport. At a fundamental level, it also supports the overall integrity of the naturalization program by ensuring that those who unlawfully procured citizenship, including those who obtained it through fraud or concealment of material information, do not maintain the benefits of the unlawful procurement.

JA181

The Civil Division shall prioritize and maximally pursue denaturalization proceedings in all cases permitted by law and supported by the evidence. To promote the pursuit of all viable denaturalization cases available under 8 U.S.C. § 1451 and maintain the integrity of the naturalization system while simultaneously ensuring an appropriate allocation of resources, the Civil Division has established the following categories of priorities for denaturalization cases:

1. Cases against individuals who pose a potential danger to national security, including those with a nexus to terrorism, espionage, or the unlawful export from the United States of sensitive goods, technology, or information raising national security concerns;

2. Cases against individuals who engaged in torture, war crimes, or other human rights violations;

3. Cases against individuals who further or furthered the unlawful enterprise of criminal gangs, transnational criminal organizations, and drug cartels;

4. Cases against individuals who committed felonies that were not disclosed during the naturalization process;

5. Cases against individuals who committed human trafficking, sex offenses, or violent crimes;

6. Cases against individuals who engaged in various forms of financial fraud against the United States (including Paycheck Protection Program ("PPP") loan fraud and Medicaid/Medicare fraud);

7. Cases against individuals who engaged in fraud against private individuals, funds, or corporations;

8. Cases against individuals who acquired naturalization through government corruption, fraud, or material misrepresentations, not otherwise addressed by another priority category;

9. Cases referred by a United States Attorney's Office or in connection with pending criminal charges, if those charges do not fit within one of the other priorities; and

10. Any other cases referred to the Civil Division that the Division determines to be sufficiently important to pursue.

These categories are intended to guide the Civil Division in prioritizing which cases to pursue; however, these categories do not limit the Civil Division from pursuing any particular case, nor are they listed in a particular order of importance. Further, the Civil Division retains the discretion to pursue cases outside of these categories as it determines appropriate. The assignment of denaturalization cases may be made across sections or units based on experience, subject-matter expertise, and the overall needs of the Civil Division.

4

JA182

**EXHIBIT H**

scriber Agreement and This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/gender-surgery-childrens-hospitals-trump-282c4cbb

EXCLUSIVE | HEALTHCARE

# Trump Administration Weighs Eliminating Funds for Hospitals Offering Gender Care to Minors

Mehmet Oz, a top federal health official, leads efforts to crack down on the treatments for young people

By *Liz Essley Whyte* [Follow]

*Updated* June 30, 2025 12:24 pm ET



Mehmet Oz is the administrator of the Centers for Medicare and Medicaid Services. SAUL LOEB/AGENCE FRANCE-PRESSE/GETTY IMAGES

WASHINGTON—The Trump administration is weighing cutting off funds to hospitals that it says provide gender-related treatments for children and teenagers, a move that would sharply escalate officials' scrutiny of such programs.

The potential for increased federal scrutiny on gender-related healthcare comes after a 30-day deadline passed Saturday for nine children's hospitals to respond to letters from Mehmet Oz, the Centers for Medicare and Medicaid Services administrator and celebrity physician known as Dr. Oz. The former heart surgeon and television host

JA184

demanded data related to sex-reassignment surgeries, hormone therapy and puberty blockers.

"President Trump has been clear: America will protect kids from life-altering and experimental procedures," Oz said. "CMS has warned hospitals and state Medicaid programs about these dangers—and is taking regulatory enforcement actions."

Three hospitals—in Boston, Los Angeles and Seattle—told CMS they would respond to the probe, but none have yet sent the agency data, a Department of Health and Human Services official said. Two other hospitals, in Colorado and Ohio, told The Wall Street Journal they are planning to respond.

Though Oz's letter didn't threaten specific actions against the hospitals, CMS officials said they believe they have authority to stop funds for gender treatments for children and teenagers through Medicaid and Marketplace insurance plans. The agency is reviewing its authority to kick hospitals out of Medicaid altogether if they don't cease providing the surgeries, the CMS officials said.



Children's Hospital of Los Angeles intends to drop its program offering gender-related care to children.
ROBYN BECK/AGENCE FRANCE-PRESSE/GETTY IMAGES

Many children's hospitals are financially dependent on Medicaid.

CMS sets conditions that hospitals must meet in order to participate in Medicare and Medicaid, including health and safety standards.

At least one of the hospitals that received a letter, Children's Hospital of Los Angeles, is closing its program offering gender-related care to children and specifically cited the CMS inquiry in its announcement. The hospital said more than 65% of its annual revenue comes from federal sources.

JA185

has already cut out institutions.

"These threats are no longer theoretical. The federal government has already cut off hundreds of millions of dollars from U.S. academic and research institutions," hospital leaders wrote in a June 12 letter to staff that was viewed by the Journal. "The hospital has been left with no viable path forward."

A spokesperson for Boston Children's Hospital said it had an obligation under Massachusetts state law to provide access to gender-affirming care. "We uphold this responsibility with the utmost seriousness," the spokesperson said, adding that the hospital is still reviewing the recent CMS letter.

The Oz outreach is part of the administration's broader efforts to crack down on gender-related surgeries and treatments for minors. Attorney General Pam Bondi issued a memo in April saying the Justice Department would investigate doctors and hospitals that perform the surgeries or that mislead families about drug treatments. The Supreme Court ruled in June that states could restrict the procedures for minors, and public opinion has grown more opposed to pro-transgender policies on bathrooms, sports and more.

The nine hospitals that were sent letters from CMS include Children's Hospital of Philadelphia, Seattle Children's Hospital, Children's Hospital Los Angeles, Boston Children's Hospital, Children's National Hospital, UCSF Benioff Children's Hospital Oakland, Children's Hospital Colorado, UPMC Children's Hospital of Pittsburgh and Cincinnati Children's Hospital Medical Center, according to the HHS official.

CMS targeted the nine hospitals because the agency believed them to be the vanguard for the gender treatments for children, the HHS official said.

Some hospitals re-examined their programs for transgender youth after a January executive order from the White House that took aim at what it called "surgical mutilation."

One hospital that received a CMS letter, UPMC Children's of Pittsburgh, said the hospital would no longer offer certain types of gender care, including puberty blockers. A spokesman didn't specifically cite the CMS letter, but said: "As we continue to monitor executive-branch memos, directives and other guidance from the federal government, these actions have made it abundantly clear that our clinicians can no longer provide certain types of gender-affirming care without risk of criminal prosecution," adding that the hospital would still offer behavioral health support.

A spokesperson for Cincinnati Children's said that the hospital doesn't provide sex-reassignment surgeries for minors and that the hospital "complies with Ohio law

JA186

related to the provision of medical care and treatment for patients with gender-related conditions."

A spokesperson for Colorado Children's said the hospital has never offered gender-transition surgeries to patients under the age of 18.

Children's Hospital of Philadelphia, Seattle Children's, Children's National Hospital and UCSF Benioff Children's Hospital Oakland didn't respond to requests for comment.

Twenty-seven states now have policies or laws restricting gender-related treatments for youth, according to health-research nonprofit KFF. Advocates for the treatments say they can help children and teenagers who experience gender dysphoria, but debate has raged over the evidence for the interventions. An influential report from the U.K. last year declared "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress."

Ellen Kahn, senior vice president of equality programs at LGBT-advocacy group Human Rights Campaign, said doctors, patients and families should make decisions about care, and that surgeries for transgender youth are rare.

"Studies consistently show that affirming care reduces depression, anxiety and suicide risk among transgender youth," she said. "The Centers for Medicare and Medicaid Services should protect healthcare, not politicize it."

Write to Liz Essley Whyte at liz.whyte@wsj.com

*Appeared in the July 1, 2025, print edition as 'Hospital Funding at Risk Over Gender Care'.*

**Videos**

JA187

**EXHIBIT I**

JA188



**PRESS RELEASE**

# Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children

Wednesday, July 9, 2025

**For Immediate Release**

Office of Public Affairs

WASHINGTON — Today, the Department of Justice announced that it has sent more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children.

The Department's investigations include healthcare fraud, false statements, and more.

"Medical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." — Attorney General Pamela Bondi

Updated July 9, 2025

**Topic**

JA189

HEALTH CARE FRAUD

**Component**

Office of the Attorney General

Press Release Number: 25-717

# Related Content

---

**PRESS RELEASE**

## Pharmacy Owner and Pharmacists Sentenced for Pill Mill Scheme Involving Hundreds of Thousands of Opioid Pills

A Texas pharmacy owner and three Texas pharmacists were sentenced today in Houston for unlawfully distributing more than half a million opioid pills and other commonly abused prescription drugs, including...

September 25, 2025

---

**PRESS RELEASE**

## Walgreens Agrees to Pay Up to $350M for Illegally Filling Unlawful Opioid Prescriptions and for Submitting False Claims to the Federal Government

The Justice Department, together with the Drug Enforcement Administration (DEA) and Department of Health and Human Services Office of Inspector General (HHS-OIG), today announced a $300 million settlement with Walgreens Boots...

JA190

April 21, 2025

✉ **Office of Public Affairs**

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

📞 Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

JA191

**EXHIBIT J**

JA192

11/13/25, 3:54 PM    Justice Dept. Demands Private Patient Info From Trans Youth Medicine Providers - The New York Times

# Justice Dept. Demands Patient Details From Trans Medicine Providers

Doctors and hospitals were subpoenaed for private information on gender-related care for minors, the latest move by the Trump administration to stop the treatments.

▶ Listen to this article · 8:36 min  Learn more

**By Azeen Ghorayshi and Glenn Thrush**

Published July 10, 2025   Updated July 17, 2025

The Justice Department has issued subpoenas demanding confidential patient information from more than 20 doctors and hospitals that provide gender-related treatments to minors, according to officials with knowledge of the move.

The action marks a new turn in the Trump administration's efforts to limit transgender medical care. Most of the subpoenas, issued through the consumer protection unit of the department's civil division, attempt to pierce powerful federal confidentiality protections for patients and their medical providers.

Officials briefed on the investigation described the action as a fact-finding mission, an effort to determine whether any laws have been broken and a spur to kick-start negotiations with the providers over transgender treatment policy.

Investigators could eventually seek criminal charges if evidence of fraud is uncovered, officials said. But critics say the motivation is more political than investigative — a campaign of intimidation.

JA193

The subpoenas are part of a coordinated effort between the Justice Department and the White House to fulfill President Trump's promises to curtail pediatric gender care. Pam Bondi, the attorney general, said in a statement Wednesday that "medical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable."

Revelations of the subpoenas come in the wake of a Supreme Court decision that upheld state laws banning youth gender medicine in about half the country. Hospitals and doctors in other states, where legislatures are unlikely to enact such bans, have faced increasing threats from the federal government. In response, a small number of clinics have limited their treatments or closed altogether.

It is unclear which hospitals and doctors received the subpoenas. But in May, nine leading children's hospitals across the country received letters from the Centers for Medicare and Medicaid Services, demanding data on revenue from pediatric gender treatments and the rates of regret among patients, according to a person with knowledge of the effort.

Those letters applied explicit financial pressure to the hospitals. Dr. Mehmet Oz, the head of the agency, wrote that it "has an obligation to be a good steward of taxpayer dollars." He added, "Hospitals accepting federal funds are expected to meet rigorous quality standards and uphold the highest level of stewardship when it comes to public resources."

Other agencies have also been applying increased pressure to meet Mr. Trump's demands.

In June, the F.B.I. put out a call to the public to report hospitals and doctors who were performing surgeries on minors.

And on Wednesday, the Federal Trade Commission hosted a daylong event devoted to the question of whether providers of transgender medical treatments were engaging in unfair or deceptive trade practices. A top Justice Department official,

JA194

11/13/25, 3:53 PM                    Justice Dept. Demands Private Patient Info From Trans Youth Medicine Providers - The New York Times

drugs used appearing at the event, announced that manufacturers of drugs used in such care marketing l were under investigation for possible violations of drug marketing laws, in addition to the subpoenas to health care providers.

Gender treatments for minors, which can include puberty-blocking drugs, hormones and, in rarer cases, surgeries, are at the center of fierce medical debate around the world.

Many clinicians and families in the United States and elsewhere have said that the treatments can be profoundly beneficial for transgender adolescents. While the number of minors who medically transition is small, demand for the treatments has increased in recent years, and countries have taken different approaches. Health agencies in England, Sweden and Finland have limited the treatments, citing the uncertain evidence of the benefits and the possible risks, which can include loss of fertility. Meanwhile, Germany has cautiously endorsed the treatments, citing the lack of effective alternatives.

None of these governments have banned the care or prosecuted hospitals or providers.

In the United States, a coalition of critics of youth gender medicine from both the right and the left have argued for banning the treatments. But now that most Republican-led states have already enacted such laws, the strategy appears to have shifted to singling out specific hospitals and providers in states without restrictions in place.

JA195



Demonstrators outside Children's Hospital Los Angeles protested the closure of its transgender youth clinic. Maggie Shannon for The New York Times

Multiple clinicians working at gender clinics in blue states declined to comment on the subpoenas and other recent actions, citing fears that doing so would endanger them and their patients.

"This politically motivated effort is a drastic overreach and a backhanded attempt to intimidate providers and institutions serving the transgender youth population," said Dr. Scott Leibowitz, a child and adolescent psychiatrist who led a youth gender clinic in Columbus, Ohio, until that state's ban took effect last year. The Justice Department's subpoenas, he added, will create "widespread fear for every patient in the country who will be wondering when or if their private health care records will be released."

Opponents of gender-related treatments called out specific doctors and hospitals during the discussions hosted by the F.T.C. on Wednesday, sometimes drawing from medical records and internal hospital presentations to argue that they had misled patients and insurers.

JA196

11/13/25, 3:54 PM    Justice Dept. Demands Private Patient Info From Trans Youth Medicine Providers - The New York Times

transition. Also prominently featured were several young adults who transitioned as adolescents and later regretted it. While studies are limited, researchers estimate that 5 to 10 percent of patients choose to detransition.

"We need to make sure that no more kids are sold a product they can't return," said one panelist, Claire Abernathy, who underwent testosterone treatment and a mastectomy at age 14 and later detransitioned.

But the F.T.C. does not have authority over the practice of medicine, said Samuel Levine, the former head of the agency's Bureau of Consumer Protection.

"The F.T.C. is in the business of commercial regulation, not medical decision-making," said Mr. Levine, who led cases against companies falsely advertising supplements, stem cell treatments and addiction treatments during his tenure. "This is a significant departure from F.T.C. norms and a clear politicization of consumer protection."

At least two hospitals, in Los Angeles and Pittsburgh, have decided to shut down their youth gender clinics entirely, citing mounting pressure from the Trump administration.

Children's Hospital Los Angeles notified staff members in June that the clinic would shutter in late July. In an email, it told employees that the potential termination of federal funds — which account for 65 percent of its annual funding and enable it to be the largest pediatric safety net provider in California — would be "an existential threat to our hospital operations."

The Los Angeles and Pittsburgh children's hospitals are among the nine that received the demand letter from Dr. Oz this spring; the others are in Boston, Philadelphia, Denver, Oakland, Cincinnati, Seattle and Washington. All of them appear on the so-called Dirty Dozen list of major providers identified by the activist group Do No Harm, which helped craft state bills banning pediatric gender medicine.

https://www.nytimes...

JA197

The group's chairman, Dr. Stanley Goldfarb, a kidney specialist who was a former dean at the University of Pennsylvania's medical school, said in an interview that his organization had worked with the Trump administration and that threats of funding cuts were key to the effort.

The federal government's "ability to restrict payment is going to be a big influence," he said.

At Wednesday's F.T.C. event, speakers were asked to suggest next steps, now that the Supreme Court has allowed state bans of gender medicine for minors.

On the panel was Dr. Eithan Haim, a Texas surgeon who was indicted last year for releasing private medical information about transgender youth treatments; federal prosecutors under the Trump administration dropped the charges against Dr. Haim, who called himself a whistle-blower. On Wednesday, he argued that doctors providing this care should be prosecuted to create a chilling effect across the country.

"Then these people will be held accountable," he said, "And there's a very good chance this will stop even in blue states."

Jordan Campbell, a fellow panelist who represented several detransitioners in malpractice lawsuits and now works for the Justice Department, responded, "Working on it, Dr. Haim."

David McCabe and Reed Abelson contributed reporting.

**Azeen Ghorayshi** is a Times science reporter.

**Glenn Thrush** covers the Department of Justice for The Times and has also written about gun violence, civil rights and conditions in the country's jails and prisons.

A version of this article appears in print on , Section A, Page 16 of the New York edition with the headline: U.S. Demands Confidential Patient Data About Trans Care

JA198

**EXHIBIT K**

JA199

*Democracy Dies in Darkness*

# Children's National Hospital to end gender-transition care

The change comes as the Trump administration has sought to restrict access to such care nationwide.

July 18, 2025

By Jenna Portnoy, Kyle Swenson and Karina Elwood

Children's National Hospital announced Friday that because of "escalating legal and regulatory risks," the D.C.-based medical system will no longer provide gender-transition care for patients, leaving families reeling.

Effective Aug. 30, the hospital's providers will discontinue the "prescription of gender-affirming medications," according to a statement on the hospital's website. Mental health and other support services will still be available, the statement says.

"We recognize the impact this has had on you and your family, and we are here to support you. Our care teams are available to assist you as you move forward," reads a message the hospital sent to families that was obtained by The Washington Post. The note also says the hospital will no longer evaluate patients for medication or monitor medications through labs such as bloodwork.

Advertisement

The move comes after the Justice Department on July 9 said it had subpoenaed nearly 20 doctors and clinics that provide gender-transition care.

A Children's National spokeswoman declined to say if the Northwest Washington hospital, a pediatric Level 1 trauma center, or any of its providers received a subpoena. A Justice Department spokesman did not immediately respond to requests for comment.

Gender-transition care has been called lifesaving by patients and providers and is endorsed by most major medical associations. Certain medications give patients time to assess their situation before starting more intense interventions, such as hormones.

At Children's National, the Gender Development Program does not provide gender-transition surgery for anyone under 18 and does not provide hormone therapy to children before puberty begins, according to the clinic's website. Parental consent is required to provide gender-transition medical care to a minor in the District.

JA201

Advertisement

"The hospital is a vital resource, and I would never want anything to put that in jeopardy," said Mary Raibman, the mother of a college student who received gender-transition care at Children's starting in 2018, but if the hospital continued offering care, "I don't believe that they would have had to close. I believe they're choosing not to stand up and fight. ... This decision is really disgusting."

Since January, the Trump administration has sought to restrict access to gender-transition care nationwide while also blocking the transgender community from high school and college sports, military service, and legal protections.

Children's National and other hospitals like it around the nation face pressure to limit or end such care or risk jeopardizing federal payments, including public insurance reimbursements, to providers of all kinds of medical care, potentially costing them billions and forcing them to close.

Advertisement

JA202

A Children's National spokeswoman declined to say how many patients will be affected by the decision to halt care, or if it was related to pressure from the Trump administration.

Aggressive and sweeping rollbacks to transgender care and protections have become a policy priority for the Trump administration. Early in his second term, President Donald Trump signed an executive order seeking to cut Medicare and Medicaid funding to health providers that offer gender-transition care to people under 19.

Several hospitals across the country, including Children's National, complied with the executive order and suspended care, halting prescriptions, refills and medication administration for trans minors.

Advertisement

Days later, however, a court action blocked the president's order, paving the way for providers to continue working with transgender patients. By Feb. 13, some hospitals, including Children's National and the health care system affiliated with the University of Virginia, had resumed care for existing patients.

**Make the most of the DMV with our newsletter**

JA203

Make living in D.C. a little easier and more fun. Sign up for the Post Local newsletter to get local news, weather and expert advice — where to eat, where to drink and how to get around — every weekday.

(The Washington Post)

Raibman, the mother, said that a monthly virtual support group with parents of trans patients being treated at Children's didn't happen as expected Thursday, but she didn't realize care would be curtailed in this way.

At 13, her transgender son was in a mental health crisis and confided in his parents that for years, while being raised as a girl, he had questioned his gender identity. His pediatrician immediately recommended the clinic at Children's, and the family showed up, terrified about what this would mean for their child and his future.

Advertisement

"From the moment we walked in that door, I knew it would be okay," Raibman said. "I didn't think, 'Oh it's going to be easy,' but I thought: 'It's going to be okay. They were going to help us through this.' [Today] my child is thriving. He's an adult man, and he's thriving, and it's because of the care he received at Children's National Hospital."

JA204

As Raibman sees it, amid pressure from the Trump administration, Children's and other hospitals that are ending care have decided trans children "are expendable."

"And no one is expendable," she said.

In the past five years, more than half of states have banned doctors from offering transition health care, including medication, to minors. Yet most transgender children do not take medication to assist with their transition.

Advertisement

Ben Takai, the board president of Metro DC PFLAG, called the move by Children's National very sad, but not surprising given the constant attacks on transgender rights. He said that organizations such as PFLAG, which joined the lawsuit challenging Trump's executive order, will keep fighting for LGBTQ+ youth.

"There are many ways to bully minority populations," Takai said. "This is one of those ways."

Last month, the Supreme Court upheld Tennessee's ban on gender-transition care for minors, paving the way for more restrictions.

The Center for Transyouth Health and Development at Children's Hospital Los Angeles, the country's biggest public provider of gender-transition care for youths, announced this summer that it will shut its doors on July 22.

JA205

The center said in the announcement that the decision came from a thorough legal and financial review and in response to the "increasingly severe impacts of recent administrative actions and proposed policies."

*Casey Parks contributed to this report.*

# EXHIBIT L



**EXHIBIT M**

11/13/25, 4:00 PM                      President Trump Promised to End Child Sexual Mutilation — and He Delivered – The White House

The Democrat Shutdown is Officially Over After 42 Days, 22 Hours and 25 Minutes.

*The* WHITE HOUSE

ARTICLES

President Trump Promised to End Child Sexual Mutilation — and He Delivered

The White House

July 25, 2025

During his campaign, President Donald J. Trump repeatedly pledged to end the irreversible chemical and surgical mutilation of our children: "We are not going to allow child sexual mutilation."

**For years, politicians have promised to end the barbaric, pseudoscientific practice — but President Trump is the only one who has actually delivered.**

This week, Yale New Haven Health and Connecticut Children's Medical Center announced they are ending their so-called "gender-affirming care services." They join a growing list of health systems across the country following President Trump's executive action.

- Phoenix Children's Hospital stopped providing puberty blockers and hormone therapy to minors.

- Stanford Medicine ended sex-change surgeries for minors.

- Children's Hospital Los Angeles closed its "Center for Transyouth Health and Development and Gender-Affirming Care."

- Denver Health suspended sex change surgeries for patients under 19.

- UCHealth ended so-called "gender-affirming services" for patients under 19.

- Lurie Children's Hospital of Chicago stopped sex-change surgeries for patients under 19.

- UChicago suspended so-called "gender-affirming care" for minors.

- Northwestern Memorial Hospital stopped sex-change surgeries for minors.

JA210

- Rush Medical Center <u>halted</u> gender-affirming care for new patients under 18.

- In New York City, Mount Sinai and New York-Presbyterian both <u>curbed</u> so-called "gender-affirming care" for minors.

- In Pennsylvania, <u>Penn State Health</u>, the <u>University of Pittsburgh Medical Center</u>, and the <u>University of Pennsylvania Health System</u> all stopped so-called "gender-affirming care" for patients under 19.

- The Hospital of Richmond at VCU Health <u>halted</u> so-called "gender-affirming care" for <u>new patients</u> under 19.

- Children's Hospital of The King's Daughters <u>suspended</u> hormone therapy and puberty blockers for gender-affirming care in children under 19.

- Seattle Children's Hospital <u>stopped</u> providing so-called "gender-affirming surgery" to patients under 19.

- In Washington, D.C., Children's National Hospital "<u>paused</u>" prescribing puberty blockers and hormone therapies for minors.

- Kaiser Permanente <u>paused</u> sex-change surgeries for patients under 19 across all its hospitals and surgical centers.

 

GET THE FACTS →

NEWS

WIRE

ISSUES

JA211

11/13/25, 4:00 PM                President Trump Promised to End Child Sexual Mutilation — and He Delivered – The White House

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

## Subscribe to The White House newsletter

Your email

SIGN UP

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

https://www.whitehouse

WH.GOV

Copyright

Privacy

# EXHIBIT N

Case 1:25-mc-91324-MJJ   Document 5-1   Filed 07/08/25   Page 1 of 28

# EXHIBIT 1

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

No. 25-1431-019

To:  The Children's Hospital Corporation d/b/a Boston Children's Hospital
300 Longwood Avenue
Boston, Massachusetts 02115

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C., on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

## BRETT SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:04:06 -04'00'

*(signature)*

JA216

## RETURN OF SERVICE

I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:

1. Personal delivery to an individual, to wit:

_____
(name)

_____
(title)

_____
(address)

2. Personal delivery to an address, to wit:

_____
(description of premises)

_____
(address)

3. Registered or certified mailing to:

_____
(name)

_____
(address)

_____ a.m. | p.m. on

_____
(date)

_____
(signature)

_____
(title)

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.

## ATTACHMENT A TO SUBPOENA TO:

THE CHILDREN'S HOSPITAL CORPORATION d/b/a BOSTON CHILDREN'S HOSPITAL
300 LONGWOOD AVENUE
BOSTON, MASSACHUSETTS 02115

## I. DEFINITIONS

1.    "You," "Your Company," and "the Company," means:

    a.    The Children's Hospital Corporation d/b/a Boston Children's Hospital, a Massachusetts corporation, whose principal place of business is located at 300 Longwood Avenue, Boston, Massachusetts, without regard to any name under which it has done business;

    b.    All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Gender Multispecialty Service at Boston Children's Hospital; and

    c.    Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.    "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.    "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

    a.    All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

JA218

b.    Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.    Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.    Any electronic files saved as a backup, including metadata;

e.    Any deleted but recoverable electronic files, including metadata;

f.    Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.    Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.    All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.    "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.    "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.    "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.    "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

JA219

8.  "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.  "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (e.g., leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.  You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

    a.  If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

    b.  If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

JA220

Case 1:25-mc-91324-MJJ    Document 5-1    Filed 07/08/25    Page 7 of 28

2. **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3. Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a. Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b. The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c. The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4. The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5. If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6. The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7. All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

4

JA221

8. If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

   a. The name and title of the author (and if different, the preparer and signatory);

   b. The name(s) and title(s) of the individual(s) to whom the document was addressed;

   c. The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

   d. The date of the document;

   e. The number of pages;

   f. A brief description of the subject matter;

   g. A statement of the specific basis on which privilege is claimed; and

   h. The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1. Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2. All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3. All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

JA222

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not

6

JA223

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

7

JA224

SUBPOENA ATTACHMENT B

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a.  **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

JA225

*July 2022*

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

    ii. All TIFF image files shall be stored with the ".tif" extension.

    iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

    REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
    REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
    REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
    REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
    REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

JA226

*July 2022*

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

   1. Text delimited load files are defined using the standard Concordance delimiters. For example:

      | | |
      |---|---|
      | Field Separator | ¶ or Code 020 |
      | Text Qualifier | þ or Code 254 |
      | Newline | ® or Code 174 |
      | Multi-value | ; or Code 059 |
      | Nested values | \ or Code 092 |

   2. This load file should contain the relative file path to the individual multi-page, document level text files.
   3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
   4. There should be one line for every record in a collection.
   5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

      þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d.  **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e.  **Directory and folder structure:** The directory structure for productions should be:

   \CaseName\**LoadFiles**
   \CaseName\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \CaseName\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \CaseName\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

JA227

*July 2022*

\CaseName\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder) \CaseName\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

4

JA228

Case 1:25-mc-91324-MJJ    Document 3-1    Filed 07/08/25    Page 15 of 28

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

5

JA229

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

JA230

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

JA231

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a.  De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b.  De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

c.  All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d.  All files should be globally de-duplicated with the following conditions:

8

JA232

*July 2022*

i.  The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii.  All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv.  No customization of hashing may occur without prior express approval by the Government.

v.  De-duplication must be done by document family, not by individual document.

vi.  A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

JA233

*July 2022*

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.

    b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

    a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

    b.  The first document in the collection represents the parent document and all other documents will represent the children.

    c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

10

JA234

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11. Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

JA235

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

JA236

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

JA237

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

JA238

*July 2022*

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

JA239

Case 1:25-mc-91324-MJJ    Document 5-1    Filed 07/08/25    Page 26 of 28

*July 2022*

THE COLORADO SUN

### 17. Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18. Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19. Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20. Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21. Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

    a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

    b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

JA240

Case 1:25-mc-91324-MJ    Document 3-1    Filed 07/08/25    Page 27 of 28

*July 2022*

   c.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.   Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.   Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

   a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.

   b.   External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives

   c.   Government approved File Transfer Protocol (FTP) technologies.

   d.   Storage media used to deliver ESI shall be appropriate to the size of the data in the production.

   e.   Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.   Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

17

JA241

*July 2022*




### 25.    Privilege Logs

a.    The name and title of the author (and if different, the preparer and signatory);

b.    The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.    The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.    The date of the document;

e.    The number of pages;

f.    A brief description of the subject matter;

g.    A statement of the specific basis on which privilege is claimed; and

h.    The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

JA242

# EXHIBIT O

JA243

 THE COLORADO SUN

NEWS: HEALTH

# Trump administration subpoenas Children's Hospital Colorado over gender-affirming care

Children's said it is "engaging outside counsel" to decide how to respond to the Department of Justice

 John Ingold
3:39 AM MDT on Jul 18, 2025



The exterior of Children's Hospital Colorado in Aurora, photographed on Oct. 18, 2019. (John Ingold, The Colorado Sun)

JA244



All politics, no agenda.

C hildren's Hospital Colorado, the state's largest pediatric specialty hospital, has received a subpoena from the U.S. Department of Justice as part of an apparent investigation into gender-affirming care for transgender youth.

The hospital received the subpoena this week. It did not disclose the contents or say whether the subpoena seeks patient records.

"We are engaging outside counsel and evaluating it to determine how we should respond," the hospital wrote in a statement Thursday.

The subpoena comes one month after Fox News, citing an anonymous source, **reported** that the DOJ had opened an investigation into three children's hospitals across the country, including Children's Hospital Colorado. The others were Boston Children's Hospital and Children's Hospital Los Angeles.

The investigation reportedly is looking at gender-affirming surgeries to kids under the age of 18, which the administration of President Donald Trump has suggested could be prosecuted as illegal female genital mutilation.

Fox reported that the DOJ investigation stems from a memo U.S. Attorney General Pam Bondi issued earlier this year instructing prosecutors to use a federal law against female genital mutilation — or FGM, in the memo's terminology — to investigate medical providers offering gender-affirming surgeries.

JA245

Case 1:25-cv-03780-JRR Document 1-30 Filed 11/17/25 Page 4 of 6



Attorney General Pam Bondi speaks at a news conference at the Drug Enforcement Administration, Tuesday, July 15, 2025, in Arlington, Va. (AP Photo/Julia Demaree Nikhinson)

"I am directing all U.S. Attorneys to investigate all suspected cases of FGM — under the banner of so-called 'gender-affirming care' or otherwise — and to prosecute all FGM offenses to the fullest extent possible," the memo stated, as reported by Fox.

The **federal law banning female genital mutilation** dates back to 1996, and the debate over it in Congress focused primarily on people from other countries **who had brought the practice to the United States**. The law contains a detailed definition of what constitutes illegal genital mutilation and also contains an exemption if a surgery is "necessary to the health of the person on whom it is performed."

There are **numerous different types** of gender-affirming surgeries, and many do not involve changes to the genitals.

In a statement to The Sun last week, Children's said it has never provided gender-affirming surgeries to patients under the age of 18. It **stopped offering such surgeries to patients 18 and older** in 2023. The hospital continued to provide non-surgical care.

JA246

The subpoena adds to the pressure Children's and other pediatric hospitals face over gender-affirming care.

Children's Hospital Colorado was among the nine hospitals that in May **received a letter from federal health authorities** asking for financial information and other details related to gender-affirming care. Children's said it provided a response to that request but did not elaborate.

Children's was one of three Colorado health systems — Denver Health and UCHealth were the others — that **shut down most gender-affirming care for trans youth** in January, when the Trump administration announced it would pull federal funding from hospitals that provided such care. Children's and Denver Health **started their care back up in February** after a federal judge blocked the order.

**The Daily Sun-Up podcast** | **More episodes** ─────────────────────────────

Like Children's, Denver Heath does not provide gender-affirming surgeries to youth. Both hospitals' care consists of providing hormone therapies, treatments that block the onset of puberty, counseling and other supportive care. UCHealth previously provided care only to patients 18 and older. Earlier this year, it changed the age cutoff to 19 and older.

Denver Health said it had not been contacted by the DOJ.

In its statement Thursday, Children's said it has not made changes to the care it offers as a result of the new subpoena.

"We believe families know what is best for their child and should have the right to access expert medical care to support their child's well-being, including gender-diverse youth," the hospital's statement read. "There is no change to our care model at this time."

© 2025 The Colorado Sun

JA247

JA248

**EXHIBIT P**

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

—————•◆•—————

## SUBPOENA DUCES TECUM

No. 25-1431-014

**To:**  The Children's Hospital of Philadelphia
3401 Civic Center Boulevard
Philadelphia, Pennsylvania 19104

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C.
on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to
proceedings in the district court of the United States to enforce obedience to the
requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996,
Public Law No. 104-91 (18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the
undersigned official of the United States Department of
Justice, has set his hand this 11th day June, 2025.

**BRETT
SHUMATE**

Digitally signed by BRETT
SHUMATE
Date: 2025.06.11 12:05:50
-04'00'

*(signature)*

JA250

**ATTACHMENT A TO SUBPOENA TO:**

THE CHILDREN'S HOSPITAL OF PHILADELPHIA
3401 CIVIC CENTER BOULEVARD
PHILADELPHIA, PENNSYLVANIA 19146-2305

## I. DEFINITIONS

1.    "You," "Your Company," "the Company," and "CHOP" means:

    a.    The Children's Hospital of Philadelphia, a Pennsylvania nonprofit corporation, whose principal place of business is located at 3401 Civic Center Boulevard, Philadelphia, Pennsylvania, without regard to any name under which it has done business;

    b.    All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, CHOP's Gender and Sexuality Development Program; and

    c.    Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2.    "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.    "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

    a.    All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

JA251

b.   Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.   Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.   Any electronic files saved as a backup, including metadata;

e.   Any deleted but recoverable electronic files, including metadata;

f.   Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.   Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.   All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.   "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.   "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.   "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.   "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

2

JA252

8.    "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.    "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10.    "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (e.g., leuprolide, triptorelin) used to delay the onset of puberty.

11.    "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12.    "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.    You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

a.    If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

b.    If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

2. **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3. Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a. Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b. The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c. The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4. The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5. If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6. The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7. All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

4

JA254

8.  If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

   a.  The name and title of the author (and if different, the preparer and signatory);

   b.  The name(s) and title(s) of the individual(s) to whom the document was addressed;

   c.  The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

   d.  The date of the document;

   e.  The number of pages;

   f.  A brief description of the subject matter;

   g.  A statement of the specific basis on which privilege is claimed; and

   h.  The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.  Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.  All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.  All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

JA255

4.  All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.  All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.  Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.  All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.  All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.  All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not

6

JA256

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

7

JA257

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

    **1.    Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

    **2.    Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a.    **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i.  All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

    ii.  All TIFF image files shall be stored with the ".tif" extension.

    iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

        1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

    iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

    v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,,\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,,\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,,\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,,\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,,\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

\\*CaseName*\LoadFiles
\\*CaseName*\Images < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\Natives <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\Text <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

\CaseName\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)
\CaseName\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3. Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

4

July 2022

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

4.    **Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

    b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

    c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    d. All files should be globally de-duplicated with the following conditions:

8

    i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

    ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

    iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

    iv. No customization of hashing may occur without prior express approval by the Government.

    v. De-duplication must be done by document family, not by individual document.

    vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

JA266

### 7.   Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.   Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

- a.   The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
- b.   If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.   Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

- a.   Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
- b.   The first document in the collection represents the parent document and all other documents will represent the children.
- c.   All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
- d.   All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.   Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

10

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

### 14.   Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.   Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.   Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

JA272

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

    a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

    b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

JA273

c.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.  Bates Number Convention

All images should be assigned Bates numbers before production to the government.  Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.  The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document.  Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field).  The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion.  The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file).  If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production.  There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
b.  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
c.  Government approved File Transfer Protocol (FTP) technologies.
d.  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
e.  Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses.  Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government.  Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions.  All encryption software shall be used with approval by and with the written consent of the government.

17

### 25. Privilege Logs

a.   The name and title of the author (and if different, the preparer and signatory);
b.   The name(s) and title(s) of the individual(s) to whom the document was addressed;
c.   The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d.   The date of the document;
e.   The number of pages;
f.   A brief description of the subject matter;
g.   A statement of the specific basis on which privilege is claimed; and
h.   The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

JA275

# EXHIBIT Q

Case 1:25-cv-03780-JRR    Document 1-32    Filed 11/17/25    Page 2 of 4



🖨 Print    ✖ Close

# FBI launches probes into 3 children's hospitals for alleged genital mutilation of minors

By Alec Schemmel

Published June 24, 2025

Fox News

**FIRST ON FOX:** The FBI has initiated criminal investigations of three children's hospitals after commitments from Attorney General Pam Bondi that the Trump administration would enforce federal statutes outlawing female genital mutilation to protect children from often irreversible sex-change surgeries.

The investigations target providers who work at Boston Children's Hospital, Children's Hospital Colorado and Children's Hospital Los Angeles, according to a source familiar with the investigation who spoke to Fox News Digital on the condition of anonymity. These hospitals have been among some of the foremost providers of sex change procedures for minors in America over the last several years, according to the source.

Just days after taking office, President Donald Trump issued an executive order directing all federal agencies to work toward terminating the ability for children under 18 to receive "irreversible medical interventions" as a treatment for gender dysphoria. Part of that effort included Attorney General Bondi issuing a memorandum several weeks later, directing Justice Department personnel to enforce 18 U.S.C. § 116, which is a federal statute that makes female genital mutilation against the law.

### FBI CALLS FOR PUBLIC TIPS ON CHILDREN HURT IN 'GENDER-AFFIRMING' SURGERIES



Attorney General Pam Bondi issued a memorandum in April instructing Justice Department personnel to enforce a federal statute that makes female genital mutilation against the law. (AP Photo/J. Scott Applewhite)

"I am putting medical practitioners, hospitals and clinics on notice: In the United States, it is a felony to perform, attempt to perform or conspire to perform female genital mutilation ("FGM") on any person under the age of 18," Bondi's memo said. "That crime carries a maximum prison sentence of 10 years per count. I am directing all U.S. Attorneys to investigate all suspected cases of FGM — under the banner of so-called 'gender-affirming care' or otherwise — and to prosecute all FGM offenses to the fullest extent possible."

Bondi also said in the memo that the Justice Department would be launching a new Coalition Against Child Mutilation, which will partner with state attorneys general to build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation. The memo added that the Justice Department's Office of Legislative Affairs is drafting legislation establishing a private right of action for children and parents of children "whose healthy body parts have been damaged by medical professionals through chemical and surgical mutilation" so they can hold hospitals and providers retroactively liable.



The FBI is launching new investigations of three children's hospitals for potential violations of federal female genital mutilation laws.

JA277

(Getty Images)

Amid the Trump administration's focus on banning irreversible transgender medical treatments for minors, numerous hospitals have amended their policies for who can obtain gender transition treatments and surgeries.

**MARJORIE TAYLOR GREENE PUSHES BILL TO PUNISH THOSE WHO PERFORM GENDER TRANSITION MEASURES ON MINORS**

Earlier this month, Children's Hospital Los Angeles announced it would permanently close its Center for Transyouth Health and Development, effective July 22, 2025. The decision was attributed to "significant operational, legal and financial risks stemming from the shifting policy landscape at both the state and federal levels," according to CBS News.

Children's Hospital Los Angeles did not respond to Fox News Digital's repeated requests for comment.



Children's Hospital Los Angeles announced this month it would permanently close its Center for Transyouth Health and Development. (Robyn Beck/AFP via Getty Images)

Children's Hospital Colorado initially suspended its transgender medical treatments for patients under 19 in response to the president's executive order directing hospitals to halt irreversible transgender treatments for minors. But after a judge's ruling blocking Trump's order, the hospital announced it would resume providing puberty blockers and hormone-based treatments to minors.

In a statement to Fox News Digital, a spokesperson for Children's Hospital Colorado noted that it has "never" provided transgender surgeries for those under 18, adding that, two years ago, the hospital stopped providing these surgeries for patients over 18. Instead, starting in 2023, the hospital decided to begin referring patients to outside providers for such services, according to Colorado Newsline.

**CLICK HERE TO GET THE FOX NEWS APP**



Boston Children's Hospital continues to operate its Gender Multispecialty Service program, according to publicly available information. (Lane Turner/The Boston Globe via Getty Images)

Boston Children's Hospital continues to operate its Gender Multispecialty Service (GeMS) program, according to publicly available information. While the hospital only provides gender-change surgeries for patients over 18, its GeMS program does offer transgender hormone therapy, puberty blockers and social transitioning for patients under 18. It also provides referrals for gender-transition surgeries to minors as well.

In a statement to Fox News Digital, Boston Children's said it had not yet received any notice from the FBI regarding alleged

JA278

violations of federal law. The FBI said that, as a matter of policy, it "declines to confirm or comment on investigations."

🖶 Print      ⊗ Close

**URL**
https://www.foxnews.com/politics/fbi-launches-probes-against-3-childrens-hospitals-genital-mutilation-minors

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

JA279

**EXHIBIT R**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re 2025 UPMC Subpoena | Civil Action No. 2:25-mc-01069 A. et al |

## MOTION TO QUASH SUBPOENA DUCES TECUM

1.    Upon information and belief, in or around June of 2025, an administrative Subpoena was issued by Requester, The United States of America Department of Justice ("Requester"), upon Respondent, University of Pittsburgh Medical Center ("Respondent" or "UPMC"), pursuant to 18 U.S.C. § 3486. The presence of such Subpoena has been publicly reported and confirmed by counsel for UPMC.

2.    Upon information and belief, the Subpoena issued to UPMC is identical or substantially similar to the subpoenas issued to Children's Hospital of Philadelphia and Boston Children's Hospital.[1]

3.    Movants are patients and former patients who received gender-affirming care from UPMC, along with their parents. Upon information and belief, the Subpoena seeks Movants' identities and medical records and the intimate personal details therein. In requesting such records, the Subpoena violates the privacy rights of patients and their parents. The Requester also issued the Subpoena for an improper purpose.

---

[1] See In Re: Subpoena No. 25-1431-014, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1; In Re: Administrative Subpoena No. 25-1431-019, 1:25-mc-91324 (D. Mass. July 8, 2025), Dkt. No. 5-1.

1

JA281

4.      Movants hereby move this Court for an order quashing requests for patient records demanded in the Subpoena, more specifically identified below. Movants seek to quash the Subpoena as to the following requests:

    a.  Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

    b.  Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

    c.  Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."[2]

    d.  Any and all other Requests enumerated in the Subpoena (Request 1 through Request 15) to the extent that such Requests or sub-Requests call for the production of the identities or health information of patients and their parents or guardians.

5.      In support of this Motion, Movants incorporate an accompanying memorandum of law and declarations.

**WHEREFORE**, Movants respectfully request that this Court quash the Subpoena as requested in this motion.

---

[2] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 at 40–41.

2

JA282

Dated: September 24, 2025

By: /s/ Jill Steinberg
Jill Steinberg* (PA 82127)
J. Chesley Burruss* (PA 331521)
Kevin M. Hayne* (NY 5967526)
Elizabeth A. Lilly* (PA 336185)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
215-665-8500
steinbergj@ballardspahr.com
burrussc@ballardspahr.com
haynek@ballardspahr.com
lillye@ballarspahr.com

By: /s/ Alison Gutierrez
Rachael L. Dizard (PA 315482)
Alison Gutierrez (PA 330738)
FOX ROTHSCHILD LLP
Six PPG Place
Suite 1000
Pittsburgh, PA 15222
RDizard@foxrothschild.com
agutierrez@foxrothschild.com

Respectfully submitted,

By: /s/ Mary M. McKenzie
Mary M. McKenzie* (PA 47434)
Daniel Urevick-Ackelsberg* (PA 307758)
Meghan Binford* (PA 321212)
Olivia Mania* (PA 336161)
PUBLIC INTEREST LAW CENTER
2 Penn Center
1500 JFK Blvd., Suite 802
Philadelphia, PA 19102
267-546-1316
mmckenzie@pubintlaw.org
dackelsberg@pubintlaw.org
mbinford@pubintlaw.org
omania@pubintlaw.org

*Counsel for Movants*
*Pro hac vice forthcoming*

3

JA283

# EXHIBIT S

### RETURN OF SERVICE

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1. Personal delivery to an individual, to wit:

_____
*(name)*

_____
*(title)*

_____
*(address)*

2. Personal delivery to an address, to wit:

_____
*(description of premises)*

_____
*(address)*

3. Registered or certified mailing to:

_____
*(name)*

_____
*(address)*

At _____ a.m. | p.m. on

_____
*(date)*

_____
*(signature)*

_____
*(title)*

**UNITED STATES OF AMERICA**
**DEPARTMENT OF JUSTICE**

**SUBPOENA DUCES TECUM**

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

JA285

## ATTACHMENT A TO SUBPOENA TO:

QUEER DOC PLLC
C/O REGISTERED AGENT: SHARON K. COGGINS
348 17TH AVENUE
SEATTLE, WASHINGTON 98122-5707

## I. DEFINITIONS

1.    "You," "Your Company," "the Company," and "Queer Doc" means:

    a.    Queer Doc PLLC., a Washington professional limited liability company, whose principal mailing address is: 113 Cherry Street, Seattle, Washington, 98104-2205, without regard to any name under which it has done business;

    b.    All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part; and

    c.    Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority, including without limitation: Crystal Joy Beal; Stetson Jo Aman; Lin-Fan Wang; Courtney Lee Rawls; Nora Gause; and Kai Mai.

2.    "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3.    "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

    a.    All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

JA286

b.  Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.  Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.  Any electronic files saved as a backup, including metadata;

e.  Any deleted but recoverable electronic files, including metadata;

f.  Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.  Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.  All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.  "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.  "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.  "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.  "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

JA287

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9. "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs (*e.g.,* estradiol, testosterone) used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1. You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a. If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b. If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

JA288

2.  **<u>No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible</u>**. Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3.  Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

    a.  Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

    b.  The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

    c.  The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.  The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.  If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.  The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.  All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

4

JA289

8.   If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

   a.   The name and title of the author (and if different, the preparer and signatory);

   b.   The name(s) and title(s) of the individual(s) to whom the document was addressed;

   c.   The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

   d.   The date of the document;

   e.   The number of pages;

   f.   A brief description of the subject matter;

   g.   A statement of the specific basis on which privilege is claimed; and

   h.   The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.   Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.   All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.   All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

JA290

4.  All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.  All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.  Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.  All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.  All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.  All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

6

JA291

approved by the United States Food and Drug Administration) and potential risks.

14.     All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15.     All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

7

JA292

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

**1.     Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2.     Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto.  The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties.  No alteration shall be made to file names or extensions for responsive native electronic files.  If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction..  Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

   a. **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

   b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

ii. All TIFF image files shall be stored with the ".tif" extension.

iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

   1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

    REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
    REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
    REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
    REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
    REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

2

JA294

*July 2022*

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

\\*CaseName*\\**LoadFiles**
\\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

JA295

*July 2022*

*\CaseName\***Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)
*\CaseName\***Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.  Required Metadata/Database Fields

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

4

JA296

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

5

JA297

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

JA298

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

JA299

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

8

JA300

*July 2022*

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

JA301

*July 2022*

### 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

  a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

  b. If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

  a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

  b. The first document in the collection represents the parent document and all other documents will represent the children.

  c. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

  d. All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

10

JA302

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

11

JA303

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

JA304

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

JA305

*July 2022*

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

14

*July 2022*

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

JA307

*July 2022*

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

b.   GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

JA308

*July 2022*

    c.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.

    b.   External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives

    c.   Government approved File Transfer Protocol (FTP) technologies.

    d.   Storage media used to deliver ESI shall be appropriate to the size of the data in the production.

    e.   Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

17

JA309

*July 2022*

### 25.  Privilege Logs

a.   The name and title of the author (and if different, the preparer and signatory);

b.   The name(s) and title(s) of the individual(s) to whom the document was addressed;

c.   The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d.   The date of the document;

e.   The number of pages;

f.   A brief description of the subject matter;

g.   A statement of the specific basis on which privilege is claimed; and

h.   The paragraph or subparagraph of the Subpoena to which it is responsive.

### 26.  Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 27.  Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 28.  Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 29.  Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

18

JA310

# EXHIBIT T

JA311

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 2 of 9

11/13/25, 4:21 PM    Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught - TPM – Talk...

 Send Tips   Sign In   Join

NEWS

# Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught

 **by Josh Kovensky and Kate Riga**
08.25.25 | 6:08 pm

JA312

11/13/25, 4:21 PM     Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught - TPM – Talk…

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 3 of 9



U.S. President Donald Trump talks to the media at Trump Turnberry golf club on July 28, 2025 in Turnberry, Scotland. (Photo by Christopher Furlong/Getty Images)

💬 77

The Trump administration has strong-armed the University of Michigan's statewide hospital system over its provision of transgender health care services for minors, sending a subpoena in recent weeks to University of Michigan Health, TPM has learned.

The investigation has prompted the university to suspend gender-affirming care at its hospitals for those under 19, the university told TPM in an exclusive statement.

"The University of Michigan, including Michigan Medicine, is one of multiple institutions across the country that has received a federal subpoena as part of a criminal and civil investigation into gender-affirming care for minors," the statement reads. "In light of that investigation, and given escalating external threats and risks, we will no

JA313

longer provide gender affirming hormonal therapies and puberty blocker medications for minors."

For the Trump administration, University of Michigan Health's decision is a win. In this case, federal officials have used the prospect of a lengthy civil or criminal investigation to pressure the hospital system.

One source familiar with the university's decision-making told TPM that University of Michigan Health's leadership interpreted the subpoena as a threat that could portend criminal prosecution. Per the source, individual doctors received a hold order not to destroy documents.

The demand came in the form of an administrative subpoena, per the source. The demand is similar to a subpoena received by the Children's Hospital of Philadelphia and entered as an exhibit into a lawsuit earlier this month, the source said.

The Department of Justice did not respond to a request for comment.

Per an internal university memo obtained by TPM, University of Michigan Health first received a subpoena on July 14 that indicated the DOJ was pursuing a civil and criminal investigation.

DOJ attorneys had indicated they were investigating the doctors on suspicion of abusing their authority to prescribe medication, among other potential charges, the source said. The source said that those at the University of Michigan Health system had heard for a few weeks that they were next in line.

"We recognize the gravity and impact of this decision for our patients and our community. We are working closely with all those impacted, and we will continuously support the well-being of our patients, their families, and our teams," the hospital system added in its statement to TPM. "We

JA314

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 5 of 9

11/13/25, 4:21 PM          Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught - TPM – Talk…

are deeply grateful to our clinicians for their unyielding commitment to providing the highest quality care, and to all of our team members for their dedication to helping our patients, and to supporting each other, as we navigate these changes together."

The targeting of the health system appears to be part of a broader salvo from the Trump administration, as it takes further steps to threaten hospitals into backing away from providing gender-affirming care.

The FBI posted a tipline on X in early June, seeking names of "any hospitals, clinics, or practitioners" "mutilating children under the guise of gender-affirming care."

Trump's DOJ announced on July 9 that it had sent more than 20 subpoenas to doctors and clinics "involved in performing transgender medical procedures on children." University of Michigan Health received its subpoena a few days later. The Children's Hospital of Philadelphia, the University of Pittsburgh Medical Center and UChicago Medicine have been reported to be among the institutions that received subpoenas.

Michigan Attorney General Dana Nessel joined a multistate lawsuit on August 1 — two weeks after the University of Michigan health system received its subpoena — to block the administration from using threats of criminal prosecution to restrict care.

Significant evidence has emerged in recent weeks that the Trump administration is aggressively pursuing investigations into other providers of transgender health care, particularly for minors. The administrative subpoena to the Children's Hospital of Philadelphia, filed this month in a lawsuit brought by state attorneys general, seeks a broad range of documents relating to "puberty blockers," "gender-related care," and other

JA315

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 6 of 9

topics related to transgender care. In that case, the subpoena directed the hospital to appear before the DOJ's consumer protection branch.

It cited a statute that allows investigators to issue administrative subpoenas for investigations into federal health care-related offenses for use in either civil or criminal cases.

For the University of Michigan hospital system's administrators and clinicians, the subpoena left little clarity on how to fight back: There's no criminal charge that they can defend against, no new law or federal rule interpretation to challenge in court, the person familiar emphasized. All they have, the person said, is the prospect of heavy legal fees and, for the doctors, a looming fear of potentially losing their medical licenses while under the cloud of an endless investigation.

The University of Michigan may have been in the Trump administration's sights already, as it had targeted the hospital system over a separate gender-affirming care-related issue earlier in the summer.

Back in June, Trump's HHS launched an <u>investigation</u> into the case of a physician's assistant in University of Michigan Health system who claimed that she was fired after refusing to perform gender-affirming care or use patients' preferred pronouns under a religious exemption. Valerie Kloosterman's case was taken up by the First Liberty Institute, a right-wing law firm that sits on the advisory board of Project 2025.

"The investigation will probe whether the health system has policies consistent with the Church Amendments for accommodating health care workers with religious beliefs or moral convictions that are contrary to certain procedures or certain health service programs," HHS' Office for Civil Rights said in a <u>press release</u>.

JA316

Case 1:25-cv-03780-JRR   Document 1-35   Filed 11/17/25   Page 7 of 9

11/13/25, 4:21 PM          Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught - TPM – Talk...

A federal judge dismissed Kloosterman's lawsuit, ruling she had to proceed to arbitration. Her attorneys appealed, and the case is currently before the 6th Circuit.

Rachel Crandall Crocker, co-founder of TransGender Michigan, told TPM that the university's medical system is one of two transgender health care providers in the state. Losing it will massively complicate the lives of transgender Michiganders, she said.

"It would leave a big hole in services," Crocker told TPM. "A lot of people would be out of luck."

The focus on Michigan is just one front in an onslaught from an administration fixated on making health care, legal protection and self-identification much more fraught for the trans community. Its right-wing media allies have derived hours of content from the skirmishes, contributing to the souring of public opinion on trans rights.

"The approach now can best be described as misleading, punitive, and invasive of adults' ability to make their own healthcare decisions in consultation with their providers and, for young people, of the privacy of parents, youth, and their healthcare providers, all informed by experience and expertise in the field," Suzanne Goldberg, cofounder of Columbia Law School's Center for Gender and Sexuality Law, told TPM.

✈ Send Tips

**Josh Kovensky** is an investigative reporter for Talking Points Memo, based in New York. He previously worked for the Kyiv Post in Ukraine, covering politics, business, and corruption there.

**Kate Riga** is a D.C. reporter for TPM and cohost of the Josh Marshall Podcast.

Includes:   Department of Justice   Donald Trump   featured   gender-affirming care   transgender rights

JA317

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 8 of 9

University of Michigan

PAID PROMOTION

Promoted Links by Taboola

**Amazon Worst Nightmare: Shoppers Are Canceling Prime For This Clever Hack**

This simple trick can save tons of money on amazon but most Prime members are ignoring it.

Online Shopping Tools

**The sea comes under the Christmas tree with sea glass gifts**

Christmas 2025

**Side Sleepers Get Achy Shoulders, Few Know This "Side Sleeper" Trick**

Sleep Digest Publication

**Meet the powerful tools everyone needs to thrive at work.**

Learn how to create, edit, e-sign, and so much more with tools from Adobe Acrobat Pro. You can do ...

Adobe Systems Incorporated

**Emma & Mia Are Retiring — Their Jewelry Is 50% Off**

For over 30 years, Emma & Mia crafted each piece with love. Now they're retiring. Their final ...

The Art Journal

**Up to 50% Off Her Final Italian Leather Collection**

JB

Learn More

**Most Put Parents in Assisted Living, But This Son Knew Better**

This doctor found what Japanese have always known

US Medicine Today

**Donald Trump Has Triggered A Groyper Meltdown**

After Donald Trump announced Sen. JD Vance (R-OH) as his running mate several weeks back, we ...

**CVS Hides This $1 Generic Viagra - Here's the Aisle It's Really In.**

Friday Plans

JA318

Case 1:25-cv-03780-JRR    Document 1-35    Filed 11/17/25    Page 9 of 9

11/13/25, 4:21 PM    Exclusive: The University of Michigan Will End Gender-Affirming Care for Minors Amid Trump Admin Legal Onslaught - TPM – Talk...

LATES



### TPM 25

## We Tried to Get Big Tech to Pay for Wrecking Journalism. It Didn't Work Out.

11.13.25 | 11:24 am



### MEMO MORNING

## The Corrupt Roots of America's Elite Run Deep

11.13.25 | 7:44 am



### NEWS

## How the Trump Admin Has Sown Fear Among Progressive Nonprofits

11.13.25 | 7:00 am

 **Talking Points Memo**

© 2025 TPM MEDIA LLC.

   

Masthead    Contact    Privacy Policy

JA319

# EXHIBIT U

 Children's National.


**MENU**

Get Care › Departments

# LGBTQ+ Care and Support



Menu



## A Message for Existing and New Patients

In light of escalating legal and regulatory risks to Children's National, our providers, and the families we serve, we are discontinuing the prescription of gender-affirming medications. This

JA321

change went into effect on August 30, 2025.

Mental health and other support services for LGBT patients remain available. You are always welcome at Children's National for your other medical needs.

We know this change will have a significant impact on affected patients, families and staff. Our care teams are working directly with families of current patients to support them.

If you have questions or need further assistance, please contact us directly.

At Children's National Hospital, we support our LGBTQ+ (lesbian, gay, bisexual, transgender and questioning/queer) patients through a variety of programs and services:

- The Youth Pride Clinic provides comprehensive primary, specialty and mental healthcare to youth and young adults between the ages of 12 to 21. We also provide high-quality health and wellness care in a safe and affirming environment for transgender and gender-nonconforming youth.

- The Gender Development Program is our multidisciplinary program for transgender and gender-diverse youth and their families. Psychiatry, psychology, speech therapy, endocrinology and gynecology collaborate to help parents and gender-diverse youth navigate gender development through personalized assessments and care.

- Children and teens who have gender dysphoria and autism spectrum characteristics (or related conditions) have access to our Gender and Autism Program.

If you are unsure of what services you need to seek for your child, contact our **patient navigator** at 202-476-5744.

⊕   **Career Opportunities at Children's National**

JA322

Case 1:25-cv-03780-JRR    Document 1-36    Filed 11/17/25    Page 4 of 4



**Donate**    **Pay Your Bill**

| | |
|---|---|
| About Us | Residencies and Fellowships |
| Careers | |
| Contact Us | Children's National Hospital Foundation |
| Departments | Español |
| In the Community | International Patients |
| News and Events | Research News |
| Price Transparency | Wellness Advice |

📍 111 Michigan Avenue NW, Washington DC 20010

📞 202-476-5000

   

 

© Children's National Hospital 2025

Terms of Use | Patient Family Rights | Report a Compliance Concern | Web Accessibility

JA323

**EXHIBIT V**

 **Children's National.**

**MENU**

Get Care › Departments

# Gender Development Program

Call 202-476-5744



Menu

## A Message for Existing and New Patients

In light of escalating legal and regulatory risks to Children's National, our providers, and the families we serve, we are discontinuing the prescription of gender-affirming medications. This change went into effect on August 30, 2025.

Mental health and other support services for LGBT patients remain available. You are always

JA325

welcome at Children's National for your other medical needs.

We know this change will have a significant impact on affected patients, families and staff. Our care teams are working directly with families of current patients to support them.

If you have questions or need further assistance, please contact us directly.

Some young people feel, sense or know they are a gender different than the one they were assumed at birth. They may live and dress in ways typical of another gender (gender non-conformity), and some may experience the need to live and be affirmed as this gender in some or all settings. This can be an urgent need, or for others, there may be experimentation and exploration. There are also some young people who show gender non-conformity in their everyday behaviors, but may not yet have the self-advocacy skills to discuss their gender identity and their gender-related needs.

The Gender Development Program at Children's National recognizes that each child's gender journey is unique. Our team has been supporting the gender needs of youth and their families for the past 20 years, providing essential care at a time they need it most. Care is individualized for each patient and always involves families making decisions in coordination with a team of highly trained pediatric specialists.

## Our Providers

Our pediatric specialists provide personalized care for your child's physical, mental and emotional health needs.

Meet the Team

JA326

## Contact Information

For appointments, please call 1-888-884-BEAR (2327) and for information, call 202-476-5744.

Appointments    Information 📞

# Programs Related to Gender Development

We collaborate with departments throughout Children's National to provide the best possible care to children with gender development needs.

### Gender and Autism Program

---

### Positive Reevaluation of Urogenital Differences (PROUD) Clinic

---

### Youth Pride Clinic

# Caring for Gender-Diverse Youth and Their Families

Our multidisciplinary Gender Development Program team understands that the gender development of a child may be confusing to parents and families, providers and sometimes young people themselves. Parents may wonder:

- How can my child's gender-related needs best be supported?
- How do we navigate our child's gender diversity in everyday life (e.g., with family, in school, when moving into adulthood, etc.)?
- Is my child transgender?
- Will my child's gender and gender-related needs change over time?

JA327

The needs of gender-diverse youth are often complex, requiring a multidisciplinary team approach and ongoing care supports over time.

## About Us

As one of the earliest founded youth gender programs, we are a multidisciplinary team of specialists who work in the assessment and broad care needs of youth on the gender spectrum and their families. We also conduct cutting-edge research to move forward our understanding of youth gender development and ways to best support gender-diverse and transgender youth. Research findings inform all of our clinical care.

We work with gender exploring, gender non-conforming, gender dysphoric, gender non-binary, transgender and gender-questioning young people, and we see children and adolescents of all ages. We also work with youth who have genetic and other conditions in which gender variation is common.

We offer:

⊕  **Personalized Evaluations and Tailored Care**

⊕  **Comprehensive Services and Collaboration with Multiple Specialties**

⊕  **Unique Programs for Diverse Needs**

## Evaluation and Ongoing Supports

Your child's care will start with an initial evaluation by our team. During this two to three-hour visit, you will meet the team together with your child and also separately. The goals of these visits vary from family to family and may include:

- Understanding the various aspects of your child's gender development
- Screening for any mental health concerns/risks

JA328

- Support for parenting a gender diverse child

- Support for families navigating issues related to siblings, friends, school, etc.

We may ask you and your child to return for periodic follow-up visits. These visits can help us make a more extended evaluation. Your team also may suggest treatments or supportive services through Children's National or in the community such as:

- Individual supports for youth and/or parents

- Family-specific supports

- School supports/interventions

- Support groups for you and/or your child

# Recognized for Excellence

Our colleagues and peers have recognized the important care our Gender Development Program provides. Our advocacy and education efforts have been honored with the following national awards recognizing our commitment to providing compassionate, patient- and family-centered care:

- The Skylight Project Ma Vie En Rose Children's Advocate Award, San Francisco, California

- The D.C. Youth Pride Alliance's 10 Year Anniversary Award

- The Stuart Nichols Award for outstanding achievements in gay, lesbian, bisexual and transgender community mental health

## Frequently Asked Questions About Our Gender Development Program

At Children's National, we understand that families have many questions about their child's condition and care. Review our frequently asked questions regarding the Gender Development Program to learn more.

**Read our FAQs**

JA329

# Locations





## Main Hospital

⦿ 111 Michigan Avenue, NW
Washington, DC 20010

☎ 1-888-884-2327

✚ Emergency Department Info

( Specialty Care )   ( Emergency Care )

## Montgomery County

⦿ 9850 Key West Avenue
Rockville, Maryland 20850

☎ 301-765-5400

🖨 301-294-0897

( Specialty Care )

**All Gender Development Program Locations**

## Family Resources

Learn about the support groups we offer for parents and children, and explore our other family resources.

View family resources

JA330

Case 1:25-cv-03780-JRR     Document 1-37     Filed 11/17/25     Page 8 of 9



# Visiting Children's National

We're here to help make your trip to Children's National as easy as possible. Discover information about transportation and parking, visiting hours, where to stay during your visit, spending the night at the hospital and things to do in the area.

Plan Your Visit



**Children's National.**

Donate        Pay Your Bill

**About Us**                    **Contact Us**

**Careers**                     **Departments**

JA331

In the Community

News and Events

Price Transparency

Residencies and Fellowships

Children's National Hospital Foundation

Español

International Patients

Research News

Wellness Advice

**♥** 111 Michigan Avenue NW, Washington DC 20010

**☎** 202-476-5000

f      ⊙      ♪      in      ▶

 

© Children's National Hospital 2025

Terms of Use | Patient Family Rights | Report a Compliance Concern | Web Accessibility

JA332

# EXHIBIT W

 Outlook

---

**RE: Challenge to Subpoena to Children's National Hospital regarding gender transition treatment**

---

**From** Goldstein, Ross <Ross.Goldstein@usdoj.gov>

**Date** Fri 11/14/2025 4:43 PM

**To** Eve Hill <EHill@browngold.com>; Runkle, Patrick <Patrick.R.Runkle@usdoj.gov>; Dahlquist, Scott B. <Scott.B.Dahlquist@usdoj.gov>

**Cc** Jennifer Levi <jlevi@gladlaw.org>; Donovan Bendana <dbendana@gladlaw.org>

Good afternoon, Ms. Hill:

Thank you for reaching out. In response to your queries:

- Yes, the subpoena to Children's National is substantively identical to those served on Boston Children's and CHOP.
- ███████████████████████████████████
- ███████████████████████████████████

Of course, please feel free to call if you wish to discuss further.

Regards,
Ross

 **Ross S. Goldstein | Assistant Director**
United States Department of Justice
Enforcement & Affirmative Litigation Branch
450 Fifth Street, NW #6400
Washington, D.C. 20001

Tel: (202) 353-4218
Fax: (202) 514-8742
ross.goldstein@usdoj.gov



JA334

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

Case No.: JRR 2 5 MC 0 0 7 0 9

In Re. 2025 Subpoena to Children's National Hospital

**[PROPOSED] ORER**

Upon consideration of the Movants' Motion to Quash Subpoena Duces Tecum, any response thereto, and argument thereupon, it is hereby **ORDERED** that the Subpoena is hereby **Quashed** as to Requests 11, 12, and 13, and any and all other Requests to the extent that such Requests or sub-Requests call for the production of the identities or records of Children's National Hospital patients or their families.

To the extent any quashed records have been produced previous to this Order, the United States Department of Justice shall no longer access such records, and the parties shall within seven (7) days meet and confer regarding appropriate prophylactic measures to be taken and submit a joint report and any joint or individual proposals to the Court.

**IT IS SO ORDERED.**

Dated:                                            BY THE COURT:

_____

JA335

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

USDC- BALTIMORE
'25 NOV 17 PM3:52

Case No.: ___JRR 2 5 MC 0 0 7 0 9___

**MOVANTS' MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS, TO WAIVE REQUIREMENT UNDER LOCAL RULE 102.2(a) TO PROVIDE ADDRESSES IN COMPLAINT CAPTION, AND FOR PROTECTIVE ORDER**

Movants, by and through their attorneys, respectfully move this Court to (1) grant them leave to proceed under pseudonyms; (2) waive the requirement under Local Rule 102.2(a) to provide their names and addresses; and (3) issue a related protective order that prohibits disclosure of Movants' identities to Requester and the public. Movants' counsel has conferred with Requester's counsel, who does not oppose Movants proceeding pseudonymously.

Movants challenge a subpoena they believe was issued by Requester, the U.S. Department of Justice, to Children's National Hospital. The subpoena seeks voluminous private and personal information about Movants and their receipt of transgender healthcare from Children's National Hospital. Through a motion to quash, Movants seek to prevent the disclosure of this extremely sensitive information to Requester. Requiring Movants to reveal their names in order to challenge the subpoena would undermine the very purpose of their motion, as it would identify them as patients who received transgender healthcare from Children's National Hospital.

In light of their status as transgender minors, young adults, and parents of transgender children, the importance of sensitive medical information in this case, the animus expressed by the administration, and the salience of this issue in the news media, Movants are concerned about the social stigmatization, harassment, retaliation, discrimination, and potential violence they may



HD

Rcv'd by: _____

JA336

experience from others, including Requester, the U.S. Department of Justice, that could cause them significant harm if their identities are disclosed to Requester and the public. Movants thus respectfully request that this Court grant Movants' motion to proceed under pseudonyms, waive the requirement under Local Rule 102.2(a) to provide their names and addresses, and issue a protective order protecting their identifying information from release to Requester or the public.

Dated: November 17, 2025

*Eve L. Hill*

Eve L. Hill (Bar No. 19938)
ehill@browngold.com
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869

Jennifer L. Levi (Pro Hac Vice to be submitted)
**GLBTQ Legal Advocates & Defenders**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
saustin@glad.org

*Attorneys for Movants*

2

JA337

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Movants' Motion to Proceed Under Pseudonyms, Memorandum of Law in Support, and Proposed Order were served via first-class mail and email by agreement of the Requestor, on November 17, 2025, to Requester U.S. Department of Justice as follows:

> Kelly O. Hayes
> **U.S. Attorney for the District of Maryland**
> 36 S. Charles Street
> 4th Floor
> Baltimore, MD 21201
>
> Jolene Anne Lauria
> **U.S. Department of Justice**
> **Justice Management Division**
> 950 Pennsylvania Avenue, NW
> Room 1111
> Washington, DC 20530
>
> Ross S. Goldstein
> Patrick Runkle
> Scott B. Dahlquist
> **U.S. Department of Justice**
> Ross.Goldstein@usdoj.gov
> Patrick.R.Runkle@usdoj.gov
> Scott.B.Dahlquist@usdoj.gov

DATED: November 17, 2025

_Eve L. Hill_
Eve L. Hill
Brown, Goldstein & Levy LLP
120 East Baltimore St, Suite 2500
Baltimore, MD 21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869
E-mail: ehill@browngold.com

*Attorney for Movants*

3

JA338

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: ___JRR 25 MC 0 0 7 0 9___<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO PROCEED UNDER PSEUDONYMS, TO WAIVE REQUIREMENT UNDER LOCAL RULE 102.2(a) TO PROVIDE ADDRESSES, AND FOR PROTECTIVE ORDER** |

**INTRODUCTION**

Movants are transgender former patients of Children's National Hospital ("Youth Movants") and their parents ("Parent Movants"). They bring this action to challenge the subpoena issued by the U.S. Department of Justice ("Requester") to Children's National Hospital seeking voluminous private and personal information about their healthcare. Counsel for Requester, the U.S. Department of Justice, does not oppose Movant's motion to proceed pseudonymously.

Movants seek to protect their privacy to avoid the risk of harassment and retaliation they would be likely to face if their identities were disclosed. There is tremendous social stigmatization associated with being transgender and with receiving treatment for gender dysphoria, especially as individuals standing up for their rights in the face of such stigma.

The Youth Movants are minors and young adults seeking to proceed under pseudonyms to protect their identities and sensitive medical information. The Parent Movants seek to proceed under pseudonyms to protect their children's identities and sensitive medical information, and to avoid retaliation. The identification of the Parent Movants by their legal names would erase the

protection of confidentiality to which the Youth Movants are entitled because the Youth Movants would be readily identifiable through the names of their parents.  Proceeding under pseudonyms is also necessary to protect Movants from undue harassment, discrimination, and violence because of their transgender status and because the Parent Movants have sought medical advice and consented to gender transition healthcare for their transgender adolescent children.

To avoid invading Youth Movants' medical privacy and subjecting them to risks of serious harm, Movants respectfully request permission to litigate under pseudonyms for the duration of this case.  To protect their privacy and safety and to avoid exposure to discrimination, harassment, and retaliation, Movants also request waiver of the requirement under Local Rule 102.2(a) that they provide their addresses and seek a protective order limiting disclosure of their identities to the court only, and not to Requester or the public.

Because this request is vital for protecting Movants from harm and will not impede the public's understanding of the case, Movants' request easily satisfies the Fourth Circuit's five-factor balancing test announced in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), and should be granted.

**LEGAL STANDARD**

The Fourth Circuit has held that trial courts have discretion to permit parties to proceed pseudonymously, acknowledging that pseudonymity is appropriate where "privacy or confidentiality concerns are . . . sufficiently critical." *James*, 6 F.3d at 238.  Under *James*, the Fourth Circuit instructs district courts to balance several factors when determining whether to permit a party to proceed under pseudonyms.  Those factors include:

2

JA340

> [1] [W]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;
>
> [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties;
>
> [3] the ages of the persons whose privacy interests are sought to be protected;
>
> [4] whether the action is against a governmental or private party; and, relatedly,
>
> [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* (numerals added).

The five *James* factors are "guidelines" and are not exhaustive. *See id.* (noting five factors were among the guidelines "that have relevance to this case"). "At bottom . . . the trial court must 'carefully review *all* the circumstances of the case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns.'" *Doe v. Alger*, 317 F.R.D. 37, 39–40 (W.D. Va. 2016) (quoting *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992)) (emphasis in original).

## ARGUMENT

Movants should be permitted to proceed under pseudonyms. Theirs is precisely the type of case that warrants an exception to the general rule favoring public disclosure.

## I. Courts regularly allow transgender youth to proceed pseudonymously.

Applying the *James* test, courts in this Circuit and across the nation have permitted transgender plaintiffs to proceed under pseudonyms because "transgender individuals often face verbal and physical harassment when forced to reveal their transgender status." *Hersom v. Crouch*, No. 2:21-CV-00450, 2022 WL 908503, at *2 (S.D. W. Va. Mar. 28, 2022) (applying *James* factors); *see also Doe v. City of Detroit*, No. 18-CV-11295, 2018 WL 3434345, at *2 (E.D. Mich. July 17, 2018) (collecting cases and noting "the increased threat of violence to

3

which transgender individuals are exposed"); *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 549 n.14 (D. Md. 2025) (allowing plaintiffs to proceed under pseudonyms because their transgender status is the basis of "'undue harassment, discrimination, and violence'" (citation omitted)); *Voe v. Mansfield*, No. 1:23CV864, 2024 WL 5120258, at *2 (M.D.N.C. Dec. 16, 2024) (noting court permitted "two parents and their transgender minor child" to proceed under pseudonyms); *Doe v. McHenry*, Civ. No. 25-286 (JEB), 2025 WL 596650, at *4-5 (D.D.C. Jan. 31, 2025) (pseudonymity granted for incarcerated transgender people); *Jones v. Trump*, Civ. No. 25-401 (UNA), 2025 WL 485419, at *5 (D.D.C. Feb. 13, 2025) (same); *Doe v. Blue Cross & Blue Shield of R.I. (BCBSRI)*, 794 F. Supp. 72, 74 (D.R.I. 1992) (transgender "plaintiff's privacy interest is both precious and fragile, and this Court will not cavalierly permit its invasion."); *Doe v. United Services Life Ins. Co.*, 123 F.R.D. 437, 438 (S.D.N.Y. 1988) (allowing pseudonym in recognition of privacy concerns related to exposure of plaintiff's sexual orientation).

The five-factor balancing test set forth in *James* strongly favors permitting Plaintiffs to proceed under pseudonyms in this litigation.

### A.    Disclosing Movants' identifying information would reveal highly sensitive and personal matters.

Under *James*, pseudonymity is favored where the matter is one "of sensitive and highly personal nature." *James*, 6 F.3d at 238. Courts have recognized that a "person's transgender status is a highly sensitive and personal matter" worthy of protection under the first *James* factor. *Hersom*, 2022 WL 908503, at *1 (permitting transgender college student to proceed under pseudonym). Additionally, courts have recognized that "information about [a] plaintiff's medical conditions" is "sensitive and highly personal." *Doe v. Chesapeake Med. Sols., LLC*, No. SAG-19-2670, 2020 WL 13612472, at *1 (D. Md. Feb. 26, 2020). "Courts have held that minors' privacy interests in medical and financial information sufficiently outweigh the common

4

law right of access" when considering motions to proceed pseudonymously. *J.K. v. Bedell*, No. 1:25-CV-00483-JRR, 2025 WL 694541, at *2 (D. Md. Mar. 3, 2025) (quoting *A.P.G. by Jones v. Fisher-Price, Inc.*, No. 3:22CV112 (DJN), 2023 WL 4406023, at *4 (E.D. Va. July 7, 2023)) (cleaned up); *see also Charles H. v. District of Columbia*, No. 1:21-cv-00997, 2021 WL 6619327, at *2 (D.D.C. Apr. 9, 2021) (disabilities and medical histories "are paradigmatically 'sensitive' and 'highly personal.'") (citing *J.W. v. District of Columbia*, 318 F.R.D. 196, 202 (D.D.C. 2016)); *Courtenay J. v. Cigna Health and Life Ins. Co.*, Civ. No. 25-80 (JEB), 2025 WL 435987, at *2 (D.D.C. Feb. 7, 2025) (same); *McCutchen v. Becerra*, No. 1:21-cv-01112, 2021 WL 1718806, at *3 (D.D.C. Apr. 23, 2021) (citation omitted) (granting pseudonyms to minor plaintiffs and their parents to protect "detailed information regarding their medical conditions and medical treatment").

Here, Youth Movants' transgender status, medical diagnoses of gender dysphoria, medical treatment, and medical and mental health histories are central to this case – this highly sensitive and private information is precisely the information Movants seek to prevent being revealed to Requester. Requiring Movants to identify themselves would reveal their transgender status and that the Youth Movants sought treatment for gender dysphoria, which is among the very information they seek to protect from disclosure. Disclosure of their identities would defeat much of the purpose of their request for protection by quashing the subpoena.

Movants' interest in retaining the privacy of their medical information is especially compelling here given the stigmatized nature of their diagnoses and treatment for gender dysphoria. "Gender dysphoria and transition remains [sic] highly stigmatized, lending greater weight to Plaintiffs' argument that there is a compelling interest to keep . . . information private." *Kadel v. Folwell*, 620 F. Supp. 3d 339, 390 (M.D.N.C. 2022) (quoting *Watson v. Lowcountry*

5

*Red Cross,* 974 F.2d 482, 487 (4th Cir. 1992)), *aff'd,* 100 F.4th 122 (4th Cir. 2024), *vacated on other grounds sub nom. Folwell v. Kadel,* 145 S. Ct. 2838 (2025); *see also id.* (granting motion to seal where information concerned "most intimate and sensitive nature concerning [plaintiffs'] struggle with, and treatment of, gender dysphoria, often during adolescence"); *Foster v. Andersen,* No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019) (collecting cases).

So here, Movants are entitled to proceed pseudonymously given that the subpoena at issue concerns intimate details about their lives, including their transgender status, their medical and mental health diagnoses, and past and current medical treatments.

**B.     Disclosing Movants' identifying information would expose them to harm.**

For related reasons, the second *James* factor also weighs heavily in favor of allowing Movants to proceed under pseudonyms.  Identifying Movants publicly would subject them to immediate and serious risks of retaliatory physical and psychological harm.  "[T]ransgender individuals often face verbal and physical harassment when forced to reveal their transgender status." *Hersom,* 2022 WL 908503, at *2.  Hostility towards transgender people and transgender healthcare is well-documented.  For example, a recent report found that transgender individuals are more than four times more likely to be victims of violent crimes than other individuals. Andrew Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018,* 111 AM. J. PUBLIC HEALTH 726, 727 (2021).  Further, in 2022, over 70% of clinics that provided gender transition care to minors received threats specific to their provision of that care.  Landon D. Hughes et al., *Adolescent Providers' Experiences of Harassment Related to Delivering Gender-Affirming Care,* 73 J. ADOLESC. HEALTH 672, 674 (2023).

6

JA344

Indeed, rampant animosity towards transgender Americans is evident from the actions of the Trump Administration. For example, on his first day in office, President Trump issued an executive order describing transgender identity as "false" and directed federal agencies to exclude transgender people from social services including shelters. *See* Exec. Order 14168, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025). A week later, President Trump issued another executive order denigrating transgender health care and declaring transgender healthcare to be "a stain on our Nation's history." Exec. Order 14187, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025).  In an executive order banning transgender people from serving in the military, President Trump characterized being transgender as "conflict[ing] with a soldier's commitment to an honorable, truthful, and disciplined lifestyle." Exec. Order 14183, 90 Fed. Reg. 8757, 8757 (Feb. 3, 2025). *See also* Exec. Order 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025); Exec. Order 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025). These examples, among many others, demonstrate a concerted effort by this Administration to delegitimize and demean transgender people. If Movants' identities were disclosed to the Requester or to the public in connection with their transgender status and medical histories, they would face serious risks of harassment, discrimination, and retaliation that would threaten their physical and mental health, livelihoods, and wellbeing.

Disclosing Plaintiffs' identities to the federal government also means that their parents— some of whom are federal employees[1]—could face retaliation or harassment from their superiors and other colleagues who work for the government. *See, e.g.*, Pete Hegseth (@PeteHegseth), X (Sep. 4, 2025), https://x.com/PeteHegseth/status/1963781182715261326 ("Pronouns updated: She/Her/Fired"); *see also* Elisabeth Bumiller, *People Are Going Silent: Fearing Retribution, Trump Critics Muzzle Themselves*, N.Y. TIMES (Mar. 6, 2025),

---

[1] Declaration of Parent C.C. at ¶ 16.

JA345

https://www.nytimes.com/2025/03/06/us/politics/trump-democracy.html ("People say they are intimidated by online attacks from the president, concerned about harm to their businesses or worried about the safety of their families"). The second *James* factor, therefore, weighs heavily in favor of permitting pseudonymity to protect Movants' and their families' privacy, health, and safety.

In addition, given the politically and socially disfavored status of transgender people in American society, especially in the current challenging political climate, a lack of pseudonymity in this case would be likely to chill these and other transgender litigants from challenging violations of their privacy rights. The First Circuit has explained that "a deterrence concerns typically arises in cases involving 'intimate issues'" including medical concerns. *Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 71 (1st Cir. 2022) (quoting *In re Sealed Case*, 971 F.3d 324, 327 (D.C. Cir. 2020)). *See also Charles H.*, 2021 WL 6619327, at *2 ("The interest in anonymity is particularly great because of the risk that forcing disabled individuals to disclose deeply personal medical information could deter litigants from filing claims to vindicate their rights."). To prosecute their claims in cases such as this, transgender litigants are required to disclose numerous private details regarding their lives, as well as sensitive medical histories and treatments. If those litigants are forced to associate their names with such sensitive personal information, many potential litigants will be discouraged from vindicating their rights in cases like this. Indeed, several of the Movants in this case have declared that they would reconsider their participation if pseudonymity is not granted. *See* Decl. of Parent A.A. at ¶ 21; Decl. of Parent B.B. at ¶ 23; Decl. of Parent C.C. at ¶ 21; Decl. of Parent D.D. at ¶ 17; Decl. of Parent E.E. at ¶ 14; Decl. of Parent F.F. at ¶ 19; Decl. of Youth F.F. at ¶ 14; Decl. of Parent G.G. at ¶

8

JA346

17; Decl. of Parent H.H. at ¶ 19. Denial of permission to proceed under a pseudonym in this case would deter these and countless other transgender individuals from seeking redress via litigation.

### C.    Pseudonymity would protect the privacy and safety of Youth Movants.

The third *James* factor of age strongly supports pseudonymity in this case. Movants are minor and young adult current and former patients and their parents. Courts in this and other districts have permitted minors, young adults, and their parents to proceed under pseudonyms. *See, e.g., PFLAG*, 766 F. Supp. 3d at 549 n.14; *McCutchen*, 2021 WL 1718806, at *3 (granting pseudonymity to both minor plaintiffs and their parents); *Charles H.*, 2021 WL 6619327, at *3 (granting pseudonymity to young adult plaintiffs based on their "relative youth in conjunction with their disabilities"); *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 4560820, at *5 (N.D. Okla. July 17, 2023) (same); *Poe v. Labrador*, 709 F. Supp. 3d 1169, 1200 (D. Idaho 2023) (noting that plaintiffs, who were transgender adolescents and their parents, were proceeding under pseudonyms in challenge to ban on transgender healthcare), *stay granted in part on other grounds,* 144 S. Ct. 921 (2024), *appeal dismissed*, 2025 WL 1872749 (9th Cir. June 18, 2025); *Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1215 (N.D. Fla. 2023) (same).

Allowing Parent Movants to proceed pseudonymously is also necessary because the disclosure of their names could easily be used to identify the Youth Movants, particularly in combination with the details provided in the subpoenaed records.  *See PFLAG*, 766 F. Supp. 3d at 549 n.14 (granting motion to permit pseudonymity of young adult plaintiffs, minor plaintiffs, "and by extension, the Parent Plaintiffs" to protect plaintiffs "from undue harassment, discrimination, and violence because of the . . . Plaintiffs' transgender status"); *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004) (upholding pseudonymity of minors and parents to protect "the special vulnerability of the[] child-plaintiffs") (quoting *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. Unit A Aug. 1981)).

9

JA347

Courts also regularly grant requests to proceed under pseudonyms for transgender adults. *See Hersom*, 2022 WL 908503, at *2 (permitting transgender college student to proceed under pseudonym); *J.C. v. McKnight*, No. DKC 23-2019, 2023 WL 5487216, at *2 (D. Md. Aug. 24, 2023) ("Courts have found that the third *James* factor weighs in favor of pseudonymity for eighteen- and nineteen-year-old plaintiffs because they are young adults who may still possess the immaturity of adolescence.") (quotations omitted); *BCBSRI*, 794 F. Supp. at 72–73  (granting motion in suit involving transgender-related healthcare coverage, listing other cases reaching the same result, and recognizing "the highly sensitive and personal nature of each person's sexuality" and the refusal to "strip plaintiff of the cloak of privacy which shields him"); *Doe v. Mass. Dep't of Corr.*, No. 1:17-cv-12255, 2018 WL 2994403, at *2 n.4 (D. Mass. Jun. 14, 2018) (noting court previously granted incarcerated transgender person's motion to proceed pseudonymously); *Doe v. Pa. Dep't of Corr.*, 585 F. Supp. 3d 797, 805-06, 808 (W.D. Pa. 2022) (granting incarcerated individual's motion due to reasonable fear of severe harm and invasions of privacy, and finding pseudonymity would not materially impair public's right); *Meriwether v. Trs. of Shawnee State Univ.*, No. 1:18-cv-753, 2019 WL 2392958, at *4 (S.D. Ohio Jan. 30, 2019) (granting motion because "the information Doe seeks to protect is 'of the utmost intimacy' and ... there continues to be a serious social stigma associated with transgender identity with the potential for harmful repercussions"); *Doe v. Trump*, No. 1:17-cv-1597, Dkt. No. 3 (D.D.C. Aug. 10, 2017) (granting transgender military members' motion); *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, No. 2:16-cv-524, 2016 WL 4269080, at *5 (S.D. Ohio Aug. 15, 2016) (granting motion and listing cases allowing "non-minor transgender plaintiffs to proceed anonymously due to the social stigma associated with their gender identity").

JA348

### D. Because this case is against government officials, pseudonymity does not undermine the public's interest in open proceedings.

Courts have generally concluded that the fourth *James* factor favors pseudonymity where the claims are against the government or government officials rather than private parties. *See, e.g., Doe v. Alger*, 317 F.R.D. at 41 ("When a plaintiff challenges the government or government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym than if an individual has been accused publicly of wrongdoing."); *Yacovelli v. Moeser*, No. 1:02CV596, 2004 WL 1144183, at *8 (M.D.N.C. May 20, 2004) (finding fourth factor weighed in favor of plaintiffs where they challenged constitutionality of a school policy); *E.W. v. N.Y. Blood Ctr.*, 213 F.R.D. 108, 111 (E.D.N.Y. 2003) ("[W]here a plaintiff attacks governmental activity, . . . the plaintiff's interest in proceeding anonymously is considered particularly strong" while "the government is viewed as having a less significant interest in protecting its reputation from damaging allegations than the ordinary individual defendant"); *Doe v. U.S. Dep't of State*, No. 1:15-cv-01971, 2015 WL 9647660, at *3 (D.D.C. Nov. 3, 2015) (same).

Here, Movants challenge a federal government Requester's subpoena. They do not sue individuals who face an asymmetric risk of reputational damage from pseudonymous litigation. Moreover, Requester does not oppose their request to proceed pseudonymously.

### E. Permitting Movants to proceed pseudonymously would not prejudice the Government.

The fifth factor weighs in Movants' favor because allowing the suit to proceed pseudonymously would not prejudice the government and the government does not oppose the request. *See James*, 6 F.3d at 238 (instructing courts to consider whether there is a "risk of unfairness to the opposing party from allowing an action against it to proceed anonymously"); *Free Speech v. Reno*, No. 98-cv-2680, 1999 WL 47310, at *2 (S.D.N.Y. Feb. 1, 1999) (stating that governmental entities are generally not prejudiced when plaintiffs proceed

JA349

pseudonymously). The government does not need to know the Movants' identities in order to defend its subpoena. Movants' right to prevent disclosure depends, not on the factual details of their treatment, but on the legal protections provided to private sensitive medical treatment information generally. Any interests Defendants have in proceeding publicly are undoubtedly outweighed by Plaintiffs' interests in protecting their health and safety.

**F.      Denying pseudonymity would force Movants to experience the very injury against which they are litigating.**

The *James* factors are non-exhaustive. Many courts, in considering requests to proceed pseudonymously, consider whether the revelation of a plaintiff's identity in court would incur the very injury being litigated against. *See Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992); *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000); *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 190 (2nd Cir. 2008). In this case, the public revelation of Movants' identities to the government would result in precisely the harm the Movants are litigating to prevent. This factor, therefore, weighs heavily in favor of pseudonymity.

**II.      Local Rule 102.2(a)'s requirement to provide addresses should be waived.**

The Court should waive disclosure of Movants' addresses under Local Rule 102.2(a) for the same reasons it should allow Plaintiffs to proceed under pseudonyms. Requiring Movants to identify their addresses would severely undermine their pseudonymity because they could be identified—and located—based on their addresses.

**III.      A protective order for Movants' identities is warranted.**

Under Federal Rule of Civil Procedure 26(c), a court may issue a protective order to protect a party from harassment, retaliation, or any other form of discrimination and violence that might result from participating in the litigation. As in *PFLAG, Inc.*, 766 F. Supp. at 549, n.14,

12

JA350

such a protective order is necessary in order to protect transgender adolescents "from undue harassment, discrimination, and violence because of [their] transgender status."

A recent decision in the District of Columbia District Court supports Movants' request to prohibit disclosure to both the public and the Requester. In *League of Women Voters et al. v. U.S. Department of Homeland Security et al.*, No. CV 25-3501 (JEB), 2025 WL 2897654 (D.D.C. Oct. 10, 2025), the Court granted Plaintiffs' motion to prevent disclosure of their identities to the federal government defendant. The Court pointed to "the administration's actions against individuals for 'their involvement in litigation that is perceived as a legal or political threat to this Administration' [and found those actions] sufficiently analogous for the Court to credit Plaintiffs' retaliation fears." *Id.* at *2. *See also* CONSIDER THIS FROM NPR: *Trump Uses Government Powers to Target Perceived Enemies* (NPR, Apr. 29, 2025), https://www.npr.org/2025/04/29/1247777260/trump-uses-government-powers-to-target-perceived-enemies (describing retaliatory actions by federal officials against institutions and individuals).

Therefore, Movants seek a protective order to prevent disclosure of Movants' identities to Requester and to the public.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court grant their motion to proceed under pseudonyms, to waive the requirement of Local Rule 102.2(a) to provide their addresses, and to issue a protective order preventing disclosure of Movants' identifying information to Requester and the public.

13

JA351

Dated:  November 17, 2025

_____

Eve L. Hill (Bar No. 19938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Jennifer L. Levi (Pro Hac Vice to be submitted)
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
Tel: (617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*

14

JA352

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Civil Action No. JRR 2 5 MC 0 0 7 0 9 _____<br><br>[PROPOSED] ORDER GRANTING MOVANTS' MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS, TO WAIVE REQUIREMENT UNDER LOCAL RULE 102.2(a) TO PROVIDE ADDRESSES, AND FOR PROTECTIVE ORDER |

THIS MATTER is before the Court on the motion of Movants for leave to proceed under pseudonyms, for waiver of the requirement under Local Rule 102.2(a) to provide their addresses, and for a protective order ("Movants' Motion"). Having considered the motion, the memorandum in support, and the record in this case, and having otherwise been fully advised, the Court finds that there is good cause and GRANTS Plaintiffs' motion. The Court hereby ORDERS as follows:

1.      Movants' Motion is GRANTED;

2.      Movants may proceed in this action under the pseudonyms Parent A.A., Parent B.B., Parent C.C., Youth C.C., Parent D.D., Parent E.E., Youth E.E., Parent F.F., Youth F.F., Parent G.G., and Parent H.H.

JA353

JA354

3.      Movants' counsel shall disclose Movants' true names and, to the extent otherwise discoverable under the Federal Rules of Civil Procedure, other information that directly or indirectly identifies Movants to Requester's counsel and the Court upon request once an appropriate protective order has issued;

4.      Plaintiffs are not required to provide their addresses in the their initial filings under Local Rule 102.2(a);

5.      All publicly filed documents shall identify the Movants only by their pseudonyms;

6.      All documents filed with Court that contain a Movant's name or address shall be redacted; and

7.      Requester's counsel is prohibited from disclosing Movants' identifying information, including to Requester.

**IT IS SO ORDERED.**

Dated:                                    BY THE COURT:

_____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE: 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL | Case No. 1:25-cv-03780-JRR |

## REQUEST FOR STATUS CONFERENCE

1.  On November 17, 2025, Plaintiffs in this matter, eight families who obtained sex-trait modification services at Children's National Hospital ("CNH"), filed a miscellaneous action to quash portions of an administrative subpoena issued under the authority of 18 U.S.C. § 3486 to CNH by the Attorney General's designee in connection with an investigation of potential federal healthcare offenses. Plaintiffs initiated that action by filing a "Motion to Quash Subpoena Duces Tecum." ECF 1.

2.  Plaintiffs' proposed order on its motion goes beyond quashal of the subpoena. Plaintiffs additionally propose that the Court prohibit and restrain the United States from accessing certain patient-related information that may already be in the Government's possession. *See* ECF 1-39. The proposed order further contemplates the Court ordering future, although undefined, "prophylactic measures." *Id.*

3.  On November 18, 2025, the Court transferred the miscellaneous case to a civil action and assigned it a new "cv" case number, reflected in the caption above.

4.  Because the case is now docketed as a civil action, the Federal Rules of Civil Procedure presumptively govern. *See* Fed. R. Civ. P. 1. Under the rules, there is "one form of action—the civil action." Fed. R. Civ. P. 2. And "[a] civil action is commenced by filing a complaint with the

court." Fed. R. Civ. P. 3. Here, however, the action was not commenced by complaint, but rather by motion. The procedural implications of this posture are unclear.

5.  If the Court were to treat Plaintiffs' motion as the functional equivalent of a complaint for purposes of Rule 12, the United States would have 60 days in which to serve a responsive pleading. *See* Fed. R. Civ. P. 12(a)(2). Under that approach, the Government's response would be due on Friday, January 16, 2026.

6.  If, instead, the case-initiating filing continues to be treated as a Rule 7(b) motion notwithstanding the Court's designation of this matter as a civil action, the Government's opposition ordinarily would be due within fourteen days of service. *See* Loc. Civ. R. 105.2(a). Under that timeline, the Government's response would be due next Monday, December 1, 2025.

7.  The conversion of the proceeding from a miscellaneous action to a civil action, coupled with the Plaintiffs' apparent request for broader injunctive relief, creates ambiguity concerning (a) the applicable response deadline(s); (b) whether the motion should be treated as a case-initiating pleading, and if so, what responsive pleading(s) are appropriate and/or necessary; and (c) what procedural framework—Rules 7 (governing pleadings and motions), 12 (governing responses and objections), 65 (governing injunctive relief), and Local Rule 105 (governing motions)—now governs the parties' obligations.

8.  In light of this uncertainty, and given the possibility that the Court may deem the Government's response to be due next Monday (following this week's Thanksgiving holiday), the United States respectfully requests a status conference at the Court's earliest convenience to clarify the governing procedures, applicable deadlines, and the appropriate path forward. A brief conference would promote efficiency and avoid unnecessary motion practice on threshold procedural issues.

JA356

9.   The parties conferred on Sunday, November 23, 2025, regarding this request for a status conference. Plaintiffs' counsel consents to the scheduling of a status conference as requested herein. The parties jointly and respectfully request that if the Court convenes a status conference, that it be held by videoconference, if practicable.

Dated this 23rd day of November, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 */s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

Enforcement & Affirmative Litigation Branch
United States Department of Justice
P.O. Box 386
Washington, D.C. 20044

Ross.Goldstein@usdoj.gov
Tel:     202-353-4218
Fax:     202-514-8742

3

JA357

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No. 1:25-cv-03780 |

## MOVANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Movants respectfully submit this Notice of Supplemental Authority in support of their pending motion to quash certain portions of the Department of Justice ("DOJ") subpoena issued against Children's National Hospital.

On November 21, 2025, the United States District Court for the Eastern District of Pennsylvania issued a Memorandum and Order in *In re: Subpoena No. 25-1431-014*, Misc. No. 25-39 (E.D. Pa. Nov. 21, 2025) (Kearney, J.), striking portions of a DOJ subpoena issued against Children's Hospital of Philadelphia that is "substantively identical" to the subpoena challenged here.[1]

After full briefing, Judge Mark A. Kearney held that:

(1)     DOJ lacked statutory authority under 18 U.S.C. § 3486 to compel production of patient-identifying information and associated clinical records because those materials were not shown to be relevant to the investigation of a federal health care offense as Congress defined that term; and

(2)     Even assuming statutory authority, the children's and families' heightened privacy interests in their confidential medical records outweighed DOJ's asserted need for those records under the privacy-balancing framework set forth in *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980).

---

[1]  *See* Aff. of Eve Hill, Esq., in Supp. of Mot. to Quash Subpoena Duces Tecum at ¶ 20.

JA358

The Court, therefore, struck subpoena Requests 11, 12, and 13 and all information contained in responses to other requests disclosing the same information.

Copies of the Memorandum and subsequent Order are attached as Exhibit 1 and 2, respectively.

Dated: November 24, 2025

*/s/ Eve L. Hill*

Eve L. Hill (Bar No. 11938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Jennifer L. Levi (Pro Hac Vice)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*

JA359

# EXHIBIT 1

JA360

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: SUBPOENA NO. 25-1431-014     :   **MISCELLANEOUS ACTION**

                                                 :

                                                 :   **NO. 25-39**

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                   **November 21, 2025**

Our elected Congresspersons granted the Department of Justice limited authority in 1996 to investigate federal health care offenses involving the labeling and distribution of prescription drugs. The Department of Justice is now investigating the labeling and distribution of prescribed clinically authorized puberty blockers and hormone therapy. It subpoenaed fifteen categories of records from The Children's Hospital of Philadelphia including billing and insurance records, communications with manufacturers and sales representatives, and the names and complete medical and psychological records of children receiving gender-affirming care. The Hospital agrees to produce most of the requested materials. But it objects to producing the identities of its child patients and their families along with their confidential medical files. Its objection requires we study two questions: whether Congress authorized a subpoena for the children's confidential medical records, and, if so, whether the children's privacy interests outweigh the Department of Justice's need for these confidential medical records under the Food, Drug, and Cosmetic Act.

We find the answer to both questions is "no." We strike the three requests for these child-identifying and treatment and disclosure records as beyond the authority granted by Congress. We also find, even if this private information could be relevant, the heightened privacy interests of children and their families substantially outweighs the Department's need to know the children's names, addresses, and treatment along with disclosures for gender-affirming care at The Children's Hospital of Philadelphia.

JA361

## **TABLE OF CONTENTS**

I.   Facts adduced from submitted exhibits and public record......................................................... 1

II.  Analysis................................................................................................................................... 10

   A.  The Hospital enjoys standing to challenge the three requests. ......................................... 12

   B.  The Department of Justice lacks statutory authority to compel the Hospital produce
       documents responsive to Requests 11, 12, and 13.......................................................... 14

       1.  The Department, absent demonstrating relevance of Requests 11, 12, and 13, lacks
           statutory authority to demand the children's identities and files....................................16

       2.  We are not persuaded by the Department of Justice's later evolving theories of relevance
           for statutory authority.................................................................................................20

           a.  The Hospital's experience is not evidence of a federal health care offense. ...................21

           b.  Commercial practices of others is not statutory authority for producing the children's
               identities, diagnoses, or authorizations. ..............................................................21

           c.  Congress did not authorize demanding children's records when investigating fraud in
               distribution or promotion of puberty blockers and cross-sex hormones under the Act. ...22

           d.  The Department of Justice misreads Congress's mandate in the Food, Drug, and Cosmetic
               Act.....................................................................................................................23

   C.  Our Court of Appeals's *Westinghouse* analysis requires we balance the child's privacy
       interests with the Department of Justice's need for the children's records in Requests 11,
       12, and 13.................................................................................................................... 28

       1.  Congress in Section 3486 does not supersede *Westinghouse*.............................................29

       2.  We do not find our Court of Appeals wrongly decided *Westinghouse*...............................35

   D.  The *Westinghouse* factors weigh in favor of protecting the most sensitive information
       regarding a child's gender-affirming care....................................................................... 35

       1.  The type of medical records requested and information they do or might contain weighs in
           favor of protecting the children's privacy. ....................................................................36

       2.  Potential for harm in subsequent nonconsensual disclosure weighs in favor of the child's
           privacy interests. .....................................................................................................40

       3.  Injury to the physician–child-patient relationship from disclosure favors the children's
           privacy interests. .....................................................................................................43

       4.  The undefined adequacy of safeguards to prevent unauthorized disclosure in this uniquely
           public attack on children's gender identities and their doctors' medical care slightly favors
           the children's privacy absent the Department of Justice offering specific sanctions or
           prohibitions for unauthorized disclosure.......................................................................45

       5.  The Department's stated needs for access are outweighed by the children's privacy
           interests given the Hospital is not today contesting the other twelve requests tied to the
           Department's investigative purposes. ...........................................................................47

       6.  The President's and Attorney General's articulated public policy weighs in favor of
           disclosure.................................................................................................................51

III. Conclusion .............................................................................................................................. 52

## I.    Facts adduced from submitted exhibits and public record

We review three document requests demanded under a subpoena issued by the United States Department of Justice to The Children's Hospital of Philadelphia seeking the identity of child patients and their medical treatment under the Hospital's long-established program offering gender-affirming medical care. We appreciate the Department of Justice enforces the Food, Drug, and Cosmetics Act. It should do so by ensuring compliance with the Act's requirements governing the manufacturing, distribution, and labeling of drugs in interstate commerce and by prosecuting violations of those requirements. But it remains governed by law and its conduct is subject to the scrutiny of judges and juries. The three document requests to the Hospital before us today seek the identity of transgender children and their treatment seeking the most confidential of medical information in an environment where the described policy of the United States is to end this prescribed medical care notwithstanding Pennsylvania's exclusive authority to allow it.

*The Commonwealth retains the police power to supervise medical procedures and care.*

The three requests warrant a return to fundamentals set by our Framers and the persons we elect to Congress.  The Framers reserved the police power, and with it the authority to set standards of medical care, to the states such as Pennsylvania.[1] Pennsylvania regulates the practice of medicine through its exercise of state police powers to protect public health and safety. It exercises its traditional police powers to protect vulnerable groups against discrimination and to ensure equal access to care. The Commonwealth, for example, has long adopted civil rights protections for transgender people in areas such as education, employment, housing, and public accommodations.[2] Pennsylvania Governor Shapiro confirms gender-affirming medical care is legal in the Commonwealth.[3] The Commonwealth covers gender-affirming care through its Medicaid program and bars state-regulated health insurance plans from denying coverage based on gender identity or gender dysphoria.[4] No Pennsylvania professional licensing board has ever found gender-affirming

1

care when provided consistent with the Commonwealth's standard of care to be inappropriate.[5] But this does not reflect an unwillingness to police harmful medical practices including in sexual identity. For example, several Pennsylvania licensing boards adopted policies condemning conversion therapy as harmful and unprofessional conduct, subject to administrative discipline, due to its discredited pseudoscientific basis and significant emotional and psychological harm it inflicts on children.[6]

### *The Hospital offers medical care for transgender children for the last eleven years.*

The Commonwealth through its police powers closely supervises the Hospital.[7] The Hospital opened its Gender and Sexuality Development Program in 2014 consistent with Pennsylvania law.[8] The Program "offers psychosocial and medical support for transgender children, adolescents, young adults and their families" and "provides services based on individual and family needs, including comprehensive assessments, monthly support groups, connections to community resources, and, where appropriate, medical care."[9] Patients describe the Program as a "safe space to share their experience without fear of repercussions" and characterize the medical care they receive "as a lifeline."[10]

Families guide the medical care decisions for their transgender children under the Program.[11] Each child begins with an assessment by a mental health provider involving the child and their parent or guardian.[12] The assessment process then includes a "comprehensive psychosocial evaluation" if gender dysphoria is under consideration.[13] The psychosocial evaluation "typically involves patients sharing intimate and extremely sensitive personal details, often touching on such subjects as discomfort with specific body parts, sexual history, past trauma, interfamilial dynamics, use of self-harm or other negative coping mechanisms that may risk their health and well-being such as disordered eating, and experiences of harassment and bullying."[14]

2

JA364

The evaluation also considers the patient's "cognitive abilities, executive function skills, communication skills, emotional functioning, self-awareness/social cognition, and capacity for decision-making."[15] If gender dysphoria is diagnosed, the care plan is tailored to the patient's age, development, and specific needs.[16] Treatment proceeds if the family and care team agree on the plan and after a discussion of risks, benefits, and alternatives.[17] Treatment can include puberty blocking medication and hormone therapy.[18] Medical care requires parental informed consent and the child's assent. [19] Care under the Program "is and has always been consistent with standards of care supported by leading medical organizations."[20]

***The United States Government decided in January 2025 to end gender-affirming medical care.***

President Trump issued Executive Order 14168 on his Inauguration Day, January 20, 2025, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[21] The President declared "[i]t is the policy of the United States to recognize two sexes, male and female[, and t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality."[22]

The President issued a second Executive Order 14187 on January 28, 2025 titled "Protecting Children From Chemical and Surgical Mutilation."[23] The President, through Executive Order 14187, pronounced "medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions."[24] The President proclaimed "this dangerous trend" is "a stain on our Nation's history" and "it must end."[25] The President further declared "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."[26] The President defined "chemical

JA365

and surgical mutilation," which "sometimes is referred to as 'gender-affirming care'" as "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions."[27]

The President, through Executive Order 14187, directed federal agencies funding research or education at medical institutions to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children."[28] The President ordered the Department of Justice to "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation."[29]

The United States Senate confirmed the President's nominee Pamela Bondi as Attorney General on February 4, 2025.[30] Attorney General Bondi issued a memorandum on April 22, 2025 titled "Preventing the Mutilation of American Children."[31] Attorney General Bondi described a "radical ideological agenda" of "teach[ing] children to deny biological reality" and issued "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents."[32]

Attorney General Bondi claimed her authority through Congress's prohibitions in the Food, Drug, and Cosmetic Act focusing on manufacturers and distributors promoting off-label uses for approved drugs. She directed federal prosecutors must now "act decisively to protect our children

4

JA366

and hold accountable those who mutilate them under the guise of care" and to "undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[33] "Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the [Food and Drug Administration]'s prohibitions on misbranding and mislabeling."[34] Attorney General Bondi further described gender-affirming care as "an unconscionable ideology" and pledged "the Department of Justice will bring these practices to an end."[35]

### *Congress regulates drug manufacturing, labeling, and distribution through the Food, Drug, and Cosmetic Act.*

The Department of Justice based its investigation on perceived violations of the Food, Drug, and Cosmetic Act. Congress, through the Act, sets the mandates governing the development, manufacture, labeling, and interstate distribution of drugs and medical devices.[36] Congress empowered the Food and Drug Administration to ensure drugs and devices are safe and effective for their intended uses before they may be introduced into interstate commerce.[37] A drug manufacturer must obtain Food and Drug Administration approval to market a prescription drug in the United States through the New Drug Application Process.[38] "[T]he manufacturer must demonstrate the drug's safety and effectiveness," meet manufacturing and facility requirements, and "obtain [Food and Drug Administration approval] of the drug's labeling.[39]

"Labeling" is defined broadly to include "all labels and other written, printed, or graphic matter" on or accompanying a drug.[40] This encompasses materials travelling with the product or supplementing its description—not only packaging materials but also promotional pieces

distributed by the manufacturer.[41] The Food and Drug Administration regulations treat a wide array of materials supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor as labeling.[42]

Congress through Section 331 of the Act identifies the unlawful conduct and the section serves as the "heart of the enforcement provisions."[43] Congress acknowledges these "prohibitions have been described as a catalogue of definitions elaborating two basic concepts: 'adulteration' and 'misbranding,'" the Act's two principal categories of violations.[44] It is unlawful to introduce an adulterated or misbranded product into interstate commerce and violations carry criminal penalties, including strict-liability misdemeanors and felonies when committed with intent to defraud or mislead.[45]

Adulteration relates to a product's physical condition and can include contamination, improper manufacturing processes, or failure to meet established quality standards.[46] Misbranding concerns the accuracy and adequacy of a product's labeling and promotional representations and can include false or misleading labeling or inadequate directions for use.[47] Congress through the Act prohibits a manufacturer from selling a misbranded drug and from promoting or advertising a drug for any use not included in its Food and Drug Administration-approved labeling.[48] A drug is also misbranded if it lacks "adequate directions for use," meaning instructions allowing a layperson to use the drug safely for its intended purposes.[49] The drug's "intended use" is determined by the objective intent of the manufacturer or other entity responsible for the labeling, as reflected in its labeling, advertising, and statements by the manufacturer or its representatives.[50] Prescription drugs are exempt from the "adequate directions for use" requirement if dispensed by a licensed practitioner through a prescription.[51]

6

***The Department of Justice further defines the scope of its investigation under the Food, Drug, and Cosmetic Act.***

Attorney General Bondi's prosecutors set out to enforce her mandate to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care."[52] Assistant Attorney General for the Civil Division Brett Shumate followed with a June 11, 2025 memorandum titled "Civil Division Enforcement Priorities."[53] Assistant Attorney General Shumate echoed the Executive Orders and Attorney General Bondi's views confirming the Department of Justice: "will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives."[54] Assistant Attorney General Shumate promised "these efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs."[55] Assistant Attorney General Shumate did not direct the Department of Justice to obtain children's and their families' identities or their confidential medical files.

***The Department of Justice subpoenas the Hospital for records including the children's names, treatment records, and disclosures to their guardians.***

The United States Department of Justice wasted no time implementing Attorney General Bondi's directives to investigate misbranding by manufacturers and distributors promoting off-label uses of puberty blockers and hormones. Assistant Attorney General Shumate issued more than twenty subpoenas to medical centers around the Nation "to investigate [f]ederal health care offenses" on the same day as his June 11, 2025 memorandum.[56] The Department served the Subpoena upon the Hospital the following day under the authority granted by Congress in 1996 under the statute commonly referred to as "HIPPA" (Health Insurance Portability &

7

JA369

Accountability Act of 1996).[57] Although Congress defines a "federal health care offense" more broadly, the Department limits its reliance here to "a violation of, or a criminal conspiracy to violate . . . section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) . . . if the violation or conspiracy relates to a health care benefit program."[58] Congress defines a "'[h]ealth care benefit program' to mean 'any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.'"[59]

The Department of Justice in looking for a federal health care offense tied to misbranding by manufacturers and distributors promoting off-label uses under the Act demanded the Hospital produce records consistent with fifteen identified requests.[60] It demanded the Hospital produce broad categories of records including, among other things, complete personnel files for executives, prescribing providers, and billing staff; all documents concerning International Classification of Diseases coding and billing practices for gender-related care; internal and external communications regarding coding strategies; insurance communications; training materials; and correspondence with pharmaceutical manufacturers and representatives.[61] The Hospital groups the fifteen requests into four categories: (1) "files for any personnel responsible for directing [the Hospital]'s affairs and personnel who prescribe medication;" (2) "documents regarding the promotion of off-label uses of puberty blockers and cross-sex hormones;" (3) "documents related to billing records and practices, insurance claims, diagnosis codes, and the use of puberty blockers and hormones in connection with gender related care;" and (4) "documents related to any adverse event connected with such care."[62]

Counsel for the Hospital met with the Department of Justice on July 7, 2025.[63] The Hospital agreed to produce many categories of records responsive to the Subpoena but told the Department "it could not compromise the privacy of its patients by providing their confidential health information."[64] The Hospital objected to "all parts of the Subpoena calling for health information of [its] patients, including but not limited to Requests 11, 12, and 13,"[65] which seek:

> 11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.
>
> 12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.
>
> 13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.*, uses not approved by the United States Food and Drug Administration) and potential risks."[66]

The Hospital timely moved to limit the Subpoena as to Requests 11, 12, and 13.[67] The Department of Justice issued a press release the day after the Hospital's motion titled "Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children."[68] The Department touted sending "more than [twenty] subpoenas to doctors and clinics involved in performing transgender medical procedures on children" and the "investigations include health[ ]care fraud, false statements, and more."[69] Attorney General Bondi proclaimed "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice."[70]

### *Patients, states, and other medical institutions seek relief here and in other Districts.*

Several patients and former patients who received gender-affirming care at the Hospital and their parents also moved to limit the Subpoena before us on September 22, 2025.[71] The Department of Justice responded with a sworn Declaration of Lisa K. Hsiao, the Director of the

9

Department of Justice's Enforcement and Affirmative Litigation Branch to show the basis for the Department's investigation.[72] Director Hsiao purports to explain "the relevant [Federal Food, Drug, and Cosmetic Act] violations implicated by the Government's investigation" and "how the documents demanded by the [S]ubpoena are relevant to the Government's investigation" of those potential violations, "which are [f]ederal health care offenses."[73]

We ordered the Department to supplement the record by submitting joint *in camera* letters apprising us of related challenges, reporting on the status of the more than twenty other subpoenas issued to health care providers nationwide, and attaching docket sheets, orders, and opinions entered to date.[74] At least five other districts—including the United States District Courts for the Western District of Pennsylvania, the Western District of Washington, the District of Massachusetts, the District of Maryland, and one additional matter under seal—are addressing or addressed parallel motions to limit or quash.

Sixteen jurisdictions, led by Pennsylvania Governor Josh Shapiro and joined by Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Illinois, Maryland, Minnesota, Nevada, New Jersey, New York, Oregon, Vermont, and Washington, filed an amicus curiae brief three weeks ago in support of the Hospital's motion to limit the Subpoena.[75] The Department of Justice opposed the Amici earlier this month.[76]

## II.    Analysis

The Hospital moves to limit the Subpoena to strike  Requests 11, 12, 13, and "[a]ny and all other Requests enumerated in the Subpoena (Request 1 through Request 15) to the extent that such Requests or sub-Requests call for the production of health information of [its] patients."[77] The Hospital argues these three requests violate its child-patients' privacy rights and disregard the exceptionally sensitive nature and special character of the records sought.[78] It argues the seven factors established by our Court of Appeals forty-five years ago in *United States v. Westinghouse*

*Elec. Corp.* warrant limiting the Subpoena by striking Requests 11, 12, and 13 and other requests to the extent they seek the same information.[79] The Hospital "does not categorically contest [the Department of Justice]'s authority to review its conduct or to initiate an investigation through a subpoena issued under [Section] 3486" and does not seek to quash "the Subpoena in its entirety."[80]

The Department of Justice is not interested in limiting these three requests; it wants the intimate, individualized, and personally identifying medical files of every child seeking gender-affirming care permitted under Pennsylvania law.[81] It argues our Court of Appeals's *Westinghouse* analysis is either inapplicable to the Subpoena, wrongly decided, or, alternatively, the factors weigh in its favor requiring we deny the Hospital's Motion.[82]

We expect the Department of Justice agrees we do not have the ability to disregard precedent in a nation of laws. The Subpoena before us (as well as one in the Western District of Pennsylvania) is the only Section 3486 subpoena (disclosed to us) governed by our Court of Appeals for the Third Circuit's longstanding *Westinghouse* framework, notice of which the Department of Justice has had for over forty-five years. We are guided by Congress's mandate the requested information must be relevant to be authorized and our Court of Appeals's established guidance. We find the three requests are not statutorily authorized and, even if they are, our Court of Appeals's balancing test in *Westinghouse* is controlling precedent. We further find a balancing of the defined *Westinghouse* factors overwhelmingly weigh in favor of protecting the privacy interests of the Hospital's child patients given the Department of Justice's stated purpose of examining alleged misbranding arising from false or misleading claims under the Act about the on- or off-label use of puberty blockers and hormone therapy. We limit enforcement of the Subpoena to exclude Requests 11, 12, and 13.

11

But we cannot venture into a speculative declaration about records not before us. We deny the Hospital's broader request to exclude "[a]ny and all other Requests enumerated in the Subpoena (Request 1 through Request 15) to the extent that such Requests or sub-Requests call for the production of health information of [its] patients" without prejudice. The request as to "health information" is too indefinite to permit relief on the present record, but the Hospital may seek more specific protection if future disputes arise after experienced counsel confer on their obligations.

### A.  The Hospital enjoys standing to challenge the three requests.

We must first ensure the Hospital can object to the three requests regarding the child-patients' names and medical records. Standing is a threshold issue under Article III.[83] The Department of Justice claims (at least in response to the Hospital's Motion) it is "highly skeptical" whether the Hospital enjoys standing to raise a Fourth Amendment challenge to this subpoena on behalf of all its patients.[84] We must determine whether the Hospital has constitutional standing to object to disclosing its child-patients' identities and medical information. We find the Hospital enjoys standing.

The Department of Justice's position on standing is belied by its admissions before us. It argued in opposition to the related patients' motion: "Congress specifically limited who may challenge" a subpoena under Section 3486—only the Hospital.[85] The Department of Justice also emphasizes Congress imposes no notice requirement to patients, meaning they receive no opportunity to assert their own interests.[86] The Department's theory precludes anyone from challenging its wishes. Such a reading would leave the Department of Justice's administrative subpoena power untethered to any check and place it beyond meaningful judicial review.

Our Court of Appeals applying the rule of law rejects this result. Parties seeking to challenge an administrative subpoena "must assert their own legal interests and show . . . their

JA374

interests are within the zone of interests the statute is intended to protect."[87]  We look to whether Congress provides an "express right to challenge the subpoenas issued under it."[88] The Department of Justice (given its lawyers' professional obligations) must concede "by [Section 3486's] plain terms, *only* 'the person or entity summoned' may move to quash or modify the subpoena. Here, the 'entity summoned' is [the Hospital]."[89]

Our Court of Appeals confirmed in *Westinghouse* the Hospital may assert its patients' privacy interests because it has "the necessary concrete adverseness."[90] The subpoena in *Westinghouse* targeted the employer, compelled production of documents in its possession, and exposed it to contempt if it refused.[91] The employer has "an ongoing relationship with its employees" and "an adverse decision on the merits of the constitutional claim regarding employee privacy may adversely affect the flow of medical information which it needs from them."[92] "[T]he absence of any notice . . . of the subpoena means that no person other than [the movant] would be likely to raise the privacy claim."[93]

The Hospital stands in the same posture. The Department of Justice targets it and demands records in its custody. It faces the burden of compliance and the risk of contempt. It relies on patient trust in maintaining sensitive medical information and has a direct interest in preserving its child-patients' willingness to share such information. Patients receive no notice of the Subpoena but for the Department of Justice's press releases touting Attorney General Bondi's efforts to end this Pennsylvania-approved medical treatment (which she considers a warped and radicalized ideology) irrespective of whether the subpoenaed records come close to showing manufacturers and distributors are violating the Food, Drug, and Cosmetic Act. The Department of Justice's theory would create precisely the vacuum our Court of Appeals in *Westinghouse* rejected. The Constitution does not tolerate such an unreviewable subpoena power and neither does Congress.

The Hospital enjoys standing to challenge the Subpoena.

**B.  The Department of Justice lacks statutory authority to compel the Hospital produce documents responsive to Requests 11, 12, and 13.**

We, like the Department of Justice and Hospital, are bound by the rule of law. Our task is not to evaluate whether Attorney General Bondi's view—casting Pennsylvania-approved gender-affirming medical care as mutilating children in service of a warped and radicalized ideology and yielding a mandate to end such care—is good for our Nation or a fair policy. We instead must focus on our respect for Congress allowing the Department of Justice to prosecute federal health care offenses under the Food, Drug, and Cosmetics Act.

We are first mindful "[j]udicial review of administrative subpoenas is 'strictly limited.'"[94] Our Court of Appeals instructs we enforce an administrative subpoena if the Department of Justice can show: (1) "the investigation will be conducted pursuant to a legitimate purpose;" (2) "the inquiry is relevant;" (3) "the information demanded is not already within the [Department of Justice's] possession;" and, (4) "the administrative steps required by the statute have been followed."[95] Our Court of Appeals explains the same standard as requiring enforcement "if the subpoena is for a proper purpose, the information sought is relevant to that purpose, and statutory procedures are observed."[96] "The demand for information must not be unreasonably broad or burdensome."[97]

This mandate is not new or responsive to the President's or Attorney General Bondi's views now manifested in demands for children's identities and their medical and psychological records from their doctors. The Supreme Court has articulated the same principle for more than seventy years: "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."[98] "The gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable."[99] "It is contrary to

14

JA376

the first principles of justice to allow a search through all [of a party's] records, relevant or irrelevant, in the hope that something will turn up."[100] "[R]easonableness, including particularity in describing the place to be searched, and the persons or things to be seized . . . comes down to [whether] specification of the documents to be produced [is] adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, . . . this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."[101]

"The ultimate inquiry . . . is whether the enforcement of the administrative subpoena would constitute an abuse of the court's process."[102] "The subpoenaed party bears the heavy burden of establishing [such] abuse."[103] Enforcing an administrative subpoena "for an improper purpose, such as to harass the [investigation's target] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation" would be an abuse of the court's process.[104] Federal judges are entrusted by the Framers and the people to ensure the unparalleled power of a Department of Justice subpoena is not abused; our role is "not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure [sic] the integrity of the proceeding."[105] We "must insist that the [Department of Justice] not act arbitrarily or in excess of its statutory authority."[106]

This inquiry leads us back to the first principles and to the authority vested by the Framers in our elected persons representing us in Congress. The authority to issue administrative subpoenas is not inherent in the Executive Branch—it is a delegation from Congress. Congress permitted the Department of Justice, through Section 3486, to issue subpoenas only to investigate a "[f]ederal health care offense" and only to seek "records or other things relevant to the investigation" of such an offense.[107] The scope of this power extends only as far as Congress allows. And Congress ties

15

JA377

the authority directly to relevance—the Department of Justice may not use a federal court subpoena to demand specific records if they are not relevant to a federal health care offense.[108]

So our task today is to determine whether Congress authorized the Department of Justice to compel the documents demanded in Requests 11, 12, and 13. We find the Department of Justice lacks statutory authority because these three requests seek information which bear no relevance to the investigation Congress permitted or to the investigation the Department of Justice tells the world it is pursuing under the Act. Enforcing these requests would transform Congress's 1996 grant of authority in Section 3486 from a tool of legitimate inquiry into a license for intrusion Congress never granted. The Department of Justice must operate within the limits set by our elected representatives in Congress.[109]

**1. The Department, absent demonstrating relevance of Requests 11, 12, and 13, lacks statutory authority to demand the children's identities and files.**

The Hospital does not challenge most of the Subpoena's broad categories of requests. Those categories—Requests 1–10 and 14–15—seek billing data, insurance-claim submissions, coding guidance, communications with insurers, materials exchanged with manufacturers and compounding pharmacies, and safety-related communications.[110] They could plausibly bear on the commercial conduct the Department describes in its investigative purposes under the Act.

The dispute today instead centers on a narrower set of requests of a fundamentally different character. Requests 11, 12, and 13 seek child-patients' identities and highly sensitive medical information: psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents.[111] These materials reflect individualized clinical care and deeply personal medical disclosures.[112] They do not speak to how products were labeled, marketed, introduced into interstate commerce, or billed to health care benefit plans. We cannot discern how such information is *relevant* to an inquiry into a "federal health care offense"

as Congress defined it or as the Department of Justice describes it here—potential violations of Section 331 of the Food, Drug, and Cosmetic Act relating to a health care benefit program.

The Department asserts the child-patient-specific files are relevant to a Section 331 investigation because "[l]inking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent" and "[d]ocumentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by [the Food and Drug Administration]."[113] It further contends "[a]bsence or minimization of such warnings could establish the intent to mislead" and "reviewing multiple patient records . . may reveal systemic use of the same masking codes, fraudulent informed consent documents," or other "institutionalized practice[s]."[114] It argues "providing patient records, including patient identities, can provide essential investigative leads" because "parents may be witnesses about what disclosures were made" and "patients . . . may provide information about the informed-consent process, side effects, or other false or misleading information about the drugs conveyed during treatment."[115]

These explanations do not withstand scrutiny. As we explained, Congress, through the Act, regulates the introduction, labeling, and distribution of drugs in interstate commerce; it does not govern how physicians diagnose patients, obtain consent, document treatment, or communicate with them.[116] The conduct the Department of Justice describes—miscoded diagnoses, allegedly incomplete disclosures, or purportedly misleading consent forms—concerns how drugs are used in practice, not how they are labeled, promoted, or distributed in commerce. Alleged deficiencies in those areas may implicate state informed-consent or professional-discipline standards, but they

17

do not establish a Section 331 violation "relating to" a health care benefit program within the meaning of Section 3486.

Linking individualized clinical narratives to billing data does not transform clinical narratives into statutorily relevant material. If coding accuracy or billing irregularities exist, the relevant evidence lies in the Hospital's coding guidance, claim forms, insurer correspondence, and internal communications—precisely the information captured in Requests 2–6. Likewise, the Department of Justice's own later-articulated theories, which shift toward examining manufacturer marketing, consulting arrangements, or broader supply-chain conduct, underscore the relevant evidence for such commercial practices lies in Requests 7–10, 14, and 15. Those requests seek communications with manufacturers and compounding pharmacies, promotional or "scientific exchange" materials, contracts, and safety-related documents.

The Department of Justice's Requests 11, 12, and 13 seek none of this information. These requests concern how clinicians treated individual children and intimate clinical details shedding no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the Act and Section 331. And the "fraudulent intent" and "intent to mislead" language the Department of Justice cites enhances the penalty for an existing Section 331 violation; it does not create one where none exists.[117] We agree with Judge Joun the connection between child-patient-identifying information and potential fraudulent billing codes or unlawful off-label promotion is tenuous at best and cannot shoulder the weight of compelled disclosure of a child's medical files.[118]

The Department of Justice's reliance on children's identities, social security numbers, and addresses as "investigative leads" underscores the speculative nature of Requests 11, 12, and 13. Congress in Section 3486 authorizes the Department of Justice to compel documents *relevant* to

an investigation—not to conduct open-ended discovery in search of witnesses or narratives to support a theory. "The requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from engaging in arbitrary fishing expeditions and from selecting targets of investigation out of malice or an intent to harass."[119]

The Supreme Court long ago recognized the need to balance the Department's investigatory authority with the individual's right to be free from unreasonable intrusion. The Court described this balance as a "basic compromise" designed to secure the public interest in effective investigation "and at the same time to guard the private ones affected against the only abuses from which protection rightfully may be claimed."[120] Those private interests are "the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason."[121] Administrative subpoenas, including those issued under Section 3486, must remain tethered to lawful authority and reasonable relevance, lest the investigatory process itself become the abuse Congress forbids. The breadth and intrusiveness of Requests 11, 12, and 13 surpass the boundary set by the Court.

The Department of Justice has not offered a factual basis (rather than investigative speculation) to find the personally identifying and clinical child-patient records sought in Requests 11, 12, and 13 are relevant to an authorized investigation of a *federal health care offense* within the meaning of Section 3486. Those children's records concern lawful medical practice governed by Pennsylvania law, not potential Section 331 violations involving a health care benefit program.

19

JA381

The Department of Justice lacks statutory authority for a rambling exploration of the Hospital's files to learn the names and medical treatment of children.

### 2. We are not persuaded by the Department of Justice's later evolving theories of relevance for statutory authority.

The Department of Justice has shifted its explanations for the investigation before us as our colleagues across the Nation have identified problems with the Department's numerous subpoenas. These shifts reinforce why the specific child-patient-identifying and clinical records demanded in Requests 11, 12, and 13 fall outside Congress's grant of authority in Section 3486. The Department's latest characterizations of its inquiry vary widely and do not establish a connection between an authorized investigation into a federal health care offense and the intimate individualized medical files of a child patient.

The Department—varying over the weeks following Attorney General Bondi's mandate and Assistant Attorney General Shumate's admissions—described its purposes over the last few months into: (1) hospitals' and clinicians' off-label dispensing and billing practices where insurance claims related to off-label use "could constitute a federal health care offense";[122] (2) whether the Hospital itself "is violating the [Food, Drug, and Cosmetic Act]—either directly or through a conspiracy with others (*e.g.,* with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead";[123] (3) drug manufacturers' "market[ing of] puberty-blocker drugs and cross-sex hormones directly to pediatric transgender programs" and "consulting agreements" with prescribing clinicians;[124] and (4) a broad "supply-chain" theory encompassing "entities in the drug supply chain, including hospitals, manufacturers, and distributors," alleged to have "caused the introduction of misbranded or unapproved drugs into interstate commerce (or have misbranded them while held for sale)."[125] These categories concern commercial practices, billing practices, and interactions with manufacturers or distributors. The

20

Department of Justice does not explain why the Hospital needs to personally identify children entrusted by their families to its care along with diagnoses, psychosocial histories, clinical rationales, or informed-consent disclosures. The Department of Justice has not shown statutory authority with its latest theories.

### a. The Hospital's experience is not evidence of a federal health care offense.

The Department of Justice admits seeking these records because the Hospital managed its Program under Pennsylvania law with some renown over the past eleven years. Director Hsiao swears the Department's investigation ties directly to the Hospital because its eleven-year Program is "one of the largest pediatric gender clinics in the country" and thus—simply because it has more children patients—the Department of Justice can jump to a conclusion of having "ample reason to suspect" federal health care offenses "may be occurring at [the Hospital]."[126] Director Hsiao cites an ongoing review of anonymized insurance claims data and <u>one</u> patient complaint as the basis for this suspicion.[127] Her sworn explanation suggests a long-standing medical program with one patient complaint over eleven years is somehow the basis to assume fraud. But Director Hsiao does not articulate a reason why or how the identities and individualized medical files of children patients bear on these theories. The Hospital's meaningful role in more children's lives than other medical providers is not a federal crime to our understanding. More patients do not mean there could be more fraud.

### b. Commercial practices of others is not statutory authority for producing the children's identities, diagnoses, or authorizations.

The Department of Justice recast these three requests as "targeted for information bearing on commercial practices involving federally-regulated drugs."[128] This belated explanation differs markedly in both *scope* and *subject*—shifting from potential provider-level billing or dispensing irregularities—to manufacturer-level marketing relationships and, most recently, to a nationwide

21

JA383

supply-chain inquiry encompassing actors far beyond the Hospital and its child patients. The Department of Justice insists the requested three categories of documents are "plainly" "tethered to a proper statutory inquiry . . . as [Director] Hsiao['s] [D]eclaration, made under penalty of perjury, makes clear."[129] It concludes Congress gave it subpoena authority whenever the Department of Justice concludes documents are "plainly tethered" to the limited inquiries authorized by Congress. Its wayward reasoning makes it difficult to identify a consistent statutory basis or investigative target within the limits Congress imposed in Section 3486 and leaves uncertain whether the present three requests (for personally identifying and highly confidential and sensitive medical records of children) remains confined to the "federal health care offense" Congress authorized the Department of Justice to investigate for the stated purposes under the Food, Drug, and Cosmetics Act. This explanation is not credible.

### c. Congress did not authorize demanding children's records when investigating fraud in distribution or promotion of puberty blockers and cross-sex hormones under the Act.

The Department of Justice invokes sweeping needs for the children's identities far removed from those claimed purposes granted by Congress. It describes its investigation over the past few months as focusing on "the distribution, promotion, and use of puberty blockers and cross-sex hormones in minors for the treatment of gender dysphoria—uses that the [Food and Drug Administration] has never approved and that raise grave safety concerns."[130] The Department of Justice is investigating "expressly prohibited potential misconduct in the health[ ]care field . . . involving lifelong consequences to vulnerable minors."[131] It concludes, without anything more than its belief, the records "bear directly" on whether prescribing puberty blockers and cross-sex hormones to treat gender dysmorphia—"drugs not proven safe or effective for this use—may violate federal law and endanger children. This off-label use of these powerful drugs may be putting children at significant risk, leaving lifelong mental and physical side effects and

22

JA384

consequences—the full extent of which may yet be unknown to science."[132] Even taken at face value, these concerns describe policy disagreements about the propriety of medical care left to the Commonwealth since the Nation's founding and not a federal crime under the Act. They do not establish statutory relevance of child-patient-specific files.

The Department of Justice's evolving rationales expose a uniquely misplaced view of its ability to expand the limits Congress imposed in Section 3486 and the investigation it claims to be pursuing. We remind the Department Congress authorized this investigation of a federal health care offense, which—when the Department of Justice relies on the Act—means a violation of Section 331 relating to a health care benefit program. Congress never authorized a roving mandate to regulate and alter state-licensed medical care. States retain "wide discretion to pass legislation in areas of medical and scientific uncertainty" and the use of puberty blockers and hormone therapy to treat gender dysmorphia is legal in Pennsylvania as confirmed by Governor Shapiro.[133]

Attorney General Bondi's and Assistant Attorney General Shumate's mantra of concern for child welfare, however genuine, is not a substitute for the limited authority granted to them by the elected representatives. The Department of Justice's subpoena power extends only to information relevant to a Section 331 offense relating to a health benefit program, not to generalized policy objections about medical treatment decisions. Congress, through Section 3486, does not authorize a federal investigation into lawful medical practice simply because the President or current Attorney General disapproves of the care provided regardless of Pennsylvania's approval in the exercise of its police powers.

> **d. The Department of Justice misreads Congress's mandate in the Food, Drug, and Cosmetic Act.**

The Department of Justice's theory rests on an admittedly unprecedented interpretation of the Food, Drug, and Cosmetic Act. The Department seeks to transform Congress's regulation of

JA385

the manufacture, distribution, and labeling of drugs into a vehicle for federal oversight of how physicians diagnose, treat, and counsel child patients. And then to go a step further and obtain the identity of those children. This view misstates the conduct Section 331 reaches. This theory cannot supply the statutory relevance needed to justify Requests 11, 12 and 13 under Section 3486.

Congress, through the Act, regulates *commerce*, not *care*. Both the Food and Drug Administration and our colleagues long recognized off-label prescribing—the use of an approved drug for an unapproved indication—is lawful and beyond the Act's reach.[134] "Although the Act regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of medicine."[135] Congress likewise expressly preserved state authority over medical practice, providing in part, "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease."[136] The Food and Drug Administration "can only regulate the marketing and labelling of devices. It cannot regulate what physicians do with the devices with respect to their patients."[137] The United States Office of Legal Counsel agrees: "As a general matter, [the] [Food and Drug Administration] does not regulate the practice of medicine, which includes 'off-label' prescribing."[138] "Federal regulation of medical products is grounded in the introduction of [articles] in interstate commerce for commercial distribution, not use by physicians. This concept forms the basis for the 'practice of medicine' doctrine, which maintains that [the Food and Drug Administration] lacks authority under the [the Act] to regulate patient treatment decisions made by licensed physicians."[139]

Director Hsiao blurs these fundamental distinctions. She swears "a drug manufacturer or other person distributes" a misbranded or unapproved drug simply by prescribing or administering an approved drug for an unapproved indication and "to the extent these drugs are intended to treat

gender dysphoria in minors, they constitute unapproved new drugs under federal law, and their distribution for that unapproved indication violates the [Act] and is a federal crime."[140]

The Director's assertion is wrong as a matter of law. The practice of off-label prescribing and administering puberty blockers and cross-sex hormones to children with gender dysphoria is lawful in Pennsylvania and clinicians "are free to exercise their professional judgement [sic] to prescribe [Food and Drug Administration]-approved drugs for any use they see fit."[141] Director Hsiao further stretches the concept of "labeling" to suggest ordinary clinical documents may qualify as "false or misleading labeling."[142] But "labeling" under the Act refers to written or graphic materials accompanying a drug in commerce—materials disseminated by *manufacturers, packers, or distributors* to describe or promote the product—not to internal medical records, informed consent forms, or physician–patient communications.[143] Director Hsiao finally suggests health care providers become part of the "chain of distribution" of a drug when a drug must be administered by a physician or nurse at a medical facility purchasing and storing the drug.[144] This theory has no cognizable bounds; it defies both law and logic. Accepting this interpretation would transform every act of treatment into a potential federal offense. And be directly contrary to Congress's mandate.

The Department of Justice belatedly disclaimed an intent "to criminalize routine, non-fraudulent off-label prescribing" yet simultaneously contends the Act and "its implementing regulations make it unlawful to distribute drugs in interstate commerce when the intended use . . . is not a [Food and Drug Administration]-approved indication and/or where the drug does not have adequate directions for that intended use."[145] But the first clause simply restates Director Hsiao's assertion using an approved drug for an unapproved indication renders it an "unapproved new drug" and the second echoes the misbranding provision which requires manufacturer labeling to

25

JA387

include "adequate directions for use." Neither theory governs physicians acting within their state-regulated scope of practice—prescribing or administering Food and Drug Administration-approved drugs in the exercise of professional medical judgment. Misbranding liability, as Congress structured it, attaches to those who design, control, or disseminate a drug's labeling—such as manufacturers and distributors—not to physicians engaged in patient-specific treatment.[146] Clinicians neither create a drug's labeling nor define its "intended use" under the Act, and the statutory exemption for prescription drugs removes a requirement they provide "adequate directions for use" when prescribing Food and Drug Administration-approved drugs to individual patients.[147] The prescription-drug framework rests on licensed practitioners exercising medical judgment rather than layperson-directed labeling. Nothing in the Act treats a physician's diagnosis, counseling, or prescription decisions as misbranding. The Department of Justice's disavowal of criminal intent thus conflicts with (and does not cure) the premise underlying Director Hsiao's sworn belief off-label medical practice itself violates the Act. We again cannot fathom where Director Hsiao's theory would lead in prosecutions of clinicians who exercise their learned judgment to find these drugs will help their child patients and the Commonwealth agrees with them. The Director may, of course, pursue legitimate violations of the Act (such as the interstate distribution of unapproved drugs or the misbranding of manufacturer labeling) but she offers no basis for compelling disclosure of child-patient identities and intimate medical records absent any showing those records could reveal a federal health care offense relating to a health care benefit program as Section 3486 requires. We find no such showing possible on the theories Director Hsiao advances here.

The Department of Justice further reasons "Congress . . . did not intend to insulate from scrutiny every transaction that happens to involve a licensed practitioner" and relies heavily on a

JA388

decision from another Circuit over a decade ago in *United States v. Regenerative Sciences, LLC*.[148] But the Court of Appeals for the District of Columbia's analysis in *Regenerative Sciences* offers no basis for the Department's attempt to classify ordinary prescribing of approved drugs as actionable under the Act or to justify obtaining the identities of children patients. The Court of Appeals for the District of Columbia reviewed a fact pattern with physicians who manufactured and administered an unapproved stem cell mixture—a drug the Food and Drug Administration had "*not approved . . .* as safe for *any use*" and "hence challenge[d the physicians'] right to prescribe [it] *at all*."[149] "[T]he focus of the [Food and Drug Administration]'s regulation [was] the Mixture. That is, the [Food and Drug Administration did] not claim that the procedures used to administer the Mixture [were] unsafe; it claim[ed] that the Mixture itself [was] unsafe."[150] The Court of Appeals for the District of Columbia's limited discussion of the Act's scope as it applied to physicians recognized doctors who step into the manufacturing or compounding role cannot rebrand conduct prohibited under the Act as the "practice of medicine" to evade oversight because doing so would "create an enormous gap in the Act's coverage."[151] The Department of Justice's reasoning has no bearing here where physicians prescribe approved drugs already in lawful commerce and subject to state regulation of medical practice. The Department of Justice's reliance on two other out-of-Circuit citations fare no better.[152] Neither supports treating prescribing and administering a Food and Drug Administration-approved drug as "distribution" or "misbranding." And they do not come close to requiring disclosure of children's identities and clinical files to investigate misbranding concerns under the Act.

The Department of Justice hopes to reinterpret Congress's longstanding mandate in the Act to reach lawful clinical care. Extending it so far would subvert Congress's design, erase the long-recognized boundary between drug regulation and the practice of medicine, and intrude upon

Pennsylvania's sovereign authority to oversee the medical profession in the Commonwealth guaranteed under the Tenth Amendment. Such an interpretation would seem to disregard the limits of Congress's intent and risk undermining the physician-patient relationship and open, evidence-based communication about care—a result at odds with both Congress's direction in Section 3486 and sound medical practice set by the Commonwealth. As a bottom line, the subpoena authority granted by Congress does not reach lawful off-label prescribing or internal clinical documentation requiring we find the patient-specific materials in Requests 11, 12 and 13 cannot be relevant to investigating a Section 331 "federal health care offense."

## C. Our Court of Appeals's *Westinghouse* analysis requires we balance the child's privacy interests with the Department of Justice's need for the children's records in Requests 11, 12, and 13.

The Hospital offers an alternative even if we found Requests 11, 12, and 13 satisfy the criteria for judicial enforcement (which we do not). The Hospital alternatively argues we must strike Requests 11, 12, and 13 after balancing the seven factors set by our Court of Appeals when evaluating whether "an intrusion into an individual's privacy is justified."[153] Our Court of Appeals defines these seven factors ("*Westinghouse* factors"): (1) "the type of record requested;" (2) "the information it does or might contain;" (3) "the potential for harm in any subsequent nonconsensual disclosure;" (4) "the injury from disclosure to the relationship in which the record was generated;" (5) "the adequacy of safeguards to prevent unauthorized disclosure;" (6) "the degree of need for access;" and, (7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access."[154]

The Department of Justice argues the *Westinghouse* factors do not apply to the Subpoena because Congress in Section 3486 "superseded the *Westinghouse* test by addressing the concerns about medical privacy that animated the *Westinghouse* decision" and "*Westinghouse* was wrongly decided."[155]  We disagree with the Department on both fronts.

28

JA390

### 1. Congress in Section 3486 does not supersede *Westinghouse.*

The Department of Justice maintains Congress establishes a narrow set of procedural requirements for issuing and enforcing a subpoena and includes no reference to the *Westinghouse* balancing test.[156] Congress addressed medical privacy when it enacted the Health Insurance Portability and Accountability Act of 1996 (including Section 3486) by limiting disclosure of protected health information and granting the Department of Justice a distinct, constitutionally sound subpoena power to obtain such information.[157] The Department of Justice argues compliance with Section 3486's procedural requirements automatically resolves all constitutional privacy concerns.[158] It relies on our Court of Appeal's analysis in *In re KB Toys Inc.* to argue statutory text alone controls.[159] It also cites three out-of-Circuit decisions and concludes "[t]he only circuit courts to have considered [Section 3486] subpoenas have upheld them over Constitutional challenges that attempt to place privacy-based, *Westinghouse*-like additional restrictions on their use."[160]

The Hospital counters Section 3486 does not define constitutional boundaries and Congress through Section 3486(a)(7) preserved legal standards recognized by federal courts.[161] Congress in Section 3486(a)(7) confirms the Subpoena cannot compel the production of materials protected under standards governing federal court subpoenas and those standards in our Circuit at the time Congress enacted Section 3486(a)(7) included privacy balancing under *Westinghouse*.[162] Congress is presumed to legislate with knowledge of existing law leading the Hospital to argue Congress incorporated those limits into Section 3486.[163] It also distinguishes the Department's out-of-Circuit authorities.[164]

We will not disregard binding precedent. The *Westinghouse* analysis is binding precedent in our Circuit. The Department of Justice's contrary and unsupported position is unpersuasive. The Department reaches to suggest a subpoena issued under Section 3486 stands beyond constitutional

29

review because the Department's asserted interest always outweighs privacy interests.[165] But a court enforcing a federal statute must do so in a manner consistent with the Constitution. Statutory authorization—whether broad or silent—does not displace constitutional limits or insulate executive action from judicial review. Our Supreme Court directs even in areas where Congress exercises its most expansive authority, courts must still ensure executive action complies with fundamental constitutional protections.[166] Section 3486 cannot override the constitutional privacy framework set by *Westinghouse*.

The Department of Justice's claim is belied by the viability of the *Westinghouse* analysis after Congress enacted Section 3486 almost thirty years ago. Our Court of Appeals applied the *Westinghouse* factors in *F.D.I.C. v. Wentz* to assess privacy interests in personal financial records and explained "[w]hen personal documents of individuals, as contrasted with business records of corporations, are the subject of an administrative subpoena, privacy concerns must be considered" and again cited the *Westinghouse* factors.[167] It emphasized "[p]ersonal financial records have never been as tightly guarded as 'information concerning one's body'" and found the defendants failed to "produce[] any evidence to show that the information contained in their personal financial records 'is of such a high degree of sensitivity that the intrusion could be considered severe or that the [directors] are likely to suffer any adverse effects from disclosure to [government] personnel.'"[168] It concluded the "strong public interest in safeguarding the [Federal Deposit Insurance Corporation]'s legislative mandate outweighs the minimal intrusion into the privacy that surrounds the directors' personal financial records."[169] Our Court of Appeals in *United States v. Oncology Servs. Corp.* distinguished the situation where the defendant raised no privacy claim but reaffirmed "agency requests for medical records implicate[] privacy rights" under *Westinghouse*.[170] Judge Shapiro reiterated in *Matter of Delaware River Stevedores* "privacy,

breadth, potential for harm from subsequent, non-consensual disclosure, adequacy of safeguards, and the burden of production" are relevant considerations.[171] And Judge Padin confirmed last year in *CMA CGM S.A. v. CIS Dev. Found., Inc.* "courts must also consider privacy concerns when 'personal documents of individuals, as contrasted with business records of corporations, are the subject of an administrative subpoena.'"[172] None of these cases involved Section 3486 subpoenas for child medical records, but each applied or reaffirmed *Westinghouse* as controlling precedent in our Circuit and confirmed privacy remains a constitutional consideration in administrative subpoena cases involving personal or medical information.[173]

The Department of Justice reaches to avoid this precedent in our Circuit. Its reliance on our Court of Appeals's reasoning *In re KB Toys Inc.* is misplaced. It cites the case for the proposition "[i]f the text [of a statute] is clear and unambiguous, this Court must simply apply it."[174] But our Court of Appeals in *In re KB Toys Inc*. addressed when legislative history may be used to interpret ambiguous statutory text.[175] The Hospital does not claim Section 3486 is ambiguous or rely on legislative history. It argues statutory compliance alone does not displace constitutional limits.[176] We agree with the Hospital finding Congress through Section 3486(a)(7) underscores this deference to the highest law in the land by preserving legal standards recognized by federal courts when evaluating subpoenas.[177]

The Department of Justice's out-of-Circuit cases involving constitutional challenges to Section 3486 subpoenas fare no better. None foreclose application of *Westinghouse* in a case where patients' privacy interests in sensitive and identifying medical records are squarely presented. Its reliance on these decisions overstates both their holdings and their relevance. The subpoena in *Whispering Oaks* sought financial and business documents, such as invoices, tax returns, personnel files, and communications with state agencies about the residential care facility's operations.[178]

The subpoena did not seek children patients' medical records and the facility never raised a constitutional privacy concern.[179] The Court of Appeals for the Eighth Circuit simply applied only the traditional administrative subpoena enforceability framework (statutory authority, lawful purpose, relevance, and reasonableness) and found the subpoena enforceable without considering possible privacy interests in financial records (including the type of records the Hospital agrees to produce in response to other requests).[180]

The subpoena in *Doe* sought various records from a physician under investigation for an alleged kickback arrangement.[181] The requests most comparable to those here concerned "all documents and patient files evidencing Doe's referral of patients for *certain* electrodiagnostic tests" and "referral of patients to a *specific* medical testing laboratory for *certain* diagnostic ultrasound tests."[182] Those requests involved limited referral information, not comprehensive or identifying medical records, and the Court of Appeals for the Sixth Circuit "did not address this aspect of the subpoena" because the physician "no longer dispute[d] the reasonableness of the government's request for patient documents."[183] The physician did not raise a constitutional privacy claim.[184] The Court of Appeals for the Sixth Circuit similarly applied only the traditional administrative subpoena enforceability framework and observed "the primary point of contention [was] whether the [other] documents requested [were] relevant to the investigation."[185] The characterization of *Whispering Oaks* and *Doe* as cases "uph[olding Section 3486 subpoenas] over Constitutional challenges that attempt to place privacy-based, *Westinghouse*-like additional restrictions on their use" is misleading.[186] Neither case presented a constitutional privacy challenge, leaving the Courts of Appeals for the Sixth and Eighth Circuits no reason to go beyond the traditional administrative subpoena enforceability framework and consider *Westinghouse* or a similar balancing test.

32

JA394

Judge Jones's analysis, as affirmed by the Court of Appeals for the Fourth Circuit in *In re Subpoena,* reflects a case-specific balance of interests, not a determination Section 3486 inherently provides constitutionally sufficient privacy protection for all subpoenaed medical records "as a matter of law."[187] The subpoena before Judge Jones sought extensive patient materials, "including "medical files, patient appointment books, patient billing records, office sign-in sheets, and telephone messages" for services billed to various federal and private programs.[188] The physician and medical practice moved to quash the subpoena and argued the "patients' privacy interests in their medical files outweigh the government's interest in those files."[189] The Department of Justice offered to seek only those "patient files which remain relevant to [the] investigation after [its] review of the initial production" which excluded patient treatment files. [190] So Judge Jones did need to face the question of the Department of Justice seeking patient treatment files now before us. Judge Jones recognized the "express statutory mandate and articulated public policy" and "safeguards against further disclosure" under Section 3486 but also acknowledged "the personal nature of the information sought" and prohibited disclosure "to anyone other than the employees and representatives of the Department of Justice" or "to a grand jury or court in any subsequent proceeding."[191] Judge Jones found the public interest in combating health care fraud outweighed the individual privacy interest given the limited scope of requested production.[192] The Court of Appeals for the Fourth Circuit affirmed holding the Department of Justice's "compelling interest in identifying illegal activity and in deterring future misconduct" outweighed "the privacy rights of those whose records were turned over to the government" under the facts presented.[193] Both courts expressly considered privacy interests and balanced them against the Department of Justice's asserted need for redacted records—an approach consistent with, not contrary to, *Westinghouse*. We face a much greater privacy interest of children and their families receiving

JA395

physician-recommended gender-affirming care at a time when their Attorney General describes their medical care as a warped ideology. And the Department of Justice today has not shown the specific need to investigate the children.

The Department of Justice also references *United States v. Hertel & Brown Physical & Aquatic Therapy* as the only decision in our Circuit discussing a Section 3486 subpoena and emphasizes Judge Baxter did not mention *Westinghouse* but instead cited and quoted from the Court of Appeals for the Sixth's Circuit's decision in *Doe*.[194] But Judge Baxter's analysis in *Hertel* arose in the context of motions to suppress in a criminal prosecution after the Federal Bureau of Investigations already issued requests and obtained patient data from third-party health insurers.[195] The insurers voluntarily complied with the requests in the *Hertel* ongoing criminal case, which sought billing and claims information including patient names, social security numbers, diagnosis codes, dates of service, and amounts billed and paid.[196] Judge Baxter addressed only whether the defendants could assert their own expectation of privacy in those insurer records sufficient to establish standing for a Fourth Amendment challenge, not whether the patients held a constitutional privacy interest of the kind established in *Westinghouse*.[197] The "protected privacy interest in medical data generally concern[s] an individual's privacy interest in his own medical data, which is not at issue here."[198] Judge Baxter cited *Doe* only to describe Section 3486's broad investigatory authority.[199] Judge Baxter did not address the constitutional privacy question and did not address *Westinghouse* or its relevance to Section 3486 subpoenas. Judge Baxter's analysis in *Hertel* provides no support for the Department of Justice's suggestion *Westinghouse* does not apply to our review of Requests 11, 12, and 13 seeking the identity of child patients and their treatment files.

34

JA396

The Department of Justice's unprecedented reading of Section 3486 requires us to find Congress removed a federal court's power to protect medical privacy, no matter its sensitivity or scope, and turn a procedural statute into a shield against constitutional review. Such an outcome conflicts with both *Westinghouse* and the principle federal statutes yield to constitutional protections. Statutory compliance does not dissolve privacy interests. We must weigh those interests against the Department's asserted need. *Westinghouse* remains binding precedent in this Circuit, and we apply its factors.

### 2.  We do not find our Court of Appeals wrongly decided *Westinghouse*.

The Department of Justice next urges us to disregard *Westinghouse* on the theory our Court of Appeals "wrongly decided" it because the court identified no statutory or Supreme Court basis for its holding.[200] It expresses skepticism about "an affirmative, free-floating right to control the disclosure of medical records in whatever context they may be found" given what it views as the "lack of historical grounding for such a right."[201]

This is not a legal argument—it is an invitation to ignore precedent. We may not ignore controlling law to accommodate a party's skepticism. Our Court of Appeals's *Westinghouse* guidance remains binding precedent in this Circuit unless and until our Court of Appeals or the Supreme Court says otherwise. We have found no authority to the contrary and the Department offers none. We will apply the *Westinghouse* factors in balancing the children's privacy interests with the Department of Justice's demands for their identities and medical treatment records in Requests 11, 12, and 13.

### D. The *Westinghouse* factors weigh in favor of protecting the most sensitive information regarding a child's gender-affirming care.

We next weigh our Court of Appeals's seven *Westinghouse* factors to determine whether the Department of Justice's demands for the children's identities and medical treatment records

justify "intrusion into an individual's privacy."[202] We weigh the competing interests and the scale weighs in favor of protecting the privacy of children's identities and treatment in an investigation into whether medical professionals are using false billing codes or misbranding the puberty blockers and hormone therapy. The Department's asserted need falls short of justifying an intrusion of this magnitude. The Department through Requests 11, 12, and 13 seeks intensely personal and sensitive medical information warranting the highest level of protection. The Department of Justice can pursue its investigation into federal health care offenses without forcing disclosure of these records, particularly given the breadth of other information the Hospital already agreed to produce. The exceptional privacy interests at stake compel limiting the Subpoena to exclude Requests 11, 12, and 13.

      **1.   The type of medical records requested and information they do or might contain weighs in favor of protecting the children's privacy**.

The first two *Westinghouse* factors require we study the type of record requested and the information the record contains or might contain. We address and weigh the first and second *Westinghouse* factors together because they both concern the sensitivity of the information sought and are closely intertwined. Both the Hospital and the Department of Justice likewise group these factors together.[203]

The Hospital emphasizes the extraordinary sensitivity of the requested information regarding its child patients.[204] The Department of Justice in Requests 11, 12, and 13 demand assessments, diagnoses, and informed consent records underlying medical decisions to prescribe puberty blockers and hormone therapy and documents identifying the patients associated with those records by name.[205] These records reflect comprehensive psychosocial and medical evaluations and often involve intimate disclosures about "discomfort with specific body parts, sexual history, past trauma, interfamily dynamics, use of self-harm or other negative coping

mechanisms . . . such as disordered eating, and experiences of harassment and bullying."[206] The Hospital argues such information sits at the core of patient privacy and has long been recognized as such by courts and federal regulators.[207] It maintains these records are far more sensitive than the "results of routine testing, such as X-rays, blood tests, pulmonary function tests, hearing and visual tests" at issue in *Westinghouse*.[208] It also underscores the compounded intrusion created by the Department of Justice's demand for child-patient identifiers and our Court of Appeals recognition linking highly personal medical information to specific individuals substantially magnifies the privacy stakes.[209]

The Department of Justice "does not quibble with the sensitivity of the patient information involved" but rejects the Hospital's "characterization and balancing" of the factors.[210] It portrays the Hospital as having "cho[sen] to bankroll and run a specialty clinic" in a "controversial" field and argues the Hospital cannot insulate sensitive medical practices from investigation simply by invoking the "sensitivity of [the] information" at the outset.[211] It suggests the Hospital's reliance on privacy concerns would effectively create a "zone of impunity" for providers operating in areas of medicine the Hospital labels "sensitive."[212] The Department of Justice offers its inability to investigate "the provision of pharmaceuticals to minors without obtaining records of pharmaceuticals provided to minors" as an example.[213]

The Department of Justice further asserts the sensitivity of these records "actually militates in favor of disclosure, not against it—because the consequences to children of unlawful practices in gender-related care practices are potentially so severe" and cites Justice Thomas' recent concurrence in *United States v. Skrmetti* as "evidence suggesting that gender-related care for minors in the United States is rife with potential consumer-protection violations."[214] It argues the

37

JA399

Hospital's showing on these factors "is entirely outweighed by the need for the records and the [Department of Justice's] interest in preventing potential lifelong consequences to children."[215]

The sensitivity of the requested records is beyond dispute. Our Court of Appeals has long recognized "[t]here can be no question . . . medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection."[216] This protection squarely extends to prescription records.[217] One can "look[] at an individual's prescription records to determine [their] illnesses" or "to ascertain such private facts," including "whether a woman is attempting to conceive a child through the use of fertility drugs"—"precisely the sort [of information] intended to be protected by penumbras of privacy."[218] It likewise extends to information regarding sexuality and sexual orientation, and disclosures entailing "stigma, potential for harassment, and risk of much harm from non-consensual dissemination of the information," such as an individual's HIV-positive status or a minor's pregnancy.[219] When highly sensitive medical information is linked to an identified individual—such as pairing a patient's name with HIV-specific medications—the resulting information is a "private matter" into which intrusion may occur only upon a showing of "sufficient cause."[220] The governing principle is straightforward: "[t]he more intimate or personal the information, the more reasonable the expectation is that it will remain confidential."[221]

The records sought here fall at the highest end of the intimate and personal spectrum. They contain comprehensive psychosocial evaluations and deeply personal disclosures by children about their bodies, sexuality, trauma, family dynamics, self-harm, mental-health history, and cognitive and emotional functioning. They also include the diagnoses, clinical reasoning, and informed-consent discussions underlying treatment decisions. This level of detail places the information among the most personal and sensitive a medical provider can hold and squarely

JA400

within the class of intimate material our Court of Appeals has long regarded as warranting the strongest constitutional protection. The Department of Justice seeks to pair these disclosures with the names, dates of birth, addresses, and social security numbers of the children involved. Linking such intimate material to identified children—across assessments, diagnoses, psychosocial histories, and consent discussions—invokes the strongest privacy protections recognized in *Westinghouse* and applied for forty-five years.

We are not persuaded in the least by the Department of Justice's attempt to invert these factors by claiming the sensitivity of the information "militates in favor of disclosure . . . because the consequences to children of unlawful practices in gender-related care practices are potentially so severe."[222] Its stated investigation concerns potential federal health care offenses premised on a violation of Section 331 only to the extent the violation relates to a health care benefit program.[223]The focus of such an inquiry is conduct involving a "public or private plan or contract, affecting commerce"—not clinical risks, potential medical consequences to individual children, or the adequacy of informed-consent discussions.[224] Invoking patient welfare to justify disclosure therefore misdirects the inquiry. The underlying medical care does not become subject to compelled disclosure simply because it is sensitive or controversial; sensitivity cannot be transformed into a reason to compel disclosure when the authorized (and represented) investigative purpose concerns only a potential Section 331 offense relating to a health care benefit program, not patient safety or medical judgment governed by the Commonwealth's police power.

The Department of Justice's reliance on Justice Thomas's concurrence does not strengthen its position. A concurrence about consumer-protection concerns is not evidence of a Section 331 violation nor does it supply the "sufficient cause" required to intrude into constitutionally protected medical information.

The *Westinghouse* factors one and two weigh heavily in the Hospital's favor. But we do not treat them as dispositive. We simply find the Department of Justice's stated rationale does not diminish the highest level of privacy interests inherent in these records or convert their sensitivity into a basis for compelled disclosure.

### 2. Potential for harm in subsequent nonconsensual disclosure weighs in favor of the child's privacy interests.

The third *Westinghouse* factor considers the potential for harm in subsequent nonconsensual disclosure. The Department of Justice offers little to address the privacy concerns; it instead confirms it is seeking the records to investigate further including the children and their families and risks including turning parents into witnesses against their child's doctors regarding the most private and sensitive medical care.

The Hospital describes the potential harm as severe.[225] It points to the "embarrassment, humiliation, and trauma" its patients could face if their records and exceptionally sensitive information "were somehow made public" through leaks or other disclosure.[226] The records contain intimate details about patients, their families, friends, and others in their lives and the Hospital stresses the harm would reach beyond its patients to people named in the records "who have little or no connection to the Program and no idea that information concerning them is at issue."[227] Awareness of the Requests 11, 12, and 13 heightened fears of surveillance and exposure among patients and families.[228] The Hospital warns these fears of future disclosure will deter some patients from seeking care and engaging in daily life, with serious health and psychological consequences.[229] It further explains the Department of Justice's intent to obtain identifiable records creates a risk of direct contact between federal investigators and patients.[230] The Hospital describes such potential encounters as distressing, potentially outing patients and increasing their risk of harassment, discrimination, and violence.[231]

The Department of Justice gives this factor little attention. It groups it with the first two factors and offers one response—it is "willing to work with [the Hospital] to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise."[232] The third factor concerns harm if nonconsensual disclosure occurs, not the likelihood of disclosure. The Department's cursory statement does not meaningfully address the potential harms the Hospital describes.

The Hospital makes a detailed and unrebutted showing of the harm and consequences to follow even from the slightest disclosure of a child's sensitive medical records. Such disclosures would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma. The disclosures would inflict deep emotional harm, destroy trust in medical care, and spread the damage to families, peers, and many others.

We must also be realistic when recognizing disclosure of certain medical conditions—particularly those burdened with political controversy or public misunderstanding—can inflict extraordinary harm on the patient and their family. Judge Brotman in *Doe v. Borough of Barrington* described how profound harms can follow revelation of an individual's AIDS status and emphasized "the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease."[233] "The potential for harm in the event of a nonconsensual disclosure is substantial."[234] Judge Brotman ultimately found "[t]he government's interest in disclosure here does not outweigh the substantial privacy interest involved."[235]

JA403

We do not suggest, in any respect, gender-affirming care for transgender children is comparable in medical gravity to the once-fatal HIV/AIDS disease. We reference the history for a far narrower purpose: to illustrate how the disclosure of highly sensitive medical information can expose individuals to stigma, misunderstanding, or hostility—particularly in political climates where those charged with protecting the public's welfare have taken an adversarial view of certain medical care based on ideology rather than deferring to Pennsylvania's police power to regulate medical care at the Hospital. Gender-affirming medical care, like HIV-AIDS care not too long ago, has become a flashpoint of national political conflict, saturated with name-calling, fear, and hostility. In such an environment, disclosure of children's identities and treatment details (when they wish to keep them confidential) would expose them and their families to the same kinds of stigma, harassment, and social injury Judge Brotman recognized as both foreseeable and intolerable when intimate medical information becomes public.

And the harm to the Hospital's patients is not hypothetical. The Department of Justice already described the very disclosures this factor exists to guard against. It intends to use patient identities as "essential investigative leads."[236] "Parents may be witnesses" and "[p]atients (depending on age and circumstances) may provide information."[237] This is not a distant privacy concern. It is a plan to intrude on the most private sphere of vulnerable children and their families and to investigate them. The harm is grave, foreseeable, and—by the Department of Justice's own admission—imminent in an area of medical care the President and Attorney General claim are "a stain on our Nation's history" and "a warped ideology." In pressing forward while acknowledging this consequence, the Department effectively confirms the very harm the third *Westinghouse* factor exists to prevent. The potential, and apparent forthcoming, harm from nonconsensual disclosure of these records is extraordinary and weighs decisively against enforcement.

42

JA404

The third factor weighs in the Hospital's favor.

### 3. Injury to the physician–child-patient relationship from disclosure favors the children's privacy interests.

The fourth factor considers the injury to the relationship between the child patient and the medical provider creating the records.[238] The Hospital argues this factor weighs heavily against disclosure. It describes the physician–patient relationship as a cornerstone of effective care with confidentiality at its core.[239] Patients share deeply personal information expecting their records to remain private and not open to unfettered access by federal investigators based on the care they received.[240] The Hospital warns disclosure through Requests 11, 12, and 13 would discourage families from seeking treatment, deter open communication with providers, and erode trust needed for accurate diagnosis and effective care.[241] It distinguishes the employer-employee relationship in *Westinghouse* where disclosure carried little risk of deterrence and argues the chilling effect here is real and far-reaching with public health consequences beyond just the patients in the Program.[242] It cautions patients and families may avoid seeking care at the Hospital if they fear their records will be shared with federal investigators.[243]

The Department of Justice "does not doubt that the relationship between [the Hospital] and its patients might be somehow affected by" the investigation but dismisses the Hospital's concerns as speculative and essentially universal.[244] It argues any medical provider could make the same claim and this factor "is similar to the first three in that it will almost always militate against disclosure" in nearly every investigation.[245] It further laments the first four *Westinghouse* factors will always weigh against it "before subpoena enforcement even begins" in sensitive medical cases, creating an exception to Section 3486 broad enough to "swallow the rule."[246] It urges us to treat this factor "as neutral here, as it should in any Government investigation of a medical provider."[247]

The Department's argument on this factor misses the mark. Disliking how the first four *Westinghouse* factors often favor nondisclosure in sensitive medical contexts is not a legal basis to declare the fourth factor "neutral." Our Court of Appeals in *Westinghouse* directs us to assess the injury to the physician–child-patient relationship creating the records and weigh it against the other factors, not to rewrite the framework. And these are not x-rays. The Department of Justice describes the care as controversial. There is no basis for a slippery-slope theory on this reach. We today face a unique challenge in a charged environment where the child's medical care is disparaged by the highest levels of law enforcement. The *Westinghouse* factors remain binding in our Circuit. We apply the test as it exists.

The Hospital makes a persuasive and unchallenged showing of harm to the physician–child-patient relationship. Patients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns (given the present attacks on this care by the highest levels of law enforcement). This is not speculation; it is a rational response to a legitimate risk particularly given the rhetoric from federal law enforcement about persons seeking this care. The Department offers no evidence to the contrary. Its sole argument—any medical provider for any medical concern could make the same claim—does not neutralize the factor. It is an admission the harm the fourth factor recognizes is real and recurring in highly sensitive medical contexts as opposed to financial or commercial records or information about knee injuries or diabetes medicines. Disclosure in this context harms the physician–child-patient relationship. The Department of Justice gives us no reason to find otherwise. This factor weighs against disclosure.

The fourth factor weighs in the Hospital's favor.

44

JA406

> **4. The undefined adequacy of safeguards to prevent unauthorized disclosure in this uniquely public attack on children's gender identities and their doctors' medical care slightly favors the children's privacy absent the Department of Justice offering specific sanctions or prohibitions for unauthorized disclosure.**

Factor five of the *Westinghouse* balancing test considers the adequacy of safeguards to prevent unauthorized disclosure. The Hospital argues this factor weighs against disclosure because no statutory or regulatory provision broadly prohibits the Department of Justice from further disseminating patient-specific information obtained under a Section 3486 subpoena.[248] It emphasizes the "limitation on use" under Section 3486(e)(1) protects only against using or disclosing information "in any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information"—the patient here—but does not restrict disclosure for any other purpose by its terms.[249] The Hospital also points to the Department of Justice's public statements committing to "partner" with state officials to "share intelligence" and "build cases against hospitals and practitioners" and contends nothing in Section 3486 prevents the Department of Justice from providing patient-specific information to state law-enforcement agencies.[250] The Hospital argues these possibilities heighten the risk of both authorized and unauthorized disclosures.[251] We are also mindful of Attorney General Bondi and Assistant Attorney General Shumate's repeated public denouncement of this medical care. We cannot compare the production of routine medical records for adults to medical records in areas where the Attorney General has now essentially condemned the doctors helping the children.

The Department of Justice responds courts of appeals repeatedly find the Section 3486 statutory safeguards adequate to protect patient privacy.[252] It contends the Hospital misunderstands those statutory protections: Congress through Section 3486(a)(8) requires the Department of Justice return records if the investigation does not ripen into an enforcement action and Congress "broadly prohibits" the Department from using or disclosing information obtained under the

45

JA407

Subpoena.[253] The Department dismisses concerns about potential disclosure to state officials because such sharing would be authorized by statute and the fifth factor concerns only *unauthorized* disclosure.[254] It also notes additional protections such as a protective order, sealing, or a written agreement could further limit dissemination.[255]

The Department of Justice's reliance on Section 3486(e)(1) to claim the statute "broadly prohibits" the disclosure or use of patient information obtained under a Section 3486 subpoena is misleading. Congress in Section 3486(e)(1) restricts only the use or disclosure of a patient's health information in actions or investigations directed against that individual and even then allows disclosure upon a judicial finding of good cause.[256] Congress imposes no general bar on further sharing of patient information obtained under a Section 3486 subpoena, including with state officials where authorized. Congress does require the Department of Justice to return or destroy materials if its investigation does not proceed to enforcement.[257] But the provision concerns return and not disclosure. It does not itself provide a nondisclosure safeguard.

The Hospital's remaining broader concerns would, in an ordinary case, drift into speculation. Federal officials' general enforcement rhetoric or policy statements are not, by themselves, proof of an imminent unauthorized leak. We appreciate courts of appeals to consider the question have found the statutory safeguards associated with Section 3486 adequate and the Department correctly notes protective orders, sealing, and similar mechanisms can further mitigate risks of disclosure.

But we are in a different posture. This investigation has a significant public shaming (for some) component following on public condemnation of persons seeking gender-affirming care. The Department has not offered examples of similar situations, but we only need to look a few years back to the shaming of persons with HIV-related illnesses as Judge Brotman ably reviewed.

46

JA408

The President described this medical care as a stain on our history and the Attorney General pronounced this gender-affirming care mutilates children in service of a radicalized and warped ideology.  The Department of Justice offers nothing to mitigate a concern for these children and their families given these pronouncements.   And we do not find a basis to risk harm absent concrete assurances from the Department of protections and penalties for those who disclose this information without authorization, and who might share the Attorney General's condemnation of these patients.

Factor five slightly weighs in favor of the Hospital.

**5.    The Department's stated needs for access are outweighed by the children's privacy interests given the Hospital is not today contesting the other twelve requests tied to the Department's investigative purposes.**

The sixth factor our Court of Appeals identified in *Westinghouse* requires we balance the degree of the Department of Justice's need for access to the children's and their family's identification and treatment records. The Hospital argues the Department of Justice "has multiple avenues to investigate health care offenses without intruding on patient privacy."[258] It emphasizes the Department already possesses numerous alternative investigative tools—such as subpoenaed billing records, the Program's policies and practices for informed consent, and solicited whistleblower tips—none of which require the patient-identifying and clinical information demanded in Requests 11, 12, and 13.[259]

The Department of Justice counters its need for access to the children's identity and treatment records is "extremely heightened" because: (1) it is investigating statutory violations routinely examined under the Act and the records requested are "common in such investigations;" (2) subpoena recipients cannot dictate what evidence an investigator may obtain and the Hospital does not offer a "compelling reason" to restrict the Department's approach here; and (3) the secrecy surrounding gender-affirming care makes patient records essential.[260] It further claims factor six

47

JA409

is "essentially dispositive" because "the investigation relates to potential misconduct committed against vulnerable children, leaving lifelong mental and physical side effects and consequences."[261] The Department's view is a "compelling interest in investigating health care offenses involving children outweighs, as a matter of law, an individual's privacy interest in medical records" and "[t]he Constitution cannot reasonably be interpreted to divest the Government of its ability to protect children and combat offenses committed against them."[262]

The Hospital responds its position is supported by "specific, credible, and *uncontested* evidence" showing compelled disclosure of these patient records would itself inflict serious psychological harm on the very children the Department of Justice claims to protect.[263] It stresses recognizing the force of "the four privacy-focused *Westinghouse* factors" does not divest the Department of Justice of its "ability to protect children" as the Department of Justice suggests.[264] The Hospital reiterates the Department retains numerous investigative options "without enforcing a dragnet-style subpoena for sensitive patient records."[265] It also argues the Department's reliance on Director Hsiao's Declaration does little to establish "need" because "[t]o the extent the investigation concerns activities with a nexus to patient information, the legal theories on which [the Declaration] is predicated are fatally flawed."[266]

Our studied examination confirms the records sought in Requests 11, 12, and 13 do not meaningfully advance the Department of Justice's stated investigative purposes. We are also persuaded the unchallenged Requests 1–10 and 14–15 should already capture the relevant evidence without requiring disclosure of the children's and their families' identities and most sensitive personal information. The Department of Justice identifies four broad areas of inquiry across its multiple filings.[267] These categories concern commercial practices, billing practices, and interactions with manufacturers or distributors. None of these areas of inquiry inherently requires

access to children's and their families' identities, psychosocial histories, sexual-development disclosures, family dynamics, trauma histories, or other intimate clinical details sought in Requests 11, 12, and 13.

Off-label dispensing is addressed directly through Requests 2–6, which seek the entire universe of billing records, insurance claims, internal protocols and guidance regarding International Classification of Diseases codes, communications about coding, training materials, and communications with insurers.[268] These requests capture the documents bearing on how medical professionals coded diagnoses and how they submitted claims. We then contrast the child patients' psychosocial evaluations, intimate clinical narrative, or informed-consent materials and their personal identities; we have no basis to find this information would shed light on whether a medical professional miscoded a diagnosis. Potential violations of Section 331 (the Department's second investigative purpose) concern introduction, labeling, and distribution of drugs in interstate commerce as it relates to a health care benefit plan. The Department of Justice's theories of downplayed risks, off-label use, and "masking" codes instead concern clinical practice and internal documentation. Congress through Section 331 does not regulate clinical practice. Even taking the Department of Justice's theory at face value, the relevant evidence would appear in Requests 7–10 and 14, which seek communications with manufacturers and compounding pharmacies, communications with sales representatives or medical-science liaisons, "scientific exchange" materials and promotional documents, contracts or consulting agreements, and communications about drug safety.[269] Whether manufacturers improperly marketed puberty blockers or hormones or whether clinicians entered into consulting agreements (the Government's third investigative purpose) is likewise fully addressed through Requests 7–10.[270] Contrast once again Requests 11, 12, and 13 which do not seek information about marketing practices, financial relationships, or

promotional conduct. A child's diagnosis, consent form, or identity does not reveal whether a manufacturer reached out to clinicians, sponsored programs, paid honoraria, or encouraged off-label use. The supply-chain theories involving manufacturers and distributors (the Department's fourth investigative purpose) would be reflected, if at all, in Requests 7–10 and 14–15, which seek communications with manufacturers and compounders, safety-related communications, and documents concerning adverse events, side effects, or medically unfavorable consequences.

The unchallenged Requests collectively capture every category of evidence relevant to the Department of Justice's stated investigations. We face a different analysis in reviewing Requests 11, 12, and 13 which concern how clinicians treated individual patients and contain no information about marketing conduct, upstream distribution protocols, billing protocols, coding policies, financial arrangements with manufacturers, or supply-chain transactions.

The Department of Justice's attempts to explain Requests 11, 12, and 13 by appealing to the seriousness of its investigation and arguing the sensitivity of the information "heightens" the Department of Justice's need misdirects the inquiry. Congress through Section 3486 authorizes Requests 11, 12, and 13 only for investigating potential Section 331 offenses relating to a health care benefit program consistent with the stated investigation purposes. The Department of Justice cannot expand its purposes by reframing Requests 11, 12, and 13 as an instrument to "protect children" nor by invoking generalized concerns about "misconduct against vulnerable minors." The need analysis must remain tethered to the purpose Congress identified. The Department of Justice's reliance on *New York v. Ferber* for the proposition "[i]t is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling" is misplaced.[271] The facts reviewed in *Ferber* involved criminal prohibitions on the distribution of child sexual-abuse materials, a context in which the Court recognized a

50

JA412

compelling state interest wholly distinct from the administration of health care benefit programs.[272]

Invoking *Ferber* in this context conflates two entirely different spheres of regulatory authority. It does not bear on whether children's constitutionally protected medical records are needed for an investigation into a potential Section 331 offense relating to a health care benefit program.

The Department of Justice's theory factor six is "essentially dispositive" and overrides all others cannot be squared with *Westinghouse*. Our Court of Appeals has long emphasized a balancing test, not a hierarchy or sliding scale on which the governmental need presumptively eclipses medical privacy. Treating factor six as dispositive would nullify decades of *Westinghouse* precedent and collapse the analysis into a single governmental-need inquiry. Nothing in Section 3486 or judicial guidance supports this reaching result.

Nothing in the present record establishes a need—within the meaning of *Westinghouse* or Congress's grant in Section 3486—for the patient-identifying clinical files demanded in Requests 11–13. The investigative purposes are fully addressed by the unchallenged requests. The personal and intimate material sought in Requests 11–13 does not advance an inquiry into a potential Section 331 offense relating to a health care benefit program. This factor favors nondisclosure.

Factor six weighs in the Hospital's favor.

### 6. The President's and Attorney General's articulated public policy weighs in favor of disclosure.

The final *Westinghouse* factor considers whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access. The Hospital does not dispute Section 3486 grants the Department of Justice investigative authority over health care offenses.[273]

The *Westinghouse* seventh factor weighs in favor of disclosing the children's identities and medical treatment under strict protocols.

### III.    Conclusion

Congress granted the United States Department of Justice in 1996 the ability to subpoena documents from medical professionals relevant to investigating the labeling and distribution of prescription puberty blockers and hormone therapy under the Food, Drug, and Cosmetic Act. The Department of Justice now invokes this power twenty-nine years later to demand doctors and hospitals governed by Pennsylvania law disclose the identities of transgender child-patients and the medical and psychological care records documenting their gender-affirming care. The Department of Justice is following the President's January 2025 executive order announcing the policy of the United States is to recognize only two sexes and the United States will now pursue a policy of ending puberty blockers or hormone therapy to children although prescribed by doctors consistent with an individual state's authority to supervise medical care. Attorney General Bondi announced in April 2025 the Department of Justice will investigate false or misleading claims about the on- or off-label use of puberty blockers and hormone therapy to transgender children under the Food, Drug, and Cosmetic Act. The Department of Justice then issued subpoenas to twenty medical providers across the Nation including The Children's Hospital of Philadelphia seeking fifteen categories of records. The Department of Justice touted its stated investigative purpose of protecting children "mutilated" in "the service of a warped ideology."

The Hospital has treated children facing these gender identity issues for the last eleven years consistent with Pennsylvania citizens approving the legality of gender-affirming medical care. The Hospital agreed to produce defined financial, insurance, and billing records consistent with the Department's stated purposes.

But the Department of Justice, following the President's and Attorney General's specific direction to only recognize two sexes and end the use of puberty blockers and hormone therapy notwithstanding a state's view under its police powers, also demanded the Hospital produce three

52

JA414

categories of records beyond internal financial and billing records. It demands (subject to contempt of court for failing to do so) the Hospital's Gender and Sexuality Development Program now produce documents: (1) identifying the names, addresses, and social security numbers of its child patients prescribed puberty blockers and hormone therapy and their families' identifying information; (2) the child's medical treatment records including diagnoses; and, (3) describing each child's informed consent, patient intake, parent or guardian authorization, and use of medicine not approved by the Food and Drug Administration. The Hospital objects to producing child-patients' confidential medical records.

We asked for briefing to understand how these three requests fit within Congress's authorization to obtain information relating to a violation of the Food, Drug, and Cosmetic Act. We studied several rounds of briefing including from Amici Pennsylvania Governor Shapiro and several other states addressing two questions: whether Congress authorized the production of the children's confidential medical records; and, if so, whether the children's privacy interest outweigh the Department of Justice's need for these confidential medical records for the stated investigative purposes under the Food, Drug, and Cosmetic Act. The Department of Justice shifted much of its focus during our study admittedly in response to other Judges precluding the production of records by medical centers outside of Pennsylvania.

We find the Department of Justice has not shown Congress granted it authority to compel information relevant to its defined investigation under the Food, Drug, and Cosmetic Act. It offers no basis to compel the Hospital to identify the children (and their families), their treatment records, and disclosures made to them. We further find, even if the information responsive to these three requests is relevant (and thus authorized by Congress for a subpoena), the children's and their families' privacy interests in their highly sensitive and confidential medical and psychological

53

JA415

treatment in an charged political environment which considers their medical treatment to a radicalized warped ideology far outweigh the Department of Justice's shifting need for the information specifically identified in the three challenged requests. We grant the Hospital's motion in part striking the three challenged requests and all information contained in responses to other requests disclosing the same information.

---

[1] The Tenth Amendment reserves to the states powers not delegated to the federal government. U.S. CONST. amend. X. These police powers include the authority to protect public health and safety. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Slaughterhouse Cases*, 83 U.S. 36, 62 (1873).

[2] 43 P.S. § 955; 16 Pa. Code §§ 41.204, 41.206; Commonwealth of Pennsylvania, Pennsylvania's Human Relations Commission's Guidance on Discrimination on the Basis of Sex Under the Pennsylvania Human Relations Act (PHRA), https://www.pa.gov/content/dam/copapwp-pagov/en/phrc/documents/Sex%20Discrimination%20Guidance%20PHRA-3-3-2021.pdf (last visited Nov. 18, 2025).

[3] ECF 36 at 9.

[4] Pennsylvania Dep't of Human Servs., *Children's Health Insurance Program (CHIP) Eligibility and Benefits Handbook* 54 (Apr. 5, 2017), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/chip/eligibility-and-benefits/documents/CHIP%20Eligibility%20and%20Benefits%20Handbook%202017_May2021.pdf; Pennsylvania Dep't of Human Servs., Medical Assistance Bulletin No. 99-16-11, *Federal Final Rule, "Nondiscrimination in Health Programs and Activities" and Implication for Coverage of Services Related to Gender Transition* (July 18, 2016), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/docs/publications/documents/forms-and-pubs-omap/c_233793.pdf.

[5] ECF 36 at 9.

[6] 49 Pa. Code §§ 16.63, 21.416, 25.218, 41.62, 47.5; Commonwealth of Pennsylvania*, Shapiro Administration Announces Five State Boards Have Adopted New Policies Making Clear That Conversion Therapy on LGBTQ+ Minors is Harmful and Unprofessional* (May 2, 2024), https://www.pa.gov/governor/newsroom/2024-press-releases/shapiro-administration-announces-five-state-boards-have-adopted-. The Commonwealth defines the scope of medical practice, sets licensure requirements, and oversees professional discipline through state licensing boards. ECF 36 at 7–8. The State Boards of Medicine and Osteopathic Medicine in Pennsylvania hold exclusive authority to license, regulate, and discipline medical and osteopathic physicians and other health

JA416

professionals. *See* 63 P.S. §§ 422.1–422.51a; *id.* §§ 271.1–271.19. Physicians must meet education, training, and examination requirements before receiving a license and must be licensed to practice medicine in the Commonwealth. *See id*. §§ 422.22, 271.6. The State Board of Medicine adopts regulations "defin[ing] the accepted standard of care." *Id.* § 422.41(8)(ii). The standard in the absence of a regulation is care "normally exercised by the average professional of the same kind in [the] Commonwealth under the circumstances." *Id.* The Boards discipline physicians who deliver care below the accepted standard or engage in incompetence, gross negligence, or repeated negligence. *Id.* §§ 422.41, 271.15; 49 Pa. Code § 16.61. Regulation of the practice of medicine rests with the states and in the Commonwealth the authority lies with its Boards.

[7] The Hospital opened in 1855 as the first hospital in the United States dedicated exclusively to pediatric care. ECF 1 at 4; Children's Hosp. of Phila., *A History of Breakthroughs,* https://www.chop.edu/about-us/our-history (last visited November 18, 2025).

[8] ECF 1 at 4.

[9] *Id.* at 5; *see also id.* at 61–66 ("Hawkins and Dowshen Decl.").

[10] *Id.* at 63–64 (Hawkins and Dowshen Decl. ¶¶ 12, 16).

[11] *Id.* at 62 (Hawkins and Dowshen Decl. ¶ 4).

[12] *Id.* (Hawkins and Dowshen Decl. ¶¶ 4–5).

[13] *Id.* (Hawkins and Dowshen Decl. ¶ 6).

[14] *Id.* at 64 (Hawkins and Dowshen Decl. ¶ 14).

[15] *Id.* at 62 (Hawkins and Dowshen Decl. ¶ 6).

[16] *Id.* (Hawkins and Dowshen Decl. ¶ 7).

[17] *Id.* at 62 (Hawkins and Dowshen Decl. ¶¶ 8–9).

[18] *Id.* at 6.

[19] *Id.* at 63 (Hawkins and Dowshen Decl. ¶ 10).

[20] *Id.* at 5.

[21] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[22] *Id.* § 2.

[23] Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

JA417

[24] *Id.* § 1.

[25] *Id.*

[26] *Id.*

[27] *Id.* § 2(c).

[28] *Id.* § 4.

[29] *Id.* § 8(c).

[30] PN11-2 — Pamela Bondi — Department of Justice, 119th Congress (2025-2026), https://www.congress.gov/nomination/119th-congress/11/2.

[31] Memorandum from Pamela Bondi, Attorney General to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[32] *Id.* at 1, 3.

[33] *Id.* at 3–4.

[34] *Id.* at 4 (citing 21 U.S.C. §§ 321(m)–(n), 331, 352(a), (t); 21 C.F.R. §§ 201.100, 201.128, 202.1(1)(2)).

[35] *Id.* at 6.

[36] 21 U.S.C. § 301 *et seq*.

[37] *See id.* §§ 331, 355.

[38] Agata Dabrowska & Susan Thaul, How FDA Approves Drugs and Regulates Their Safety and Effectiveness, Congressional Research Services (May 8, 2018), https://www.congress.gov/crs-product/R41983.

[39] *Id.*

[40] 21 U.S.C. § 321(m).

[41] *Kordel v. United States*, 335 U.S. 345, 349–50 (1948).

[42] *See* 21 C.F.R. § 202.1(l)(2) (These materials include "[b]rochures, booklets, mailing pieces, detailing pieces, file cards, bulletins, calendars, price lists, catalogs, house organs, letters, motion picture films, film strips, lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces of printed, audio, or visual matter descriptive of a drug and references published (for example, the 'Physicians Desk Reference') for use by medical practitioners, pharmacists, or

56

JA418

nurses, containing drug information supplied by the manufacturer, packer, or distributor of the drug and which are disseminated by or on behalf of its manufacturer, packer, or distributor are hereby determined to be labeling as defined in section 201(m) of the act."). "In essence, virtually all communication with medical professionals concerning a drug constitutes labeling." 21 C.F.R. § 202.1(l)(2). *In re Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Prods. Liab. Litig.*, No. 24-3094, 2024 WL 4520117, at *9 (E.D. Pa. Oct. 17, 2024) (citing 21 C.F.R. § 202.1(l)(2)) (collecting cases).

[43] Jennifer A. Staman, Enforcement of the Food, Drug, and Cosmetic Act: Select Legal Issues, Congressional Research Service (Feb. 9, 2018), https://www.congress.gov/crs-product/R43609 (citing Peter Barton Hutt, Richard A. Merrill, and Lewis A. Grossman, Food and Drug Law 12-16, 1196 (Foundation Press, 3d ed. 2007)). Section 301 is codified at 21 U.S.C. § 331.

[44] *Id.* (internal citation and quotations omitted); *see also* 21 U.S.C. § 331.

[45] 21 U.S.C. §§ 331, 333.

[46] *See id.* § 351.

[47] *See id.* § 352.

[48] *Id.*

[49] 21 U.S.C. § 352(f); 21 C.F.R. § 201.5.

[50] 21 C.F.R. § 201.128.

[51] 21 U.S.C. § 353(b)(2). Congress in Section 353(b)(2) exempts "[a]ny drug dispensed by filling or refilling a . . . prescription of a practitioner licensed by law to administer such drug" if basic labeling requirements are met. *Id.* The prescription must "bear[] a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription." *Id.* A parallel regulatory exemption applies to prescription drugs at any stage of distribution. *See* 21 C.F.R. § 201.100.

[52] *See supra* note 33.

[53] Memorandum from Brett A. Shumate, Assistant Attorney General to All Civil Division Employees, *Civil Division Enforcement Priorities,* U.S. Dep't of Just., Civ. Div. (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl.

[54] *Id.* at 2.

JA419

[55] *Id.* at 2–3 (citing [2]1 U.S.C. § 301 *et seq*.). Neither the President nor Attorney General Bondi ever mentioned exposing the names and diagnoses of children of the people who elected President Trump a few months earlier.

[56] The Assistant Attorney General for the Civil Division is authorized through Attorney General Order Number 3591-2015 dated November 10, 2015 to issue and serve administrative subpoenas to investigate possible violations of the Food, Drug, and Cosmetic Act relating to a health care benefit program. ECF 42-1 at 2.

[57] 18 U.S.C. § 3486(a)(1)(A)(i)(I) (commonly referred to as "Section 3486"); ECF 1 at 34 (Subpoena).

[58] *In re: Administrative Subpoena No. 25-1431-014*, No. 25-mc-54 (E.D. Pa. Oct. 6, 2025) ("Patients' Case"), ECF 16 at 3 n.1 (quoting 18 U.S.C. § 24(a)(2)); *see also* Patients' Case, ECF 16-1 at 2 (Declaration of Lisa K. Hsiao ("Hsiao Decl.") ¶ 5).

[59] Patients' Case, ECF 16 at 3-4 n.1 (quoting 18 U.S.C. § 24(b)); *see also* Patients' Case, ECF 16-1 at 2 (Hsiao Decl. ¶ 9).

[60] ECF 1 at 39 (Subpoena Section III).

[61] *See id.* (Subpoena Request No. 1) ("Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities."); *id.* (Subpoena Request No. 2) ("All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (i.e., International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care."); *id.* at 40 (Subpoena Request No. 4) ("All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes."); *id.* (Subpoena Request No. 5) ("All communications with public or private health care benefit programs or plans regarding the use of [International Classification of Diseases] codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care."); *id.* (Subpoena Request No. 6) ("Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy."); *id.* (Subpoena Request No. 7) ("All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors."); *id.* (Subpoena Request No. 8) ("All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty

JA420

blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.").

[62] *Id.* at 7–8.

[63] *Id.* at 8.

[64] *Id.*

[65] *Id.*

[66] ECF 1 at 40 (Subpoena Request Nos. 11–13).

[67] ECF 1.

[68] U.S. Dep't of Just., Off. of Pub. Affairs, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[69] *Id.*

[70] *Id.*

[71] Patients' Case, ECF 1.

[72] Patients' Case, ECF 16-1 (Hsiao Decl.). The Enforcement and Affirmative Litigation Branch is the successor to the Consumer Protection Branch. *Id.* at 1 (Hsiao Decl. ¶ 2). It is authorized as the successor "to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*." *Id.* (citing 28 C.F.R. § 0.45(i); Justice Manual 4-8.000).

[73] Patients' Case, ECF 16 at 3-4 (citing Patients' Case, ECF 16-1 at 13-15 (Hsiao Decl. ¶¶ 37–41)). We told the Department of Justice we would address the patients' and former patients' argument as part of our study of the Hospital's arguments. Patients' Case, ECF 6.

[74] ECF 22.

[75] ECF 36.

[76] ECF 38.

[77] ECF 1 at 4.

[78] *Id.* at 1, 9.

JA421

---

[79] *Id.* at 9; *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir. 1980).

[80] ECF 1 at 4.

[81] *See* ECF 13.

[82] *Id.* at 2.

[83] *Wayne Land & Min. Grp., LLC v. Delaware River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020) (citing *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019)).

[84] ECF 13 at 6. It is worth noting the Department of Justice relies on *United States v. Miller,* 425 U.S. 435 (1976) for the proposition the Fourth Amendment does not protect information voluntarily shared with a third party, even if the individual expected the information to remain confidential. *See id.* (citing *Miller*, 425 U.S. at 443) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."). But *Miller* is a far cry from the information sought here. *Miller* concerned an individual defendant who sought to suppress his own bank records obtained through subpoenas issued to two banks after indictment on federal charges. *Id.* at 436. The bank records at issue were "not confidential communications but negotiable instruments to be used in commercial transactions" and the Supreme Court found no "legitimate 'expectation of privacy'" in those documents. *Id.* at 442. Reliance on a case involving routine bank records to justify compelled disclosure of sensitive medical information ignores the profound difference between commercial transactions and the most private details of a person's life.

[85] *See* Patients' Case, ECF 16 at 4; *see also id.* at 8 ("While patients may have a generalized privacy interest in their medical records, that interest does not confer ownership or legal control. The medical records at issue here are the property of [the Hospital].").

[86] *See id.* at 5 ("This construction is confirmed by other aspects of the statute, including that § 3486 imposes no notice requirement on the Government or the entity summoned to inform patients or other individuals whose records might be implicated.").

[87] *United States v. Brooks*, 841 F. App'x 346, 351 (3d Cir. 2020) (citing *Davis ex rel. Davis v. Phila. Hous. Auth.*, 121 F.3d 92, 96 (3d Cir. 1997)).

[88] *Id.* (internal citation omitted).

[89] Patients' Case, ECF 16 at 4 (quoting 18 U.S.C. § 3486(a)(5)) (emphasis in original).

[90] *Westinghouse,* 638 F.2d at 574; *cf. Singleton v. Wulff,* 428 U.S. 106, 118 (1976) (allowing physician to assert privacy rights of his patients); *Griswold v. Connecticut,* 381 U.S. 479, 481 (1965) (same).

JA422

[91] *Id.*

[92] *Id.*

[93] *Westinghouse,* 638 F.2d at 574.

[94] *University of Med. & Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003).

[95] *Id.* (quoting *F.D.I.C v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995); *see also United States v. Powell*, 379 U.S. 48, 57-58 (1950), *United States v. Morton Salt Co.,* 338 U.S. 632, 652 (1950))

[96] *See, e.g., CMA CGM S.A. v. CIS Dev. Found., Inc.*, No. 24-364, 2024 WL 3964322, at *2 (D.N.J. Aug. 28, 2024) (quoting *N.L.R.B. v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992)); *In Matter of Petition for Enf't of Subpoenas of Fed. Mar. Comm'n Issued to Jose Diaz/Tioga Fruit Terminal, Inc., Chilean Line, Inc.*, No. 97-21, 1997 WL 414944, at *2 (E.D. Pa. July 22, 1997).

[97] *Wentz*, 55 F.3d at 908 (quoting *United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 166 (3d Cir. 1986)).

[98] *Morton Salt Co.*, 338 U.S. at 652.

[99] *Id.* (quoting *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 208 (1946)).

[100] *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).

[101] *Oklahoma Press Publ'g Co., 327 U.S. at 209 (footnote and internal quotation marks omitted).*

[102] *Univ. of Med. & Dentistry of New Jersey*, 347 F.3d at 64 (quoting *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981)).

[103] *Wentz*, 55 F.3d at 908 (citing *United States v. Cortese*, 614 F.2d 914, 919 (3d Cir. 1980)).

[104] *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 128 (quoting *Powell,* 379 U.S. at 58); see also *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-67 (3d Cir. 1986) (first citing *Pickel v. United States*, 746 F.2d 176, 185 (3d Cir. 1984); and then citing *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 125 ("[I]f a subpoena is issued for an improper purpose . . . its enforcement constitutes an abuse of the court's process.").

[105] *Wearly v. F.T.C.*, 616 F.2d 662, 665 (3d Cir. 1980)

[106] *N.L.R.B. v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992) (cleaned up).

[107] 18 U.S.C. §§ 3486(a)(1)(A)(i), (a)(1)(B)(i); *see also* Patients' Case, ECF 16 at 3 ("Congress granted to the Attorney General to issue subpoenas requiring 'the production of any records or other things relevant to [any] investigation' of a 'Federal health care offense.'").

61

JA423

[108] *See, e.g., Doe v. United States*, 253 F.3d 256, 266 (6th Cir. 2001) ("Because § 3486 authorizes subpoena requests for documents 'which *may be relevant* to an authorized law enforcement inquiry,' . . . the question of the relevance of the documents requested is inherently a question of whether the [Department of Justice] had the statutory authority to issue this subpoena.") (emphasis in original).

[109] We are aware of two publicly available decisions by our colleagues quashing similar administrative subpoenas upon medical centers for exceeding the Department of Justice's statutory authority. We are also aware of cases where the Department of Justice and the subpoenaed medical provider are not allowing public access to their arguments but are sharing them with us given our Order to do so but we do not describe those cases in deference to the parties' wishes in those cases.

The Department of Justice served Boston Children's Hospital with an identical administrative subpoena seeking records related to the hospital's provision of gender-affirming care. *In re: Administrative Subpoena No. 25-1431-019*, No. 25-91324, 2025 WL 2607784, at *1 (D. Mass. Sept. 9, 2025). The Department of Justice purportedly issued the subpoena to "investigate whether [the hospital] engaged in unlawful off-label promotion of puberty blockers and cross-sex hormones in violation of the [Act] and other false claims that may have been submitted to federal health[ ] care programs." *Id.* at *1. The hospital challenged the subpoena, arguing the Department of Justice issued the subpoena in bad faith and courts must not enforce administrative subpoenas issued in bad faith. *Id.* at *5 (citing *United States v. Powell*, 379 U.S. 48 (1964)). Judge Joun noted courts enforce administrative subpoenas if the agency shows: "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Id.* at *4 (citation omitted). Judge Joun first considered whether the Department of Justice made a prima facie showing of proper purpose and then considered whether the hospital demonstrated an improper purpose. *Id.* at *5 (citing *United States v. Comley*, 890 F.2d 539 (1st Cir. 1989)). Judge Joun found the Department failed to make a prima facie showing of proper purpose because it had not submitted affidavits or other evidence tying the "broad array" of subpoenaed material to a legitimate investigation. *See id.* at *5–6. Judge Joun emphasized the Department did not adduce evidence the hospital engaged in billing fraud or unlawful off-label promotion of puberty blockers and requested documents unrelated to these practices. *Id.* at *6. Judge Joun reasoned the context of the President's executive orders challenging gender-affirming care and the lack of evidence supporting the Department's stated reasons for the subpoena showed improper purpose. *Id.* at *7. Judge Joun granted the hospital's motion to quash. The Department of Justice moved to alter or amend Judge Joun's opinion on October 7, 2025 followed by a notice of appeal to the United States Court of Appeals for the Court of Appeals on November 7, 2025. *In re: Administrative Subpoena No. 25-1431-019*, 25-91324, ECFs 35, 46. Judge Joun did not rule on the Department's motion to alter or amend before it appealed.

Judge Whitehead similarly granted a motion to quash a few weeks ago. The Department of Justice issued an identical administrative subpoena to QueerDoc, a telehealth provider of gender-affirming care. *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25-42, 2025 WL 3013568, at *1–2 (W.D. Wash. Oct. 27, 2025). As in the Boston case, the Department of Justice argued our elected officials in Congress gave it authority under Section 3486 to request documents which would aid in its

investigation of "billing fraud" and "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act." *Id.* at *2. Judge Whitehead granted QueerDoc's motion to quash. Judge Whitehead found the Supreme Court held in *Powell* government agencies must not issue administrative subpoenas "for an improper purpose, such as to harass the [recipient] or to put pressure on [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* at *4 (quoting *United States v. Powell*, 379 U.S. 48, 58 (1964)). Judge Whitehead further relied on his governing Court of Appeals's guidance subpoenas may be challenged "on any appropriate grounds, including failure to satisfy the *Powell* requirements or abuse of the court's process," *id.* at *5 (quoting *Crystal v. United States*, 172 F.3d 1141, 1144 (9th Cir. 1999)), and courts in his Circuit "both can and do examine whether subpoenas are issued in bad faith." *Id.* Judge Whitehead concluded the record revealed improper purpose and emphasized the Department of Justice issued the subpoena shortly after President Trump expressed his views through executive orders challenging gender-affirming care and the stated reasons for the investigation (to investigate drug manufacturers, distributors, and providers submitting false insurance claims) did not match QueerDoc's actual operations, because it did not manufacture or distribute puberty blockers, nor did it submit insurance claims for patients. *Id.* at *5–6. Judge Whitehead reasoned "the breadth of the subpoena requests" suggested the Department "issued the subpoena first and searched for a justification second." *Id.* at *6. He found the record established the Department of Justice issued the subpoena "for a purpose other than to investigate potential violations of the [Food, Drug, and Cosmetic Act] or [False Claims Act]." Judge Whitehead granted QueerDoc's motion to quash. *Id.* at *7. The Department of Justice has not moved to alter or amend Judge Whitehead's opinion nor yet appealed to the United States Court of Appeals for the Court of Appeals.

We are also aware of another case which remains entirely under seal. Our colleague also quashed the subpoena in its entirety for similar statutory authority reasons.

[110] ECF 1 at 4; *id.* at 39–41 (Subpoena Requests).

[111] *Id.* at 4, 10–12.

[112] *See supra* notes 12–15.

[113] Patients' Case, ECF 16-1 at 14 (Hsiao Decl. ¶ 41).

[114] *Id.*

[115] *Id.*

[116] *See generally* 21 U.S.C. § 331; *see also supra* notes 36–51.

[117] *See* 21 U.S.C. § 333(a)(2).

63

JA425

[118] *In re Admin. Subpoena No. 25-1431-019*, No. 25-91324, 2025 WL 2607784, at *6 (D. Mass. Sept. 9, 2025).

[119] *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (citing *United States v. R. Enter., Inc.*, 498 U.S. 292, 299 (1991) (cleaned up); *see also U.S. E.P.A. v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443, 447 (9th Cir. 1988), *abrogated by, McLane Co. v. E.E.O.C.*, 581 U.S. 72 (2017) ("[W]hile the 'investigatory powers . . . should be interpreted broadly,' 'the subpoena cannot be so broadly stated as to constitute a fishing expedition.'") (citation omitted); *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (quashing subpoena to the extent that the agency sought "unfettered authority to cast about for potential wrongdoing"); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a 'fishing expedition' . . . and where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced.") (citations omitted).

[120] *Oklahoma Press Publ'g Co.,* 327 U.S. at 213.

[121] *Id.*

[122] *See* ECF 13 at 1 (The inquiry concerns "whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act[]. Because public or private insurance plans were presented with claims related to off-label use of these medications, such a violation of the [Act] could constitute a federal health care offense."); *see also* Patients Case, ECF 16-1 at 2 ("[T]he United States is conducting a nationwide investigation involving potential violations of the [Act] relating to puberty blockers and cross-sex hormones when used to treat gender dysphoria and related disorders in minors.").

[123] Patients' Case, ECF 16 at 18.

[124] ECF 38 at 2.

[125] *Id.* at 5.

[126] Patients' Case, ECF 16-1 at 12 (Hsiao Decl. ¶ 34).

[127] *Id.* (Hsiao Decl. ¶¶ 35–36). We also take note of the inconsistency in Director Hsiao's Declaration. Director Hsiao's original Declaration represented under penalty of perjury "the Government is also aware of a lawsuit filed just this year" alleging misconduct by a former Hospital patient. ECF 33 at 29. The Department of Justice then replaced Director Hsiao's Declaration the following day and removed her sworn reference to a lawsuit. The revised sworn paragraph refers only to unspecified "allegations." Patients' Case, ECF 16-1 at 12 (Hsiao Decl. ¶ 36). The Hospital swears they are "unaware of any such lawsuit and ha[d] not been served" as of October 20, 2025. ECF 33 at 4. We cannot determine on this record whether the Department of Justice grounded its submission in substantiated evidence or in something far less reliable. We do not rest our reasoning on the shifting sworn statements but remind counsel sworn declarations filed in federal court must reflect verified facts, not speculation recast as fact. The integrity of the

64

JA426

process tolerates nothing less than full candor from officers of the Court regardless of their zeal to end a perceived warped ideology in medical care for children.

[128] ECF 38 at 4.

[129] Patients' Case, ECF 16 at 18. We earlier expressed concern with the veracity of Director Hsiao's sworn statements and appreciate her lawyers recognize false statements may be subject to a perjury investigation.

[130] *Id.* at 17.

[131] ECF 13 at 12; *see also id.* at 7 ("[T]he investigation relates to potential misconduct committed against vulnerable children, leaving lifelong mental and physical side effects and consequences.").

[132] Patients' Case, ECF 16 at 13 (citing Patients' Case, ECF 16-1 at 7–10 (Hsiao Decl. ¶¶ 22–29)).

[133] *See United States v. Skrmetti*, 605 U.S. 495, 523 (2025); ECF 36 at 9.

[134] Food and Drug Admin., *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (acknowledging "health[]care providers generally may prescribe [approved] drugs for an unapproved use when they judge that it is medically appropriate for their patient"); Food and Drug Admin., *Communications From Firms to Health Care Providers Regarding Scientific Information on Unapproved Uses of Approved/Cleared Medical Products; Questions and Answers; Guidance for Industry* 8-9 (Jan. 2025), https://www.fda.gov/media/184871/download (acknowledging various circumstances in which health care providers may validly prescribe drugs for off-label use); *see also, e.g.*, *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (Off-label use "is an accepted and necessary corollary of the [Food and Drug Administration]'s mission to regulate in this area without directly interfering with the practice of medicine."); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012) ("Because the [Act] does not regulate the practice of medicine, physicians may lawfully prescribe drugs for off-label uses."); *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 541 F. Supp. 3d 164, 173 (D. Mass. 2021), *aff'd*, 57 F.4th 327 (1st Cir. 2023) ("It is generally lawful for physicians to prescribe medications for purposes for which they have not been [Food and Drug Administration]-approved."); *Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the [Food and Drug Administration].").

[135] *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021) (citing *Buckman*, 531 U.S. at 350-51).

[136] 21 U.S.C. § 396; *see also Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 766-67 (3d Cir. 2018) (The Act "expressly contemplates the possibility that physicians may use [approved products] for unapproved purposes.") (applying Pennsylvania law).

65

JA427

---

[137] *Seavey v. Globus Med., Inc.*, No. 11-2240, 2014 WL 1876957, at *15 (D.N.J. Mar. 11, 2014) (internal citations omitted).

[138] Steven A. Engel, *Whether the Food & Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (May 2019).

[139] John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 245, 251 (2000).

[140] *See* Patients' Case, ECF 16-1 at 4, 7 (Hsiao Decl. ¶¶ 13, 22). Director Hsiao advances the same premise under different statutory labels. She first invokes the misbranding provisions and asserts "if a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses." *Id.* at 4 (Hsiao Decl. ¶ 13) (citing 21 U.S.C. §§ 331(a)-(c), (k) and 352(f)(1)). She then repeats the same reasoning under the "new drug" provision and claims "if a drug manufacturer or other person distributes (or causes the distribution of) an approved drug for an unapproved use, the manufacturer or other person could be charged with distributing an unapproved new drug." *Id.* at 6 (Hsiao Decl. ¶ 18) (citing 21 U.S.C. § 331(d)).

[141] *See supra* note 132; *Sommers v. UPMC*, 185 A.3d 1065, 1072 n.6 (Pa. Super. Ct. 2018).

[142] Patients' Case, ECF 16-1 at 5 (Hsiao Decl. ¶¶ 14–16). Labeling under the Act "is broadly defined as any 'written, printed, or graphic matter … *accompanying*' the drug. . . . The term 'accompanying' is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug." *Id.* (Hsiao Decl. ¶ 15) (citing 21 U.S.C. § 321(m) (emphasis in original)). It "can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials." *Id.* (Hsiao Decl. ¶ 15).

[143] *See supra* notes 36–51.

[144] Patients' Case, ECF 16-1 at 8 (Hsiao Decl. ¶ 23).

[145] ECF 37 at 5–6.

[146] *See supra* notes 36–51.

[147] *Id.*

[148] ECF 37 at 6; *United States v. Regenerative Scis. LLC*, 741 F.3d 1314 (D.C. Cir. 2014).

[149] *Regenerative Scis. LLC*, 741 F.3d at 1318–19, 1324–25 (emphasis added).

66

JA428

150 *Id.* at 1319.

151 *Id.* at 1319–20.

152 *See United States v. Jackson*, 126 F.4th 847, 860 (4th Cir. 2025) (rejecting the argument equating "the sort of off-label usage that [Section] 396 is designed to protect with the holding for sale of an adulterated device, an action *not* protected by the statute. Section 396 protects only physicians who 'prescribe or administer any *legally marketed* device.'" The Act "bars adulterated devices from the stream of commerce entirely, so they cannot be lawfully sold. . . . They therefore are not legally marketed devices within the meaning of [Section] 396. . . . And while off-label use is 'an accepted and necessary corollary of the [Food and Drug Administration]'s mission to regulate in this area without directly interfering with the practice of medicine,' . . . holding adulterated devices for sale is not.")  (internal citations omitted); *United States v. Cal. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1217, 1220 (9th Cir. 2024) (adopting *Regenerative Sciences LLC's* reasoning to hold physicians who manufactured and administered unapproved stem-cell mixtures were subject to the Act).

153 ECF 1 at 9; *Westinghouse*, 638 F.2d at 576, 578.

154 *Westinghouse*, 638 F.2d at 576, 578.

155 ECF 13 at 3.  It is worth addressing the Department of Justice's first contention. It opens by calling the Hospital's reliance on *Westinghouse* a "novel" argument, insists our Court of Appeals "fashioned a non-statutory seven-factor test not found in any Supreme Court precedent or prior decision," and notes the Hospital "does not cite a single case applying the *Westinghouse* factors." *Id.* at 2. But it is of course within our Court of Appeals's prerogative to articulate a test for subpoenas implicating medical privacy so long as it fits within established limits. The Hospital's argument is novel only because our Circuit has not yet had occasion to consider a privacy challenge to a subpoena issued under Section 3486. The absence of such a case proves nothing beyond the fact the Hospital is the first to need to raise the issue to protect child-patient identities and medical records after *Westinghouse*. Its advocacy is not a defect in the Hospital's position. It is how law properly develops.

The Department's reference to a case in our Circuit "discussing a [Section 3486] subpoena [but] mak[ing] no mention at all of *Westinghouse*" does not alter this conclusion. *See* ECF 13 at 3 n.1 (citing *United States v. Hertel & Brown Physical & Aquatic Therapy*, No. 21-cr-39, 2025 WL 83789 (W.D. Pa. Jan. 13, 2025). Judge Baxter did not address patients' privacy interests in their own medical records in *Hertel*. *See infra* notes 195–99. Its silence on *Westinghouse* is of no moment.

156 ECF 13 at 3.

157 *Id*. at 4.

158 *Id*.

67

JA429

[159] *Id.* at 3; *In re KB Toys Inc.* 736 F.3d 247, 251 (3d Cir. 2013).

[160] *Id.* at 4 (citing *In re Subpoena*, 228 F.3d at 350–51; *Doe v. United States*, 253 F.3d 256, 264–65 (6th Cir. 2001); *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012)).

[161] ECF 20 at 2–3.

[162] *Id.* at 3–4; *see* 18 U.S.C. § 3486(a)(7) ("A summons issued under this section shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States.").

[163] *Id.* at 4.

[164] *Id.* at 5.

[165] *See* ECF 13 at 4 ("[A Section 3486] subpoena that meets the statutory requirements for enforcement satisfy the *Westinghouse* test (and the Constitution's privacy guarantees) as a matter of law; no further balancing is required."); *id.* ("[T]he Government's 'compelling interest in identifying illegal activity and in deterring future misconduct' using a § 3486 subpoena outweighs Constitutional privacy concerns as a matter of law…").

[166] *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) ("The Government also looks for support to cases holding that Congress has 'plenary power' to create immigration law, and that the Judicial Branch must defer to Executive and Legislative Branch decisionmaking in that area. . . . But that power is subject to important constitutional limitations. *See INS v. Chadha,* 462 U.S. 919, 941–942 (1983) (Congress must choose 'a constitutionally permissible means of implementing' that power); *The Chinese Exclusion Case,* 130 U.S. 581, 604 (1889) (congressional authority limited 'by the Constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations')."); *see also Patel v. Zemski*, 275 F.3d 299, 308 (3d Cir. 2001), *abrogated on other grounds by, Demore v. Kim,* 538 U.S. 510 (2003) (Congress'[s] power is subject to constitutional limitations, including due process constraints.); *Landau v. Corp. of Haverford College*, No. CV 24-2044, 2025 WL 1796473, at *2 (E.D. Pa. June 30, 2025) ("A court enforcing a federal statute must do so in a way that comports with the Constitution."). If Congress's plenary power over immigration cannot insulate executive detention from constitutional scrutiny, then certainly a statutory subpoena power under Section 3486 cannot displace the constitutional privacy protections recognized in *Westinghouse*.

[167] *Wentz*, 55 F.3d at 908 (citing *Whalen v. Roe,* 429 U.S. 589, 599 (1977) (in the context of a Federal Deposit Insurance Corporation administrative subpoena).

[168] *Id.* at 909 (quoting *Westinghouse* 638 F.2d at 577, 579).

[169] *Id.*

68

JA430

[170] *United States v. Oncology Servs. Corp.*, 60 F.3d 1015, 1020 (3d Cir. 1995) (citing *Westinghouse,* 638 F.2d at 578) (in the context of a Nuclear Regulatory Commission administrative subpoena).

[171] *Matter of Delaware River Stevedores*, 178 F.R.D. 51, 52 (E.D. Pa. 1997) (citing *Wentz,* 55 F.3d at 908–09; *Whalen,* 429 U.S. at 599; *Westinghouse,* 638 F.2d at 578) (in the context of a Federal Maritime Commission administrative subpoena); *see also In Matter of Petition for Enf't of Subpoenas of Fed. Mar. Comm'n Issued to Jose Diaz/Tioga Fruit Terminal, Inc., Chilean Line, Inc.*, No. 97-21, 1997 WL 414944, at *2 (E.D. Pa. July 22, 1997) (Our Court of Appeals "acknowledged that other factors may be considered; those factors include privacy, breadth, potential for harm from subsequent nonconsensual disclosure, adequacy of safeguards, and burden of production.") (also in the context of a Federal Maritime Commission administrative subpoena).

[172] *CMA CGM S.A. v. CIS Dev. Found., Inc.*, No. 24-364, 2024 WL 3964322, at *2 (D.N.J. Aug. 28, 2024) (citing *Wentz*, 55 F.3d at 908; *Whalen*, 429 U.S. at 599) (also in the context of a Federal Maritime Commission administrative subpoena).

[173] Courts in our Circuit invoke and apply *Westinghouse* in other contexts, further underscoring its continued force as controlling precedent on constitutional privacy interests. *See, e.g., Scheetz v. Morning Call, Inc.*, No. 89-6755, 1990 WL 82082, at *1–2 (E.D. Pa. June 11, 1990) (applying *Westinghouse* privacy balancing framework to a motion to quash a Rule 45 subpoena in a civil discovery dispute involving medical records); *Malleus v. George*, 10-1357, 2010 WL 3069669, at *3 (E.D. Pa. Aug. 5, 2010), *aff'd*, 641 F.3d 560 (3d Cir. 2011), *as amended* (June 6, 2011) (applying *Westinghouse* privacy balancing in a § 1983 action challenging the disclosure of confidential statements made during a school investigation); *Doe v. Luzerne Cnty.*, 660 F.3d 169, 178 (3d Cir. 2011) (applying *Westinghouse* privacy balancing in a § 1983 action challenging the disclosure of intimate photographs).

[174] ECF 13 at 3 (quoting *In re KB Toys Inc.*, 736 F.3d at 251).

[175] *In re KB Toys Inc.*, 736 F.3d at 251 (citing *Roth v. Norfalco L.L.C.,* 651 F.3d 367, 379 (3d Cir.2011) ("When the meaning of statutory text is plain, our inquiry is at an end.")). "[C]ourts 'must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Id.* (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 559 (3d Cir.2003) (en banc)). "If the statutory text is ambiguous, a court may look to the legislative history." *Id.* (citing *Blum v. Stenson,* 465 U.S. 886, 896 (1984)).

[176] *See* ECF 1 at 1–2; ECF 20 at 2–3.

[177] Neither party offered, and we are unable to find, a case analyzing this subsection in depth but its text supports the Hospital's reading.

[178] 673 F.3d 813, 818–19 (8th Cir. 2012). The subpoena sought "documents relating to goods and services provided at [the residential care facility], expenditures for those goods and services, personnel records and job descriptions, bank statements and tax returns for the care facility and management company as well as documents that describe the relationship between the two, and

any communications either company had with state agencies about governing health care regulations." *Id.*

[179] The facility challenged enforcement of the subpoena as violating its Fourth Amendment right "to be free from unreasonable searches" and argued certain requests were "overly broad" but its reasoning focused on "conclusory statements about the relevance of the requests to a lawful investigation." *Id.* at 816, 819.

[180] *Id.* at 817–19.

[181] 253 F.3d 256, 260 (6th Cir. 2001).

[182] *Id.* at 260–61 (emphasis added).

[183] *Id.* at 265.

[184] The physician challenged the other requests as "unreasonably burdensome" and "questioned [their] relevance." *Id.* at 261.

[185] *Id.* at 266.

[186] ECF 13 at 4.

[187] *Id.*

[188] 228 F.3d 341, 344 (4th Cir. 2000).

[189] *Id.* at 351.

[190] *Id.* at 739; *see also id.* at 729 (The government "offered to allow the movants to first produce all documents with the exception of patient treatment files and records pertaining to claim filing procedures. After reviewing these documents, the [Government] would then notify the movants what, if any, patient files and records pertaining to claim filing procedures [it] wished them to produce.").

[191] *In re Subpoenas Duces Tecum*, 51 F. Supp. 2d 726, 738–39 (W.D. Va. 1999), *aff'd, In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000).

[192] *Id.* at 738–39.

[193] 228 F.3d 341, 351 (4th Cir. 2000).

[194] ECF 13 at 3 n.1 (citing *United States v. Hertel & Brown Physical & Aquatic Therapy*, No. 21-cr-39, 2025 WL 83789, at *7 (W.D. Pa. Jan. 13, 2025)).

[195] *Hertel,* 2025 WL 83789, at *1.

[196] *Id.*

[197] *Id.* at *2–5.

[198] *Id.* at *5.

[199] *Id.* at *7.

[200] ECF 13 at 5.

[201] *Id.*

[202] ECF 1 at 9 (citing *Westinghouse*, 638 F.2d at 578).

[203] The Department also seeks to group the third factor with the first two factors, but the third factor involves distinct considerations regarding potential harm from disclosure requiring we address it separately. *See* ECF 13 at 9–11.

[204] ECF 1 at 10–13.

[205] *Id.* at 10; *see supra* notes 12–15.

[206] *Id.* at 11.

[207] *Id.* (citing Dep't of Health and Hum. Servs., Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82464 (Dec. 28, 2000) ("If, in Justice Brandeis' words, the 'right to be let alone' means anything, then it likely applies to having outsiders have access to one's intimate thoughts, words, and emotions."); *Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178, 1181 (W.D. Pa. 1991) ("There can be no doubt that [this] information [is] of the types most associated with expectations of privacy."); *Haw. Psychiatric Soc., Dist. Branch of Am. Psychiatric Ass'n v. Ariyoshi*, 481 F. Supp. 1029, 1038 (D. Haw. 1979) ("Many courts and commentators have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality.")).

[208] *Id.* at 12 (quoting *Westinghouse,* 638 F.2d at 579).

[209] *Id.* at 12–13.

[210] ECF 13 at 10.

[211] *Id.*

[212] *Id.*

71

[213] *Id.*

[214] *Id.* at 10–11. The "potential consumer-protection violations" include "false statements made to induce patient and parental consent to off-label drug use and other life-altering procedures; powerful pharmaceuticals casually being given off-label to very young minors, causing lifelong side effects; purported treatment guidelines based on false or insufficient evidence; and other alarming trends that the Executive Branch could reasonably believe deserve exploration." *Id.* at 11 (citing *Skrmetti*, 605 U.S. at 539–46).

[215] *Id.* at 11. The Department of Justice argues the Hospital's showing on the first three factors is outweighed by the need for records and Department's interest but again we are only considering the first two factors at this point and address the third factor separately. *See supra* note 203.

[216] *Westinghouse*, 638 F.3d at 577; *see also, e.g., In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 752 (D. Del. 2018), *aff'd sub nom., In re A C & S Inc.*, 775 F. App'x 78 (3d Cir. 2019) (emphasizing "[w]here materials contain personal identifiers, paired with confidential medical information, the potential risk to privacy interests in disclosure is self-evident" and citing *Westinghouse*); *In re Search Warrant (Sealed)*, 810 F.2d 67, 71 (3d Cir. 1987) (recognizing an individual's constitutional right to privacy "extends to the individual interest in avoiding disclosure of personal matters" and "medical records are clearly within this constitutionally protected sphere"); *Papasavvas v. Davis*, No. 23-22165, 2024 WL 3585650, at *1 (D.N.J. July 30, 2024) (acknowledging "an individual's right to privacy in her medical records is well established" and finding mental health record medical records "are well within the ambit of materials entitled to privacy protection"); *United States v. Bowers*, 676 F. Supp. 3d 403, 423 (W.D. Pa. 2022) (noting medical records "are well within the ambit of materials entitled to privacy protection"); *Weisman v. Buckingham Twp.*, No. 04-4719, 2005 WL 1406026, at *7 (E.D. Pa. June 14, 2005) (same); *Wilson v. Pa. State Police Dep't*, No. 94-6547, 1999 WL 179692, at *2–3 (E.D. Pa. Mar. 11, 1999) (recognizing "the limited right to privacy in medical records" but finding the *Westinghouse* factors favored disclosure of the narrow "vision-related material[s]" at issue—while withholding names, addresses, and other identifying information—because the requested vision information was "not as intimate as many other kinds of medical information" and "it is difficult to see how the [individuals] would be harmed if their vision scores became public").

[217] *Doe v. Se. Pa. Trans. Auth.,* 72 F.3d 1133, 1138 (3d Cir. 1995), *cert. denied,* 519 U.S. 808 (1996).

[218] *Id.*

[219] *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) (internal quotations omitted); *Doe v. Delie*, 257 F.3d 309, 315 (3d Cir. 2001); *Gruenke v. Seip,* 225 F.3d 290, 301 (3d Cir. 2000).

[220] *See Doe v. Se. Pa. Transp. Auth.*, No. 93-5988, 1995 WL 334290, at *6 (E.D. Pa. June 2, 1995), *rev'd on other grounds*, 72 F.3d 1133 (3d Cir. 1995), *cert. denied,* 519 U.S. 808 (1996).

JA434

---

[221] *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011).

[222] ECF 13 at 10–11.

[223] *See supra* notes 58–59.

[224] *Id.*

[225] ECF 1 at 13–15.

[226] *Id.* at 13.

[227] *Id.*

[228] *Id.*

[229] *Id.* at 13–14.

[230] *Id.* at 14.

[231] *Id.* at 14–15.

[232] ECF 13 at 11.

[233] 729 F. Supp. 376, 378–79, 384 (D.N.J. 1990); *see also id*. at 385 ("Revealing that one's family or household member has AIDS causes the entire family to be ostracized.").

[234] *Id.* at 384; *see also Se. Pa. Transp. Auth.*, 72 F.3d at 1140 ("Although AIDS hysteria may have subsided somewhat, there still exists a risk of much harm from non-consensual dissemination of the information that an individual is inflicted with AIDS.").

[235] *Borough of Barrington*, 729 F. Supp. at 385 (relying on *Westinghouse* and distinguishing the factual circumstances).

[236] Patients' Case, ECF 16-1 at 14 (Hsiao Decl. ¶ 41).

[237] *Id.*

[238] The Hospital erroneously refers to this factor as Factor Five. *See* ECF 1 at 15.

[239] ECF 1 at 15.

[240] *Id.* at 15–16.

[241] *Id.*

73

JA435

[242] *Id.*

[243] *Id.* at 16.

[244] ECF 13 at 12.

[245] ECF 13 at 11–12.

[246] *Id.* at 12.

[247] *Id.*

[248] ECF 1 at 17.

[249] *Id.* at 17–18 (citing 18 U.S.C. § 3486(e)(1)); ECF 20 at 8–9. The full text of Section 3486(e)(1) reads: "Health information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information unless the action or investigation arises out of and is directly related to receipt of health care or payment for health care or action involving a fraudulent claim related to health; or if authorized by an appropriate order of a court of competent jurisdiction, granted after application showing good cause therefor." 18 U.S.C. § 3486(e)(1).

[250] *Id.* at 18–19 (citing 5 U.S.C. § 552a(b)(7), (9)); ECF 20 at 8.

[251] ECF 1 at 18–19.

[252] ECF 13 at 8 (citing *In re Subpoena*, 228 F.3d at 350; *Doe v. United States*, 253 F.3d at 264–65; *Whispering Oaks Residential Care Facility*, 673 F.3d at 817).

[253] *Id.* at 8–9 (citing 18 U.S.C. § 3486(a)(8), (e)(1)).

[254] *Id.* at 9.

[255] *Id.* at 9.

[256] See *supra* note 249.

[257] *See* 18 U.S.C. § 3486(a)(8).

[258] ECF 1 at 20.

[259] *Id.* at 20.

[260] ECF 13 at 6–7.

74

JA436

[261] *Id.* at 7–8.

[262] *Id.* at 8.

[263] ECF 20 at 9 (emphasis in original).

[264] *Id*.

[265] *Id.*

[266] ECF 33 at 6.

[267] *See supra* notes 122–25.

[268] ECF 1 at 39–40 (Subpoena Request Nos. 2–6).

[269] *Id.* at 40–41 (Subpoena Request Nos. 7–10 and 14).

[270] *Id.* at 40 (Subpoena Request Nos. 7–10).

[271] 458 U.S. 747, 756–57.

[272] *Id.*

[273] ECF 1 at 20.

JA437

# EXHIBIT 2

JA438

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE: SUBPOENA NO. 25-1431-014     :   MISCELLANEOUS ACTION
       :
       :   NO. 25-39

## <u>ORDER</u>

**AND NOW**, this 21st day of November 2025, upon studying The Children's Hospital of Philadelphia's Motion to limit (ECF 1) the scope of the Department of Justice's document requests in an administrative subpoena (ECF 1 at 33–59), the Department of Justice's Opposition (ECF 13), The Children's Hospital of Philadelphia's Reply (ECF 20) and Supplement (ECF 33), the *Amici* Brief (ECF 36), the Department of Justice's Response to the Supplement (ECF 37), Response to the *Amici* Brief (ECF 38), and Notice of supplemental authority (ECF 39), The Children's Hospital of Philadelphia's Response to Notice of supplemental authority (ECF 40), as well as advising the parties we will consider the arguments raised by patients and former patients in related action No. 25-mc-24 (ECFs 1, 16, 17, 18, 19), and as detailed in today's accompanying Memorandum, it is **ORDERED** we **GRANT in part** and **DENY in part** The Children's Hospital of Philadelphia's Motion to limit (ECF 1) requiring we:

1.     **STRIKE** Requests 11, 12, and 13 and grant leave to redact the same information sought in those Requests from documents produced in response to Requests 1–10, 14, or 15;

2.     **DENY** The Children's Hospital of Philadelphia's undefined request to preclude any other Request or sub-Request seeking patients' "health information" without prejudice; and,

3.     **DIRECT** the Clerk of Court **close** this action.

KEARNEY, J.

JA439

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

**DECLARATION OF YOUTH F.F.**

1. I am Youth F.F., a young adult who as a minor and young adult received gender transition medical care at: the Washington D.C. location of Children's National Hospital ("CNH"), and via telehealth from Maryland between 2020 and 2022.

2. During my care at CNH, I, along with others in my family, visited with CNH physicians, nurses, mental health clinicians, and other health-care professionals in person, by telephone, and via electronic communication.

3. Throughout these visits, we shared details about my life, mental and physical health, and other personal information that I only shared because of the privacy I knew I was afforded. I disclosed this in confidence because it was necessary for my care. If this information was to be shared with anyone without my consent, I would feel distrustful of the health-care system, and feel fearful of continuing to seek medical treatment in the future.

4. During my care, me and my family discussed treatment options privately, making decisions together about which treatment options to pursue based on: the side effects, long term effects, risks, and benefits.

5. Follow up appointments included updates about my health, feedback on the medication I was receiving, and how I thought the treatment was going.

JA440

6. I have never been contacted by the federal government regarding my medical care. Nobody from the federal government has informed me that my medical history has been requested. Me and my family would never tell the federal government any medical information.

7. Me and my family understood that the information I shared would be protected with the highest level of privacy, and would not be shared with anyone outside of CNH without explicit consent. I have not provided any consent, and I do not want to provide any consent.

8. As a transgender person, I do not feel safe in public due to harassment I have experienced in public using public transportation, walking around, at my job, and at school. I have experienced unfair treatment as a transgender person, and private medical information regarding my medical transition being shared with anyone would put me at more risk for harassment and discrimination for being transgender in the aforementioned public spaces.

9. I am aware that at this time, the federal government is acting viciously towards transgender individuals, which makes me more fearful of sharing this information with the federal government out of fear for more discrimination.

10. I went through the process of receiving this care with the understanding that the information I shared was confidential. For that trust to be violated, would mean I would be less likely to seek out any form of medical care in the future, and/or less likely to share sensitive information with any professionals I may meet with. This would compromise my ability to get proper medical care ever again.

11. My family's privacy and security would not be protected by redacting our names. This is because the information I reported to CNH healthcare providers—such as my personal

JA441

relationships, where I went to school, where I lived, and more— could identify me and my family regardless of whether or not my name was submitted alongside my most sensitive and identifiable information.

12. I have not shared my family's involvement in this litigation with anyone outside of my family or legal counsel.

13. My name being shared publicly would put me at risk for harm, and would cause severe emotional distress to me and my family. Releasing any medical information to the federal government would put us at the risk of harassment, discrimination, and violence.

14. For my privacy and security to remain protected throughout the duration of this process, I must proceed under a pseudonym in an effort to protect my most sensitive and identifiable information.

15. For all of the reasons above, I object to my medical records being obtained by the federal government.

16. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Youth F.F.

Dated: 11/15/2025

JA442

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

**DECLARATION OF PARENT A.A.**

1. I am the parent of Child A.A., a minor who received medical care at Maryland and Washington D.C. locations of Children's National Hospital ("CNH") between 2023 and 2025. That care included general pediatric and adolescent care, specialty care, and transgender health care.

2. I live in Montgomery County, Maryland.

3. When we decided to seek care at CNH, I believed that my child's medical information would be treated as confidential and used only by health-care professionals involved in my child's treatment and would not be viewed by government officials or anyone else who are not part of their medical team.

4. We chose CNH because of its reputation for high-quality pediatric and adolescent medicine and because we believed the providers would handle sensitive issues with care and respect.

5. During my child's care at CNH, my child and I, along with others in my family, visited many times with CNH medical professionals in person, by telephone and by electronic communication.

6. Throughout those visits and communications, we disclosed private sensitive information about my child's mental and physical health, emotional state, school experiences,

JA443

friendships and family relationships. We believed this information was necessary for medical providers to understand my child's health care needs, make treatment recommendations, and monitor the results.

7. My child met separately with a licensed mental health professional at CNH for an in-depth assessment and follow-up sessions. My child spoke with that provider about matters that were extremely personal and that my child has not shared with people outside our immediate family and the medical team.

8. My child and I also met with CNH physicians to discuss different treatment options, to ask questions, and to talk through concerns. These were in-depth private conversations in which we relied on the providers' expertise and on the confidentiality of the setting. During these meetings, we shared private personal and medical information.

9. My child received medications recommended by their healthcare providers at CNH. These medications required regular follow-up visits, lab tests, and physical examinations.

10. At follow-up appointments, my child's doctors asked for updates about how my child was feeling—physically, mentally, and emotionally. They asked about school, friendships, and family life, and about how my child was handling day-to-day stresses. I believe that these discussions were documented in detailed notes in my child's medical record.

11. Neither my child nor I have made my child's diagnoses or treatment known to the federal government or anyone outside our family and health care providers. We have not been informed by the federal government that my child's care is the subject of any government investigation.

JA444

12. I believed that medical information gathered would be used only by CNH and other medical professionals to diagnose and treat my child. I did not expect, and did not agree, that my child's medical records could be turned over to government investigators or prosecutors who have no role in my child's treatment.

13. The idea that my child's medical records could be disclosed to the government is upsetting to me. Those records contain intimate information about my child's body, emotions, family situation, and private thoughts. I do not want anyone other than treating medical professionals, including government officials, reading and interpreting those details.

14. My child is transgender and already feels exposed and at risk in many public settings. If my child's records are turned over to government officials, my child would feel that their most personal information is being taken out of the confidential space of the doctor's office and placed in the hands of others who have no relationship with my child and no obligation of medical confidentiality. That would cause serious emotional distress for my child and me. My child previously was harassed and cursed at in a public restroom based on his appearance, leaving them hesitant to use sex-segregated facilities because of the persecution and stigma often faced by transgender individuals.

15. I am aware of the government's current public hostility toward transgender people and its efforts to eliminate rights and protections for transgender individuals, and this dangerous climate adds to my fear about the release of our identities.

16. Forcing my child's medical providers to release medical information will have a chilling effect on our willingness to seek medical care in the future and on the willingness of other transgender individuals to seek medical care. If my child does not feel able to be

JA445

fully honest with providers, it will undermine the quality of care my child receives and may lead them to delay or avoid seeking care in the future.

17. Once my child's records leave the health-care system and enter government files, I will have no control over how they are used, who will read them, how long they will be kept, how they are disseminated or released, legally or through a data breach, and whether they will be used to dox or otherwise harass us or others. I am deeply concerned that this loss of control will have serious long-term consequences for my child's privacy and sense of safety.

18. Simply redacting our names from documentation turned over to the government would not prevent our family from being identified. In our meetings with CNH medical professionals, we disclosed innumerable details to CNH medical providers that could identify our family and my child. This includes information about my child's relationships in school, parents' occupations, neighborhood, family and friends, and more.

19. Apart from other Movants, I have not disclosed, nor will I disclose, my involvement or my child's involvement in this litigation.

20. Given the current climate, public disclosure of my name, which would necessarily identify my child, or the disclosure of the name of my child, would also expose my child and our family to bullying, harassment, and discrimination.

21. If we are not permitted to proceed under pseudonyms, we may have to withdraw from this case to protect the safety of our child and our family.

22. For all the reasons above, I object to my child's medical records being shared outside of their medical treatment team.

JA446

23. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Parent A.A._

**Parent A.A.**

Dated: _11/13/25_

JA447

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No.: _____ |

**DECLARATION OF PARENT D.D.**

1. I am the parent of Child D.D., a minor who received medical care at Children's National Hospital ("CNH") between March 2022 and December 2024.

2. Throughout my child's care at CNH, my child, other family members, and I met with CNH providers and medical professionals. We also communicated with CNH by phone and through electronic messages.

3. In the course of these visits and communications, my child and I revealed sensitive information concerning my child's mental health, physical development, and their relationships in school, with peers, and with other family members. All of these disclosures were made to CNH medical providers for the purposes of diagnosis, formulation of treatment recommendations, and development of an appropriate treatment plan.

4. During the course of my child's care at CNH, my child participated in a mental health assessment conducted by a licensed mental health provider and received social and psychological support, all of which included sensitive and confidential conversations.

5. During the course of my child's care, my child received puberty blocking medication and hormone replacement therapy as recommended by their healthcare providers at CNH.

JA448

6. Follow-up appointments regularly included updates about my child's mental health, response to medications, on-going monitoring, and discussions about the effectiveness of the medical treatment my child was undergoing.

7. During my child's care, we trusted that the information we shared would stay strictly within CNH. I was reassured by CNH that our disclosures would remain confidential.

8. Disclosure of my child's medical records to government investigators would cause my child deep distress and intensify my anxiety and fears about their safety and well-being.

9. Information in my child's medical records is private and not available anywhere else. Disclosing it would undermine the safeguards we have carefully put in place to protect my child's future.

10. We chose CNH for its stellar reputation as a premier provider of pediatric healthcare and have always trusted that CNH would ensure the privacy of patient records.

11. Disclosure of my child's medical records to the government could cause them deep emotional harm and leave both my child and me vulnerable to the possibility of discrimination, harassment, or even unjust legal consequences.

12. Watching the government's present antagonism toward transgender people and their families only deepens my fear about my identity—and my child's—being exposed.

13. If my child's confidential medical information were shared with the government, it would represent a profound breach of trust in the healthcare system. My child would likely become fearful or unwilling to seek medical help in the future, severely affecting their access to essential care over the course of their life.

14. The release of my child's private medical information would result in significant and lasting harm.

JA449

15. Redacting our names from my child's medical records would not meaningfully protect our privacy once those records are shared with the government. Throughout my child's treatment, we provided CNH medical providers with countless sensitive details that could easily reveal our identities, including information about my child's school relationships, my occupation, our neighborhood, our family, friends, and more.

16. Revealing my name, and by extension my child's identity, in the context of litigation over safeguarding the privacy of our family's medical records, would cause my child serious emotional harm. It would also open our family up to potential harassment, bullying, and discrimination.

17. If we are not permitted to proceed under pseudonyms, we might have to withdraw this motion and abandon litigation for the safety of our child and our family.

18. For all the reasons above, I object to my child's medical records being shared with the government.

19. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

JA450

JA451

D. D.

Dated: 11/15/2025

**Parent D.D.**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In Re. 2025 Subpoena to Children's National Hospital

Case No.: _____

## DECLARATION OF PARENT H.H.

1. I am the parent of Child H.H., a minor who received medical care at Children's National Hospital ("CNH") between approximately December 2022 and June 2025. That care encompassed a range of medical care, including transgender-specific healthcare.

2. During the course of my child's care at CNH, my child and I, along with other members of our family, met with CNH physicians, nurses, and other staff. We also stayed in contact with CNH through phone calls and electronic messages.

3. I believe there are extensive medical records relating to my child's care held by CNH.

4. In those visits and communications, my child and I shared private information about my child's physical health, mental and emotional well-being, development and maturation, school life, relationships with peers and family members, and concerns about safety and stress. We understood that this information was gathered so CNH providers could assess my child's health, offer treatment recommendations, and track my child's progress over time.

5. My child and I met with physicians to discuss possible treatment options, the risks and benefits of those options, and our questions and concerns. These were careful, in-depth conversations about my child's health and well-being.

JA452

6. At various times, we spoke privately with CNH providers to ask questions and share concerns. We depended on those confidential discussions to determine how to best support our child.

7. Follow-up appointments included updates about my child's mental health, daily functioning, response to medications, and school and family life. These visits likely generated detailed notes in my child's medical record.

8. We consistently viewed the details we shared with CNH as sensitive medical information. It was our understanding that this information would be accessed only by healthcare professionals involved in my child's treatment and used solely to provide and coordinate care. We did not expect it to be released to anyone outside the healthcare system.

9. We chose CNH because of the providers' careful and thoughtful approach to transgender adolescent healthcare and the extensive processes and protocols in place. Our decision to seek care there was also based in part on our understanding that my child's medical information would be kept confidential, and CNH assured us that my child's records would remain confidential.

10. The possibility that my child's medical records could be handed over to the government is deeply distressing to me. These records contain highly personal information about my child's body, mental health, family situation, and private thoughts. I do not want government personnel to have access to or review these details. I am also concerned for my child's safety if the current administration were to obtain these records, given what I have seen it do to target and harm transgender individuals.

JA453

11. Releasing my child's medical records to the government would be extremely upsetting for them. My child already experiences a sense of vulnerability and understands the risks they face as a transgender person. The thought that government officials could scrutinize the most private aspects of their life would make my child feel exposed and targeted. It would also increase my anxiety about their safety and overall well-being.

12. I am concerned that if my child's records are disclosed in this case, it will affect how my child approaches healthcare in the future. My child has conveyed to me that the idea of government officials reading their medical chart gives them pause about speaking freely with doctors and therapists. If they do not feel they can be honest, they may delay or avoid seeking care they need. That makes me concerned as a parent about my child's ability to get the healthcare they need going forward.

13. I am additionally concerned that releasing my child's medical records would expose unique information about them that cannot be found elsewhere and has been essential in safeguarding their personal history.

14. As a parent, the idea of my child's confidential medical information being shared with the government would represent a profound violation of trust in the healthcare system. Like any parent, it would make me far more cautious about what we share in future appointments and influence where we choose to seek care.

15. The consequences of releasing my child's medical records would be far-reaching. Once these records are in government hands, my child would have no control over who reviews them, how they are used, or how long they are kept. This could result in lasting harm to their privacy and well-being.

JA454

16. I do not think that simply removing our names from my child's records would adequately safeguard our privacy. Throughout my child's care, we shared many details—like age, timing of appointments, family structure, school information, and other life events—that, when taken together, could reveal our family's identity.

17. Providing my child's medical records to the government would go against the expectations of privacy that guided our decision to seek care. We shared deeply personal information with CNH providers, believing it would remain protected within the healthcare system and be used only to care for my child.

18. Making my name public, which would inevitably reveal my child's identity, or releasing my child's name in a legal matter concerning their medical records, would inflict serious emotional distress on my child and expose us to possible threats of bullying, harassment, and discrimination.

19. If I am not allowed to use pseudonyms, I will probably need to withdraw from this case to safeguard my child's privacy and ensure their safety.

20. For all the reasons above, I strongly object to my child's medical records being shared with the government.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Parent H.H._
**Parent H.H.**

Dated: 11/14/2025

JA455

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No. 1:25-cv-03780 |

### MOVANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Movants respectfully submit this Notice of Supplemental Authority in support of their pending motion to quash certain portions of the Department of Justice ("DOJ") subpoena issued against Children's National Hospital.

On September 3, 2025, the United States District Court for the Western District of Washington issued an Order granting a motion to set aside a DOJ subpoena issued against Seattle Children's Hospital that is substantively identical to the subpoena challenged here. *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041 (W.D. Wash. Sept. 3, 2025) (Chun, J.). The Order setting aside the subpoena was only recently unsealed and became available to the public on December 11, 2025.

After full briefing, Judge John H. Chun held that:

(1)     18 U.S.C. § 3486 permits subpoenas only in furtherance of an investigation of "a Federal health care offense." Applying Supreme Court and Ninth Circuit precedent, the court held that the government must demonstrate a realistic expectation, not merely an "idle hope," that the subpoenaed materials would yield information relevant to such an offense. The court concluded that the DOJ failed to make this showing, and the subpoena therefore exceeded the authority conferred by § 3486.

(2)     Even assuming DOJ had made a prima facie showing of authority, Seattle Children's independently demonstrated that the subpoena was issued for an improper

JA456

purpose. The record showed that the subpoena was not prompted by any allegation of unlawful conduct but instead was issued pursuant to executive and departmental directives aimed at ending gender-transition medical care for minors. Because providing such care is not itself a federal health care offense, the court found that the subpoena was not issued to further a lawful investigation authorized by Congress and that enforcement of the subpoena would constitute an abuse of the court's process.

The court therefore set aside the entirety of the subpoena issued against Seattle Children's Hospital, including Requests 11, 12, and 13 which sought patient information and medical records.

A copy of the Order is attached as Exhibit 1 to this Notice.

Dated: December 15, 2025          */s/ Eve L. Hill*
Eve L. Hill (Bar No. 11938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Jennifer L. Levi
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*

JA457

# EXHIBIT 1

JA458

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE SUBPOENA DUCES TECUM NO. 25-1431-016 | CASE NO. 2:25-mc-00041-JHC *SEALED* <br><br> ORDER GRANTING MOTIONS TO SET ASIDE SUBPOENA AND TO SEAL DOCKET |

**I**
**INTRODUCTION**

This matter comes before the Court on Seattle Children's Hospital's Motions to Set Aside or Modify Subpoena, Dkt. # 1, and to Seal Docket, Dkt. # 4. The Court has reviewed the materials filed in support of and in opposition to the motions, the record, and the governing law. Being fully advised, and for the reasons below, the Court GRANTS the motions.

**II**
**BACKGROUND**

On January 28, 2025, President Donald Trump issued Executive Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation" (the EO). Dkt. # 2-1 at 30. The EO orders:

JA459

> Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end. . .
>
> Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

*Id.*

The EO defines "chemical and surgical mutilation" as (1) "the use of puberty blockers . . . to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex"; (2) "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex"; and (3) "surgical procedures" related to "gender affirming care." *Id.* The EO orders agencies providing research or education grants to medical institutions to "take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." *Id.* at 31. It also orders the Attorney General to, as pertinent here:

> prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation.

*Id.*

On April 22, 2025, Attorney General Pamela Bondi issued a memorandum titled, "PREVENTING THE MUTILATION OF AMERICAN CHILDREN" (the Bondi Memo). *Id.* at 43. It describes the "radical ideological agenda" of "teach[ing] children to deny biological reality" and, pursuant to the EO, issues "guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents." *Id.* at 43, 45. As pertinent here, it provides:

JA460

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations.  To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition."  Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling.  [citing 21 U.S.C. §§ 321 (m)-(n), 331, 352(a), (f); 21 C.F.R. §§ 201.100, 201.128, 202.1(l)(2).]

*Id.* at 46.  The memo concludes that the Department of Justice (DOJ) will bring "to an end" practices related to "gender-affirming care." *Id.* at 48.

On June 11, 2025, Assistant Attorney General Brett Shumate issued a memorandum to all employees of the DOJ's Civil Division titled "Civil Division Enforcement Priorities." *Id.* at 50. After referring to the EO and the Bondi Memo, it states:

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives.  These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs.  31 U.S.C. § 301 *et seq.*

*Id.* at 51–52.

That same day, Shumate issued a subpoena to Seattle Children's Hospital, the largest provider of pediatric services in the Pacific Northwest. *Id.* at 2; Dkt. # 3 at 3, ¶ 8.  Seattle Children's cares for patients diagnosed with gender dysphoria.  Dkt. # 3 at 4–6.  The subpoena contains 15 requests, which Seattle Children's summarizes into four categories:

1. *Personnel files*: Personnel files for all Hospital executives, management employees, or board members; employees with authority to prescribe medications or perform medical evaluations; and employees engaged in billing activities (Request 1).

JA461

2.  *Patient information and medical records*: Documents sufficient to identify every patient prescribed puberty blockers or hormone therapy (by name, date of birth, SSN number, address, and parent/guardian information); for each such patient, all documents related to clinical indications, diagnoses, or assessments that formed the basis for the prescription; all documents relating to informed consent, intake, and parent/guardian authorization; and all documents related to adverse events, side effects, or medically unfavorable consequences (Requests 11-13, 15).

3.  *Billing information*: All documents related to billing, insurance claims, and diagnosis codes related to gender-related care, and all other diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (Requests 2-6).

4.  *Information regarding pharmaceutical companies and government agencies*: Communications with and documents received from or related to pharmaceutical companies providing puberty blockers or hormones for gender-related care; communications with government agencies related to the safety of puberty blockers or hormones for minor patients (Requests 7-10, 14).

Dkt. # 1 at 9 (citing Dkt. # 2-1 at 8–10).

On July 1, 2025, counsel for Seattle Children's met with DOJ attorneys to discuss the subpoena. Dkt. # 2 at 2, ¶ 3. According to a declaration by one of the attorneys representing Seattle Children's, the DOJ attorneys explained that the DOJ issued the subpoena because of the EO and the Bondi Memo. *Id.* at 2, ¶ 4a. They said that the subpoena was not prompted by any specific allegations about Seattle Children's, nor were they aware of any allegation that Seattle Children's had made a false or misleading statement. *Id.* at 3, ¶ 4e. They said that the DOJ issued the subpoena because it knows that Seattle Children's provides gender-related care for minors and thus, in its view, the hospital might have information relating to an investigation. *Id.* The DOJ had not yet determined whether the investigation is civil or criminal. *Id.* at 2, ¶ 4c.

JA462

The DOJ issued the subpoena under 18 U.S.C. § 3486(a)(1)(A)(i)(I).  Dkt. # 2-1 at 2.

Seattle Children's moves to set aside or modify the subpoena under 18 U.S.C. § 3486(a)(5).[1]

### III
### DISCUSSION

A.    Motion to Set Aside or Modify Subpoena

1.    Standards of review

"The scope of the judicial inquiry in an . . . agency subpoena enforcement proceeding is

quite narrow." *United States v. Exxon Mobil Corp.*, 943 F.3d 1283, 1287 (9th Cir. 2019)

(quoting *E.E.O.C. v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009)).  In assessing

administrative subpoenas, courts in the Ninth Circuit ask "(1) whether Congress has granted the

authority to investigate; (2) whether procedural requirements have been followed; and

(3) whether the evidence is relevant and material to the investigation." *United States v. Golden*

*Valley Elec. Ass'n*, 689 F.3d 1108, 1113 (9th Cir. 2012) (quotation marks and citations omitted).

These factors reflect a Fourth Amendment reasonableness inquiry.[2]

---

[1] This subsection provides, "At any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons, or a prohibition of disclosure ordered by a court under paragraph (6)."

[2] In *Golden Valley Elec. Ass'n*, the Ninth Circuit explained that even if the three factors discussed above are met, "a Fourth Amendment 'reasonableness' inquiry must also be satisfied."  689 F.3d at 1113 (quoting *Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 444 n.5 (9th Cir. 1994)).  But such an inquiry need not be separate because the Ninth Circuit's three-factor test reflects the Fourth Amendment reasonableness inquiry.

The Ninth Circuit articulated its three-factor test in *E.E.O.C. v. Children's Hosp. Med. Ctr. of N. California*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), *overruled on other grounds as recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994).  In *Children's Hosp.*, the Ninth Circuit relied on several Supreme Court decisions that the Sixth Circuit has, in the context of reviewing another subpoena issued under 18 U.S.C. § 3486, summarized to adopt a similar test based on Fourth Amendment principles that asks whether a subpoena (i) is authorized by statute; (ii) seeks relevant documents; (iii) seeks information not already in the agency's possession; and (iv) will, if enforced, be an abuse of the court's process.  *See Doe v. United States*, 253 F.3d 256, 262–65 (6th Cir. 2001).  And in *Golden Valley Elec. Ass'n*, the Ninth Circuit explained that "[a]n administrative subpoena is consistent with the Fourth Amendment if 'the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry.'"  689 F.3d at 1115 (quoting *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946)).

The agency must make a prima facie showing that these requirements have been met.

*See F.D.I.C. v. Garner*, 126 F.3d 1138, 1142–43 (9th Cir. 1997).  An affidavit from a

government official suffices to do so.  *Id.*  If these requirements are met, the burden shifts to the

recipient of the subpoena to "disprove" the agency's showing.  *United States v. Tan*, 16 F.4th

1346, 1352–53 (9th Cir. 2021).  The recipient of the subpoena may also show that enforcement

of the subpoena would be an abuse of the court's process.  *Crystal v. United States*, 172 F.3d

1141, 1143–44 (9th Cir. 1999) (citing *United States v. Powell*, 379 U.S. 48, 57–58 (1964)).  The

Court discusses the precise burden *infra* Section III.A.3.c.(1).  Ultimately, the recipient of the

subpoena bears the burden of showing that the subpoena is unlawfully issued or that its

enforcement would be an abuse of the court's process; the agency does not bear the burden of

proving that the subpoena is lawfully issued.  *See Crystal*, 172 F.3d at 1144 & n.3 (declining to

follow dicta in *United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995)).

In reviewing a subpoena issued, as here, under 18 U.S.C. § 3486, the Eighth Circuit has

applied a similar standard:

> It is well established that a subpoena is properly enforced if (1) issued pursuant to
> lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the
> lawful purpose, and (4) the information sought is not unreasonable. If an agency
> has satisfied these requirements for an administrative subpoena, the burden shifts
> to the respondent to show that judicial enforcement would amount to an abuse of
> the court's process.

*United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir.

2012) (quotation marks and citations omitted).

A point of semantic distinction—which does not make a legal difference—is that the

Eighth Circuit assesses whether the subpoena is issued "for a lawful purpose."  *Id.*  The Ninth

Circuit has summarized its three-factor test as follows: "courts must enforce administrative

subpoenas unless the evidence sought by the subpoena [is] plainly incompetent or irrelevant to

*any lawful purpose* of the agency." *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th

Cir. 2001) (quotation marks and citations omitted) (emphasis added). And in the context of

Internal Revenue Service (IRS) summons, the Ninth Circuit, quoting *Powell*, 379 U.S. at 57–58,

has held that "the IRS must establish that the summons (1) was issued pursuant to a 'legitimate

purpose'; (2) seeks information 'relevant' to that purpose; (3) seeks information that is 'not

already within the Commissioner's possession'; and (4) satisfies all 'administrative steps

required by the Code.'" *Stewart v. United States*, 511 F.3d 1251, 1254 (9th Cir. 2008). The

Ninth Circuit has applied the criteria set forth in *Powell* to administrative summonses issued by

agencies other than the IRS. *See Tan*, 16 F.4th at 1353. And these criteria do not materially

differ from those assessed under the Ninth Circuit's three-factor test. In fact, the Ninth Circuit

relied on *Powell* in setting forth this test. *See Children's Hosp.*, 719 F.2d at 1428. Thus, the

Court assesses whether the purpose for which the subpoena was issued is lawful and discusses

how it can be considered under the three-factor test *infra* Section III.A.3.c.(1).

2.      Procedural requirements

The DOJ makes a prima facie case that it has complied with the procedural requirements.

The DOJ issued its subpoena under 18 U.S.C. § 3486(a)(1)(A)(i)(I), which authorizes the

Attorney General to issue a subpoena in an investigation of "a Federal health care offense,"

defined in § 24(a). In its opposition to the motion to set aside or modify the subpoena, the DOJ

says that the Attorney General delegated authority to Shumate to issue the subpoena to

investigate "among other things, whether off-label promotion and/or unlawful dispensing of

puberty blockers and cross-sex hormones for use by minors violated federal law, including the

Food, Drug, and Cosmetic Act ('FDCA')." Dkt. # 18 at 1, 3 & n.2. In support of this

proposition, the DOJ offers only a declaration by Lisa Hsiao, Acting Director of the DOJ's

Consumer Protection Branch, in which she cites 28 U.S.C. § 510, a statute generally authorizing the Attorney General to delegate authority. Dkt. # 18-1 at 3, ¶ 4. Hsiao also declares:

> Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(1)(A) and (a)(1)(B) to investigate violations of the FDCA that relate to a health care benefit program.

*Id.* at 3, ¶ 5.

The DOJ does not provide Attorney General Order Number 3591-2015. And it is unclear whether investigation of off-label promotion or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors "relate[s] to a health care benefit program." *Id.* The Bondi Memo, however, directs "the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the [FDCA]," which Seattle Children's does not dispute are federal healthcare offenses under 18 U.S.C. § 3486. Dkt. # 2-1 at 46. Although the DOJ could make a stronger showing that the Attorney General delegated authority to issue the subpoena, it need carry only a "slight" burden to make its prima facie case. *Crystal*, 172 F.3d at 1144 (quoting *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1414 (9th Cir. 1993)). Hsiao's declaration, along with the Bondi Memo, suffice to carry this minimal burden. *See Tan*, 16 F.4th at 1352 (a declaration can make a prima facie case for enforcement).

Seattle Children's does not carry its burden to show otherwise. It points to a section of the DOJ's Justice Manual titled, "Overview of Authorized Investigative Demands – Delegation," which provides:

> The Attorney General's authority to issue investigative demands pursuant to 18 U.S.C. § 3486 has been delegated, with authority to redelegate, to the following officials:
>
>     1. Each United States Attorney;
>
>     2. The Assistant Attorney General for the Criminal Division.

JA466

U.S. Department of Justice, Justice Manual 9-44.201.  Seattle Children's contends that Shumate

has not been delegated authority to issue a subpoena under 18 U.S.C. § 3486 because he is part

of the Civil Division.  But Seattle Children's does not show that this provision of the Justice

Manual is an exclusive list of individuals to whom the Attorney General has delegated such

authority.  Thus, the Court cannot conclude that Seattle Children's has carried its burden to

refute the DOJ's prima facie case that the subpoena met procedural requirements.[3]  The DOJ's

thin prima facie case for its compliance with procedural requirements, however, suggests that the

purpose of its investigation is unclear – an issue to which the Court now turns.

      3.      Purpose of the investigation

The Court considers the purpose of the DOJ's investigation in assessing the first factor of

"whether Congress has granted the authority to investigate."  *Golden Valley Elec. Ass'n*, 689

F.3d at 1113.  As an initial matter, the DOJ contends that courts cannot review the purpose for

which a subpoena is issued.  *See* Dkt. # 18 at 4.  But in support of this contention, the DOJ cites

*Whispering Oaks*, which holds to the contrary.  673 F.3d at 817; *see supra* Section III.A.1.  The

thrust of the DOJ's contention, rather, appears to be that the scope of such review is limited.

Thus, the Court begins by discussing the applicable standard before applying it to the DOJ's

subpoena.

      a.   "Realistic expectation" standard

To make its prima facie case that Congress has granted it authority to issue its subpoena,

the DOJ must demonstrate that it has a realistic expectation that it might discover something

relevant to its investigation.  In *Whispering Oaks*, the recipient of the subpoenas (Whispering

---

[3] Seattle Children's also points out that the DOJ has not formally moved to compel enforcement of its subpoena.  *See* 18 U.S.C. § 3486(c); Dkt. # 22 at 7.  Because the Court grants Seattle Children's motion to set aside the subpoena, it need not reach this issue.

Oaks), asserted that the subpoenas were issued for the improper purpose of harassment "because

of unspecified political or racial animus" and that the district court erred by not "requiring the

Government to present evidence of a 'reasonable suspicion' that the law had been violated."  673

F.3d at 817–18.  The Eighth Circuit rejected this assertion:

> Whispering Oaks cites no legal authority for requiring the Government to justify its administrative subpoenas by revealing the identity of any informants, the information those informants may have provided, or any other facts revealing the motives behind a lawful investigation.  The Government, with its subpoena power, "does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."

*Id.* at 818 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)).

Agencies need not show probable cause to justify a subpoena.  *Golden Valley Elec.*

*Ass'n*, 689 F.3d at 1115.  But agencies must make some prima facie showing of reasonableness.

*See id.* at 1115–16; *Oklahoma Press Pub. Co.*, 327 U.S. at 208 ("The gist of the [Fourth

Amendment's] protection is in the requirement, expressed in terms, that the disclosure sought

shall not be unreasonable.").  The DOJ acknowledges as much, observing that courts have

reviewed "whether the subpoena is not actually attempting to obtain evidence in furtherance of

an investigation of potential federal offenses."  Dkt. # 18 at 5.

Thus, the Supreme Court's language in *Morton Salt Co.* that an agency can investigate

"even just because it wants assurance" that the law is not being violated cannot be read so

expansively as to mean that an agency can make a prima facie case for enforcement with mere

speculation of unlawful conduct.  The language must be taken in context:

> [An administrative agency] has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

JA468

*Morton Salt Co.*, 338 U.S. at 642–43.  The Supreme Court made this statement in analogizing administrative agencies to grand juries.  It did not set forth a general rule as to what an agency must show to make a prima facie case that its subpoena is valid.  Nor could it, because a particular statute governs the scope of an agency's authority to issue a subpoena.  *See Peters v. United States*, 853 F.2d 692, 696, 699 (9th Cir. 1988) (observing that "[t]he authority of an administrative agency to issue subpoenas for investigatory purposes is created solely by statute" and disapproving "imputations of power from one agency to an entirely different agency").

The Ninth Circuit has thus given broad effect to this passage in *Morton Salt Co.* in cases involving statutes that confer an agency capacious authority to issue a subpoena.  *See, e.g.*, *id.* at 695–96.  For example, in *Reich*, the Occupational Safety & Health Administration (OSHA) received an employee complaint that a company did not x-ray its welds or certify its welders.  32 F.3d at 442.  OSHA then issued a subpoena for documents about, among other things, welding procedures.  *Id.* at 442–43 & n.3.  On appeal, the company contended that OSHA must identify a specific regulation that might be violated.  *Id.* at 444.  And even if the subpoena could be enforced, the company contended that the request must be limited to the scope of the employee complaint.  *Id.* at 445.  The Ninth Circuit rejected these contentions and affirmed enforcement of the subpoena because the Occupational Safety and Health Act confers broad authority for OSHA to seek documents "related to whether the employer was 'furnishing to its employees . . . a place of employment which [is] free from recognized hazards that are causing or likely to cause death or serious physical harm.'"  *Id.* at 444–46 (citing, among other authorities, 29 U.S.C. § 654(a)(1)).  In so holding, the Ninth Circuit distinguished subpoenas issued by the Equal Employment Opportunity Commission (EEOC) because "[t]he EEOC's authorizing statute specifically limits its subpoenas to the investigation of discrete charges."  *Id.* at 446 (citing *U.S.*

JA469

*E.P.A. v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443, 447 (9th Cir. 1988), *abrogated on other*

*grounds by McLane Co. v. E.E.O.C.*, 581 U.S. 72, 80–81 (2017)).

Although 18 U.S.C. § 3486(a)(1)(A)(i)(I) does not require subpoenas to be related to a

discrete *charge*, it requires subpoenas to be related to the investigation of "a Federal health care

offense," defined in § 24(a).  Thus, the statute is more like—but still narrower than—Section

7602(2) of the Internal Revenue Code of 1954, which was at issue in *Powell* and which provides:

> For the purpose of ascertaining the correctness of any return, making a return where
> none has been made, determining the liability of any person for any internal revenue
> tax or the liability at law or in equity of any transferee or fiduciary of any person in
> respect of any internal revenue tax, or collecting any such liability, the Secretary or
> his delegate is authorized—
>
> > (1) To examine any books, papers, records, or other data which may be
> > relevant or material to such inquiry;
> >
> > (2) To summon the person liable for tax or required to perform the act . . .
> > to produce such books, papers, records, or other data, and to give such
> > testimony, under oath, as may be relevant or material to such inquiry,

379 U.S. at 49, 53 & n.12.

"As stated in [*Powell*], the required standard that the IRS must meet is clearly less than

probable cause." *United States v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980).  Although the

applicable standard is difficult to articulate, one way is to ask "whether the inspection sought

might have thrown light on the correctness of the taxpayer's return." *Id.* (citations omitted).  The

Second Circuit elaborated that "the 'might' in the articulated standard 'might throw light upon

the correctness of the return,' is in the particular circumstances *an indication of a realistic*

*expectation rather than an idle hope that something may be discovered*." *Id.* (quoting *United*

*States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1969)) (emphasis added).  The Ninth Circuit has

favorably quoted this standard, *id.*, and it tracks the Supreme Court's recognition that "[i]t is

contrary to the first principles of justice to allow a search through all [of a party's] r[e]cords,

relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924).  Although the DOJ need not allege a federal healthcare offense, it must at least show that it has a realistic expectation rather than merely an "idle hope" that something supporting such unlawful activity might be discovered in its investigation. *Goldman*, 637 F.2d at 667 (citation omitted).

This also accords with the Ninth Circuit's emphasis that a court must enforce a subpoena unless "the agency's jurisdiction is plainly lacking." *Karuk Tribe Hous. Auth.*, 260 F.3d at 1077 (quotation marks and citation omitted).  In *Karuk Tribe Hous. Auth.*, the Ninth Circuit reiterated, "[A] party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it." *Id.* at 1076 (quoting *Children's Hosp.*, 719 F.2d at 1429).  For example, a court cannot quash a subpoena based on a contention that turns on the merits of the investigation or, for example, that res judicata applies.  *Id.* at 1075–76.  A court can, however, quash a subpoena if the defense is "'jurisdictional' in nature— i.e., when the agency lacks jurisdiction over the subject of the investigation." *Id.* at 1077.

Thus, a court can set aside a subpoena if the agency does not carry its light burden of showing that the subpoena is issued within the authority conferred to the agency by Congress. After all, the anchor of the court's inquiry is the investigation.  *See Fed. Exp. Corp.*, 558 F.3d at 855 ("Thus, the subpoena seeks information relevant and material *to the investigation*.") (quotation marks and citation omitted).  Although the DOJ need not define the contours of its investigation, it must convince the court that there is *some* investigation that allows it to issue a subpoena.  Without such minimal evidence, the Court cannot enforce the subpoena because it is "too indefinite or broad" to be enforced.  *Golden Valley Elec. Ass'n*, 689 F.3d at 1113 (quoting *Peters*, 853 F.2d at 699); *see also In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (reversing in part enforcement of a subpoena issued for the general purpose of

JA471

uncovering "other wrongdoing, as yet unknown" because "the broad language used to describe this purpose makes it impossible to apply [the relevant standard]").

        b.  Prima facie case

The DOJ does not make a prima facie showing that its subpoena is authorized by Congress because it does not establish that it has a realistic expectation of discovering something relevant to the investigation of a federal healthcare offense. The DOJ's "burden, while not great, is also not non-existent." *Goldman*, 637 F.2d at 667. Compared to the IRS's burden to issue a summons, the DOJ's burden here is slightly heavier because 18 U.S.C. § 3486(a)(1)(A)(i)(I) is more restrictive than the provisions of the Internal Revenue Code such as that at issue in *Powell*. *See Liberty Fin. Servs. v. United States*, 778 F.2d 1390, 1392 (9th Cir. 1985) (the burden to make a prima facie case is "minimal" in the context of an IRS summons "because the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted"). In any event, the DOJ's evidence is threadbare. The DOJ provides only Hsiao's declaration that the subpoena to Seattle Children's "was lawfully issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil Division in connection with a valid investigation being conducted in my office."[4] Dkt. # 18-1 at 3, ¶ 6.

Although it is a close question, this conclusory statement is insufficient. The Ninth Circuit has affirmed enforcement of a subpoena in cases involving more than a bare assertion that an investigation exists.[5] For example, in *Golden Valley Elec. Ass'n*, the Ninth Circuit

---

[4] Although the DOJ provides other justifications for its subpoena in its briefing, it cites no case (and the Court could not find any) suggesting that the Court can consider justifications made in a brief to determine whether an agency has made a prima facie case for enforcement of a subpoena. Thus, the Court does not consider these justifications here, but does so below in reasoning that even if the DOJ had made its prima facie case, Seattle Children's has sufficiently shown that the subpoena was issued for an improper purpose.

[5] Other circuits are in accord. For example, the Seventh Circuit concluded that the IRS made its prima facie case with an affidavit in which the revenue agent conducting the audit "declared that the IRS

JA472

affirmed a district court's enforcement of a subpoena served by the Drug Enforcement

Administration (DEA) on an electricity company seeking information about the electricity

consumption at three specified customer addresses. 689 F.3d at 1111. A DEA agent provided

the district court with an affidavit "stating that the subpoenaed records were relevant to

determine whether individuals at three residences were involved in the manufacture and

distribution of controlled substances," which would violate the Controlled Substances Act. *Id.* at

1111, 1114. And in *Tan*, the Ninth Circuit affirmed enforcement of a summons issued by the

United States Customs and Border Protection division of the Department of Homeland Security,

which provided the district court with a "declaration [that] explain[ed], among other things, that

Tan and companies that he owns and operates import merchandise and may have violated 19

U.S.C. § 1592 pertaining to the payment of duties." 16 F.4th at 1353. The DOJ's declaration, by

contrast, lacks any mention of the kind of investigation at issue. *Cf. Doe*, 253 F.3d at 260

(affirming denial of a motion to quash an 18 U.S.C. § 3486 subpoena in a case involving

allegations that a podiatrist had a "kickback" arrangement with two medical testing laboratories).

Because the DOJ has shown only that it has an "idle hope" of discovering information

related to a federal healthcare offense, it has not established a prima facie case. *Goldman*, 637

F.2d at 667 (citation omitted). To hold otherwise would be to contravene the statute, which

authorizes subpoenas only in an investigation of a federal healthcare offense. 18 U.S.C.

§ 3486(a)(1)(A)(i)(I); *see also Alyeska Pipeline Serv. Co.*, 836 F.2d at 447 (when a statute is

---

was auditing the Wellington; [and] the mudd sheets might help her reconstruct the Wellington's income by exposing repeat banquet customers and tracing their payments for banquets held in 1992 and 1993." *2121 Arlington Heights Corp. v. I.R.S.*, 109 F.3d 1221, 1224 (7th Cir. 1997).

Similarly, although the First Circuit has observed that "a conclusory affidavit" is enough for an agency to establish its prima facie case, the examples to which it cites contain more specific conclusions than that presented here. *See Gertner*, 65 F.3d at 968 (citing *Sylvestre v. United States*, 978 F.2d 25, 26 (1st Cir. 1992)).

limited to specific investigations, it does not authorize a broad "fishing expedition") (citation omitted).

    c.   Improper purpose

Even if the DOJ's threadbare evidence establishes its prima facie case, Seattle Children's has carried its burden to show that the subpoena was issued for an improper purpose. Considering the many variations of the applicable legal standard as discussed thus far, the Court again begins with a point of clarification before turning to the parties' contentions.

    (1) The meaning of "improper purpose" and a subpoena recipient's burden to challenge enforcement of a subpoena

To reiterate, when an agency satisfies its requirements to establish a prima facie case that its subpoena is valid, the burden shifts to the recipient of the subpoena to show (i) that these requirements are not met; or (ii) that enforcement of the subpoena would be an abuse of the court's process. *United States v. Jose*, 131 F.3d 1325, 1328 (9th Cir. 1997) (en banc) (citations omitted). Although these options have been articulated separately, *see, e.g.*, *id.*, the Supreme Court considers them as both part of a broader "good-faith exercise":

> Prior to a recommendation for prosecution to the Department of Justice, the IRS must use its summons authority in good faith. In *Powell*, the Court announced several elements of a good-faith exercise:
>
> > "[The Service] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . . . [A] court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation."

*United States v. LaSalle Nat. Bank*, 437 U.S. 298, 313–14 (1978) (citations omitted).

Whether a subpoena is issued for an "improper purpose" is susceptible to at least two meanings. It could mean that the subpoena is not issued to further an investigation within the authority conferred by Congress – the first of the factors in the Ninth Circuit's three-factor test. *See, e.g.*, *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008) ("The lawful purpose of the subpoenas [issued under 18 U.S.C. § 3486] was to investigate FMC's Epogen practices, due to allegations of wrongdoing."). Or it could mean that the subpoena is issued not only to further an investigation within the agency's authority but also for a different, suspect purpose such as settling a collateral dispute. Granted, there may be no daylight between these meanings if issuing a subpoena for such a suspect purpose would not be authorized by Congress.[6] But the Court need not resolve this issue because Seattle Children's shows that the DOJ did not issue its subpoena to investigate a federal healthcare offense.

Before turning to the evidence presented by Seattle Children's, the Court observes that the weight of its burden is unclear. The Ninth Circuit has explained that "[o]nce the government establishes a *prima facie* case, the person opposing the summons shoulders a 'heavy burden' to 'disprove' the government's showing." *Tan*, 16 F.4th at 1352–53 (quoting *Crystal*, 172 F.3d at 1144). But this characterization originates from the Supreme Court's decision in *LaSalle Nat. Bank*, 437 U.S. at 316. There, the Supreme Court considered whether a finding that an IRS agent issues summonses solely to discover evidence of criminal conduct "necessarily leads to the

---

[6] As the Fourth Circuit has summarized in another case involving an 18 U.S.C. § 3486 subpoena:

> Articulating the reasonableness standard, the Supreme Court has stated that subpoenas shall not be excessive for the purposes of the relevant inquiry; they must be authorized by Congress for a purpose Congress can order; and they must be relevant to the inquiry. The requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from engaging in arbitrary fishing expeditions and from selecting targets of investigation out of malice or an intent to harass.

*In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (cleaned up).

conclusion that the summonses were not issued in good-faith pursuit of the congressionally authorized purposes of § 7602." *Id.* at 307–08.  The Court concluded that it could not enforce an IRS summons issued solely to uncover criminal conduct because such a summons would not satisfy the "*Powell* standards of good faith," discussed above.  *Id.* at 314–18.  But the Court pointed out that "[f]or a fraud investigation to be solely criminal in nature would require an extraordinary departure from the normally inseparable goals of examining whether the basis exists for criminal charges and for the assessment of civil penalties."  *Id.* at 314.  Thus, the Court concluded that the burden of "disprov[ing] the actual existence of a valid *civil* tax determination or collection purpose" by the IRS is a "heavy one."  *Id.* at 316 (emphasis added).

Although the Ninth Circuit has cited this "heavy" burden in a case involving a summons issued by an agency other than the IRS, *Tan*, 16 F.4th at 1352–53, this appears at odds with the Ninth Circuit's disapproval of conflating the powers of one agency with that of another.  *See Peters*, 853 F.2d at 699.  And while *Children's Hosp.*, 719 F.2d at 1428, observes that a court can set aside a subpoena if the recipient "proves the inquiry is unreasonable because it is overbroad or unduly burdensome," it does not specify the burden.  For lack of guidance, the Court adopts the preponderance standard that other circuits appear to have recognized.  *See Gertner*, 65 F.3d at 967 (citing *United States v. Kis*, 658 F.2d 526, 540 (7th Cir. 1981), *abrogated on other grounds by Church of Scientology of California v. United States*, 506 U.S. 9, 15 n.8 (1992)).  This preponderance standard is a "heavy" burden when a taxpayer contends that "the IRS seeks the information in the summoned documents for use solely in a criminal prosecution."  *Kis*, 658 F.2d at 540–41.  It is not as heavy of a burden here, where Seattle Children's contends that the DOJ did not issue its subpoena for the purpose of investigating a federal healthcare offense.  Granted, the DOJ has broad authority to issue a subpoena relevant to the investigation of a federal healthcare offense.  *See Doe*, 253 F.3d at 265 (quoting 18 U.S.C.

JA476

§ 3486(a)(1)(A)).  But it is easier to show that the DOJ is not investigating a federal healthcare offense at all than it is to "disprove the actual existence of a valid civil tax determination or collection purpose by the [IRS]."  *See Kis*, 658 F.2d at 540–41 (discussing and quoting *LaSalle Nat. Bank*, 437 U.S. at 316).

### (2) The DOJ's improper purpose

Seattle Children's contends that because the subpoena was not prompted by any specific information or allegations of unlawful activity, Dkt. # 2 at 3, ¶ 4e, the DOJ's contention that it was issued to investigate a federal healthcare offense is likely pretextual.  And it asserts that the DOJ issued the subpoena to further its broader goal of ending "gender-affirming treatment" in Washington state.  Dkt. # 1 at 11–13 (quoting RCW § 7.115.010(3)).  The Court agrees.

Because the DOJ's prima facie case that the subpoena is issued to investigate a federal healthcare offense is threadbare, it is more likely that this justification is pretextual.  *See Gertner*, 65 F.3d at 968.  The justifications presented in the DOJ's brief, which the Court considers for purposes of this inquiry, do little to mend its threadbare case.  The DOJ says:

> The Government is conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the [FDCA]. Because public or private insurance plans were presented with claims related to off-label use of these medications, such a violation of the FDCA would constitute a "federal health care offense" as defined by 18 U.S.C. § 24.

Dkt. # 18 at 1–2.  But the DOJ does not identify what entities presented insurance plans with such claims.  It points out that Seattle Children's "provides gender-related care to minors, including the use of puberty blockers and cross-sex hormones" but does not connect this to a federal healthcare offense.  *Id.* at 2.  It cites Justice Thomas's concurrence in *United States v. Skrmetti*, 145 S. Ct. 1816, 1841 (2025) (Thomas, J., concurring), which observes that it is not unlawful for puberty blockers to be administered off-label.

To justify its investigation of Seattle Children's, the DOJ further relies on the concurrence. The DOJ explains:

> Noting "the lack of consensus over the efficacy and ethics of pediatric sex-transition treatments," Justice Thomas detailed how gender-related care for minors in the United States has been littered with potential consumer-protection violations: false statements made to induce patient and parental consent to off-label drug use and other life-altering procedures; powerful pharmaceuticals casually being given off-label to very young minors, causing lifelong side effects; purported treatment guidelines based on false or insufficient evidence; and other alarming trends that the Executive Branch could reasonably believe deserve exploration.

Dkt. # 18 at 7–8 (citing *Skrmetti*, 145 S. Ct. at 1845–49 (Thomas, J., concurring)). But Justice Thomas is not a DOJ employee. Thus, his views cannot reflect whether the DOJ is investigating a federal healthcare offense. And even if the DOJ adopts these views, they are not specifically related to conduct involving Seattle Children's.[7]

The DOJ's explanation for why Seattle Children's (abbreviated as "SCH") is the target of its subpoena is rife with speculation:

> Here, the Government has not made a decision as to whether SCH is a target—so whether SCH itself complied with all relevant laws is not relevant. SCH may be simply a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use. Or it may be a witness to whom other people or entities directed false statements on the topic of gender-related pharmaceuticals for minors. Or SCH personnel may have committed federal health care offenses without the knowledge of SCH management.

Dkt. # 18 at 9. To be sure, a subpoena can be warranted based on some speculation. But even if the representations in the DOJ's brief could establish its prima facie case, they do not go much beyond "the minimal showing of specificity required." *Goldman*, 637 F.2d at 667. They do not

---

[7] The DOJ also asserts that the *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, published by the World Professional Association for Transgender Health, is based on insufficient evidence. Dkt. # 18 at 7–8 & n.5. Even if this were true, it is unclear why it is pertinent to the DOJ's investigation of a federal healthcare offense as it relates to Seattle Children's.

show that the DOJ has much more than an "idle hope" of discovering information relevant to the investigation of a federal healthcare offense. *Id.* (citation omitted).

By contrast, Seattle Children's presents significant evidence that the DOJ issued the subpoena to pressure hospitals into ending gender-related care for minors. As discussed *supra* Section II, Shumate issued the subpoena the same day he issued a memorandum stating that the Civil Division will prioritize investigations of hospitals for possible FDCA violations "consistent with" the EO and the Bondi Memo. Dkt. # 2-1 at 51–52. Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors. The EO orders the Attorney General to prioritize investigations of FDCA violations "by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* at 31. And the Bondi Memo directs investigations of FDCA violations to "hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations." *Id.* at 46. Both the EO and the Bondi Memo state that the main goal is to end practices related to gender-related care for minors. *See id.* at 30, 48. To support this point, Seattle Children's provides a February 3, 2025, White House press release stating:

> [The EO is] already having its intended effect—preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex. Hospitals around the country are taking action to downsize or eliminate their so-called "gender-affirming care" programs.

Dkt. # 1 at 7 (citing Dkt. # 2-1 at 55). The press release identifies hospitals in New York, Colorado, Virginia, Washington, D.C., Illinois, and Pennsylvania, that have stopped, suspended, or are reviewing gender-related care for minors. Dkt. # 2-1 at 55–56.

Considering the DOJ's threadbare support for its subpoena, this evidence shows that the DOJ requested documents as part of an effort to end gender-related care for minors. Because the

JA479

DOJ does not contend that providing gender-related care for minors is a federal healthcare offense, its subpoena was not lawfully issued under 18 U.S.C. § 3486(a)(1)(A)(i)(I). *See Gertner*, 65 F.3d at 970 (affirming a district court's finding of improper purpose where the agency's case for enforcing a subpoena depended solely on a conclusory declaration).

Contrary to the DOJ's contentions, this conclusion is based on narrow and principled legal grounds. The DOJ contends that a "free-wheeling inquiry" into an agency's purpose, especially in the context of a "politically charged topic" like gender-related care for minors, amounts to merely a value judgment as to whether a purpose is "improper." Dkt. # 18 at 4, 7. But the Court's opinion on the propriety of gender-related care for minors is not at issue. The Court considers only whether the DOJ served its subpoena for a purpose within its statutorily conferred authority. Because Seattle Children's has carried its burden of showing that the DOJ did not issue its subpoena to investigate a federal healthcare offense, the subpoena must be set aside. *See In re Sealed Case (Admin. Subpoena)*, 42 F.3d at 1418 ("[I]n the absence of specific authority in its enabling statute, [an agency] cannot rely on its broad investigatory powers to pursue 'other wrongdoing, as yet unknown.'"). The Court need not delve into whether the subpoena must still be set aside even if the DOJ had issued its subpoena to investigate a federal healthcare offense.

For the avoidance of doubt, the Court distinguishes the cases that the DOJ relies on. First, the DOJ suggests that a subpoena recipient must show that the improper purpose is to violate a law other than the statute authorizing the agency to issue the subpoena. Dkt. # 18 at 5–6. It cites *United States Immigr. & Customs Enf't v. Gomez*, 445 F. Supp. 3d 1213, 1216 (D. Colo. 2020), which states that an "unstated, nefarious, legally inappropriate reason" can be an improper purpose. But the court states only that such reasons are examples of an improper purpose; the list is not exclusive. *Id.* Even if a purpose to engage in unlawful conduct is

JA480

sufficient to set aside a subpoena, it is unneeded.  The subpoena can, as here, be unlawful because it exceeds the scope of the agency's authority.

Second, the DOJ cites *Sec. & Exch. Comm'n v. McGoff*, 647 F.2d 185, 187 (D.C. Cir. 1981), in which the D.C. Circuit affirmed enforcement of a subpoena issued by the Securities and Exchange Commission (SEC) requesting documents related to a controversial newspaper publisher.  The DOJ relies on the case to suggest that courts cannot consider the purpose for which a subpoena is issued.  Dkt. # 18 at 7.  But the DOJ cites part of the opinion affirming the district court's denial of the newspaper publisher's request for discovery to determine whether the SEC was politically motivated.  *McGoff*, 647 F.2d at 193–94.  Whether a recipient of a subpoena is entitled to discovery involves an inquiry separate from whether the subpoena should be enforced.  *See id.* at 193 (affirming the district court's application of "the general rule excluding discovery in summary subpoena enforcement proceedings absent 'extraordinary circumstances'") (citation omitted).

\* \* \*

In sum, the DOJ has not established a prima facie case that its subpoena was issued with a realistic expectation that it would uncover information relevant to a federal healthcare offense. And even if the DOJ's sparse evidence establishes its prima facie case, Seattle Children's has shown that the subpoena cannot be enforced because it was not issued to investigate a federal healthcare offense.[8]  To underscore this conclusion, the Court emphasizes that although courts have grappled with the applicable standard of review, the core inquiry is one of balancing a public interest in allowing for agency investigations as authorized by Congress against private

---

[8] Because the Court concludes that the DOJ has not shown that it is investigating a federal healthcare offense, the Court cannot determine whether the information sought under the subpoena is relevant or material to the investigation.  Thus, the Court neither reaches these issues nor Seattle Children's contention that the requested documents raise privacy concerns.  Dkt. # 1 at 13–16.

JA481

interests that, although not granted full Fourth Amendment protection, are nonetheless safeguarded.  As the Supreme Court has summarized, these private interests are

> the interests of men to be free from officious intermeddling, whether because irrelevant to any lawful purpose or because unauthorized by law, concerning matters which on proper occasion and within lawfully conferred authority of broad limits are subject to public examination in the public interest. Officious examination can be expensive, so much so that it eats up men's substance. It can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason.

*Oklahoma Press Pub. Co.*, 327 U.S. at 213.  Based on the scope of the DOJ's authority under 18 U.S.C. § 3486(a)(1)(A)(i)(I), the DOJ's threadbare justification for its subpoena, and strong evidence suggesting that the subpoena was issued for an improper purpose, the Court concludes that private interests must prevail in this case.[9]

B.      Motion to Seal Docket

Seattle Children's moves to seal the docket because disclosure of the DOJ's investigation will harm its reputation and put at risk the privacy and safety of its patients and employees.  Dkt. # 4 at 4–6.  Seattle Children's asserts that there are no less restrictive alternatives to sealing the entire docket because Seattle Children's is the only children's hospital in Seattle.  Dkt. # 3 at 3, ¶ 9.  The DOJ does not respond to this assertion; it merely says that it "stands ready and willing to meet and confer with the hospital about sealing, redacting, or protecting any protected health information or other information identified in Local Civil Rule 5.2 in any future filings."[10]  Dkt. # 17 at 7.  Thus, the Court does not consider any less restrictive alternatives.

---

[9] The DOJ does not request an evidentiary hearing.  *See Gertner*, 65 F.3d at 969–70 (no abuse of discretion in quashing a subpoena without an evidentiary hearing where the agency did not request one).
[10] LCR 5.2(a) provides that parties must refrain from including or partially redact personal data identifiers such as dates of birth, names of minor children, social security numbers and taxpayer-identification numbers, financial accounting information, and passport and driver license numbers.

JA482

1.      Records traditionally kept secret

Although there is a general right to access judicial records, "[a] narrow range of documents is not subject to the right of public access at all because the records have 'traditionally been kept secret for important policy reasons.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)).  Because determining whether records fall under this category requires evaluation of the First Amendment right of access, the Ninth Circuit applies the "experience and logic" test, which asks: (1) whether the type of proceeding at issue has been traditionally conducted in secret (experience); and (2) whether public access supports the function of the particular proceeding (logic).  *Forbes Media LLC v. United States*, 61 F.4th 1072, 1077–78 (9th Cir. 2023).

Based on the limited briefing before it, the Court concludes that administrative subpoenas do not fall under this narrow category.  The statute authorizing the subpoena here provides:

> A United States district court for the district in which the summons is or will be served, upon application of the United States, may issue an ex parte order that no person or entity disclose to any other person or entity (other than to an attorney in order to obtain legal advice) the existence of such summons for a period of up to 90 days.

18 U.S.C. § 3486(a)(6)(A).  Similarly, the recipient of the subpoena may move for "a prohibition of disclosure ordered by a court under paragraph (6)." *Id.* § 3486(a)(5).  Because the parties must move to keep subpoena proceedings under seal, there appears to be a presumption that such subpoenas are publicly disclosed.  That the statute maintains nondisclosure for a period of only 90 days subject to renewal also suggests that such subpoenas are not traditionally kept secret. *Id.* § 3486(a)(6)(C).

JA483

2.       Compelling reason to seal records

But Seattle Children's has shown that there is a compelling reason to keep the docket under seal.  When documents do not fall under the category of records traditionally kept secret, the starting point is a strong presumption in favor of disclosure.  *Kamakana*, 447 F.3d at 1178.  To overcome this strong presumption, a party must present "compelling reasons supported by specific factual findings" that "outweigh the general history of access and the public policies favoring disclosure."  *Id.* at 1178–79 (citations omitted).  If a "court decides to seal certain judicial records, it must 'base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture.'"  *Id.* at 1179 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)).

It appears that in enacting 18 U.S.C. § 3486(a)(6), Congress determined that the interest in public disclosure presumptively outweighs privacy interests for subpoenas issued to investigate a federal healthcare offense.  Based on the limited briefing on this issue, it is unclear why Congress weighed the interests in this manner.  As the Ninth Circuit has observed in the context of grand jury and warrant materials, criminal investigations are generally conducted in secret because otherwise prospective witnesses might hesitate to come forward out of fear of retribution and there is a risk that "those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment."  *Times Mirror Co.*, 873 F.2d at 1215 (quoting *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979)).  Moreover, "there would be the obvious risk that the subject of the search warrant would learn of its existence and destroy evidence of criminal activity before the warrant could be executed" and those identified as being suspects in the investigation might "coordinate their stories before testifying, or even flee the jurisdiction."  *Id.*

JA484

This analysis is similarly applicable to the subpoena at issue here. Again, the DOJ says that Seattle Children's might have witnessed pharmaceutical companies promoting puberty blockers for off-label use, or that its employees might have committed federal healthcare violations without its management's knowledge. Dkt. # 18 at 9. As the statute recognizes, unsealing the docket might cause pharmaceutical companies or employees of Seattle Children's to, for example, destroy evidence. *See* 18 U.S.C. § 3486(a)(6)(B) (allowing a court to issue an order prohibiting disclosure of a subpoena where disclosure might cause, among other things, "destruction of or tampering with evidence"). But whereas the Ninth Circuit has held that the interests in preserving a criminal investigation outweigh First Amendment interests, *Times Mirror Co.*, 873 F.2d at 1215, Congress has, at least in setting the initial presumption, made a contrary determination in the context of a subpoena issued to investigate a federal healthcare offense.

Congress's balancing of the interests in favor of public disclosure, however, is only entitled to deference if the subpoena is lawfully issued under the statute. The compelling reason for sealing the docket is that the DOJ did not issue its subpoena to investigate a federal healthcare offense. As discussed *supra* Section III.A.3, the DOJ issued its subpoena solely to end gender-related care for minors. And just as a subpoena cannot be enforced if it is issued for an improper purpose, court files cannot be disclosed if they "have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179 (quotation marks and citation omitted). To reiterate, the Court takes no position on whether ending gender-related care for minors is an improper purpose in itself. But such a purpose is improper to the extent that it

JA485

involves using the public nature of the court system not to further a lawful investigation but to amplify a bare accusation of criminal conduct.[11]

In addition to the evidence discussed *supra* Section III.A.3.c.(2), Seattle Children's provides a DOJ press release issued on July 9, 2025, announcing that the DOJ has "sent more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children." Dkt. # 21-1 at 2. Although it states that the DOJ's "investigations include healthcare fraud, false statements, and more," it ends with the Attorney General's statement that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by this Department of Justice." *Id.* That the DOJ publicized its subpoenas undermines the veracity of its stated purpose of investigating federal healthcare violations and supports its other stated purpose of holding medical professionals and organizations "accountable" for providing gender-related care for minors. *Id.* As discussed above, publicizing the subpoenas frustrates the purpose of investigating a federal healthcare violation.

Issuing a press release, however, supports the purpose of ending gender-related care for minors because even if targeted individuals or entities are not engaged in unlawful activity, they might still be deterred from participating in such care. For example, Children's National Hospital has announced that it "will be discontinuing the prescription of gender-affirming medications" because "of escalating legal and regulatory risks to Children's National, our

---

[11] Although the DOJ's Civil Division issued the subpoena and the DOJ has informed counsel for Seattle Children's that it has not determined whether its investigation is civil or criminal in nature, Dkt. # 2 at 2, ¶ 4c, 18 U.S.C. § 3486(a)(1)(A)(i)(I) specifically authorizes issuance of subpoenas to investigate criminal federal healthcare offenses because it cites 18 U.S.C. § 24.

JA486

providers, and the families we serve."[12]  Dkt. # 21-4 at 2.  Dr. Jeffrey Ojemann, Chief Physician

Executive at Seattle Children's, also declares that there could be safety risks to providers of

gender-related care for minors.  He says that he is aware of "at least one medical provider who

provides gender-affirming care at Seattle Children's [who] has received a suspicious package

with concerning notes inside."  Dkt. # 3 at 9, ¶ 45.  He also says that Seattle Children's has

"hired a full-time security guard and installed panic buttons at the Gender Clinic, and has

conducted drills for bomb threats and active shooters, and developed processes for managing

phone threats related to gender-affirming care."  *Id.*

Public disclosure would also deter prospective and current minor patients from seeking

gender-related care.  Dr. Ojemann declares that public disclosure of a criminal investigation

involving patient records may lead patients and families to be "reluctant to pursue care or to fully

disclose information needed for the Hospital to provide effective care."  *Id.* at 9, ¶ 43–44.  This is

supported by the declarations of anonymous parents of transgender children, who say, for

example, that they are "fear[ful] of being identified and targeted by the Federal Government."

Dkt. # 4 at 7 (quoting Dkt. # 2-1 at 180, ¶ 2).  To be sure, that Seattle Children's provides

gender-related care for minors and the Administration's position on such care are well-known

facts.  But disclosing that Seattle Children's is being specifically targeted would exacerbate the

fears of its employees and patients.

---

[12] Seattle Children's also provides evidence of the University of Chicago Medical Center's
announcement that "it will discontinue all gender-affirming pediatric care . . . in light of emerging federal
actions which would place at risk our ability to care for all Medicare or Medicaid patients."  Dkt. # 21-3
at 2.  Because such evidence does not specifically show how a healthcare provider has changed its
behavior in response to the issuance of a subpoena, it is of limited weight.  But it nonetheless supports the
general premise that the EO is intended to end gender-related care for minors.  The EO orders the
Secretary of Health and Human Services to "take all appropriate actions to end the chemical and surgical
mutilation of children, including regulatory and sub-regulatory actions, which may involve" among other
things, "Medicare or Medicaid conditions of participation or conditions for coverage."  Dkt. # 2-1 at 31.

Thus, unsealing the docket will harm Seattle Children's reputation and its provision of gender-related care for minors. As "the Supreme Court has acknowledged[,] one of the reasons for maintaining the secrecy of grand jury proceedings is to 'assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.'" *Times Mirror Co.*, 873 F.2d at 1216 (quoting *Douglas Oil Co. of California*, 441 U.S. at 219). Such a concern is of greater weight where the accusation is based not on a good faith investigation but to chill certain conduct.[13] The DOJ counters that avoiding "embarrassment, incrimination, or exposure to further litigation," are not, "without more," compelling reasons to seal documents. *Kamakana*, 447 F.3d at 1179 (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003)). Granted, it is possible to view reputational harm as a form of embarrassment and a chilling effect as a natural byproduct of any litigation. But prohibiting an agency from using its subpoena power for an improper purpose is a compelling reason to seal documents, especially where disclosing the documents would further that improper purpose.

The DOJ suggests an alternative analysis that, while well-taken, is unpersuasive. It cites authority emphasizing that "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987). But that authority recognizes that "the public's right to inspect such records . . . can be

---

[13] The DOJ quotes *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012) for the proposition that "revealing the fact that [the subpoena recipient] is the subject of some kind of government investigation" is "unavailing" as a reason to seal the docket. Dkt. # 17 at 6. But the cited passage from that case goes on to explain, "Although the respondent repeatedly emphasizes the pending confidential investigation, that involves serious allegations of misconduct which would expose Respondent to reputational damage and harm, the Government's investigation of Inchscape has been public knowledge for some time." *ISS Marine Servs., Inc.*, 905 F. Supp. 2d at 141 (quotation marks and internal citations omitted) (emphasis added). By contrast, the present proceedings have not been public knowledge.

JA488

blunted if 'court files might . . . become a vehicle for improper purposes.'" *Id.* (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).  That the public has a right to evaluate the executive branch and the judiciary does not mean that the executive branch has unfettered authority to amplify bare accusations of criminal conduct through the public court system.  And any abuse by the judiciary is offset to some extent by the ordinary process of appellate review.

### IV
### CONCLUSION

For these reasons, the Court GRANTS Seattle Children's motion to set aside the subpoena and motion to seal the docket.  The Court ORDERS as follows:

- Subpoena Duces Tecum No. 25-1431-016 is HEREBY SET ASIDE;
- The docket in this action and all submittals filed thereon shall be maintained under seal;
- Seattle Children's may nonetheless communicate with, and provide sealed filings to, the Washington Attorney General's Office;
- The Washington Attorney General's Office may attend any sealed hearings in this proceeding; and
- The Washington Attorney General's Office shall comply with this Order.

Dated this 3rd day of September, 2025.

John H. Chun
United States District Judge

JA489

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL | Case No. 25-cv-03780-JRR |

**UNITED STATES' MEMORANDUM OF LAW
IN OPPOSITION TO MOTION TO QUASH SUBPOENA**

JA490

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ........................................................................... 2

ARGUMENT ........................................................................................................................... 5

I.    Plaintiffs lack standing under 18 U.S.C. § 3486 to challenge the subpoena. ......... 5

II.    Sovereign immunity principles independently foreclose Plaintiffs' action. ......... 10

III.    Plaintiffs' motion is also time-barred. ................................................................. 11

IV.    Congress anticipated and authorized subpoenas to obtain patient records. .......... 13

V.    The subpoena satisfies the Fourth Amendment because it properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA .. 14

A.    The subpoena properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA. .................................................... 14

VI.    Plaintiffs' Fifth Amendment privacy claim collapses under the Fourth Circuit's controlling law ...................................................................................................... 17

A.    Plaintiffs' asserted privacy expectations are contrary to modern medical practice and the explicit disclosures in CNMC's Notice of Privacy Practices. .................. 18

B.    The Fourth Circuit's decision in *In Re Subpoena Duces Tecum* dictates the result in this Circuit—not *Westinghouse*—and it confirms the subpoena's validity. ....... 21

VII.    Any relief should be confined to the named Plaintiffs here and limited to modification of the subpoena. ................................................................................. 24

CONCLUSION ..................................................................................................................... 26

**TABLE OF AUTHORITIES**

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*,
  118 F.3d 786 (D.C. Cir. 1997) ........................................................................................ 10

*Bacto-Unidisk*,
  394 U.S. 784 (1969) .................................................................................................... 2, 23

*Bryant v. City of Norfolk*,
  No. 2:20CV26, 2020 WL 14038704 (E.D. Va. Aug. 7, 2020) .................................... 21

*Bullock v. Napolitano*,
  666 F.3d 281 (4th Cir. 2012) ........................................................................................ 10

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...................................................................................................... 25

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
  888 F.3d 640 (4th Cir. 2018) ........................................................................................ 11

*Dorsey v. United States*,
  618 F. Supp. 471 (D. Md. 1985) ................................................................................... 11

*Esteras v. United States*,
  606 U.S. 185 (2025) ........................................................................................................ 7

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ...................................................................................................... 10

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................................................ 24

*Google LLC*,
  579 F. Supp. 3d 62 (D.D.C. 2021) ................................................................................ 25

*In re Subpoena Duces Tecum*,
  228 F.3d 341 (4th Cir. 2000) .................................................................................. passim

*In re Subpoenas Duces Tecum*,
  51 F. Supp. 2d 726 (W.D. Va. 1999) ........................................................................... 18

*In re: Grand Jury 2021 Subpoenas*,
  87 F.4th 229 (4th Cir. 2023) ........................................................................................... 9

*Jones v. Comm'r*, No. CIV A,
  CCB-07-2024, 2007 WL 4302593 (D. Md. Aug. 23, 2007) ....................................... 12

JA492

*Lane v. Peña*,
    518 U.S. 187 (1996) ................................................................................................ 11

*Lee v. City of Columbus*,
    636 F.3d 245 (6th Cir. 2011) ................................................................................. 10

*M.J. v. District of Columbia*,
    No. 118CV01901EGSGMH, 2020 WL 13668559 (D.D.C. July 1, 2020) .............................. 25

*Mackey v. SEC*,
    No. 3:96MC407, 1997 WL 114801 (D. Conn. Feb. 21, 1997) .................................... 6

*Maryland v. Craig*,
    497 U.S. 836 (1990) ................................................................................................ 24

*NASA v. Nelson*,
    562 U.S. 134 (2011) ................................................................................................ 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................................ 13

*New York v. Ferber*,
    458 U.S. 747 (1982) ................................................................................................ 23

*Osmon v. United States*,
    66 F.4th 144 (4th Cir. 2023) ................................................................................... 10

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) ...................................................................... 7, 10, 17

*Ponsford v. United States*,
    771 F.2d 1305 (9th Cir. 1985) ................................................................................ 11

*Ponsford*,
    771 F.2d ................................................................................................................. 11

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ................................................................................................ 23

*Smith v. United States*,
    289 F.3d 843 (6th Cir. 2001) ................................................................................. 14

*Swann v. Secretary, HUD*,
    No. 05-492, 2006 WL 148738 (D.D.C. Jan. 19, 2006) ............................................ 12

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................................................................ 24

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................................................ 15

JA493

*Turner v. United States*,
881 F. Supp. 449 (D. Haw. 1995).................................................................................... 12

*U.S. ex rel. Roberts v. QHG of Indiana, Inc.*,
No. 1:97-CV-174, 1998 WL 1756728 (N.D. Ind. Oct. 8, 1998) ............................................ 25

*United States v. Armstrong*,
517 U.S. 456 (1996)......................................................................................................... 16

*United States v. Chem. Found.*,
272 U.S. 1 (1926)................................................................................................. 16, 17, 20

*United States v. Dotterweich*,
320 U.S. 277 (1943)................................................................................................ 2, 15, 23

*United States v. Elliott*,
676 F. Supp. 2d 431 (D. Md. 2009) .................................................................................. 21

*United States v. Idema*,
118 F. App'x 740 (4th Cir. 2005)....................................................................................... 9

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978)..................................................................................................... 14, 15

*United States v. Park*,
421 U.S. 658 (1975)........................................................................................................ 23

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025).................................................................................................... 16

*United States v. Westinghouse Electric Corporation*,
638 F.2d 570 (3d Cir. 1980) ...................................................................................... 18, 21

*United States v. Whispering Oaks Residential Care Facility, LLC*,
673 F.3d 813 (8th Cir. 2012) ........................................................................................... 15

*Walls v. City of Petersburg*,
895 F.2d 188 (4th Cir. 1990)...................................................................................... 10, 17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, (2011) ...................................................................................................... 24

*Warth v. Seldin*,
422 U.S. 490 (1975)........................................................................................................ 24

*Watson v. Lowcountry Red Cross*,
974 F.2d 482 (4th Cir. 1992)........................................................................................... 21

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
412 U.S. 609 (1973)........................................................................................................ 4

*Whalen v. Roe*,
  429 U.S. 589 (1977) ................................................................................................... 9, 10, 22

**Statutes**

Health Insurance Portability and Accountablity Act, Pub. L. No. 104-191 ............................. 7, 13

5 U.S.C. § 552a ..................................................................................................................... 21

12 U.S.C. § 3410 ..................................................................................................................... 6

18 U.S.C. §

  24(a)(2) ................................................................................................................................ 5

  24(b) ..................................................................................................................................... 5

  371 ........................................................................................................................................ 4

  2704(b) ................................................................................................................................. 6

  3486.............................................................................. ……………………….. 1, 5

  3486(a)(1) ............................................................................................................................ 5

  3486(a)(5) ................................................................................................................... 6, 8, 11

  3486(e)(1) ........................................................................................................................... 13

  3486(e)(6) ............................................................................................................................ 7

21 U.S.C. §

  301 ........................................................................................................................................ 2

  331 ..................................................................................................................................... 4, 5

  333(a) .................................................................................................................................... 4

42 U.S.C. § 1320d-2 ................................................................................................................. 7

47 U.S.C. § 551(h) ................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 45(d)(3) .......................................................................................................... 25

**Regulations**

45 C.F.R. § 164.520 ........................................................................................................... 19, 20

**Other Authorities**

1996 U.S.C.C.A.N. 1990 ......................................................................................................... 13

H.R. Conf. Rep. No. 104-736 .................................................................................................. 13

**INTRODUCTION**

When it enacted the Health Insurance Portability and Accountability Act of 1996, (HIPAA), Congress gave the Attorney General a specific tool to investigate federal healthcare offenses: administrative subpoenas under 18 U.S.C. § 3486. It also expressly set the conditions for challenging such a subpoena: only the subpoenaed party may object, and any petition must be filed before the return date specified on the subpoena. Plaintiffs here ignore both statutory commands. Plaintiffs are not the subpoenaed party, and Plaintiffs in any event bring this challenge more than three months after expiration of the deadline mandated by the statute. For those two independently sufficient reasons, Plaintiffs' challenge fails at the threshold.

But even on the merits, the motion still fails. Congress created the subpoena authority here precisely to permit access to patient records in investigations of healthcare offenses, subject to the safeguards it deemed sufficient. Indeed, Plaintiffs' arguments cannot survive the controlling authority of this Circuit. In that binding precedent, the Fourth Circuit Court of Appeals upheld a Section 3486 subpoena against the very same objections raised here. That decision is directly on point and leaves no room for Plaintiff's contrary theories. The Government routinely seeks and obtains patient records in healthcare offense investigations. There is nothing extraordinary or controversial about a Governmental subpoena issued to a healthcare provider, and Plaintiffs—strangers to the subpoena—have provided no plausible basis to effectively veto the Government's ability to investigate such offenses. The motion should be denied as procedurally improper and substantively meritless.

JA496

**FACTUAL AND LEGAL BACKGROUND**

The United States is conducting a nationwide investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones[1] for use by children suffering from gender dysphoria violated federal law, including the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"). This investigation is of major public importance given its implications for the safety of minor patients. *See United States v. Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 798 (1969) (FDCA's "overriding purpose" is "to protect the public health" and "is to be given a liberal construction … to ensure that [drug] products marketed serve the public with 'efficacy' and 'safety'"); *see also United States v. Dotterweich*, 320 U.S. 277, 280 (1943) ("The purposes of [the FDCA] thus touch phases of the lives and health of people, which, in the circumstances of modern industrialism, are largely beyond self-protection.").

The United States Food and Drug Administration ("FDA") has not found that these drugs are safe and effective to treat gender dysphoria or any other mental disorder. Use of prescription drugs such as these for uses not approved as safe and effective (*i.e.,* off-label use) can expose patients to unproven and potentially dangerous treatments without adequate evidence of safety and effectiveness. The risks are particularly acute where, as here, the patients are children, which makes them especially vulnerable. Indeed, the Assistant Secretary for Health at the United States

---

[1] "Puberty blockers" are gonadotropin-releasing hormone agonists (GnRHa) that suppress the normal progression of puberty and are administered to pubertal children suffering from gender dysphoria and related disorders to prevent or arrest the development of their sex characteristics. Cross-sex hormones include estrogen or testosterone (which is also a Schedule III controlled substance under the Controlled Substances Act) that are administered to induce the development of secondary sexual characteristics incongruent with the child's biological sex to alter their physical and cosmetic appearance to be more like members of the opposite sex.

Department of Health and Human Services ("HHS") summarized the conclusions of the most

comprehensive review to date of treatments for gender dysphoria in minors:

> Findings within this 400-page peer-reviewed report are clear. Sex-rejecting procedures such as **puberty blockers, cross-sex hormones** and surgeries for children **are dangerous**. They can cause infertility, a loss of sexual function, reduced bone density, metabolic and cognitive effects, and certainly surgical complications. They can scar kids both physically and emotionally for life, and **they do irreversible harm**.

Video produced and posted by U.S. Dep't of Health & Human Servs. (@HHSGov), X,

*Protecting our children's health—and their future—is good medicine. It's also our moral*

*obligation. Welcome to the @usphscc and the HHS team, @ADM_Christine. In Officio Salutis!*

(Nov. 20, 2025, at 4:28 p.m. ET), https://x.com/HHSGov/status/1991619805598908845

(reposted from ADM Brian Christine, M.D., @ADM_Christine) (emphasis added).

    With regard to the particular drugs at issue in this investigation, the danger is especially

acute. As the comprehensive, peer-reviewed November 2025 HHS report explains:

> [I]n studies, PBs [puberty blockers] are followed by cross-sex hormones (CSH) over 90% of the time; this de facto combination therapy introduces new and potentially serious risks (e.g., concerning fertility) and has never been subjected to any FDA-regulated clinical trial for any population. Further, research shows that when the evidence supporting a particular off-label use is of very low certainty—as is the case for PMT [pediatric medical transition]—the already elevated risk of adverse effects associated with off-label use is increased even further.

U.S. DEP'T OF HEALTH & HUMAN SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA:

REVIEW OF EVIDENCE AND BEST PRACTICES 102 (Nov. 19, 2025) ("HHS REVIEW"). Although off-

label prescribing itself is a generally permitted practice under federal law, "[t]he unfavorable

risk/benefit profile distinguishes PMT from many other off-label uses of drugs and medical

devices." *Id.* at 231.

JA498

Moreover, the widespread off-label use of these powerful drugs also undermines the regulatory system that Congress established to ensure that drugs are used consistent with sound scientific data. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619 (1973) (noting that legislative history for portions of FDCA "show a marked concern that impressions or beliefs of physicians [regarding a drug's efficacy], no matter how fervently held, are treacherous"). The FDCA rests on the premise that safety and efficacy must be demonstrated through rigorous, publicly accountable testing, rather than assumed based on clinical theory or intuition, or shaped by advocacy-driven ideology unrelated to scientific rigor. *Cf.* HHS REVIEW, at 210–217 (finding that appearance of broad medical consensus was largely manufactured through reliance on small committees aligned with advocacy-based organizations such as World Professional Association for Transgender Health (WPATH) and marked by suppression of dissenting views and discouragement of scientific debate).

The FDCA enumerates many different prohibited acts relating to drugs. Importantly, the statute prohibits not only engaging in certain prohibited acts but also the "causing thereof." 21 U.S.C. § 331. Similarly, an agreement amongst more than one person to do an act that violates the FDCA is also punishable as a conspiracy. 18 U.S.C. § 371. Violations of the FDCA are punishable as strict liability misdemeanors and are felonies if done with the intent to defraud or mislead. 21 U.S.C. § 333(a). The Declaration of Lisa K. Hsiao, the Director of the Department of Justice's ("DOJ") Enforcement & Affirmative Litigation Branch (attached hereto, "Hsiao Declaration") further explains the relevant FDCA violations implicated by the Government's investigation. *See* Hsiao Decl., Ex. A.

On July 3, 2025, under a delegation of authority from the Attorney General of the United States, Assistant Attorney General Brett A. Shumate caused the DOJ to issue a subpoena upon

JA499

Children's National Medical Center ("CNMC") in Washington, D.C. The subpoena—a product of the Attorney General's statutory authority to issue subpoenas requiring "the production of any records or other things relevant to [any] investigation" of a "Federal health care offense" 18 U.S.C. § 3486(a)(1)[2]—is part of an investigation (described in the Hsiao Declaration) of potential violations of the FDCA associated with puberty blockers and cross-sex hormones. The authorizing statute was enacted as part of HIPAA, and as a result, subpoenas issued under that authority are colloquially known as "HIPAA subpoenas." The Hsiao Declaration further explains how the documents demanded by the subpoena are relevant to the Government's investigation of potential FDCA violations, which are Federal health care offenses. *See* Ex. A. at ¶¶ 36–40. The subpoena was served upon CNMC on or about July 14, 2025, and specified a reasonable return date of August 7, 2025. Aside from the instant action, there has been no legal challenge to the subpoena.

## ARGUMENT

### I.      Plaintiffs lack standing under 18 U.S.C. § 3486 to challenge the subpoena.

Plaintiffs have a threshold problem that—on its own—requires the denial of their motion and dismissal of the action. Congress specifically limited who may challenge a HIPAA subpoena issued under Section 3486. The statute provides precise direction: "At any time *before the return*

---

[2] A "Federal health care offense" is defined by Section 24(a) of Title 18 as, *inter alia*, "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or conspiracy relates to a health care benefit program." 18 U.S.C. § 24(a)(2). The statute further defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). Thus, Congress authorized DOJ to issue Section 3486 subpoenas like the one here to investigate violations of the FDCA, as well as conspiracies to violate the FDCA, if the violation or conspiracy relates to products or services that might ultimately be paid for by any type of health insurance plan—whether public or private.

JA500

*date* specified in the summons, ***the person or entity summoned*** may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons[.]" 18 U.S.C. § 3486(a)(5) (emphasis added). By the statute's plain terms, **only** "the person or entity summoned" may move to quash or modify the subpoena. Here, the "entity summoned" is CNMC. Plaintiffs—CNMC patients and their parents—are not the subpoenaed entity. They therefore fall outside the statute's express grant of authority to sue, and their motion should therefore be denied out of hand.

If Congress intended to grant standing to patients to challenge a HIPAA subpoena for their records, it would have done so. In other statutes authorizing investigative demands, Congress has expressly granted notice and standing to third parties whose records are sought. For example, the Right to Financial Privacy Act ("RFPA") requires notice to a customer whose financial records are sought and expressly provides that such customers may challenge a subpoena calling for disclosure of their records. *See* 12 U.S.C. § 3410; *see also* 18 U.S.C. § 2704(b) (expressly authorizing customer/subscriber challenges as part of Stored Communications Act); *cf.* 47 U.S.C. § 551(h) (providing that governmental entity can obtain personally identifiable information from cable television service providers through court order only after cable subscriber has opportunity to appear and contest claim). And notably, courts have properly held under RFPA that *only* "customers" have standing to challenge a subpoena—corporations and other third-parties falling outside the statute's definition of "customer" do not. *See Mackey v. SEC*, No. 3:96MC407, 1997 WL 114801, at *1–2 (D. Conn. Feb. 21, 1997).

That logic straightforwardly applies here. Section 3486 allows only "the person or entity summoned" to challenge a subpoena. This construction is confirmed by other aspects of the statute, including that § 3486 imposes no notice requirement on the Government or the entity

summoned to inform patients or other individuals whose records might be implicated. Congress's choice to expressly and exclusively permit HIPAA subpoena recipients to bring challenges must therefore be read to exclude others from doing so. *See Esteras v. United States*, 606 U.S. 185, 195 (2025) (applying *expressio unius est exclusio alterius*, the "well-established canon of statutory interpretation" that provides "expressing one item of [an] associated group or series excludes another left unmentioned" (alteration in the original) (quotation omitted)).

This point is underscored by other provisions of HIPAA that demonstrate Congress recognized potential impact on patients. Indeed, Congress spoke directly to patient privacy interests and expressly required the Government to adopt rules and regulations to protect those interests. For instance, in Section 264 of HIPAA (codified as a note to 42 U.S.C. § 1320d-2), Congress directed the Secretary of HHS to develop recommendations for protecting the privacy of "individually identifiable health information," and if Congress failed to act, to promulgate regulations on its own. Pub. L. No. 104-191, § 264 (1996). Congress also deliberately chose to channel enforcement of those patient privacy protections through regulations and administrative oversight, not private suits by patients.[3] Congress passed Section 264 at the same time as the subpoena provision, which itself expressly authorized nondisclosure orders that could prevent patients from even learning of the subpoena. *See* 18 U.S.C. § 3486(e)(6).[4] The legislative

---

[3]  *See, e.g., Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) ("HIPAA does not expressly allow for a private cause of action but delegates enforcement authority to the Secretary of the Department of Health and Human Services, reflecting Congress's intent to forgo creating a private remedy.").

[4]  The fact that Section 3486(e)(6) authorizes the Government to obtain a nondisclosure order barring the recipient from disclosing the subpoena's existence further demonstrates that Congress did not intend to grant third parties standing to challenge a HIPAA subpoena. A party obviously cannot challenge a subpoena of which it is wholly unaware. Instead, as Congress has done in the other statutes discussed above, it would have at least required notice to patients. Congress's opposite choice here confirms that strangers to the subpoena are not intended to be able to challenge the subpoena. As discussed, *infra*, Section 3486's limitations on the use of patient data also demonstrate that any protections Congress intended to provide are already included in the statute.

branch's choice to address patient privacy in one HIPAA provision while simultaneously excluding patients from any role in challenging Section 3486 subpoenas confirms that Congress deliberately deprived them of standing to challenge a HIPAA subpoena unless they themselves are the "person or entity summoned."

That choice makes sense. HIPAA subpoenas are investigative tools that are specifically designed to obtain patient and billing records so that the Government can gather evidence to determine whether (or not) a federal offense relating to the healthcare products or services a patient received has been committed. It is not uncommon for a federal healthcare offense investigation to require the collection of tens of thousands of patient records for review and analysis. *See, e.g., In re Subpoena Duces Tecum*, 228 F.3d 341, 350–51 (4th Cir. 2000) (upholding HIPAA subpoena to physician for patient records and noting that if physician treated 15,000 patients, suspicion of fraud would justify reviewing all 15,000 patient records). If every patient mentioned in responsive records could move to quash a HIPAA subpoena, the statute's enforcement scheme would collapse under the weight of collateral third-party litigation. That is not the careful scheme that Congress designed, which expressly and exclusively requires HIPAA subpoena challenges to be brought by "the person or entity summoned." 18 U.S.C. § 3486(a)(5).

Ignoring the statute's clear mandate, Plaintiffs claim that disclosure of their identities and medical records to law enforcement "constitutes a concrete and imminent injury traceable to the subpoena" thereby conferring standing upon them. ECF 1-1 at 15–16 n.59. None of the cases Plaintiffs cite for their argument (which they reduce to a footnote) arose within the controlling framework of Section 3486, and none stand for the proposition that they have a constitutional right to prevent disclosure of medical records to the Government during a criminal investigation. Indeed, the controlling precedent of this Circuit enforced a HIPAA subpoena for medical records,

holding that such disclosure "is not 'meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care.'" *In Re Subpoena Duces Tecum*, 228 F.3d at 351 (quoting *Whalen v. Roe*, 429 U.S. 589, 602 (1977)).

Plaintiffs' reliance on *In re: Grand Jury 2021 Subpoenas*, 87 F.4th 229 (4th Cir. 2023) and *United States v. Idema*, 118 F. App'x 740 (4th Cir. 2005) to support their claim of standing is misplaced—and not merely because neither case involved a HIPAA subpoena with an express, statute-specific standing limitation. The standing found in *Grand Jury 2021 Subpoenas* turned on a narrow and exceptional circumstance: the subpoena directed to an attorney arguably "almost assuredly implicate[d] at least some [attorney-client] privileged materials [and] privilege interests." 87 F.4th at 249. There are no such federal privilege issues at play here. *See Whalen*, 429 U.S. at 602 n.28 ("The physician-patient evidentiary privilege is unknown to the common law."). And the Court of Appeals held in *Idema* that the third party lacked standing to challenge the government's subpoenas because he failed to demonstrate a "personal right or privilege in the information sought by the subpoena." 118 F. App'x at 744. Like *Idema*, here the Plaintiffs have no privilege or ownership interest in the subpoenaed records. The medical records question are the property of CNMC, and Plaintiffs do not contend otherwise. Because Plaintiffs have neither a property interest nor a recognized privilege in the documents, they cannot transform their privacy interests into third-party standing.

Lacking any cognizable basis for standing, Plaintiffs elevate their claim to one of constitutional significance—asserting that the subpoena unconstitutionally intrudes on their right to "informational privacy," and therefore that automatically entitles them to judicial review notwithstanding HIPAA's limitations on who may sue. ECF 1-1 at 15–16 n.59. If Plaintiffs' theory of standing were correct, anyone whose name appeared in a record could halt a federal

investigation simply by invoking an amorphous privacy interest.[5] Such a rule would also effectively nullify Congress's explicit limitation on standing in Section 3486(a)(5).

## II.    Sovereign immunity principles independently foreclose Plaintiffs' action.

Because Plaintiffs—strangers to the subpoena—have brought an independent action to quash that subpoena, this action is in substance a suit against the United States that seeks to restrain the Government's investigatory powers. Under settled law, however, such suits are barred absent an express waiver of sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). "[A]ny waiver must be unequivocally expressed in a statutory provision and strictly construed in favor of the United States." *Bullock v. Napolitano*, 666 F.3d 281, 283 (4th Cir. 2012). "[T]he terms of the United States' consent to be sued … define [a] court's jurisdiction to entertain the suit." *Osmon v. United States*, 66 F.4th 144, 147 (4th Cir. 2023) (quoting *Meyer*, 510 U.S. at 475). "[S]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack

---

[5] The Supreme Court has repeatedly refused to unequivocally endorse a constitutional right to "informational privacy" and has instead only assumed its existence arguendo while *upholding* the government's access to personal information. *See NASA v. Nelson*, 562 U.S. 134, 138, 147 (2011) (citing *Whalen*, 429 U.S. at 599); *see also id.* at 160 (Scalia, J., concurring) ("A federal constitutional right to 'informational privacy' does not exist."). The circuits appear split on the question. *See Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786, 791 (D.C. Cir. 1997) (expressing "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information"); *Lee v. City of Columbus*, 636 F.3d 245, 260–61 (6th Cir. 2011) (stating that individuals have only a limited privacy interest in medical records and disclosure of such information does not rise to level of constitutional violation). *But see Payne*, 998 F.3d at 655–56 (citing *Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990) and finding constitutional privacy right exists but that prisoner did not have expectation of privacy in his HIV status). That the D.C. Circuit Court of Appeals has expressed "grave doubts" as to the constitutional theory Plaintiffs invoke may help explain why they filed in this Court rather in the District of Columbia—where the subpoena was both issued and served. Plaintiff's choice of forum appears shaped by the absence of supportive precedent in the jurisdiction where the subpoena originated and operates.

of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018).

Absent waiver, sovereign immunity bars an action against the Government to quash a subpoena. *See Ponsford v. United States*, 771 F.2d 1305, 1309 (9th Cir. 1985); *Dorsey v. United States*, 618 F. Supp. 471, 473–74 (D. Md. 1985) (holding failure to strictly comply with statutory procedures to quash summons deprived court of jurisdiction because "any waiver of sovereign immunity requires strict compliance with statutory procedure."). Section 3486(a)(5) supplies such a waiver and procedure, but it is expressly limited to "the person or entity summoned." By authorizing *only* the recipient of the subpoena to bring a lawsuit against the United States to challenge it, Congress both defined who has standing (*see supra*) and also specified the sole context in which sovereign immunity is waived. Plaintiffs here are thus doubly barred. Permitting them to bring this challenge would require the Court to both enlarge standing and expand the Government's limited waiver of sovereign immunity beyond that which Congress authorized. To do so would also contravene the Supreme Court's command that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996).

### III.   Plaintiffs' motion is also time-barred.

Even if Plaintiffs had standing and even if the Government were not immune, their petition would still be independently barred as untimely. Section 3486 requires any petition to quash or modify a HIPAA subpoena to be filed "before the return date specified in the summons." 18 U.S.C. § 3486(a)(5). Courts strictly enforce statutory deadlines to move to quash a subpoena. *See Ponsford*, 771 F.2d at 1309 (strictly construing statute's 20-day limit to bring proceeding to quash IRS summons; holding statutory deadline is jurisdictional and "is a condition precedent to

the waiver of sovereign immunity"); *accord Jones v. Comm'r*, No. CIV A CCB-07-2024, 2007 WL 4302593, at *1 (D. Md. Aug. 23, 2007) ("failure to strictly comply with the procedures set forth for filing a petition to quash precludes this court from exercising its jurisdiction over the petition."); *see also Swann v. Secretary, HUD*, No. 05-492, 2006 WL 148738, at *1 (D.D.C. Jan. 19, 2006) (court lacks subject matter jurisdiction where motion challenging administrative subpoena is untimely under statute authorizing challenge); *Turner v. United States*, 881 F. Supp. 449, 451 (D. Haw. 1995) ("the government's waiver of its sovereign immunity is conditioned on the timely filing of the motion to quash.").

Here, Plaintiffs filed this action on November 17, 2025, more than three months after the return date specified on the subpoena: August 7, 2025.[6] As a result, they cannot invoke the statute's limited mechanism to challenge the subpoena—and this Court lacks jurisdiction to even hear such a challenge—assuming the Plaintiffs could otherwise satisfy the statute's standing requirement. Again, this scheme makes sense. Congress coupled the subpoena authority in Section 3486 with a firm deadline: any motion to quash must be filed before the return date. That bright line was no accident. To excuse the motion's tardiness would convert a clear statutory command into an open invitation for endless obstruction—paralyzing large-scale healthcare offense investigations by patient challenges brought at will. That is not the law.

---

[6]  Plaintiffs cannot contend that they should be excused from complying with Section 3486(a)(5)'s clear requirement that any petition to quash be filed "before the return date specified in the summons" on the theory that, as non-summoned parties, they were unaware of the subpoena. Plaintiffs' own memorandum acknowledges that the Attorney General announced the existence of subpoenas in this investigation on July 9, 2025, two days after the Assistant Attorney General issued the subpoena to CNMC. *See* ECF 1-1 at 5 & n.15. Counsel for Plaintiffs did not seek confirmation from the Government that CNMC received such a subpoena until November 14—three days before filing this action. *See* Aff. of Eve L. Hill, ECF 1-15 at ¶ 20. Plaintiffs certainly had notice of the possibility that CNMC received such a subpoena and could have attempted to contact the Government long before they did, had they wished to do so. Section 3486 contains no tolling provision for untimely challenges by third-parties who were aware that subpoenas existed yet declined to act before the statutory deadline.

**IV.    Congress anticipated and authorized subpoenas to obtain patient records.**

One of the key purposes of HIPAA is to "combat waste, fraud, and abuse in health insurance and health care delivery." HIPAA, Pub. L. 104-191, 110 Stat 1936 (1996). The legislative history of the statute confirms that Section 3486 was enacted to "establish procedures for the Attorney General to make investigative demands" for "**health information about an individual**" in health care offense investigations. H.R. CONF. REP. NO. 104-736, at 261 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2074 (emphasis added). Congress thus anticipated and authorized the Government's access to the very sorts of patient and billing records that Plaintiffs seek to shield.

That is why, in the same statutory section, Congress added specific protections governing the use of that information once produced. Section 3486(e) provides that generally, "[h]ealth information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information." 18 U.S.C. § 3486(e)(1). By enacting these safeguards, Congress made clear that HIPAA subpoenas would inevitably reach patient-identifying records—yet it chose not to carve out an exception simply because the records might be highly personal. If subpoenas under Section 3486 could not reach records about mental health, sexual health, or other sensitive topics, then fraud and abuse schemes exploiting those very areas would be insulated from investigation—exactly the opposite of what Congress set out to prevent in enacting the statute. Congress did not overlook the sensitivity of these records. To quash the subpoena here on that basis would be to impermissibly override a legislative judgment, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (explaining that courts are "vested with the authority to interpret the law" and possess "neither

the expertise nor the prerogative to make policy judgments"), and effectively immunize certain corners of the health care system.

V.    **The subpoena satisfies the Fourth Amendment because it properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA.**

Even if (1) the Plaintiffs had standing and (2) this Court had jurisdiction to hear this untimely challenge, the subpoena meets the applicable reasonableness standards under binding Fourth Circuit law:

> In short, an investigative subpoena, to be reasonable under the Fourth Amendment, must be (1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive, a requirement that may support a motion to quash a subpoena only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth.

*In re Subpoena Duces Tecum*, 228 F.3d at 349. Plaintiffs challenge only the first two elements, claiming that the subpoena lacks a legitimate purpose and that it is not sufficiently limited in scope for its purpose. *See* ECF 1-1 at 16–21. Neither contention has merit.

A.    *The subpoena properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA.*

Plaintiffs are both wrong and lack any basis to assert that the subpoena was issued for an improper purpose or in "bad faith." ECF 1-1 at 17–20. Director Hsiao's Declaration sets out facts that squarely refute their allegations and confirm the subpoena's legitimate purpose. *See generally* Hsiao Decl. Courts have placed a heavy burden on challengers alleging that a subpoena was issued in bad faith. *See, e.g., United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978); *Smith v. United States*, 289 F.3d 843, 846–47 (6th Cir. 2001) (rejecting physician's attempt to quash HIPAA subpoena for "complete patient files" against claim of improper purpose

because physician failed to "bear[] 'heavy' burden of proving bad faith" in issuing subpoena (quoting *LaSalle*, 437 U.S. at 316)); *see also United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012) (HIPAA subpoena "respondent bears a heavy burden to disprove the existence of a valid purpose for an administrative subpoena.").

Plaintiffs cannot carry their burden. To the contrary, the subpoena here was issued squarely within the bounds of Section 3486, which expressly authorizes the Attorney General to issue subpoenas in investigations of "Federal health care offense[s]," including violations of the FDCA that involve a health care benefit program. As Director Hsiao's declaration makes clear, that is precisely the purpose the subpoena serves here.

Director Hsiao's declaration further sets forth in detail how the subpoenaed records are directly relevant to the Government's ongoing nationwide investigation into possible violations of the FDCA. The investigation concerns the distribution, promotion, and sale of puberty blockers and cross-sex hormones in minors for the treatment of gender dysphoria—uses that the FDA has never approved and that raise grave safety concerns as explained in the HHS REVIEW. Such inquiries fall squarely within the Government's statutory mandate to protect the public from misbranded, adulterated, and unapproved drugs. *See Dotterweich*, 320 U.S. at 285 (FDCA protects the "innocent public who are wholly helpless" to protect themselves from such products).

Plaintiffs claim that "animus toward transgender individuals" is the "explicit and official policy" of the United States, thereby tainting the investigation into violations of federal law associated with commercial pharmaceutical products introduced into commerce with the unapproved intended use of treating children diagnosed with gender dysphoria. ECF 1-1 at 17–18. But that confuses political rhetoric with legal authority. *Cf. Trump v. Hawaii*, 585 U.S. 667,

JA510

701–02 (2018). What matters is whether the subpoena is tethered to a proper statutory inquiry. Here, it plainly is, as the Hsiao Declaration makes clear. The subpoena was issued to CNMC to aid in a determination as to whether the hospital, its staff, and affiliates are violating the FDCA—either directly or through a conspiracy with others (*e.g.,* with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead. It also seeks information to assist in whether other third parties might be doing so (independent of the hospital). Whether the President has a policy goal of ending gender-related pharmaceutical and surgical treatment of minors—a goal that the Supreme Court has recognized is rational, *see United States v. Skrmetti*, 145 S. Ct. 1816, 1835–36 (2025)—is not relevant to determining whether the investigation itself is lawful.

This is especially true against the backdrop of the presumption of regularity that attaches to the actions of federal prosecutors "as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. CONST. art. II, § 3); *see, e.g.*, *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). The fact that the President (or other executive branch leaders) have expressed opposition to gender-related sex trait modification treatments in minors does not convert a facially valid investigation into bad faith. If it did, nearly every enforcement effort in controversial areas would collapse under accusations of "animus" and would provide nearly anyone with a veto of HIPAA subpoenas by invoking political controversy.

Moreover, Plaintiffs conflate criticism of medical practices for modification of sex traits with hostility toward the people who receive them. There is a distinction between animus toward a group of people—a desire to harm a class of persons—and regulatory scrutiny of the interstate distribution of drugs to treat disorders for which they have not been found safe or effective. The Government is entitled to hold, articulate, and act upon policy judgments and viewpoints about a treatment modality or medical ideology involving federally-regulated drugs—including their distribution, labeling, marketing, sale, and insurance reimbursement—without it equating to animus toward a group of patients or encroaching on state regulation of medical practice. Plaintiffs' attempt to attribute political rhetoric to the specific intent of the issuing officials is not the "clear evidence" necessary to overcome the presumption of regularity owed to the federal investigative process. *Chem. Found.*, 272 U.S. 1 at 14.

In short, Plaintiffs cannot meet their "heavy burden" of proving improper purpose. The record demonstrates that this subpoena was issued pursuant to clear statutory authority, in furtherance of an ongoing nationwide investigation into possible violations of the FDCA, and supported by a declaration from a senior DOJ official. This Court has before it direct evidence of proper purpose. That evidence compels denial of Plaintiffs' motion.

**VI.    Plaintiffs' Fifth Amendment privacy claim collapses under the Fourth Circuit's controlling law.**

Plaintiffs correctly identify the two-part test used in this Circuit to determine the scope of constitutional privacy rights. That test asks first whether there is a reasonable expectation of privacy in the information sought, and second whether "a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Payne*, 998 F.3d at 656 (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 193 (4th Cir. 1990)) (internal quotation marks omitted). On the second factor, Plaintiffs' argument rests almost entirely on a seven-factor balancing test from the

Third Circuit, *United States v. Westinghouse Electric Corporation*, 638 F.2d 570 (3d Cir. 1980)—decided more than fifteen years *before* Congress enacted HIPAA. But the Fourth Circuit Court of Appeals did **not** apply that multi-factor test (even though the district court did) when confronted with an almost identical Section 3486 subpoena challenge (decided a decade after *Walls*). *Compare In re Subpoenas Duces Tecum*, 51 F. Supp. 2d 726, 738–39 (W.D. Va. 1999) *with In re Subpoena Duces Tecum*, 228 F.3d at 351.

Under the controlling standard the Fourth Circuit established in *In re Subpoena Duces Tecum*—not *Westinghouse*—Plaintiffs' privacy claim fails for two reasons. First, their expectations of privacy are greatly diminished both by the realities of modern medical practice and by CNMC's own explicit admonition to its patients of the very disclosures at issue here. Second, even assuming some privacy interest remains, the Fourth Circuit has already held—in the context of a HIPAA subpoena seeking medical records for the purpose of investigating health care offenses—that the Government's "compelling interest in identifying illegal activity and deterring future misconduct … outweighs the privacy rights of those whose records were turned over to the government, particularly in light of the limitation placed on uses of the subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

### A. Plaintiffs' asserted privacy expectations are contrary to modern medical practice and the explicit disclosures in CNMC's Notice of Privacy Practices.

While the United States acknowledges that the information contained in patient records are sensitive, Plaintiffs' claimed expectation of privacy is incompatible with both the functional realities of modern medical practice and the disclosures that CNMC provides to patients and their families. *See* CHILDREN'S NAT'L HOSP., NOTICE OF PRIVACY PRACTICES (Jan. 31, 2020), https://perma.cc/URE5-D4AZ (last visited Dec. 8, 2025) ("CNMC NPP") (Attached hereto as an Exhibit). Indeed, in the controlling case in this Circuit, the Court of Appeals explicitly

recognized that "patients have a reduced expectation of privacy in patient records because nearly every patient has agreed pursuant to their insurance policies and releases to allow their medical records to be reviewed." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

To put a finer point on it, patient medical records are not maintained in isolation. The delivery of health care today requires the routine disclosure of personal health information through a network of clinicians, laboratories, pharmacies, quality assurance and utilization reviewers, insurers, billing intermediaries, third-party administrators, accreditation bodies, and regulators. That is just the reality of modern health care—patient medical information is routinely shared across multiple third parties. Each of these entities access parts (or all) of a patient's record as a routine feature of delivering and financing medical care. For example, insurers often require detailed clinical documentation before paying claims; administrative staff and billing personnel routinely handle and access patient charts; and third-party laboratories and pharmacies likewise often receive detailed information contained in patient charts. But information is also routinely shared, as is requested here, for regulatory compliance and public health monitoring. Patients understand this reality not only because it is reflected in ordinary interactions with their physicians, office staff, and insurers, but also because that understanding is formalized through a federally-required Notice of Privacy Practices given to each patient by the health care provider. *See* 45 C.F.R. § 164.520 (generally requiring that insurance companies and health care providers provide notice to individuals about how entity may use and disclose protected health information about individual).

CNMC explicitly informs patients and their families that their personal health information will be disclosed for all sorts of reasons not directly associated with their individual medical care. Among other things, personal health information will be used for "quality assessment and

JA514

improvement," "training and evaluation," and "licensing and accreditation activities." CNMC NPP at 4. In addition, "business associates" will use this information in performing administrative functions for CNMC. *Id.* The hospital informs patients that their information will be transmitted through "Health Information Exchanges," making it accessible to a broad range of outside providers and entities, and that "certain information may remain accessible" to outsiders even if a patient opts out of the exchange. *Id* at 4–5.

And, critically, CNMC explicitly informs each and every patient and their family that the hospital may disclose their personal health information to **health oversight agencies, public health authorities, law enforcement officials, and in response to subpoenas or to "prevent criminal activity including fraud."** *Id.* at 4–6 (emphasis added). CNMC specifically notifies every patient that these disclosures may occur in the context of "audits, **investigations**, inspections, and licensure. **These activities are necessary for the government to monitor Children's National activities**, government programs and compliance with civil rights and other laws." *Id*. at 6 (emphasis added).

These disclosures, which CNMC patients receive as part of their care, foreclose any reasonable belief that their medical information would remain inaccessible to government authorities acting through lawful investigative mechanisms. They knew, and were expressly told, that their medical information would be used and disclosed precisely in the manner they now assert infringes their privacy interests. In this context, the notion that their medical information would remain shielded from a lawful federal subpoena is unsustainable.

JA515

**B.  The Fourth Circuit's decision in In Re Subpoena Duces Tecum *dictates the result in this Circuit—not* Westinghouse*—and it confirms the subpoena's validity.***

Even if Plaintiffs had a reasonable expectation of privacy that would protect them from disclosure to the government as part of an investigation into health care offenses (as opposed to the public at large)[7] in their medical records under these circumstances, the subpoena remains valid and enforceable. Plaintiffs rely on the Third Circuit's 1980 *Westinghouse* decision, which created a seven-factor balancing test for evaluating privacy considerations when the government seeks disclosure of sensitive information. *See* 638 F.2d at 578. Even if that test were the rule in the Fourth Circuit—which it is not—Plaintiffs' reliance on it would still be misplaced. *Westinghouse* involved a different statute, and it predated HIPAA by more than fifteen years. When Congress enacted HIPAA in 1996, it directly confronted the privacy concerns that animated *Westinghouse*, addressing concerns about unauthorized disclosures of health information while simultaneously creating a specific subpoena authority for the Attorney General to investigate federal health care offenses. *See United States v. Elliott*, 676 F. Supp. 2d 431, 436 (D. Md. 2009) (HIPAA "is the primary federal law which was passed to ensure an individual's right to privacy over medical records."). In doing so, Congress itself performed the balancing that *Westinghouse* envisioned and provided a constitutionally-compliant subpoena power to

---

[7]  The Fourth Circuit has "held that to the extent such a [privacy] right might exist, it is not implicated when 'the possibility of public disclosure is … remote' … And 'to the extent that avoidance of embarrassment has a constitutional dimension in [the medical records] context, it only involves the embarrassment and humiliation that might follow public disclosure' of the individual's health information." *Bryant v. City of Norfolk*, No. 2:20CV26, 2020 WL 14038704, at \*7 (E.D. Va. Aug. 7, 2020) (quoting *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487–88 (4th Cir. 1992) (citation modified)). The United States is prepared to collaborate with Plaintiffs in crafting a reasonable protective order to further safeguard against the risk of public disclosure of the records sought here, notwithstanding Departmental and statutory safeguards already in place. *See generally* Federal Privacy Act of 1974, 5 U.S.C. § 552a (preventing federal agencies from disclosing such records absent specific, enumerated circumstances).

obtain the same medical records that the statute protects, thus abrogating the need for a court-fashioned, multi-factor balancing test.

Precedent confirms as much. Like this case, the controlling Fourth Circuit precedent, *In re Subpoena Duces Tecum*, involved a set of HIPAA subpoenas issued under Section 3486 to a health care provider during an investigation into federal health care offenses. 228 F.3d at 344. The subpoenas there—similar to the one at issue here—required production of "all patient records and documentation concerning patients whose services were billed to [certain government health care benefit plans] including complete medical files, patient billing records, [etc.]." *Id.* The physician challenged the subpoenas on Fourth Amendment and privacy grounds, arguing that the subpoenas "violated [the] privacy rights" of his patients. *Id.* at 345. The Fourth Circuit first held that the subpoenas were reasonable under the Fourth Amendment, and then squarely rejected the privacy challenge, concluding that the "government has a compelling interest in identifying illegal activity and in deterring future misconduct. And this interest outweighs the privacy rights of those whose records were turned over to the government, particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *Id.* at 351. Notably, the Court of Appeals underscored that patients retain only a "reduced expectation of privacy in patient records" arising from patients' insurance-related disclosures: "We agree with the government that any disclosure of information in the files of [the medical provider's] patients is not 'meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care.'" *Id.* (quoting *Whalen*, 429 U.S. at 602).

Under that controlling precedent, the outcome here is straightforward: the subpoena should be enforced because the Government's compelling interest outweighs any limited privacy interests of the Plaintiffs. This investigation into federal health care offenses involves carrying

out the FDCA's "overriding purpose to protect the public health," *Bacto-Unidisk*, 394 U.S. at 798, and safeguarding "the innocent public who are wholly helpless," *Dotterweich*, 320 U.S. at 285, to protect themselves from dangerous or fraudulent "products which may affect the health of consumers." *United States v. Park*, 421 U.S. 658, 673 (1975).

As detailed in the Hsiao Declaration, the United States is conducting a significant, nation-wide investigation involving potential violations of the FDCA as they relate to puberty blockers and cross-sex hormones when used in the treatment of gender dysphoria and related disorders in minors. Director Hsiao explains in her declaration precisely how and why each category of information the subpoena seeks is relevant and necessary to further the Government's investigation, including how physician prescribing practices are relevant. The requested records bear directly on whether the practices surrounding distribution, promotion, and sale of these drugs—unproven as safe or effective for treating gender dysphoria or any other mental disorder—may be violating federal law and endangering children. *See generally* Hsiao Decl. This off-label use of these powerful drugs may be putting children at significant risk, leaving lifelong mental and physical side effects and consequences—the full extent of which may yet be unknown. *See id.* at ¶¶ 21–29.

The public—through its government—has an overwhelming interest in ensuring that the drugs they take into their bodies are both safe and effective for their intended uses. And of course, this interest is only heightened with minor children, who are uniquely vulnerable to long-term, potentially irreversible physical and mental harm from unproven treatments. *See New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."); *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944) (noting society's interest in protecting welfare

JA518

of youth); *see also Maryland v. Craig*, 497 U.S. 836, 852–53 (1990) (concluding that Government's interest in physical and psychological well-being of child-abuse victims can outweigh Sixth Amendment constitutional right to confront accuser).

The Government's interest in investigating health care offenses directly affecting the health and safety of children and adolescents, and the public's interest in protection against unproven and risky treatments outweighs, as a matter of law, any individual's privacy interest in medical records. To rule otherwise would be to hold that the Constitution strips the Government of its power to protect children from victimization—an absurd result that cannot be permitted.

The Fourth Circuit Court of Appeals has already told district courts exactly how to resolve the issue that Plaintiffs present: in *In re Subpoena Duces Tecum*, it upheld Section 3486 investigative subpoenas for patient medical records over the same sort of privacy objections, concluding that the Government's interest "outweighs the privacy rights" of the patients. 228 F.3d at 351. The same holding necessarily applies here, foreclosing Plaintiff's privacy challenge.

**VII.   Any relief should be confined to the named Plaintiffs here and limited to modification of the subpoena.**

Should the Court grant any part of Plaintiffs' motion, any order should be limited to the records of these specific individuals. Absent a class action, relief in federal court is confined to the parties actually before it. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, (2011). It follows that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (quotation omitted). To conclude otherwise would be to flout bedrock limitations on third-party standing and, more fundamentally, the power of the courts. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). The Supreme Court's cases on injunctive relief prove the point. *See, e.g.*, *Trump v.*

*CASA, Inc.*, 606 U.S. 831, 852 (2025) ("the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court."). Although a quashal is not an injunction in the technical sense, Plaintiffs provide no authority for the proposition that it is free from the above limitations on the judicial power. Accordingly, any relief should extend only to the named Plaintiffs, not to non-parties.

Along with limiting any relief to the named Plaintiffs, the Court should not quash the subpoena. Instead, the Court should modify the subpoena to require the production of anonymized patient records. *Cf.* Fed. R. Civ. P. 45(d)(3) (allowing court to quash or modify subpoena). This remedy would answer Plaintiffs' privacy concerns while allowing the government's investigation to proceed. *See U.S. ex rel. Roberts v. QHG of Indiana, Inc.*, No. 1:97-CV-174, 1998 WL 1756728, at *8 (N.D. Ind. Oct. 8, 1998) ("[T]he privacy interests of a patient in his or her medical records is tied to identity information contained in the records. Once the identifying information is removed from the record, the patient's privacy interest is essentially eliminated." (citation omitted)); *M.J. v. District of Columbia*, No. 118CV01901EGSGMH, 2020 WL 13668559, at *8 (D.D.C. July 1, 2020) (same); *cf. Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 89 n.26 (D.D.C. 2021) ("it is likely that Google's disclosure of anonymized location information to the government at step one does not implicate significant privacy concerns.").

**CONCLUSION**

Granting Plaintiffs' motion would upend the statutory scheme Congress enacted and seriously impair the Government's ability to investigate federal health care offenses. Section 3486 not only authorizes subpoenas and the statutory text fully contemplates that such subpoenas would seek patient records. The statute also confines any challenges to the subpoena recipient, requires strict compliance with a pre-return date deadline, and pairs that authority with privacy safeguards that cabin the use of the information obtained. Plaintiffs seek to disregard each of those components while asking the Court to grant them a free-floating veto over investigative subpoenas that seek medical records—a veto that the Fourth Circuit has already rejected in *In re Subpoena Duces Tecum*.

In the end, Plaintiffs' challenge fails on every level. Section 3486 does not authorize them to sue. Their petition is untimely under that statute. And sovereign immunity principles bar their legal attack. Even if those threshold defects could be ignored, the subpoena is valid. It is grounded in a legitimate and compelling investigation of potential federal health care offenses and is fully consistent with binding caselaw holding that subpoenas for medical records like the one at issue here do not violate the patients' privacy rights because the Government's compelling interests in identifying unlawful conduct outweighs patients' diminished privacy interests. Were Plaintiffs' theory adopted, any patient mentioned in a provider's records could collaterally obstruct routine health care investigations, effectively gutting Section 3486 and shielding entire domains of health care from investigatory review whenever the subject matter carries personal sensitivity or political controversy.

The Court should decline that invitation and deny the motion to quash, limiting any relief (if granted) to the individual plaintiffs before the Court.

JA521

Dated, this 15th day of December, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch

 /s/ Ross S. Goldstein
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov

JA522

# DECLARATION OF LISA K. HSIAO

Pursuant to 28 U.S.C. § 1746, I, Lisa K. Hsiao, hereby declare as follows:

## GENERAL BACKGROUND

1. I am the Acting Director of the Enforcement and Affirmative Litigation Branch ("EALB") within the United States Department of Justice.

2. EALB's Enforcement Section ("Enforcement") is the successor to the Consumer Protection Branch ("CPB") and is vested with CPB's legal authorities, including handling investigations and litigation arising under federal statutes that protect consumers' health, safety, economic security, and identity integrity. Enforcement, as the successor to CPB, is authorized to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, et seq. See 28 C.F.R. § 0.45(i) and Justice Manual 4-8.000.

3. Through Presidentially-appointed, Senate-confirmed officers of the Department of Justice, Enforcement is authorized to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) relating to the on- or off-label use by manufacturers and distributors of drugs, including puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." See AG Bondi Memo dated April 22, 2025.

4. The Attorney General may authorize other officers of the Department of Justice to perform certain functions of the Attorney General. See 28 U.S.C. § 510. In any investigation of a federal health care offense, the Attorney General may issue in writing and cause to be served a subpoena requiring the production and testimony described in 18 U.S.C. § 3486(a)(l)(B). See 18 U.S.C. § 3486(a)(l)(A).

JA523

5.    Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(l)(A) and (a)(l)(B) to investigate violations of the FDCA that relate to a health care benefit program.

6.    The subpoena to Children's National Medical Center ("CNMC"), No. 25-1431-028 was lawfully issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil Division, in connection with a valid investigation being conducted in my office.

7.    The facts in this Declaration come from my personal observations, my training and experience, and information obtained from other government personnel. This Declaration is intended to demonstrate that the administrative subpoena discussed herein was issued in the furtherance of an investigation authorized by law, and that the records and other things the subpoena seeks are relevant to that investigation. Accordingly, this Declaration does not set forth all my knowledge about this matter.

## LEGAL BACKGROUND

8.    The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug … Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health, including in criminal enforcement of the FDCA. *United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *see also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the Government seeks to enforce the FDCA to protect the health of children.

9.    A "Federal healthcare offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as, *inter alia,* "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the

JA524

violation or conspiracy relates to a health benefit program." 18 U.S.C. § 24(a). The statute defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under section 3486 (commonly referred to as a "HIPAA subpoena") may be used to investigate both substantive violations of the FDCA, as well as conspiracies to violate the FDCA if the violation or conspiracy relates to products or services that might ultimately be paid for by a private or public health insurance program.

10.    Administrative subpoenas issued under 18 U.S.C. § 3486 are routinely used to obtain categories of medical, billing, and related information in federal healthcare offense investigations. The materials requested by the subpoenas issued in this investigation fall within that framework and include the same kinds of records—patient files, insurance submissions, treatment documentation, and communications (such as emails)—that federal investigators typically review to determine whether a federal health care offense may have occurred.

### FDA's Approval of Drugs

11.    The FDCA regulates the development, manufacturing and distribution of drugs in the United States. For a "new drug" to enter interstate commerce, the manufacturer must first demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

12.    A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for the drug in the NDA, which must include adequate directions for how to use the drug for each of its

JA525

intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves an NDA, it determines that the drug is safe and effective **for the specific use or uses identified in the application.** As part of that approval, FDA also approves the product's proposed labeling, including prescribing information, as providing adequate directions for use for those approved indications. FDA's approval of a drug for one or more particular uses does **not** mean that the drug is safe and effective for unapproved uses, nor does approval mean that the labeling provides adequate directions for unapproved uses. While physicians are permitted to prescribe an FDA-approved drug for an unapproved use, such prescribing may warrant investigation because it may provide evidence of FDCA violations by others. *See, e.g.*, *infra* ¶¶ 13–18. Also, depending on the circumstances, prescribing for unapproved uses can itself involve FDCA violations—for example, where the physician is engaged in the distribution or labeling of an unapproved drug.

**MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL LABELING**

13.    A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses.[1] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). Enforcement's predecessor, CPB, participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009).

14.    A drug is also misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

---

[1]    As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

15.    Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter … *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles … Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature shipped by company to sales agent and then stored in agent's bedroom closet was labeling: "[I]t cannot be said that …the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling."). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

16.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). Enforcement's predecessor, CPB, participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device).

### ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG

17.    A "new drug" is any drug that is "not generally recognized, among [qualified] experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the *labeling* thereof …." 21 U.S.C. § 321(p)(1) (emphasis added). Even if a substance has been on the market for years, it can be a "new drug" if used for an indication that has not been approved by FDA and is not generally recognized as safe and effective for that indication

18.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug for an unapproved use with labeling for that unapproved use, the manufacturer or

other person could be charged with distributing an unapproved new drug in violation of the FDCA. 21 U.S.C. § 331(d).

## INTENT IN FDCA CRIMES

19.    A violation of 21 U.S.C. § 331 is a federal criminal offense that is punished as a strict liability misdemeanor without any proof of criminal intent. *See Park*, 421 U.S. at 672–73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). Through its strict liability misdemeanor provision, the FDCA imposes rigorous criminal accountability on companies and individuals involved with drugs that affect the health of consumers in circumstances where consumers realistically cannot protect themselves. *See Wiesenfeld*, 376 U.S. at 91; *Dotterweich*, 320 U.S. at 280–81. This heightened accountability is even more acute when the consumers at risk are children. Consequently, any violation of Section 331, including the causing of any prohibited act listed in Section 331, is a federal crime, even in the absence of any criminal intent.

20.    A felony FDCA violation requires the same conduct as the strict liability misdemeanor, but with the added element of an intent to defraud or mislead. 21 U.S.C. § 333(a). Evidence of intent to defraud or mislead—whether directed at a government agency, a patient, or an insurance company—thus transforms a misdemeanor FDCA violation into a felony offense. Evidence of an intent to defraud or mislead a government agency or another third-party, such as a patient or insurer, in connection with an FDCA violation is sufficient to establish a felony FDCA offense. Efforts to conceal a violation or evade detection also can demonstrate the requisite intent to defraud or mislead.

## THE DRUGS AT ISSUE IN THIS INVESTIGATION

21.    This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents suffering from a recognized mental disorder known as gender identity disorder or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, gender dysphoria. Included in this group of prescription drugs are (1) drugs used to suppress the production of sex hormones to delay puberty—the most

JA528

common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

22.    FDA has not determined these drugs to be either safe or effective for the treatment of gender dysphoria. Nor has FDA approved any of these drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these prescription drugs are FDA-approved for other indications (e.g., precocious puberty, prostate cancer, hypogonadism, etc.), FDA has not approved any NDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above, introducing a such "new drug" into interstate commerce without an FDA-approved indication is unlawful. Thus, to the extent these drugs are intended to treat gender dysphoria in minors, they constitute unapproved new drugs under federal law, and their distribution for that unapproved indication violates the FDCA and is a federal crime.

23.    Some of these drugs, including puberty blockers, are not administered orally. Rather, they are typically administered by injection by a medical professional or through an outpatient surgical procedure to implant the drug. Puberty blockers are typically implants or injectables that require administration by a physician or nurse in a medical facility that must purchase, store, and administer the drug, placing healthcare providers in the chain of distribution of that drug. Similarly, testosterone may be, and often is, administered by injection.

24.    The United States Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of this practice. The United States Department of Health and Human Services ("HHS"), of which FDA is a

JA529

component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See generally*, U.S. DEP'T OF HEALTH & HUMAN SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA, REVIEW OF EVIDENCE AND BEST PRACTICES (Nov. 19, 2025) (available at https://opa.hhs.gov/gender-dysphoria-report) ("HHS REVIEW"). Specifically, this report found that some of the pharmacologic interventions under investigation here "carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, [and] psychiatric disorders." *Id.* at 10. HHS further determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health is **very low**." *Id.* at 13 (emphasis added).

25.    The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria. In the United Kingdom, for example, the British National Health Service ("NHS") commissioned an independent review led by Dr. Hilary Cass, a pediatrician and the former President of the Royal College of Paediatrics and Child Health, to evaluate how NHS was providing care for children experiencing gender-related distress. *See generally* NHS England, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 10, 2024), *available at* https://cass.independent-review.uk/home/publications/final-report/ ("*Cass Review*"). Dr. Cass's review concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Cass Review* at 13.

JA530

26.     With regard to puberty blockers, Dr. Cass reported that a systematic review conducted by the University of York "found no evidence that puberty blockers improve body image or dysphoria" while "a known side effect of puberty blockers on mood is that it may reduce psychological functioning." *Id.* at 179. With regard to cross-sex hormones, the *Cass Review* agreed with another systematic review that concluded that: "There is a lack of high-quality research assessing the outcomes of hormone interventions in adolescents with gender dysphoria/incongruence, and few studies that undertake long-term follow up. No conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility. Uncertainty remains about the outcomes for height/growth, cardiometabolic and bone health." *Id.* at 184.

27.     As a result of the *Cass Review's* findings, in December 2024, the United Kingdom banned puberty blocker treatment for gender dysphoria. *See* Press Release, U.K. Department of Health & Social Care, *Ban on Puberty Blockers to be Made Indefinite on Experts' Advice* (Dec. 11, 2024), https://www.gov.uk/government/news/ban-on-puberty-blockers-to-be-made-indefinite-on-experts-advice (stating that "there is currently an unacceptable safety risk in the continued prescription of puberty blockers to children"). Press reports indicate that the U.K. is similarly considering banning cross-sex hormones for minors. *See* Alison Holt, *Cross-Sex Hormones for Under 18s Could be Restricted or Banned*, BBC News (May 22, 2025), https://www.bbc.com/news/articles/cg711xevd89o.

28.     Several other countries have likewise enacted restrictions on the use of these pharmacologic interventions for treating gender-related disorders in minors, or are considering them. *See, e.g., Sweden Puts Brakes on Treatments for Trans Minors*, FRANCE 24 (Aug. 2, 2023), https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-minors; Siobhan Harris, *Europe & the Puberty Blocker Debate*, MEDSCAPE MED. NEWS (Apr. 25,

2024), https://www.medscape.com/viewarticle/europe-and-puberty-blocker-debate-2024a1000831 (reporting on European countries' practices and findings including France's National Academy of Medicine recommendation that the "greatest reserve" be used in puberty blockers and/or hormones in children and adolescents; Sweden's conclusion that the risks of puberty blockers and hormones currently outweigh the potential benefits); *New Zealand Halts New Puberty Blockers for Young Transgender People*, NBC NEWS, (Nov. 20, 2025), *https://www.nbcnews.com/world/asia/new-zealand-halts-new-puberty-blockers-young-transgender-people-rcna244925*.

29.    Both the HHS review and the UK's independent *Cass Review*—along with numerous other systematic reviews of the evidence that the government is aware of—justify questioning the scientific foundation for prescribing puberty blockers and cross-sex hormones for minors. It is far from certain, therefore, that prescribing these drugs—that have not been approved by FDA for treating minors with gender-related disorders—would ever be considered by the agency as safe and effective for that indication. To the contrary, the available public record suggests there is serious potential for harm.

### EVIDENCE OF FDCA AND HEALTH CARE FRAUD VIOLATIONS IN PEDIATRIC GENDER-RELATED CARE

30.    From testimonies of public whistleblowers and leading national medical experts on the subject matter, the Government is aware of potential violations of federal law in connection with the provision of gender-related treatments for minors occurring at healthcare providers across the country.

31.    This includes allegations and evidence of fraudulent billing practices to secure insurance coverage/payment. Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified" instead of

"gender dysphoria" to prescribe cross-sex hormones, or "precocious puberty" instead of "gender dysphoria" to prescribe puberty blockers) because they know that certain insurance plans may not cover the off-label prescription of puberty blockers or cross-sex hormones for gender-related treatment[2]; (ii) changing or misrepresenting a patient's sex in the medical records and coding and billing for "endocrine imbalance," which is supported by accompanying bloodwork showing endocrine levels atypical of the incorrectly documented sex (but consistent with the patient's actual sex); and (iii) fraudulently making a gender dysphoria diagnosis where patients do not meet the DSM-5 diagnostic criteria, but the providers know that the carrier or plan will cover off-label prescription of cross-sex hormones or puberty blockers to treat gender dysphoria.

32.    The Government also knows of evidence and allegations of many cases where providers failed to supply adequate labeling and to give the information necessary to obtain informed consent, actively deceived patients and parents with false claims and statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor patients and their parents the risks associated with and the science claimed to support taking the drugs described herein for gender dysphoria.

33.    The Government has also reviewed evidence (including transcripts and video recordings) from national conferences on treating transgender patients, including minors, wherein presenters describe and encourage attendees to engage in the provision of purely patient-driven care (or "embodiment goals"), with little regard for gender dysphoria diagnoses, assessment, or clinical criteria. These recommendations include prescribing cross-sex hormones and puberty blockers to minors. The Government is concerned that such facially deficient care may be accompanied by facially deficient or misleading labelling.

---

[2]    In fact, one nonprofit organization has published guidance to health care providers advising them of "coding alternatives for trans healthcare," which detailed "codes that are commonly rejected by insurance providers" and "codes that are commonly accepted by insurance providers."

34.    The subpoena at issue here is one of several investigative tools the United States has been employing in its ongoing and legitimate investigation concerning the provision of medical sex trait modification services, including issues related to violations of the FDCA. The investigation has proceeded through multiple channels, including the analysis of insurance claims data, billing records, and other lawfully obtained material. Information developed through those efforts has raised questions concerning whether puberty blockers and cross-sex hormones have been fraudulently distributed for unapproved uses involving CNMC patients. For example, based on diagnosis codes, it appears that between 2020 and 2024, there were at least 64 minors first diagnosed at CNMC or a CNMC affiliate with central precocious puberty at age 10 or older, including several teenagers aged 14 to 17. This is well beyond the age at which children are typically diagnosed with precocious puberty, including at CNMC. *See, e.g.,* CHILDREN'S NAT'L HOSP., PRECOCIOUS PUBERTY, https://www.childrensnational.org/get-care/health-library/precocious-puberty [https://perma.cc/6HGA-CH53] ("Precocious puberty happens before age 8 in girls and before age 9 in boys.").

35.    As part of this investigation, the United States has also reviewed medical records obtained from other pediatric hospitals that have treated gender dysphoria with sex trait modification services, including through the use of pharmaceuticals. Those medical records reflect multiple instances in which diagnostic or billing codes for medical conditions such as "endocrine disorder, unspecified" notwithstanding clinical notes that reflect that the true disorder being treated with the drugs is gender dysphoria/transsexualism. Some records further reflect that certain speech or vocal interventions are coded as treatment for vocal disorders even where the purpose is voice femininization or masculinization. These observations form part of the ongoing and developing factual basis for the Government's continuing investigation of similarly situated treatment centers, such as CNMC.

**THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION**

36.     The fifteen requests in the investigative HIPAA subpoena issued to CNMC seek to further the investigation described above. The requests can be broadly broken down into four main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). All the subpoenaed records and documents are relevant to the federal healthcare investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

37.     Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

38.     The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (*e.g.,* endocrine disorder) to secure health benefit program reimbursement. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

39.     The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) are probative of an intent to market or promote drugs for unapproved uses. If CNMC, or one of its affiliated healthcare providers, received promotional

materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving unlawful off-label promotion. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing an intent to misbrand, including with intent to defraud or mislead.

40.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing the drugs described herein (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by FDA. Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes, fraudulent informed consent documents, etc. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records, including patient identities, can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide

JA536

additional information, including claim records, creating a triangulated evidentiary record. In sum, without this information, the Government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

### GOVERNMENT INVESTIGATIVE RESOURCES

41. This is a bona fide, high-priority, and substantial national investigation of potential FDCA violations in the provision of gender-related care for minors. Substantial government resources have been assigned to it. It is being handled by several veteran, career prosecutors with many decades of experience in healthcare fraud and FDCA enforcement between them, supported by a team of document analysts and other forensic specialists. The Federal Bureau of Investigation ("FBI") has assigned agents and analysts to assist with various field activities and is employing advanced data analytics to identify prescribing patterns, potential unlawful off-label promotion, and patterns in reimbursement. In addition to FBI, FDA has also assigned agents from its Office of Criminal Investigations. The scope and coordination of these efforts reflect the seriousness with which the Government is pursuing potential violations of federal law.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of December, 2025.

LISA K. HSIAO
Acting Director
Consumer Protection Branch
United States Department of Justice

JA537

Effective January 31, 2020

# NOTICE OF PRIVACY PRACTICES

This notice of Privacy Practices describes how medical information about you may be used and disclosed and how you can get access to this information.



JA538



# NOTICE OF PRIVACY PRACTICES

**This Privacy Notice (Notice) will tell you about the ways that Children's National Hospital may use and disclose medical information about you (if you are our patient) or your child (if your child is our patient) and describes your rights and our duties regarding the use and disclosure of medical information. This Notice applies to all records of your care generated by any entity listed in Section 1 of this Notice.**

Most patients of Children's National are children. If you are a parent or legal guardian receiving this Notice, please understand that when we say "you" or "your" in this Notice, we are referring to your or your child's medical information. References to disclosures of information to "you" or "your" mean disclosures to the patient, a patient's parent, guardian or other persons legally authorized to receive information about the patient. In this Notice, we use the terms "we", "us" and "our" to describe Children's National .

 **TO WHOM THIS NOTICE APPLIES?**

This Notice applies to all Protected  Health Information (PHI) maintained by Children's National for services provided by the following: Children's National Hospital, Children's National Pediatricians and Associates (CNPA), Regional Outpatient Centers and Specialty Services, Specialty Clinical Practices, Children's Research Institute, Inc., and other entities owned or controlled by Children's National Hospital.

Children's National health care professionals, employees, medical staff members, affiliated students, volunteer groups and our vendors are subject to the terms of this Notice. Our personnel may have access to your PHI as employees, professional staff members and others authorized to enter information in a Children's National medical record or persons working with us in other capacities.

 **WHAT IS PROTECTED HEALTH INFORMATION (PHI)?**

Protected Health Information (PHI) is individually identifiable health information about your past, present and future physical or mental health or condition, health care services you receive, and past, present or future payments for your health care, as well as genetic information.  PHI also includes demographic information such as your name, Social Security Number, address and date of birth. Please note that your individually identifiable health information ceases to be PHI 50 years after your death.

PHI may be in oral, written or electronic form. Examples of PHI include your medical records, claims records and communications between you and your health care provider about your care.

 **OUR RESPONSIBILITY TO PROTECT YOUR PHI**

Children's National is required by federal and state law to maintain the privacy of your health information.

By law, Children's National must:

- Protect the privacy of your PHI;
- Tell you about your rights and our legal duties with respect to your PHI;

JA539

- Notify you if there is a breach related to your PHI;
- Tell you about our privacy practices; and
- Comply with the terms of the privacy notice currently in effect.

 **(4) YOUR RIGHTS REGARDING YOUR PHI**

**(A) Right to Access your PHI.** Subject to certain exceptions, you have the right to inspect or receive a copy of your PHI that Children's National uses to make decisions about your care. Usually, this includes health and billing records.  Requests must be made in writing and sent to the Children's National Health Information Management Department. Contact information is found in Section 8 of this Notice.

- After we receive your written request, we will let you know when and how you can see or obtain a copy of your medical record. If you agree, we will give you a summary/explanation of your PHI instead of providing copies.

- If we do not have the record you asked for but know who does, we will tell you who to contact to request it.

- Upon your request, PHI maintained electronically must be provided to you in electronic format.

- We may charge you a fee for the copy or explanation/ summary, as allowed by state or federal law.

- In limited circumstances, we may deny some or all of your request to see or receive copies of requested records. If we do so, we will tell you why in writing and explain your right, if any, to have our denial reviewed.

**(B) Right to Amend Your PHI.** If you believe that your PHI is incorrect or incomplete, you may ask Children's National to correct or add to your record. Your request must be made in writing to Children's National Health Information Management Department. Contact information is found in Section 8 of this Notice.

- Please provide a reason that supports your request and the correction or addition requested.

- We will respond to your request in writing. If we approve your request, we will make the corrections or additions to your PHI. If we deny your request, we will tell you why and explain your rights to file a written statement of disagreement which will be included in your record.

- We can deny your request if you ask Children's National to amend information:
  - Not created by Children's National;
  - Not part of the information kept by or for Children's National;
  - Not part of the information which you would be permitted to inspect and copy; or
  - Which is not inaccurate or incomplete, based on Children's National review.

- You have the right to request an amendment to information generated by Children's National. If you are asking for the amendment or correction of a medical record that Children's National  has a copy of but did not create, we will instruct you to contact the source of that medical record.

**(C) Right to a Disclosure Accounting.** You can ask for a list (accounting) of disclosures of your PHI  by contacting the Children's National Health Information Management Department. Contact information is found in Section 8 of this Notice. The first accounting will be free, but we may charge a fee for additional accountings requested less than 12 months after the previous disclosure accounting is provided.

An accounting does not include disclosures:

- To carry out treatment, payment and health care operations;
- For which Children's National had a signed authorization;
- Of your PHI to you;
- From a Children's National facility directory;
- For notifications for disaster relief purposes;
- To persons involved in your care and persons acting on your behalf; or
- Not covered by the right to an accounting.

**(D) Right to Request Confidential Communication by Alternative Means or to Alternative Locations.**

- You may ask us to send your PHI to you at a different address (for example, your work or alternative address) or by a different means (such as a fax instead of regular mail).

- You must make your request in writing to the Children's National Health Information Management Department. Contact information is found in Section 8 of this Notice.

- You can ask us to contact you in a specific way (for example, a request to contact you using your home or office phone, but not via cellular phone). Contacting you via cell phone for health care related communications regarding treatment and payment requires your explicit consent.

- If your PHI is stored electronically, you may request a copy of the records in an electronic format offered by Children's National. You may also request in writing that Children's National transmit the electronic copy to a designated third party.

- If the cost of meeting your request involves more than a reasonable additional amount, we are permitted to charge you our costs that exceed such an amount.

**(E) Right to Request a Limitation or Restriction on the Use and Disclosure of PHI.** You can ask Children's National to limit its use or disclosure of your PHI for purposes of treatment, payment and health care operations.

JA540

- Requests must be in writing and sent to the Children's National Health Information Management Department. Contact information is found in Section 8 of this Notice.
- For requests to restrict disclosure of your PHI, please request the restriction prior to receiving the services or items from Children's National.
- Children's National will consider your request. If we deny your request, we will notify you in writing.
- Children's National is not required to agree to your request unless the following conditions are met:
  - You request a restriction on disclosure to a health plan or insurer for payment or health care operations purposes; and
  - The items or services have been paid for out of pocket in full.

*Please Note: Children's National can still disclose your PHI to a health plan or insurer for purpose of treating you. Also, if we are required by law to disclosure certain PHI, we will do so even if you ask that we do not.*

**F** **Right to Obtain a Paper Copy of this Notice.** You may request a paper copy of this Notice at any time, even if you have agreed to receive the Notice electronically. You may also obtain a copy of this Notice from our website. To request a paper copy of this Notice, contact the Children's National Privacy Officer. Please see Section 8 of this Notice for contact information.

**G** **Right to File a Complaint.** If you believe that your privacy rights have been violated, you may file a complaint with Children's National and the U.S. Department of Health and Human Services. Please see Section 8 of this Notice for contact information. We respect your right to file a complaint; your care and treatment will not be affected and you will not be penalized for doing so.



4    Notice of Privacy Practices

## 5 HOW CHILDREN'S NATIONAL MAY USE OR DISCLOSE YOUR PHI

**A** **Treatment.** Patient care is the most important use and disclosure of PHI. Children's National physicians, nurses and other health care personnel use and disclose your PHI to evaluate and coordinate your care and treatment needs such as disclosure needed to order prescriptions, x-rays and lab work. Also, if your care is being provided by community resources or in an emergency situation, Children's National may disclose your PHI to your community provider or health care provider rendering care.

**B** **Payment.** Your PHI may be needed for Children's National to bill and collect payment for treatment and health-related services that you receive. For example, we can use and disclose your PHI to seek payment from your health insurer and from others who may be responsible for payment. We may also tell your health plan about a treatment you will receive to obtain prior approval or to determine if your health plan or insurer will cover the treatment.

**C** **Health Care Operations.** We may use and disclose your PHI for certain health care operational functions such as Children's National quality assessment and improvement, training and evaluation of Children's National health care professionals, licensing and accreditation activities and to address and prevent criminal activity including fraud.

**D** **Business Associates.** Children's National may contract with third parties to perform functions or activities on behalf of our patients. These functions include payment and health care operational activities. Such contracts include provisions which require our business associates to comply with the same HIPAA privacy standards that Children's National follows in order to safeguard patient PHI.

**E** **Health-Related Services.** Children's National may send you information related to your health care needs, such as appointment reminders, follow-up reminders, educational materials and information about upcoming Children's National events. We may use your PHI to tell you about our health-related products or services that may be of interest to you. If you do not want Children's National to contact you about these health-related services, please notify the Children's National Privacy Officer in writing. Contact information is found in Section 8 of this Notice.

**F** **Identity Verification.** Children's National may photograph you for identification purposes and store the photograph in your medical record. This is for your protection and safety, but you may opt out.

**G** **Health Information Exchanges.** We may share information electronically that we obtain or create about you with other health care providers or entities for treatment, payment and health care operations through a Health Information Exchange (HIE). Two examples of

JA541



HIEs with which Children's National shares such information include the Chesapeake Regional Information System for our Patients (CRISP) and the Children's Integrated Quality Network (CIQN). HIE participants like Children's National are required to meet rules that protect the privacy and security of your health and personal information.

The Chesapeake Regional Information System for our Patients (CRISP) is a regional health information exchange serving Maryland and D.C. As permitted by law, your health information will be shared with this exchange in order to provide faster access, better coordination of care and assist providers and public health officials in making more informed decisions.

You can choose to not have your information shared through any of Children's National HIE networks at any time. You may opt out of sharing and searching of your medical information in CRISP and CIQN by contacting: CRISP at 1–877–952–7477 or at www.crisphealth.org and CIQN by e–mailing ciqn@childrensnational.org. However, certain information may remain accessible to the exchange participants. For example, public health reporting and Controlled Dangerous Substances information, as part of the Maryland Prescription Drug Monitoring Program (PDMP), will still be available to providers as permitted by law.

**H** **Specific types of PHI.** There are stricter requirements for the use and disclosure of some types of PHI which includes drug and alcohol abuse patient information, HIV tests and mental health information. However, there are still circumstances in which these types of information may be used or disclosed without your authorization. For example, as a patient in a Children's National chemical dependency program, we will give you a separate written notice, as required by law, about privacy rights related to chemical dependency program PHI. Most uses and disclosures of psychotherapy notes require your written authorization.

**I** **Communications with Family Members and Others Involved in Care or the Payment of Care.** Unless you specifically tell us in advance not to do so, we may disclose medical information to a friend or family member who is involved in your care or who helps pay for care. There may be times when it is necessary to disclose PHI because there is an emergency, you are not present or you lack the capacity to agree or object. In those instances, we will use our professional judgment to determine if disclosure is in your best interest. If so, we will limit disclosure to the PHI directly relevant to the person's involvement in your care. For example, we may allow someone to pick up a prescription for you.

**J** **Disaster Relief Organizations.** We may disclose medical information to organizations assisting in a disaster relief effort (such as the Red Cross) so that your family can be notified of your condition, status and location. We may disclose your name, city of residence, age, gender and general condition to a public or private disaster relief organization to assist with disaster relief efforts, unless you object at the time.

**K** **Disclosures to Parents as Personal Representatives of Minors.** In most cases, we may disclose your minor child's PHI to you. In some situations, however, we are permitted or even required by law to deny your access to your minor child's PHI. An example is when your child has the right to independently seek medical advice about family planning or treatment for sexually transmissible diseases.

**L** **To Avert a Serious Threat to Health or Safety.** Children's National may use and disclose PHI when necessary to prevent a serious threat to your health and safety or to the health and safety of the public or another person. Any disclosure will be to someone able to help prevent harm to the health or safety of you, another person or the public.

**M** **Public Health Activities.** Children's National may disclose medical information for public health activities. These generally include the following:

- To prevent or control disease, injury or conditions;
- To report births and deaths;
- To report suspected child abuse, neglect or domestic violence when required or authorized;
- To report reactions to medications, problems with products or other adverse events;
- To notify you of recalls of products that you may be using; and
- To notify a patient or personal representative who may have been exposed to a disease or may be at risk for contracting or spreading a disease or condition.

**N** **Health Oversight Activities.** Children's National may disclose medical information to a health oversight agency

JA542

for activities authorized or required by law. For example, these activities may include audits, investigations, inspections and licensure. These activities are necessary for the government to monitor Children's National activities, government programs and compliance with civil rights and other laws.

**O** **Research.** Under certain circumstances, we may use and disclose medical information for research purposes. We may use or share your information to identify prospective research participants. Researchers may contact you to determine your interest in having your child participate in our research studies. Your PHI can generally be used or disclosed for research without your permission if an Institutional Review Board (IRB) approves such use or disclosure. An IRB is a committee that is responsible, under federal law, for reviewing and approving human subjects research, to protect the safety of the participants and the confidentiality of PHI.

**P** **To Comply with the Law.** We will share information about you when required to do so by state, local or federal laws, including disclosures to the U.S. Department of Health and Human Services.

**Q** **Organ Donation.** We may use or disclose PHI to organ procurement organizations to assist with organ, eye or tissue donations.

**R** **Coroners and Funeral Directors.** We may disclose PHI to a coroner or medical examiner to permit identification of a body, determine cause of death or for other official duties. We may also disclose PHI to funeral directors.

**S** **Lawsuits and Other Legal Disputes.** We may use and disclose PHI in responding to a court or administrative order, a subpoena or a discovery request. We may also use and disclose PHI to the extent permitted by law without your authorization; for example, to defend a lawsuit or arbitration.

**T** **Law Enforcement.** We may disclose PHI to authorized officials for law enforcement purposes. For example, we can disclose PHI under the following circumstances:

- To respond to a court order, search warrant, subpoena or summons or similar process;
- To report a crime on our premises;
- As required by law to report certain types of injuries;
- To provide certain limited information to identify or locate a suspect, fugitive, material witness or missing person;
- About the victim of a crime if, under certain circumstances, we are unable to obtain the person's agreement;
- About a death we believe may be the result of criminal conduct;
- In a medical emergency to report a crime, the location of the crime or victims, or the identity, description or

location of a person who may have committed the crime.

**U** **Military Activity and National Security.** We may sometimes use or disclose the PHI of armed services personnel to the applicable military authorities when they believe it is necessary to properly carry out military missions. We may also disclose PHI to authorized federal officials as necessary for national security and intelligence activities or for the protection of the president or other government officials and dignitaries.

**V** **Inmates.** Under the federal law that requires us to give you this Notice, inmates do not have the same rights to control their PHI as other individuals. If you are an inmate in a correctional facility or under the custody of a law enforcement official, we may disclose PHI about you to the correctional facility or law enforcement official. We would only do so if the medical information is necessary for providing health care, your health and safety or the health and safety of others or the safety or security of the correctional institution.

**W** **Patient Appreciation Letters, Pictures or Cards.** We may share with Children's National staff and visitors patient appreciation letters, pictures, cards, etc.

**X** **Facility Directory Information.** We maintain a directory of information about hospitalized patients. This directory includes patient names, location/room number, general condition and religious affiliation (available to clergy only). You may specifically object to the use of some or all of this information in our directory. If you do, we will not disclose it to visitors or other members of the public.

**Y** **Incidental Disclosures.** While Children's National employs appropriate safeguards to ensure the privacy of your medical information, certain disclosures may occur incidentally. An example would be a third party overhearing a provider's confidential discussion with another provider or patient in a semi–private area where privacy safeguards are limited due to the close physical proximity of patients.



JA543



## ⑥ USES AND DISCLOSURES OF PHI THAT REQUIRE PATIENT AUTHORIZATION

Except for those uses and disclosures described above, Children's National will not disclose your PHI without written authorization. Some instances in which we may request your authorization for use or disclosure of PHI are described below.

### YOUR CHOICES:



**STUDENT IMMUNIZATIONS**

With your authorization, we may disclose proof of immunization to schools in locations with school entry laws. At your request, we will also share documentation with child care facilities when proof of immunization is required.



**MARKETING AND SALE**

Uses and disclosures of PHI for marketing purposes and disclosures that constitute a sale of PHI require your prior written authorization.



**PSYCHOTHERAPY NOTES**

On rare occasions, Children's National may ask for your authorization to use and disclose "psychotherapy notes". Federal privacy law defines "psychotherapy notes" very specifically to mean notes made by a mental health professional regarding conversations during private or group sessions that are maintained separately from the rest of your medical records. Generally, we do not maintain psychotherapy notes as defined by federal privacy law.



**PUBLIC RELATIONS**

We may contact you to determine whether you would like to participate in a media item for Children's National or an external news media. Journalists often ask to interview injured patients, those with a particular medical condition or those who have had a particular procedure. We will need your written authorization before releasing your name.



**FUNDRAISING**

We may contact you for fundraising efforts, using demographic information, dates of service, department of service, treating physician and outcome status, but you can tell us not to contact you again. To opt out of fundraising on behalf of Children's National Hospital, contact the Privacy Office. We will never condition treatment or payment on your choice to opt out.

## ⑦ OTHER USES OF MEDICAL INFORMATION

Other uses and disclosures of your medical information not covered by this Notice or the laws that apply to us will be made only with your written authorization. If you provide us with authorization, you may revoke that permission, in writing, at any time. If you revoke your authorization, this will stop the use or disclosure of your medical information for the purposes covered by your written authorization, except to the extent we have already acted in reliance on your authorization.

JA544



## CHANGES TO THIS NOTICE

*We may change this Notice and our privacy practices at any time so long as the change is consistent with state and federal law. Unless prohibited by law, a change to this Notice is effective immediately for medical information already in our possession, as well as information received in the future. If we make an important change to our privacy practices, we will promptly change this Notice. Any changes to this Notice will be posted throughout Children's National locations, the Patient Portal and our website. Unless immediate changes are required by law, we will not implement an important change to our privacy practices before we revise this Notice.*

 **8 HOW TO CONTACT CHILDREN'S NATIONAL ABOUT THIS NOTICE OR TO COMPLAIN ABOUT OUR PRIVACY PRACTICES**



If you have questions about this Notice, or have a complaint about the privacy practices of Children's National, please let us know by mail, phone or email using the following contact information:

Privacy Officer
Children's National Hospital
111 Michigan Ave NW, Washington, DC 20010
privacyofficer@childrensnational.org
Phone: 202–476–6806



You may also file a complaint in writing with the U.S. Department of Health and Human Services, Office for Civil Rights:

U.S. Department of Health and Human Services
Office of Civil Rights
200 Independence Ave SW, Washington, DC 20201
Phone: 1–877–696–6775
www.hhs.gov/ocr/privacy/hipaa/complaints



To access, amend, correct or restrict use of your PHI, to request that we contact you in a specific way or to request an accounting of the use and disclosure of your PHI, please contact Children's National Health Information Management Department at the following address:

Children's National Hospital
Health Information Management Department
12200 Plum Orchard Drive, Suite 105
Silver Spring, MD 20904



www.ChildrensNational.org

JA545

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL | Case No. 25-cv-03780-JRR<br><br>**[PROPOSED] ORDER** |

Upon consideration of the Motion to Quash Subpoena Duces Tecum filed by Movants, the Memorandum in Support thereof, the Government's Opposition, and any oral argument thereupon, it is hereby **ORDERED** that:

The Motion to Quash is **DENIED** for the reasons stated in the Government's briefing and at any oral argument.

**IT IS SO ORDERED.**

Dated:                                   BY THE COURT:

                                   _____

JA546

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE 2025 SUBPOENA TO
CHILDREN'S NATIONAL
HOSPITAL

Case No. 25-cv-03780-JRR

**GOVERNMENT'S NOTICE OF SUPPLEMENTAL AUTHORITY**

The United States of America respectfully submits this Notice of Supplemental Authority in support of its Opposition to Plaintiff's Motion to Quash the subpoena that the United States issued to Children's National Medical Center ("CNMC") under 18 U.S.C. § 3486 in the furtherance of its investigation of federal healthcare offenses.

Plaintiffs assert that the use of the drugs at issue—puberty blockers and powerful cross-sex hormones—as a treatment for minors suffering from gender dysphoria and related psychiatric disorders is "well-established," "safe and effective," and "endorsed by every medical association as a critical medical intervention." ECF 1-1. As a result, according to Plaintiffs, the Government's investigation lacks a legitimate purpose and the subpoena cannot be justified. Instead, they argue, the subpoena reflects an improper effort to intimidate providers engaged in appropriate medical care.

Recent developments refute Plaintiffs' argument. On December 18, 2025, the United States Secretary of Health and Human Services ("HHS"), the nation's highest-ranking health official, together with the Commissioner of the United States Food and Drug Administration ("FDA"), the Director of the National Institutes of Health ("NIH"), the

JA547

Administrator of the Centers for Medicare and Medicaid Services ("CMS"), and the

Assistant HHS Secretary for Health (the highest-ranking officer of the United States

Public Health Service) announced the HHS Secretary's issuance of a formal declaration

regarding "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting

Procedures on Children and Adolescents." U.S. SEC'Y OF HEALTH & HUMAN SERVS.,

DECL. ON PEDIATRIC SEX-REJECTING PROCEDURES (Dec. 18, 2025),

https://www.hhs.gov/sites/default/files/declaration-pediatric-sex-rejecting-procedures.pdf

(attached as Exh. A).

The Secretary's Declaration (supported by the accompanying Public Health Message

from the Assistant Secretary for Health, *Evidence-Based Care for Children and

Adolescents with Gender Dysphoria* (Dec. 18, 2025),

https://health.gov/sites/oash/files/Message_Pediatric_Gender_Dysphoria_Treatment.pdf

(attached as Exh. B)), expressly states that federal health authorities have determined

that the treatments that Plaintiffs seek to shield from investigation are neither safe nor

effective and categorically fail to meet professionally recognized standards of medical

care:

> **Sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care. For the purposes of this declaration, "sex-rejecting procedures" means pharmaceutical or surgical interventions, including puberty blockers, cross-sex hormones, and surgeries such as mastectomies, vaginoplasties, and other procedures, that attempt to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex.**

HHS Declaration at 9 (emphasis in original).

JA548

The Secretary's Declaration directly rebuts Plaintiffs' contention that the subpoena is improper because it is intended "to intimidate and deter the provision of lawful transgender healthcare." ECF 1-1 at 5. Although Plaintiffs claim the use of these powerful drugs is "medically necessary healthcare," (*id.* at 3) the Secretary, exercising his authority under federal law, has determined the opposite. That is, HHS has determined that puberty blockers and cross-sex hormones cannot be used to treat gender dysphoria and related disorders in minors. Because the Declaration reflects the determination that such use falls outside the professional practice of medicine, the Declaration bears on whether the Government may reasonably subpoena CNMC to investigate whether the promotion, marketing, labeling, sale, and distribution of drugs for that improper purpose violates the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 *et seq.*) and related federal statutes—including whether claims about the safety, effectiveness, or appropriateness of these drugs for such treatment may be false or misleading.

Dated: this 19th day of December, 2025.

> Respectfully submitted,
>
> BRETT A. SHUMATE
> Assistant Attorney General
>
> JORDAN C. CAMPBELL
> Deputy Assistant Attorney General
>
> LISA K. HSIAO
> Acting Director
> Enforcement & Affirmative Litigation
>    Branch

3

JA549

*/s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

United States Department of Justice
Enforcement & Affirmative Litigation
   Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov

4

JA550



# DECLARATION OF THE SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

## RE: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents

**Date:** December 18, 2025

**Declarant:** Robert F. Kennedy Jr., Secretary of U.S. Department of Health and Human Services

---

I, Robert F. Kennedy, Secretary of the U.S. Department of Health and Human Services (HHS), pursuant to my authority and responsibilities under federal law, and pursuant to 42 CFR § 1001.2, hereby declare as follows

## I. BACKGROUND AND AUTHORITY

### A. Rising Prevalence of Gender Dysphoria Diagnoses in Youth

In recent years, medical professionals have documented a substantial increase in gender dysphoria diagnoses among young people in the United States, with similar trends throughout Europe.[1] In response to this phenomenon and following the publication of the "Dutch Protocol," and subsequent endorsements by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society (ES), the number of children and adolescents receiving medical interventions for gender dysphoria increased substantially.[2] These interventions, referred to in this Declaration as sex-rejecting procedures, include puberty-suppressing hormones, cross-sex hormones, and surgical procedures.

Research indicates that thousands of American children have undergone these sex-rejecting procedures.[3] Yet current medical evidence does not support a favorable risk/benefit profile for using these interventions to treat pediatric gender dysphoria. Moreover, existing clinical guidelines endorsing these procedures demonstrate significant variation in methodological rigor and quality.

To address these methodological concerns and evaluate the evidence for sex-rejecting procedures for children and adolescents, on May 1, 2025, HHS released a review of the evidence to identify best practices for treating pediatric gender dysphoria.[4] On November 19, 2025, HHS released the final, peer-reviewed report, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* ("the HHS Report").[5] The HHS Report is a comprehensive review of the evidence and literature related to sex-rejecting procedures.

**B. Expansion of Medical Interventions for Gender Dysphoria**

Following the 2006 publication of what became known as the "Dutch Protocol" in *The European Journal of Endocrinology*, pediatric medical interventions for gender dysphoria increased substantially.[6] During the subsequent decade, growing numbers of children and adolescents diagnosed with gender dysphoria began receiving medical procedures advocated by organizations such as the WPATH and the ES.[7]

WPATH's Standards of Care Version 8 (SOC-8) specifically acknowledged this trend, attributing the development of a dedicated adolescent chapter partly to what it characterized as exponential increases in youth referrals.[8] While earlier health system studies documented referral rates below 0.1 percent, more recent surveys identifying "transgender" youth report prevalence ranging from 1.2 to 2.7 percent, with "gender diverse" identification reaching as high as 9 percent.[9] WPATH documentation also indicates that adolescent females seek these interventions at rates between two and seven times higher than adolescent males.[10]

WPATH guidelines recommend that providers conduct thorough biopsychosocial evaluations of adolescents seeking medical transition, incorporating input from mental health specialists, medical professionals, parents or guardians, except in circumstances where parental involvement might cause harm.[11]

**C. Scale of Pediatric Interventions in the United States**

The number of pediatric patients seeking sex-rejecting procedures can only be roughly estimated. The decentralized and largely privatized nature of the American healthcare system has facilitated the proliferation of specialized gender clinics alongside numerous independent practitioners offering these services.[12] Conservative estimates from March 2023 identified 271 gender clinics operating across the United States, with approximately 70 rendered inactive due to state legislative restrictions.[13]

The treatment approach referenced in this declaration as sex-rejecting procedures—terminology that some refer to as "gender-affirming care"—encompasses several intervention types, when provided to minors: puberty-suppressing drugs that prevent the onset of puberty, cross-sex hormones that induce secondary sex characteristics of the opposite-sex, and surgical procedures, including breast removal and, less commonly, genital reconstruction. Thousands of American minors have undergone these interventions.[14]

Research published in 2023 estimated that from 2016 through 2020, approximately 3,700 adolescents in the U.S., aged 12 to 18 with gender dysphoria diagnoses underwent surgical interventions. This figure includes more than 3,200 youth who underwent breast or chest surgery and over 400 who had genital surgeries resulting in permanent reproductive organ alterations and compromised sexual function.[15] Separate research examining the period from 2017 to 2021 identified more than 120,000 children ages 6 through 17 diagnosed with gender dysphoria, with over 17,000 of these minors initiating either puberty blockers or hormonal therapy.[16] However, as discussed in the HHS Review, current medical evidence does not support a favorable risk/benefit profile for the use of chemical or surgical procedures in children to treat gender dysphoria.

**D. Legal Authority for This Declaration**

This declaration is issued pursuant to the authority vested in the HHS Secretary, and is informed by 42 CFR § 1001.2, which provides that "when the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care." As such, this declaration supersedes

JA552

"Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State." For reasons explained in this Declaration, standards of care recommended by certain medical organizations are unsupported by the weight of evidence and threaten the health and safety of children with gender dysphoria.

## II. COMPREHENSIVE REVIEW OF EVIDENCE

HHS issued a comprehensive evidence review and best practices assessment regarding pediatric gender dysphoria care on May 1, 2025.[17]  After the publication of this preliminary report, HHS also invited peer reviews from major medical associations, including the American Academy of Pediatrics (AAP), the American Psychiatric Association (APA), and the ES, as well as clinical experts and evidence-based medicine methodologists. While both the AAP and the ES declined to participate, HHS received reviews from the APA and seven invited peer reviewers for consideration. The report also engaged with two unsolicited reviews that were previously published in journals. In keeping with its commitment to radical transparency, HHS published all nine peer reviews alongside its detailed responses to each one,[18] as well as a final, revised report incorporating the feedback in November 2025.[19]

Employing an evidence-based medicine approach, the HHS Review identified substantial concerns regarding outcomes from specific medical interventions—namely puberty blockers, cross-sex hormones, and surgical procedures—intended to facilitate children's and adolescents' transition away from their sex. The Review documents significant risks from these procedures, including permanent harms such as infertility, while finding markedly insufficient evidence of therapeutic benefit. Crucially, the Review determined that existing evidence cannot support effectiveness claims for medical and surgical interventions in ameliorating mental health conditions or reducing gender dysphoria symptoms. As the Review states: "Analysis of the biological plausibility of harms is necessary and suggests that some short- and long-term harms are likely (in some cases expected) sequelae of treatment."[20] The evidence examined in the HHS Review demonstrates an unfavorable risk/benefit profile for medical and surgical interventions in children and adolescents with gender dysphoria diagnoses. While the HHS Review refrains from making specific clinical, policy, or legislative recommendations, it furnishes essential insights for policymakers charged with promoting health and safety, particularly for vulnerable populations such as children and adolescents.[21]

### A. HHS Review Methodology

The HHS Review conducted an "umbrella review" of existing systematic reviews, including those that informed European health authorities' policy decisions, to assess their methodological quality and the evidence regarding the benefits and harms of hormonal and surgical interventions for treating pediatric gender dysphoria. The review found that the overall quality of evidence concerning the effects of sex-rejecting procedures on psychological outcomes, quality of life, regret, or long-term health, is very low.

### B. Evidence Quality Regarding Therapeutic Benefits

The HHS Review also concluded that available evidence cannot support determinations regarding the effectiveness of medical and surgical interventions for mental health or alleviating gender dysphoria symptoms.

The Review states that pediatric medical transition evidence for benefit remains highly uncertain, while harm evidence demonstrates less uncertainty.[22] The evidence compilation indicates that medical and surgical interventions for children and adolescents diagnosed with gender dysphoria present an unfavorable risk-benefit profile.

JA553

## C. Evidence and Analysis of Treatment Harms

While acknowledging that systematic reviews provide limited direct evidence of harms from sex-rejecting procedures in minors, the HHS Review offers plausible rationales for why such evidence may have been inadequately sought, detected, or reported. Contributing factors include the relatively recent implementation of hormonal and surgical treatment, deficiencies in monitoring and reporting adverse effects within existing studies, and publication bias.

Despite the absence of robust evidence from large-scale population studies, the HHS Review identifies known and plausible harm risks from puberty blockers, cross-sex hormones, and surgeries based on human physiology and pharmacological agents used. The Review notes that short- and long-term adverse effects are likely, and include infertility and sterility, sexual dysfunction, impaired bone density development, adverse cognitive effects, cardiovascular and metabolic disease, psychiatric conditions, surgical complications, and regret.[23]

## D. International Shift Away from Pediatric Medical Transition

The HHS Review chronicles both the weak evidentiary basis and the growing international movement away from using puberty blockers, cross-sex hormones, and surgeries for treating gender dysphoria in minors, highlighting significant harm risks.[24] The Review provides methodologically rigorous assessment of evidence underlying surgical and endocrine interventions, including puberty suppression and cross-sex hormone use, while incorporating international practice evaluations such as the United Kingdom's Cass Review.

The Review documents mounting concerns regarding both the scarcity of reliable benefit evidence and the presence of significant harm risks associated with this care model, identifying psychotherapy as a non-invasive alternative approach.

## E. Ethical Analysis and Conclusions

The HHS Review invokes widely recognized medical ethics principles to conclude that "medical interventions pose unnecessary, disproportionate risks of harm, healthcare providers should refuse to offer them even when they are preferred, requested, or demanded by patients."[25] As the Review states, "in the domain of pediatrics, these norms limit the authority not only of patients (who in any case lack full decision-making capacity) but of parents as well."[26] The first obligation of the physician, under the Hippocratic Oath, originating in the fourth century BC, is to first do no harm, as the purpose of the practice of medicine is to heal. Sex-rejecting procedures introduce a unique set of iatrogenic harms for minors, which may include "surgeries to remove healthy and functioning organs."[27] The Review states: "To discharge their duties of nonmaleficence and beneficence, clinicians must ensure, insofar as reasonably possible, that any interventions they offer to patients have clinically favorable risk/benefit profiles relative to the set of available alternatives, which includes doing nothing."[28] As related previously in this Declaration, the risk-benefit profile of these procedures for children is extremely poor. "The best available evidence," it finds, is that pediatric sex-rejecting procedures "have not been shown to improve mental health outcomes." "At the same time," the Review notes, "there is increasing recognition of the risk and harms associated" with pediatric sex-rejecting procedures, including "possible outcomes, such as impaired cognitive function, greater susceptibility to hormone-sensitive cancers, cardiac disease, reduced bone density, sexual dysfunction, infection, and infertility [that] are objectively detrimental to health." The Review concludes that "[s]uch medical harms, or plausible risks thereof, should not be imposed on children or adolescents in the absence of a reasonable expectation of proportionate medical benefit."[29]

Though the HHS Review deliberately avoids making clinical, policy, or legislative recommendations, it supplies critical information that should guide policymakers in decisions promoting health and safety, especially for vulnerable populations such as minors.[30]

# III. INADEQUACY OF CLINICAL GUIDELINE FROM MEDICAL ORGANIZATIONS

I acknowledge that guidance from prominent U.S. medical professional organizations, including the American Medical Association (AMA), AAP, and APA, has characterized sex-rejecting procedures—termed by these organizations as "gender-affirming care"—as safe and effective.[31,32,33,34] These endorsements from medical societies have encouraged widespread clinician adoption of sex-rejecting procedures throughout the United States. The most influential sources of clinical guidance for treating pediatric gender dysphoria in the United States are the WPATH and the ES clinical practice guidelines and the AAP guidance document. However, a recent systematic review of international guideline quality by researchers at the University of York found that all three documents as very low quality and should not be implemented.[35]

As the HHS Review notes regarding the role of medical organizations in the treatment of pediatric gender medicine:

> U.S. medical associations played a key role in creating a perception that there is professional consensus in support of pediatric medical transition. This apparent consensus, however, is driven primarily by a small number of specialized committees, influenced by WPATH. It is not clear that the official views of these associations are shared by the wider medical community, or even by most of their members. There is evidence that some medical and mental health associations have suppressed dissent and stifled debate about this issue among their members.[36]

## A. Endocrine Society

The ES issued clinical practice guidelines in 2017 entitled "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons."  As the HHS Review notes:

> In WPATH and ES guidelines, the principal goal of CSH administration is to induce physical characteristics typical of the opposite sex. When hormone levels rise beyond the typical reference range for a person's sex, they are considered supraphysiologic. ES guidelines suggest that the sex an individual identifies as—as opposed to their biological sex—should determine the target reference range for hormonal concentrations. Critics have argued that perceived identity does not alter physiological processes and that such a belief can result in inappropriate and potentially dangerous hormone dosing.[37]

The HHS Review states:

> The ES 2017 guideline, which used the GRADE [Grading of Recommendations Assessment, Development and Evaluation] framework, has been criticized for making strong recommendations for hormonal interventions in the setting of a weak evidence base. Notably, none of the systematic reviews that supported the ES guidelines were based on outcomes for children or adolescents. The ES recommendation to initiate puberty blockade using gonadotropin-releasing hormone agonists was derived by putting a higher value on achieving a "satisfactory physical appearance" while putting the lowest value on avoiding physical harms. The ES recommendation for the initiation of cross-sex hormones no earlier than age 16 was justified by placing a higher value on adolescent's purported ability to meaningfully consent to

cross-sex hormones (CSH) and placing a lower value on avoiding harm from potentially prolonged pubertal suppression.

## B. WPATH

As explained in Chapter 9 of HHS Review, the guidelines issued by the WPATH "have been rated among the lowest in quality and have not been recommended for implementation by systematic reviews (SRs) of guidelines."[38] As the HHS Review points out: "Despite their lack of trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States. The WPATH Standards of Care guidelines are embedded in nearly all aspects of healthcare including clinical education, delivery of care, and reimbursement decisions by private and public insurers." In 2022, WPATH issued guidelines entitled "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8" (SOC-8). These guidelines relaxed eligibility criteria for children to access sex-rejecting procedures, and ultimately recommends that adolescents wishing to undergo sex-rejecting procedures receive them. Besides the problems identified in systematic reviews of international guidelines, during recommendation development, WPATH suppressed systematic evidence reviews, failed to appropriately manage conflicts of interest, and prioritized legal and political rather than clinical considerations.[39] The HHS Review states: "In the process of developing SOC-8, WPATH suppressed systematic reviews its leaders believed would undermine its favored treatment approach. SOC-8 developers also violated conflict of interest management requirements and eliminated nearly all recommended age minimums for medical and surgical interventions in response to political pressures."[40]  The HHS Review goes on to explain: "The recommendations are couched in cautious-sounding language, stating that GD should be "sustained over time," particularly before administering CSH. However, no clear standard is set; the only guidance offered is the vague and clinically meaningless phrase "several years, leaving critical decisions open to broad and subjective interpretation.""[41]

On the surface, WPATH SOC-8 might appear to recommend a cautious approach toward assessment. Mental health providers are to conduct a "comprehensive biopsychosocial assessment" prior to initiating medical interventions in order "to understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care." At the same time, however, WPATH recommends that clinicians use the International Classification of Diseases 11th Revision diagnosis of "Gender Incongruence of Adolescence and Adulthood," which, unlike the DSM-5 diagnosis of "Gender Dysphoria," requires only "marked and persistent incongruence between an individual's experienced gender and the assigned sex." Because SOC-8 defines transgender in a similar way ("people whose gender identities and/or gender expressions are not what is typically expected for the sex to which they were assigned at birth") and provides no meaningful distinction between this meaning of transgender and gender non-conformity, SOC-8 effectively recognizes transgender identification as a medical condition justifying medical interventions.[42]

The HHS Review also argues: "Although WPATH's guidelines do not necessarily discourage mental healthcare, they likewise do not require it as a precondition for PMT [pediatric medical transition]. Some guideline authors opposed even minimal requirements for mental health support, arguing that such provisions were analogous to "conversion therapy."35 SOC-8's only formal recommendation is for a "comprehensive biopsychosocial assessment," although WPATH emphasizes that its guideline is "flexible," thereby leaving room for considerable variation in clinical practice."[43]
A recent systematic review evaluating international guideline quality concluded that healthcare professionals should account for the inadequate quality and independence of available guidance when utilizing WPATH and Endocrine Society international guidelines in practice.[44]

## C. AMA and AAP

JA556

While the AMA and the AAP have not issued their own treatment guidelines, they support the ES and WPATH guidelines, as discussed previously in this proposed rule.  AAP issued a policy statement in 2018 supporting the use of puberty blockers, cross-sex hormones, and surgeries for minors.[45] In support of sex-rejecting surgeries, AAP stated that while "current protocols [(ES, WPATH)] typically reserve surgical interventions for adults, they are occasionally pursued during adolescence on a case-by-case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family."  The AAP reaffirmed its policy statement in 2023, but also stated that it was conducting its own review of the evidence and guideline development---which still have not been released.[46]

Regarding the AAP policy statement, the HHS Review states:

> The AAP 2018 policy statement is not technically a CPG [clinical practice guideline] but has been widely cited in the U.S. as influential in establishing how pediatricians respond to children and adolescents with GD [gender dysphoria]. Because the document offers extensive clinical recommendations regarding every step of PMT—from social transition to PBs [puberty blockers], CSH [cross-sex hormones], and surgery—the York team assessed the trustworthiness of the AAP guidance using the same criteria they applied to CPGs. Using the AGREE II criteria, the AAP policy statement received the second-lowest average score among all international guidelines: 2 out of 7. As noted in Chapter 2, the AAP's policy statement's use of "gender diverse" casts a very wide net regarding which patients the organization considers eligible for medical intervention. The statement has been heavily criticized in peer-reviewed articles, which have pointed out that it is rife with referencing errors and inaccurate citations. Despite persistent advocacy among its members, who have petitioned the organization to release updated, evidence-based guidance for treating pediatric GD, the organization chose to reaffirm their policy statement in 2023.[47]

The Review comprehensively documents how SOC-8 development represented a significant departure from unbiased, evidence-driven clinical guideline development principles.[48]

The failure of professional organizations in the United States to protect children, and follow the principles of evidence-based medicine, highlights the need for this Declaration.

Global guidelines supporting care for children and adolescents experiencing gender dysphoria demonstrate variable methodological rigor and quality. The HHS Review's assessment reveals fundamental deficiencies in both the development processes and evidentiary foundations of the most frequently cited guidelines endorsing sex-rejecting procedures for minors.

## IV. INTERNATIONAL EVIDENCE REVIEWS AND CONSENSUS

The HHS Review's findings align with conclusions from multiple European nations that conducted independent, rigorous systematic evidence reviews. Sweden, Finland, and the United Kingdom each commissioned independent systematic evidence reviews through their public health authorities. All three nations concluded that medicalization[49] risks may exceed benefits for children and adolescents with gender dysphoria, subsequently implementing sharp restrictions on gender transition interventions for minors.[50,51,52,53,54,55] These three countries now recommend exploratory psychotherapy as initial treatment. Sweden and Finland reserve hormonal interventions exclusively for exceptional cases, recognizing their experimental nature.[56,57,58,59]

## A. United Kingdom's Cass Review

The United Kingdom's Cass Review represents the most influential evaluation to date—a four-year independent assessment of pediatric gender medicine published in April 2024. The Cass Review findings precipitated closure of the United Kingdom's Gender Identity Development Service (GIDS), which the Care Quality Commission had rated "inadequate" in 2021.

The Cass Review recommended restructuring the care delivery model away from centralized "gender clinic" approaches toward more holistic frameworks emphasizing psychosocial support delivered through regional hubs. The Review's findings also led the United Kingdom to prohibit puberty blocker use outside clinical trial settings and substantially restrict cross-sex hormone access.[60]

Though cross-sex hormones remain officially available, the National Health Service (NHS) recently disclosed that since the Cass Review's publication, no minor has satisfied eligibility criteria for receiving cross-sex hormones under updated policies.[61] Note that the United Kingdom has never provided gender dysphoria-related surgery to minors through the NHS.[62]

## B. Sweden

Sweden's National Board of Health and Welfare (NBHW) reviewed and revised its guidelines for minors under age 18 in 2022. The NBHW determined that risks from puberty-suppressing treatment using GnRH-analogues (injectable medications preventing ovarian and testicular hormone production) and hormonal treatment promoting opposite-sex characteristics likely exceed potential benefits.[63,64]

The NBHW specified that mental health support and exploratory psychological care should constitute first-line treatment. Hormonal interventions may serve as last-resort measures for select youth. Sweden has elected to restrict gender transition procedures for minors to research settings exclusively, limiting eligibility to early childhood-onset gender dysphoria cases.

## C. Finland

Finland's Council for Choices in Health Care, the monitoring agency for national public health services, issued guidelines in 2020 calling for psychosocial support as primary treatment, hormone therapy only after careful case-by-case consideration, and no surgical treatment for minors.[65, 66] Finland has restricted gender transition procedure eligibility to minors with early childhood-onset gender dysphoria and without mental health comorbidities.

## D. Denmark

Denmark experienced increased sex-rejecting procedure referrals from 97 individuals in 2016 to 352 in 2022, with biological females aged 11-18 constituting 70 percent.[67] Concerned about rising referrals and reports of treatment regret or attempts to reverse hormone-induced bodily changes, Denmark adopted an approach emphasizing assessment and psychosocial support for minors while postponing hormone therapy decisions, including puberty blockers and cross-sex hormones, particularly when gender incongruence has been brief or when questions exist regarding gender identity stability.[68]

## E. Norway

Norway's Norwegian Commission for the Investigation of Health Care Services (UKOM), an independent state agency, issued 2023 recommendations regarding treatment for children and young people with gender incongruence.[69] Recommendations included classifying puberty blockers and surgical treatment for children as experimental, revising national guidelines based on systematic

JA558

knowledge synthesis, and establishing a national registry to enhance quality and reduce treatment variation. Norway's public health authority has indicated intentions to adjust current treatment guidelines in response to UKOM concerns.[70]

### F. Additional Countries

Italy,[71] Brazil,[72] and Australia[73] represent additional countries that have restricted or contemplated restricting various sex-rejecting procedures for minors.

### G. International Developments Summary

Growing international concern exists regarding hormonal and surgical interventions for pediatric gender dysphoria among countries conducting rigorous, independent, evidence-based evaluations. While certain medical associations have endorsed sex-rejecting procedures, the HHS Review emphasizes that these endorsements lack grounding in evidence-based medicine and often reflect suppression of opposing ideas.

## V. DECLARATION

Based on the comprehensive evidence review published by the Department of Health and Human Services, documented risks of significant harm, markedly weak evidence of benefit, unfavorable risk-benefit profiles, inadequate existing clinical guidelines, growing international consensus among countries conducting rigorous evidence reviews, and applicable medical ethics principles, I hereby declare:

**Sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care. For the purposes of this declaration, "sex-rejecting procedures" means pharmaceutical or surgical interventions, including puberty blockers, cross-sex hormones, and surgeries such as mastectomies, vaginoplasties, and other procedures, that attempt to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex.**

This Declaration does not apply (1) To treatment of an individual with a medically verifiable disorder of sexual development; (2) For purposes other than attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex; or (3) To treat complications, including any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of a sex-rejecting procedure. 42 CFR § 1001.2 allows the Secretary to declare a "treatment modality *not* to be safe and effective," (emphasis added), and accordingly nothing in this declaration recommends a particular treatment for gender dysphoria or any other condition. However, the HHS Review points to psychotherapy (talk therapy) as a noninvasive alternative to sex-rejecting procedures. As Sweden's national health authority has recommended, "[p]sychosocial support that helps adolescents deal with natal puberty without medication needs to be the first option when choosing care measures."[74]

Under 42 U.S.C. § 1320a-7(b)(6)(B), the Secretary "may" exclude individuals or entities from participation in any Federal health care program if the Secretary determines the individual or entity has furnished or caused to be furnished items or services to patients of a quality which fails to meet professionally recognized standards of health care. This declaration does not constitute a determination that any individual or entity should be excluded from participation in any Federal health care program. Any such determination could only be made after a separate determination under 42 C.F.R. § 1001.701, which is subject to further administrative and judicial review under 42 C.F.R. §§ 1001.2007,

1005.21.  Before making any such determination, HHS will ensure compliance with applicable laws, regulations, court orders, and any required procedures.

This declaration rests upon the best available scientific evidence and aims to promote the health, safety, and well-being of children and adolescents, who constitute an especially vulnerable population deserving the highest standards of care.

---

**DECLARED** this 18th day of December, 2025.

---

_[signature]_

Robert F. Kennedy Jr.
Secretary
U.S. Department of Health and Human Services

---

[1] Stuart William Jarvis et al., "Epidemiology of gender dysphoria and gender incongruence in children and young people attending primary care practices in England: retrospective cohort study," _Archives of Disease in Childhood_ 110 (2025): 612-621, doi:10.1136/archdischild-2024-327992; Christian J. Bachmann et al., "Gender identity disorders among young people in Germany: Prevalence and trends, 2013--2022. An analysis of nationwide routine insurance data," _Deutsches Ärzteblatt International_ 121 (2024): 370-371, doi:10.3238/arztebl.m2024.0098.

[2] Henriette A. Delemarre-van de Waal and Peggy T. Cohen-Kettenis, "Clinical management of gender identity disorder in adolescents: A protocol on psychological and pediatric endocrinology aspects," European Journal of Endocrinology 155, Supp 1 (2006): S131-S137, https://doi.org/10.1530/eje.1.02231; E. Coleman et al., "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8," International Journal of Transgender Health 23, Supp 1 (2022): S1-S258, https://doi.org/10.1080/26895269.2022.2100644; and Wylie C. Hembree et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," The Journal of Clinical Endocrinology & Metabolism 102, no. 11 (2017): 3869–3903, https://doi.org/10.1210/jc.2017-01658.

[3] Wright J. D., Chen L., Suzuki Y, Matsuo K., Hershman D. L. (2023). National estimates of gender-affirming surgery in the US. JAMA Network Open,6(8), e2330348; Hughes L. D., Charlton B. M., Berzansky I., Corman J. D. (2025). Gender-affirming medications among transgender adolescents in the US, 2018–2022. JAMA Pediatrics, 179(3), 342–344.

[4] U.S. Department of Health and Human Services (HHS). _Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices. (Pre–Peer Review)_. Washington, DC: HHS, May 2025. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report-pre-peer-review.pdf

[5] U.S. Department of Health and Human Services (HHS), _Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices_. Washington, DC: HHS, November 2025.

[6] Henriette A. Delemarre-van de Waal and Peggy T. Cohen-Kettenis, "Clinical management of gender identity disorder in adolescents: A protocol on psychological and pediatric endocrinology aspects," _European Journal of Endocrinology_ 155, Supp 1 (2006): S131-S137, https://doi.org/10.1530/eje.1.02231.

[7] E. Coleman et al., "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,"_International Journal of Transgender Health_ 23, Supp 1 (2022): S1-S258, https://doi.org/10.1080/26895269.2022.2100644; Wylie C. Hembree et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," _The Journal of Clinical Endocrinology & Metabolism_ 102, no. 11 (2017): 3869--3903, https://doi.org/10.1210/jc.2017-01658.

[8] Jennifer Block, "US transgender health guidelines leave age of treatment initiation open to clinical judgment," _BMJ_ 378 (2022), https://doi.org/10.1136/bmj.o2303.

[9] Ibid.

[10] Ibid.

[11] Block, "US transgender health guidelines leave age of treatment initiation open to clinical judgment."

[12] Stephen B. Levine et al., "Reconsidering informed consent for trans-identified children, adolescents, and young adults," _Journal of Sex & Marital Therapy_ 48, no. 7 (2022): 706-727, doi:10.1080/0092623X.2022.2046221.

[13] Luca Borah et al., "State restrictions and geographic access to gender-affirming care for transgender youth," *JAMA* 330, no. 4 (2023): 375--378, doi:10.1001/jama.2023.11299.

[14] U.S. Department of Health and Human Services, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices," (May 1, 2025; final version November 18, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf.

[15] Jason D. Wright et al., "National Estimates of Gender-Affirming Surgery in the US," *JAMA Network Open* 6, no. 8 (2023), doi:10.1001/jamanetworkopen.2023.30348.

[16] Robin Respaut and Chad Terhune, "Putting numbers on the rise in children seeking gender care," Reuters, October 6, 2022, https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

[17] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices"; see also https://www.hhs.gov/press-room/gender-dysphoria-report-release.html

[18] U.S. Department of Health and Human Services (HHS), Supplement to *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices.* Peer Reviews and Replies. Washington, DC: HHS, November 2025. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report-supplement.pdf.

[19] HHS "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[20] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[21] Ibid.

[22] Ibid.

[23] Ibid, 10.

[24] Ibid.

[25] Ibid., 15.

[26] HHS Review pg. 225

[27] HHS Review pg. 128

[28] HHS Review pg. 226

[29] HHS Review pg. 227-228

[30] Ibid.

[31] Stacy Weiner, "States are banning gender-affirming care for minors. What does that mean for patients and providers?," *AAMCNews*, February 20, 2024, https://www.aamc.org/news/states-are-banning-gender-affirminghttps://www.aamc.org/news/states-are-banning-gender-affirming-care-minors-what-does-mean-patients-and-providerscare-minors-what-does-mean-patients-and-providers.

[32] "APA adopts groundbreaking policy supporting transgender, gender diverse, nonbinary individuals," American Psychological Association, released February 28, 2024, https://www.apa.org/news/press/releases/2024/02/policy-supporting-transgender-nonbinary.

[33] Alyson Sulaski Wyckoff, "AAP continues to support care of transgender youths as more states push restrictions," *AAP News*, January 6, 2022, https://publications.aap.org/aapnews/news/19021/AAP-continues-tosupport-care-of-transgender.

[34] "Criminalizing Gender Affirmative Care with Minors," American Psychological Association, accessed September 2, 2025, https://www.apa.org/topics/lgbtq/gender-affirmative-care.

[35] HHS Review pg. 141

[36] HHS Review pg. 15

[37] HHS Review. Pg. 124

[38] HHS Review, pg. 157

[39] Ibid.

[40] HHS Review, pg. 14

[41] HHS Review, Pg. 165

[42] HHS Review, pg. 194-195

[43] HHS Review, pg. 196.

[44] Taylor J, Hall R, Heathcote C, et al., "Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: a systematic review of guideline quality (part 1)," *Archives of Disease in Childhood* 2024;109: s65-s72, https://pubmed.ncbi.nlm.nih.gov/38594049/.

[45] *Pediatrics* (2018) 142 (4): e20182162.

[46] Alyson Sulaski Wyckoff, "AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update," *AAP News*, August 4, 2023, https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy.

[47] HHS Review pg. 148, 149

[48] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[49] "Medicalization," Cambridge Dictionary, accessed August 8, 2025,https://dictionary.cambridge.org/us/dictionary/english/medicalization.

[50] Jonas F. Ludvigsson et al., "A systematic review of hormone treatment for children with gender dysphoria and recommendations for research," *Acta Paediatrica* 112, no. 11 (2023): 2279-2292, https://doi.org/10.1111/apa.16791.

[51] National Institute for Health and Care Excellence (NICE), "Evidence Review: Gender Affirming Hormones for Children and Adolescents with Gender Dysphoria," (2020).

[52] National Institute for Health and Care Excellence (NICE), "Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria," (2020).

[53] I. Pasternack et al., "Lääketieteelliset menetelmät sukupuolivariaatioihin liittyvän dysforian hoidossa: Systemaattinen katsaus [Medical approaches to treating gender dysphoria: A systematic review]," Summaryx Oy (2019).

[54] Jo Taylor et al., "Interventions to suppress puberty in adolescents experiencing gender dysphoria or incongruence: A systematic review," *Archives of Disease in Childhood* 109, Supp 2 (2024): s33-s47, doi:10.1136/archdischild-2023-326669.

[55] Jo Taylor et al., "Masculinising and feminising hormone interventions for adolescents experiencing gender dysphoria or incongruence: A systematic review," *Archives of Disease in Childhood* 109, Supp 2 (2024): s48s56, doi:10.1136/archdischild-2023-326670.

[56] "Children and young people's gender services: implementing the Cass Review recommendations," NHS England, last updated August 29, 2024, https://www.england.nhs.uk/long-read/children-and-young-peoplesgender-services-implementing-the-cass-review-recommendations/.

[57] "Care of children and adolescents with gender dysphoria-summary of national guidelines," The Swedish National Board of Health and Welfare (Socialstyrelsen), December 2022, https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf.

[58] The Swedish National Board of Health and Welfare (Socialstyrelsen), "Care of children and young people with gender Dysphoria - national knowledge support with recommendations for the profession and decision makers," (2022), https://www.socialstyrelsen.se/globalassets/sharepointdokument/artikelkatalog/kunskapsstod/2022-12-8302.pdf.

[59] One Year Since Finland Broke with WPATH 'Standards of Care'," Society for Evidence Based Gender Medicine, July 2, 2021, https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors.

[60] "Children and young people's gender services: implementing the Cass Review recommendations," NHS England, last updated August 29, 2024, https://www.england.nhs.uk/long-read/children-and-young-peoplesgender-services-implementing-the-cass-review-recommendations/.

[61] Spencer, B. (2025, April 2). NHS swaps gender drugs for 'holistic' care. The Sunday Times. https://web.archive.org/web/20250420045726/https://www.thetimes.com/uk/healthcare/article/nhs-swaps-gender-drugs-for-holistic-care-jxhm3b6vk

[62] Silver, C., Calvey, R., Martin, A., & Butterworth, J. (2025). Towards best-practice healthcare for transgender patients: Quality improvement in United Kingdom general practice. Healthcare, 13(4), 353.

[63] "Care of children and adolescents with gender dysphoria-summary of national guidelines."

[64] The Swedish National Board of Health and Welfare (Socialstyrelsen), "Care of children and young people with gender Dysphoria."

[65] "One Year Since Finland Broke with WPATH 'Standards of Care'," Society for Evidence Based Gender Medicine, July 2, 2021, https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors.

[66] Council for Choices in Healthcare in Finland, "Summary of a recommendation by COHERE Finland," June 16, 2020, https://palveluvalikoima.fi/documents/1237350/22895838/Summary+transgender.pdf/2cc3f0532e34-39ce-4e21-becd685b3044/Summary+transgender.pdf?t=1592318543000.

[67] Mette Vinther Hansen et al., "Sundhedsfaglige tilbud til børn og unge med kønsubehag [Healthcare services for children and adolescents with gender dysphoria]," *Ugeskrift for Laeger* (2023), https://ugeskriftet.dk/videnskab/sundhedsfaglige-tilbud-til-born-og-unge-med-konsubehag.

[68] Nanna Ravnborg et al., "Gender Incongruence in Danish Youth (GenDa): A Protocol for a RetrospectiveCohort Study of Danish Children and Adolescents Referred to a National Gender Identity Service," *Journal of Clinical Medicine* 13 (2024), https://doi.org/10.3390/jcm13226658.

[69] Norwegian Healthcare Investigation Board (Ukom), "Pasientsikkerhet for barn og unge medkjønnsinkongruens [Patient safety for children and adolescents with gender incongruence]," March 2023, https://ukom.no/rapporter/pasientsikkerhet-for-barn-og-unge-med-kjonnsinkongruens/sammendrag.

[70] Jennifer Block, "Norway's guidance on paediatric gender treatment is unsafe, says review," *BMJ* 380 (2023), doi:10.1136/bmj.p697.

[71] Alvise Armellini, "Italy moves to tighten controls on gender-affirming medical care for minors," *Reuters*, August 5, 2025, https://www.reuters.com/business/healthcare-pharmaceuticals/italy-moves-tighten-controlsgender-affirming-medical-care-minors-2025-08-05/.

[72] AFP, "Brazil prohibits hormone therapy for transgender minors," *MSN News*, April 20, 2025, https://www.msn.com/en-in/news/other/brazil-prohibits-hormone-therapy-for-transgender-minors/arAA1D66l7.

[73] Australian Associated Press, "Queensland halts prescription of puberty blockers and hormones for children with gender dysphoria," *The Guardian*, January 28, 2025, https://www.theguardian.com/australianews/2025/jan/28/queensland-halts-prescription-of-puberty-blockers-and-hormones-for-children-with-genderdysphoria.

[74] HHS Review pg. 256

JA562



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**          Office of the Secretary

Office of Assistant Secretary for Health
Washington, D.C. 20201

| | |
|---|---|
| **FROM:** | Admiral Brian Christine, Assistant Secretary for Health |
| | U.S. Department of Health and Human Services |
| **RE:** | Evidence-Based Care for Children and Adolescents with Gender Dysphoria |
| **DATE:** | December 18, 2025 |
| **AUTHORITY:** | 42 U.S.C. § 300u et seq. (Health Information and Health Promotion) |

### PURPOSE

Pursuant to my statutory authority to coordinate disease prevention activities, disseminate health information, and promote preventive health services within the Department of Health and Human Services, I issue this public health message to inform healthcare providers, families, and policymakers about evidence-based approaches to caring for children and adolescents experiencing gender dysphoria.

### BACKGROUND

Gender dysphoria diagnoses among youth have increased substantially in recent years across the United States and Europe. In response, medical interventions including puberty-suppressing hormones, cross-sex hormones, and surgical procedures have been increasingly provided to children and adolescents. These treatments—sometimes referred to as "gender-affirming care"—have been endorsed by several U.S. medical associations as safe and effective.

However, recent comprehensive evidence reviews reveal serious concerns about the safety and effectiveness of these medical interventions for minors.

### HHS EVIDENCE REVIEW FINDINGS

On November 19, 2025, the Department of Health and Human Services released a comprehensive, peer-reviewed evidence review titled *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*. This review employed rigorous evidence-based medicine methodology and reached the following conclusions:

**Evidence Quality:** The overall quality of evidence concerning the effects of puberty blockers, cross-sex hormones, and surgeries on psychological outcomes, quality of life, or long-term health in minors is very low.

**Therapeutic Benefits:** Available evidence cannot support determinations regarding the effectiveness of these medical interventions for improving mental health or alleviating gender dysphoria symptoms in children and adolescents.

JA563

**Treatment Harms:** Known and plausible harm risks include:

- Infertility and sterility
- Sexual dysfunction
- Impaired bone density development
- Adverse cognitive effects
- Cardiovascular and metabolic disease
- Psychiatric conditions
- Surgical complications
- Treatment regret

**Risk-Benefit Analysis:** The evidence demonstrates an unfavorable risk-benefit profile for chemical and surgical interventions in children and adolescents with gender dysphoria.

## INTERNATIONAL CONSENSUS

As discussed in the HHS Review, multiple countries that have conducted independent, systematic evidence reviews have reached similar conclusions and substantially restricted these interventions for minors:

**United Kingdom:** The 2024 Cass Review led to prohibiting puberty blockers outside clinical trials and substantially restricting cross-sex hormone access. No minor has satisfied eligibility criteria for cross-sex hormones under its updated National Health Service policies since the review's publication.

**Sweden:** The National Board of Health and Welfare determined in 2022 that risks from puberty-suppressing and hormonal interventions likely exceed potential benefits. Sweden now restricts these procedures to research settings and recommends psychosocial support as first-line treatment.

**Finland:** Guidelines issued in 2020 call for psychosocial support as the primary treatment, state that medical transition is an "experimental practice," and restrict hormonal interventions to select cases.

**Denmark, Norway, and other nations** have adopted similar evidence-based restrictions emphasizing assessment and psychosocial support while limiting chemical and surgical interventions.

## CLINICAL GUIDELINE CONCERNS

The HHS Review identified serious methodological deficiencies in guidelines from the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, including:

- Suppression of systematic evidence reviews
- Inadequate management of conflicts of interest

JA564

- Prioritization of non-clinical considerations over evidence
- Failure to meet accepted standards for guideline trustworthiness and quality

**RECOMMENDATIONS FOR HEALTHCARE PROVIDERS**

Based on the HHS review, healthcare providers caring for children and adolescents with gender dysphoria should:

1. **Refuse to provide puberty blockers, cross-sex hormones, or surgical interventions** to children and adolescents, as these treatments pose unnecessary and disproportionate risks of harm with insufficient evidence of benefit.

2. **Prioritize comprehensive psychosocial assessment and support** as the foundation of care, consistent with evidence-based medicine.

3. **Address co-occurring mental health conditions** that commonly present alongside gender dysphoria through appropriate therapeutic interventions.

4. **Provide compassionate, developmentally appropriate counseling** to help young people and their families navigate gender-related concerns without resorting to harmful medical interventions.

5. **Educate families** about the weak evidence for medical interventions, the substantial documented harms, and the growing international consensus against medicalizing pediatric gender dysphoria.

**CONCLUSION**

The health and well-being of children and adolescents must remain our paramount concern. Current evidence does not support claims that puberty blockers, cross-sex hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria. Healthcare providers have an ethical obligation to provide excellent care to their patients, informed by the best evidence. As such, they should refuse interventions that pose unnecessary and disproportionate risks of harm, even when requested by patients or families.

Psychosocial support, comprehensive mental health care, and developmentally appropriate counseling represent evidence-based approaches that can help young people navigate gender-related distress without exposing them to the substantial risks associated with irreversible medical interventions.

This message serves the public health mission of promoting disease prevention, health information, and the appropriate use of healthcare for one of our most vulnerable populations—America's children and adolescents.

JA565

**FOR MORE INFORMATION:**
The complete HHS evidence review is available at: https://opa.hhs.gov/gender-dysphoria-report

**REFERENCES:**
U.S. Department of Health and Human Services (HHS), *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices.* Washington, DC: HHS, November 2025.

**ISSUED** this 18th day of December, 2025.


/s/ Brian Christine

Brian Christine, M.D.
Admiral, U.S. Public Health Service
Assistant Secretary for Health
U.S. Department of Health and Human Services

JA566

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No. 1:25-cv-03780 |

**MOVANTS' REPLY IN SUPPORT OF**
**MOTION TO QUASH SUBPOENA DUCES TECUM**

The Government's opposition asks this Court to enforce a subpoena that compels the disclosure of years of confidential medical records of children—records sought not to investigate a concrete federal offense, but to advance a preordained policy objective. At least five other courts across the country, confronting identical subpoenas, have recognized these fatal defects and quashed the respective subpoena. The Government's arguments in those cases, parroted here, have been repeatedly rejected, and its post-hoc rationalizations cannot supply the lawful purpose, relevance, or proportionality the Constitution requires. This Court should likewise act to prevent misuse of its process by quashing the subpoena's improper requests.

**ARGUMENT**

**I.      Movants Have Standing to Move to Quash the Subpoena**

The Government's threshold argument—that patients categorically lack standing to challenge a subpoena for their own medical records—is inconsistent with Fourth Circuit precedent and has already been rejected by another U.S. district court. *See In re: 2025 UPMC Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705, at *1 (W.D. Pa. Dec. 24, 2025) (finding that "the hospital has standing, and so too do the patients" to challenge the subpoena). The Government's position would leave patients whose medical records are seized with no forum to vindicate their constitutional rights, relegating those rights to hospitals facing institutional pressures to comply, an outcome incompatible with settled doctrine.

JA567

To establish Article III standing, a plaintiff must show "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Here, Movants "would be injured in fact by . . . invasion of their privacy from disclosure" of their confidential medical records, "[t]he cause[] of this injury [is] the subpoena . . . . , and the injury is redressable by quashing the subpoena." *In re Grand Jury*, 111 F.3d 1066, 1071 (3d Cir. 1997).

Subpoena practice confirms that Movants satisfy Article III's standing requirements. "A third party has standing to . . . challenge the validity of a subpoena directed to another person or entity when the third party has a legally cognizable interest in the materials sought." *In re Grand Jury Subpoena #06-1*, 274 F. App'x. 306, 310 (4th Cir. 2008) (citing *Gravel v. United States*, 408 U.S. 606, 608–609 & n.1 (1972)). That principle applies equally to administrative subpoenas, including those issued under § 3486. *See, e.g.*, *Reisman v. Caplin*, 375 U.S. 440, 449 (1964) (target of an administrative subpoena may challenge it even if not the recipient); *U.S. v. Lazar*, No. 04-20017-DV, 2006 WL 3761803, at *6 ( W.D. Tenn. Dec. 20, 2006) (non-recipient "has standing to challenge whether the government exceeded the scope of § 3486"). And where, as here, subpoenas seek medical records, courts have no difficulty finding standing. Patients possess a personal right in the confidentiality of those records and therefore may move to quash subpoenas seeking them. *See Adkins v. CMH Homes, Inc.*, No. 3:13-cv-32123, 2014 WL 7005856, at *2 (S.D. W.Va. 2014).

The Government's reliance on *expressio unius est exclusio alterius* is unavailing. Section 3486(a)(5) specifies who may invoke the statute's procedural mechanism to quash a subpoena; it

JA568

does not address, let alone abrogate, Article III standing to challenge unconstitutional government action. *See Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.") (citing *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974)). Nothing in § 3486 strips individuals of the ability to seek equitable relief when their own constitutional rights are threatened, and Congress cannot silently insulate administrative subpoenas from judicial review by limiting who may file statutory objections.

To the contrary, § 3486 expressly incorporates the standards applicable to judicial subpoenas. *See* 18 U.S.C. § 3486(a)(7). Those standards include Federal Rule of Civil Procedure 45,[1] which requires courts to quash or modify subpoenas that require disclosure of protected matter or impose undue burdens "on any 'person,' not just the recipient of the subpoena" and include burdens such as "invading privacy or confidentiality interests." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189-190 (4th Cir. 2019) (citing Fed. R. Civ. P. 45(d)(3)(A)(iv)). Therefore, "it is undisputed that an individual has an interest in the personal information contained in [their] medical records" sufficient to confer third-party standing under Rule 45 and, by extension, § 3486. *M.R. v. Tajdar*, Civ. No. TDC-17-3836, 2019 WL 3323207, at *2 (D. Md. July 24, 2019) (citing *Mezu v. Morgan State Univ.*, Civ. No. WMN-09-2855, 2011 WL 5110269, at *2 (D. Md. Oct. 25, 2011), *aff'd*, 495 F. App'x 286 (4th Cir. 2012)). Accordingly, Movants have both constitutional and statutory standing to challenge the subpoena.

---

[1] Rule 45 is also made applicable to § 3486 subpoenas through Rule 81(a)(5), which requires that the Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute[.]" *See also In re Grand Jury Subpoena Duces Tecum Issued to First Nat'l Bank Dated November 4, 1976*, 436 F. Supp. 46, 48 (D. Md. 1977) ("Application of the Civil Rules to administrative subpoenas . . . reflects a significant policy judgment that the weight and import of administrative subpoenas is comparable to that of ordinary civil subpoenas[.]")

3

Finally, a subpoena "remains at all times under the control and supervision of a court." *In re Grand Jury Subpoena*, 829 F.2d 1291, 1297 (4th Cir. 1987) (quoting *United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972)). Courts retain inherent authority to quash unlawful subpoenas *sua sponte*, regardless of a party's standing to object. *See, e.g.*, *Goldstein v. Hindle*, Civ. No. CJC-21-3124, 2025 WL 1928048, at *3 (D. Md. July 14, 2025); *United States v. Fitzgerald*, 416 F. App'x. 238, 244–45 (4th Cir. 2011).

## II.    Congress Has Waived Sovereign Immunity with Respect to Movants' Motion

The Government argues that sovereign immunity bars suit, but Congress has expressly waived immunity for suits seeking equitable relief from unlawful agency action. Under the Administrative Procedure Act ("APA"), the United States waives sovereign immunity for any suit brought by a person "suffering legal wrong because of agency action" that seeks relief "other than money damages." 5 U.S.C. § 702; *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019). "This waiver of sovereign immunity encompasses claims asserted under the APA as well claims arising under non-APA authority that seek equitable relief from agency action." *Amador v. Mnuchin*, 476 F.Supp.3d 125, 142 (D. Md. 2020) (citing *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011)). Here, Movants seek only declaratory and injunctive relief to prevent enforcement of a subpoena that compels disclosure of their medical records. They do not seek damages. Section 702 therefore applies by its plain terms.

The Government suggests otherwise by citing cases in which sovereign immunity barred suits for monetary damages,[2] or in which individuals received notice of a subpoena and a

---

[2] *F.D.I.C. v. Meyer*, 510 U.S. 471, 474, 486 (1994); *Bullock v. Napolitano*, 666 F.3d 281, 283 (4th Cir. 2012); *Osmon v. United States*, 66 F.4th 144, 146 (4th Cir. 2023); *Cunningham v. General Dynamics Info. Tech.*, 888 F.3d 640, 645 (4th Cir. 2018); *Lane v. Peña*, 518 U.S. 187, 189 (1996).

JA570

statutory opportunity to quash but failed to act within the time the statute required.[3] Those cases do not apply here. As the Government concedes, § 3486(a)(5)'s procedural mechanism to object is expressly limited to "the person or entity summoned;" therefore, "there is no other adequate remedy in a court" available to Movants. 5 U.S.C. § 704. The Fourth Circuit has made clear that "[i]n situations such as that here, in which there is no preclusion-of-review statute and no special statutory review procedure provided, the APA states the policy that a person suffering legal wrong because of agency action should have judicial review thereof by way of any applicable form of legal action, including an action for injunctive relief." *Hostetter v. United States*, 739 F.2d 983, 985–86 (4th Cir. 1984).

**III.    Movants Are Not Time-Barred from Challenging the Subpoena**

The Government's timeliness argument fails because a party cannot be faulted for failing to challenge a subpoena it never received, never saw, and had no meaningful opportunity to contest. The cases the Government cites are inapposite: each involved individuals who received actual notice that their information was subject to a subpoena and was provided a statutory process and deadline to object.[4] Movants received no such notice. *See Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 380 (D. Md. 1999) ("When a party fails to receive prior notice of the information sought from a non-party, a party is deprived of its greatest safeguard . . . that is, the ability to object to the release of the information prior to disclosure.").

The Government's July 9 announcement that subpoenas had been issued nationwide— without identifying the subpoenaed entities—did not give any patient notice that their records

---

[3] *Ponsford v. United States*, 771 F.2d 1305, 1309 (9th Cir. 1985); *Dorsey v. United States*, 618 F. Supp. 471, 472 (D. Md. 1985).

[4] *See Ponsford*, 771 F.2d at 1309 (notice presumed); *Jones v. C.I.R*, No. CCCB-07-2024, 2007 WL 4302593, at *1 (D. Md. Aug. 23, 2007) (notice presumed); *Swann v. Secretary, HUD*, No. 05-492, 2006 WL 148738, at *1 (D.D.C. Jan. 19, 2006) (notice provided); *Turner v. United States*, 881 F. Supp. 449, 451 (D. Haw. 1995) (notice provided).

JA571

were sought, let alone a meaningful opportunity to challenge disclosure. *See In re: 2025 UPMC Subpoena*, 2025 WL 3724705, at \*1 ("The timeliness argument is disingenuous, given the patients' initial lack of awareness of, and uncertainty regarding, the subpoena."). Movants did not sleep on their rights; they acted promptly once they learned that their confidential medical records were subject to a sweeping subpoena.

Even where timing rules apply, courts routinely excuse delay on untimely motions to quash where circumstances warranted equitable flexibility, including where subpoenas were facially overbroad or implicated confidential health information. *See, e.g.*, *In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999) (holding that "the failure to act timely will not bar consideration of [certain] objections" including that "a subpoena that is overbroad on its face"); *Olszewski v. Bloomberg L.P.*, No. 96 Civ. 3393, 2000 WL 1843236, at \*4 (S.D.N.Y. Dec. 13, 2000) (considering untimely motion to quash because movant was "entitled to protection from discovery of his confidential health . . . records"). Thus, nothing in § 3486, typical subpoena practice, or equity bars Movants' claims.

## IV.   The Government Fails to Show the Subpoena Serves a Lawful or Necessary Investigative Purpose

The Government's contention that the subpoena satisfies the Fourth Amendment has been rejected by five federal district courts evaluating identical subpoenas issued as part of the same nationwide effort targeting providers of lawful healthcare to transgender children and young adults. *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) (Seattle Children's Hospital); *In re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) (Boston Children's Hospital); *Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025); *In re: Subpoena No. 25-1431-014*, No. 25-39,

6

2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) (Children's Hospital of Philadelphia); *In re: 2025 UPMC Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025) (University of Pittsburg Medical Center). These courts rejected the same arguments the Government makes here.

A.      **The Subpoena Is Not Entitled to Deference Where the Record Shows an Improper and Untethered Purpose**

The Government contends that the subpoena serves a valid investigative purpose under the Food, Drug, and Cosmetic Act ("FDCA"), and that this Court must accept that purpose at face value. But administrative subpoenas are not self-validating, and the undisputed record demonstrates that this subpoena was issued to advance a predetermined policy objective—not to investigate a concrete violation of federal law.

The Administration has made its position explicit. The record demonstrates that the subpoena's purpose is not to investigate a federal healthcare offense, but to advance the Administration's stated objective to end the provision of gender-transition medical care to minors—"an unprecedented federal intrusion into the regulation of medical practice—an area long reserved to the states." *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 276 (4th Cir 2025). The subpoena was issued on the heels of Executive Orders and a public memorandum from the Attorney General pledging to "hold accountable" hospitals and doctors who provide this care.[5] Since then, the Administration has made its objective increasingly clear: the U.S. Department of Health and Human Services ("HHS") has proposed regulations to prohibit federal funding and defund hospitals providing established healthcare to transgender minors,[6] and the HHS Secretary

---

[5] U.S. Off. Of The Att'y Gen., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[6] Medicaid Program, Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 90 Fed. Reg. 59441 (Dec. 19, 2025); Medicare and Medicaid Programs;

JA573

recently issued a declaration further attempting to redefine standards of care for purposes of federal program participation in order to exclude those same providers and institutions.[7] HHS announced the purpose of these actions in plain terms: "to carry out President Trump's Executive Order directing HHS to end the practice of sex-rejecting procedures on children."[8] That is the same Executive Order that directed the Department of Justice ("DOJ") to issue the subpoena at issue here.[9]

The Government's effort to recast this policy campaign as a neutral investigation is pretextual. And the Government's reliance on a "presumption of regularity," U.S.' Mem. of Law in Opp. to Motion to Quash Subpoena, ECF 15, at 16 (hereinafter "U.S. Brief"), does not foreclose judicial scrutiny of the subpoena. That presumption cannot serve as a substitute for the required showing that the subpoena serves "a legitimate purpose" and seeks information "relevant to that purpose." *United States v. Powell*, 379 U.S. 48, 57 (1964); *see also Mayor of Baltimore v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019) (noting that while "judicial review of agency action is deferential . . . .Of course, that does not mean courts should 'rubber-stamp' agency action."). The Government's own repeated statements, declarations, and regulatory actions provide the clearest evidence that its objective is to end the very practice it claims to be merely investigating.

---

Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children, 90 Fed. Reg. 59463 (Dec. 19, 2025).

[7] Decl. of the Sec. of the Dep't of Health and Human Servs. Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents (Dec. 18, 2025), https://www.hhs.gov/sites/default/files/declaration-pediatric-sex-rejecting-procedures.pdf.

[8] *HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children*, U.S. Dep't Health & Hum. Servs. (Dec. 18, 2025), https://www.hhs.gov/press-room/hhs-acts-bar-hospitals-performing-sex-rejecting-procedures-children.html.

[9] *Protecting Children From Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/.

JA574

The Government claims that the subpoena is necessary to investigate the "distribution, promotion and sale of puberty blockers and cross-sex hormones in minors for the treatment of gender dysphoria" under the FDCA. U.S. Brief at 15. But the Government has not identified a single concrete instance of misbranding, adulteration, or unlawful promotion at Children's National Hospital ("CNH") – or anywhere else – that would justify sweeping access to years of pediatric medical records. The disconnect between the stated purpose and the records sought is fatal to the Government's position. If the Government were genuinely investigating FDCA violations by manufacturers or distributors, it would seek branding, sales, and promotional materials – not individual patient charts. Patient records cannot reveal whether a manufacturer engaged in misbranding or unlawful promotion; they show only what care a patient received. The only way these records become relevant to an FDCA investigation is if the Government has already concluded that all prescriptions for these medications are illegal – a conclusion that presupposes the answer to the question it claims to be investigating.

That approach turns the FDCA on its head. The Act "regulates *commerce*, not *care* . . . [O]ff-label prescribing – the use of an approved drug for an unapproved indication – is lawful and beyond the Act's reach. 'Although the Act regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of medicine.'" *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *17 (quoting *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021)) (internal citation omitted) (emphasis in original).

The Government must show a "realistic expectation rather than an idle hope" of finding a violation to support a subpoena. *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *6 (quoting *U.S. v. Harrington*, 338 F.2d 520, 524 (2d Cir. 1969)). Multiple courts,

9

reviewing identical subpoenas in this nationwide effort, held that the Government's justification is pretextual and fails this basic test. One court found DOJ's justification "threadbare" and concluded its true purpose was not to investigate a federal healthcare offense but to "end gender-related care for minors." *Id.* at \*15 n.12. Another quashed a subpoena because it was issued to advance "generalized policy objections about medical treatment decision," not to investigate a cognizable federal offense. *In re Subpoena No. 25-1431-014*, 2025 WL3252648, at \*17. Simply put, "Congress, through Section 3486, does not authorize a federal investigation into lawful medical practice simply because the President or current Attorney General disapproves of the care provided regardless of [a state]'s approval in the exercise of its police powers." *Id.*

### B. The Government Has Not Shown That Identified Patient Records Are Necessary to Its Investigation

The subpoena fails Fourth Amendment scrutiny for an independent reason: its scope is unreasonably broad and disproportionate to any legitimate investigation need. The Fourth Circuit has made clear that relevance in the administrative-subpoena context is not boundless. Where a subpoena does not reasonably relate to the inquiry the agency is authorized to conduct, it must be quashed. *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000). The subpoena here fails that test.

The Government asserts that patient identities are necessary to match clinical charts to billing records, review consent practices, and identify fraudulent patterns. But that inverts investigative logic. The Government can analyze billing codes, payment records, communications with manufacturers, consent form templates, and prescribing patterns without knowing the identities of individual children. If those materials reveal systemic miscoding, fraudulent billing, or deficient consent practices, that evidence exists independent of whether a particular patient is named. The Government does not need to know that a specific minor

10

JA576

received particular medications to determine whether treatments were misbilled or whether off-label promotion occurred. Identifying individual patients serves no investigative purpose at this stage – it only magnifies the privacy intrusion.

## V. The Government's Misreading of Fourth Circuit Precedent Would Eliminate Fifth Amendment Privacy Protections for Medical Records

The Government asks this Court to hold that § 3486 provides a categorical exception to the Fifth Amendment's privacy protections for medical records. This request misreads the law – neither the Supreme Court nor the Fourth Circuit has ever held that patients forfeit their constitutional privacy rights simply by seeking medical care, or that administrative subpoenas for medical records are immune from constitutional scrutiny. To the contrary, controlling precedent requires a case-specific balancing of interests, weighing the Government's asserted need against the individual's privacy interest, and considering the nature of the information sought, the breadth of the request, and the adequacy of safeguards against misuse.

### A. Patients Retain a Constitutionally Protected Privacy Interest in Their Medical Records

The Government points to CNH's Notice of Privacy Practices, which states that protected health information may be disclosed for law enforcement purposes. But general notice that disclosure is legally possible does not eliminate patients' reasonable expectation that such disclosure will occur *only when legally proper*. At most, such notices establish a reduced expectation of privacy, not its elimination. *See In re Subpoena Duces Tecum*, 228 F.3d at 351 (recognizing only a "reduced," not eliminated, expectation of privacy in patient records and balancing that interest against the Government's showing of a compelling interest). Patients reasonably expect that government access to their medical records requires lawful statutory authority and compliance with constitutional limits. A notice that records may be disclosed for lawful investigations does not authorize disclosure for unlawful or untethered ones. *See*

11

JA577

*Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001) (distinguishing information sharing within the healthcare system from the more serious intrusion on privacy that results from "the unauthorized dissemination . . . to third parties"). The Government's position would mean that anyone who signs a hospital privacy form forfeits all constitutional protection, effectively nullifying constitutional safeguards in the healthcare context. No precedent supports that result. *See, e.g.*, *Carpenter v. United States*, 585 U.S. 296, 314 (2018) (rejecting the notion that limited third-party disclosure automatically extinguishes reasonable expectations of privacy).

"Following in the Supreme Court's footsteps, the Fourth Circuit has long recognized a right to privacy in personal information." *Senior Execs. Ass'n v. United States*, 891 F. Supp.2d 745, 750 (D. Md. 2012) (citing *Taylor v. Best*, 746 F.2d 220, 225 (4th Cir.1984)). And "[f]ederal courts have acknowledged the importance of protecting a patient's right to privacy in medical records." *United States v. Elliott*, 676 F. Supp. 2d 431, 439 (D. Md. 2009). Movants' "[m]edical information is inherently intimate and personal and 'is precisely the sort [of information] intended to be protected by penumbras of privacy.'" *In re Grand Jury Subpoena*, 197 F.Supp.2d 512, 514 n.7 (E.D. Va. 2002) (quoting *Doe v. Southeastern Pa. Transp. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995). This Court should reject the Government's attempt to convert ordinary consent in the healthcare context into a comprehensive waiver of constitutional rights.

**B.** **The Government Fails to Carry Its Burden Under the Required Case-Specific Balancing Test**

The Government relies heavily on *In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000), to suggest that § 3486 categorically satisfies the Fifth Amendment's privacy protections for medical records. It does not. The Eastern District of Pennsylvania expressly applied *Subpoena Duces Tecum*'s balancing framework to an identical subpoena and concluded that the precedent "reflects a case-specific balance of interests, not a determination Section 3486

12

JA578

inherently provides constitutionally sufficient privacy protection for all subpoenaed medical records 'as a matter of law.'" *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *23. Other federal district courts evaluating identical subpoenas reached the same conclusion, quashing requests for identified patient records based on the same *In re Subpoena Duces Tecum* factors: the absence of a concrete, institution-specific showing of wrongdoing, the exceptional sensitivity of the records sought, and the availability of less intrusive means to pursue the Government's stated investigative interests.

Critical differences between this subpoena and the one at issue in *In re Subpoena Duces Tecum* compel a different result. There, the investigation targeted a specific physician suspected of concrete billing fraud based on particularized evidence. The Fourth Circuit emphasized that the Government had articulated a focused investigation into identifiable misconduct. *See* 228 F.3d at 350. Here, by contrast, the Government has identified no specific violation at CNH that would justify the disclosure of identifiable patient medical records. It advances generalized objections to an entire category of lawful medical care and seeks years of patient records in the absence of any institution-specific showing.

Second, while *In re Subpoena Duces Tecum* rested on the Government's "compelling interest in identifying illegal activity," *id.* at 351, that interest is not self-executing. District courts in this Circuit have recognized that the decision "does not mean that in all circumstances the government's interest in advancing an ongoing criminal investigation will always outweigh a patient's privacy interest in his medical records. There may be circumstances where a different result should obtain because a person's substantial privacy interest in certain medical records is not overcome by the government's interest in the contents of those records." *In re Grand Jury Subpoena*, 197 F. Supp. 2d 512, 515 (E.D. Va. 2002). This is such a case. The Government's

13

JA579

asserted interest is attenuated and speculative; the privacy interests at stake—identifiable, highly sensitive childhood medical records—are at the core of constitutional protection.

Third, the scope of the subpoena here is far broader than that in *In re Subpoena Duces Tecum*. The subpoena seeks years of identifiable medical records for all minor patients who received certain treatments, untethered to any particularized suspicion or defined instance of misconduct. The breadth of that demand magnifies the privacy intrusion and underscores the absence of the narrow tailoring that supported enforcement in *In re Subpoena Duces Tecum*.

Finally, *In re Subpoena Duces Tecum* requires a case-specific balancing analysis. The Fourth Circuit "expressly considered privacy interests and balanced them against the Department of Justice's asserted need for redacted records—an approach consistent with, not contrary to, *Westinghouse*." *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *23. Applying that framework here—considering the nature of the records, the scope of the request, the strength of the Government's interest, and the availability of less intrusive means—leads to the opposite result. The subpoena cannot stand.

## VI.    The Court Is Not Limited to Movant-Specific or Partial Relief

The Government's fallback proposal—limiting relief to the named Movants and modifying the subpoena to permit anonymized records—fails to cure the constitutional defects and disregards this Court's independent duty to prevent misuse of subpoena power. A subpoena duces tecum "remains at all times under the control and supervision of a court," and courts possess inherent authority to quash or modify subpoenas that are unlawful, unreasonable, or unconstitutional, whether or not every affected individual is formally before the Court. *In re Grand Jury Subpoena*, 829 F.2d 1291, 1297 (4th Cir. 1987) (quoting *United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972)). That authority is especially critical here, where the subpoena targets confidential medical records of many children and families who may never learn their

JA580

information is at risk of disclosure. Limiting relief to named challengers would leave similarly situated patients exposed to unconstitutional intrusion based solely on happenstance and their ability to retain counsel. This Court is not required to tolerate a plainly unlawful subpoena merely because not every affected child is a party. *See In re: 2025 UPMC Subpoena*, 2025 WL 3724705, at *3 (granting motion to quash identical subpoena requests as to all patients).

The Court is not limited to modifying the subpoena where the defect is fundamental. Modification may be appropriate where a subpoena is overbroad but otherwise lawful; quashing is required when a subpoena exceeds statutory authority, lacks a proper purpose, or violates constitutional limits. *In re Subpoena Duces Tecum*, 228 F.3d at 349. Here, the Government has identified no narrowing construction that would cure the defects, because its demands for patient identities and complete medical files are themselves unauthorized and unreasonable.

Anonymization does not cure the constitutional harm. In *Northwestern Mem'l Hosp. v. Ashcroft*, the Seventh Circuit affirmed quashing a subpoena for redacted medical records because redaction could not eliminate realistic risks of reidentification and would not prevent harm, including the chilling effect on care-seeking. 362 F.3d 923, 929–31 (7th Cir. 2004). Those concerns apply with full force here. The Government's overt hostility toward transgender healthcare magnifies the risks of reidentification, chilling of care-seeking, and erosion of trust in the healthcare system. Anonymization is not adequate.

## CONCLUSION

Because the subpoena does not satisfy governing statutory and constitutional requirements, the Court should quash Requests 11, 12, and 13.

JA581

Dated: January 5, 2026

Respectfully submitted,

*/s/ Eve L. Hill*

Eve L. Hill (Bar No. 11938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Jennifer L. Levi (*pro hac vice*)
Donovan C. Bendana (*pro hac vice* to be submitted)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org
dbendana@gladlaw.org

*Attorneys for Movants*

16

JA582

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No. 1:25-cv-03780 |

**MOVANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Movants respectfully submit this Notice of Supplemental Authority in support of their pending motion to quash Requests 11, 12, and 13 of the Department of Justice ("DOJ") subpoena issued against Children's National Hospital.

On January 5, 2026, a magistrate judge on the United States District Court for the District of Colorado issued a Recommendation that an identical administrative subpoena issued by DOJ to Children's Hospital Colorado be quashed in its entirety. *In re: Department of Justice Administrative Subpoena No. 25-1431-030*, No. 25-mc-00063 (D. Colo. Jan. 5, 2026).

After full briefing, Magistrate Judge Cyrus Y. Chung held that:

(1)     DOJ failed to demonstrate that the subpoena was sufficiently limited in scope or relevant in purpose to a congressionally authorized investigation of a federal health care offense under 18 U.S.C. § 3486. The magistrate judge emphasized that "[r]ather than limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling . . . Requests 11 to 13 create a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy."

(2)     Failure to quash the DOJ subpoena would abuse the court's process. The magistrate judge found that the evidence "paints a compelling picture illustrating that the government's aim is not actually to investigate FDCA violations, but to use the FDCA

as a smokescreen for its true objective of pressuring pediatric hospitals into ending

gender-affirming care through commencing vague, suspicionless 'investigations.'"

A copy of the Recommendation is attached as Exhibit 1 to this Notice.


Dated: January 6, 2026                    Respectfully submitted,


                                          _____/s/ Eve L. Hill_____
                                          Eve L. Hill (Bar No. 11938)
                                          BROWN GOLDSTEIN & LEVY, LLP
                                          120 E. Baltimore St., Suite 2500
                                          Baltimore, MD 21202
                                          Tel: (410) 962-1030
                                          Fax: (410) 385-0869
                                          ehill@browngold.com

                                          Jennifer L. Levi (*pro hac vice*)
                                          Donovan C. Bendana (*pro hac vice*)
                                          GLBTQ LEGAL ADVOCATES & DEFENDERS
                                          18 Tremont Street, Suite 950
                                          Boston, MA 02108
                                          (617) 426-1350
                                          jlevi@gladlaw.org
                                          dbendana@gladlaw.org

                                          *Attorneys for Movants*

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 1 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 1 of 23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Misc. No. 25-mc-00063-SKC-CYC

In re: Department of Justice Administrative Subpoena No. 25-1431-030

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**Cyrus Y. Chung, United States Magistrate Judge.**

Congress grants certain administrative agencies authority to issue subpoenas in aid of investigations premised on specific, enumerated statutes. When the recipient of one of these subpoenas moves to quash it, the government must demonstrate that its requests are reasonably relevant to the subpoena's congressionally-authorized purpose. The government does not do so here. And nothing in that grant of authority contemplates using such subpoenas to try to end practices that the statutes do not prohibit. Here, the government served upon petitioner Children's Hospital Colorado a subpoena animated by that improper purpose. For the reasons that follow, then, the Court recommends that the petitioner's Motion to Quash Subpoena, ECF No. 1, be **GRANTED**.

**BACKGROUND**

On July 14, 2025, the United States Department of Justice served the petitioner with Administrative Subpoena No. 25-1431-030 (the "Subpoena"). ECF No. 1-3 ¶ 3. On its face, the Subpoena purports to be "necessary . . . to investigate Federal health care offenses" and invokes 18 U.S.C. § 3486 for its authority. ECF No. 1-4 at 2. It seeks to compel the disclosure of information about the petitioner's provision of "gender-related care," which the Subpoena defines as treatment provided to allow individuals to resemble, physically or socially, another biological sex. ECF No. 1-4 at 6, 8–10. The Subpoena contains fifteen requests for documents:

JA585

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 2 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 2 of 23

- Complete personnel files for the petitioner's employees, contractors, or affiliates (Request 1);

- Records regarding the use of diagnosis codes for both gender-related care and for more general care of minors (Requests 2 and 3);

- Documents and communications relating to billing and coding practices for and the medical consequences of gender-related care (Requests 4–6, 14–15);

- Communications with and documents from pharmaceutical manufacturers regarding the use of puberty blockers, hormones, or other products for gender-related care (Requests 7–9);

- Documents relating to promotional arrangements or contracts between the petitioner and manufacturers of puberty blockers or hormones (Request 10); and

- Patient data, including name, address, and social security information for minors who received puberty blockers or hormone therapy; medical records "relating to the clinical indications, diagnoses, or assessments" leading to the prescription of such medicines; and intake, informed consent, and parent authorization documentation for such patients (Requests 11–13).

ECF No. 1-4 at 8–10. Following receipt of the Subpoena, the petitioner met and conferred with the government. ECF No. 1-3 ¶ 5. For some requests, that resulted in a narrower focus: the government clarified, for example, that its interest in Requests 1 through 3 extended only so far as they related to the petitioner's TRUE Center for Gender Diversity, *see* ECF No. 1-5, which provides "a safe and supportive environment for transgender youth to be their authentic selves" at which some, but "[n]ot all . . . patients . . . receive medical gender-affirming care." ECF No. 1-15 ¶ 16. For other requests, the effort was futile: the government insisted, for instance, that it had a right to the patient information referenced in Requests 11 through 13 and rebuffed any compromise that required de-identifying patient records. ECF No. 1-3 ¶ 9.

Having clarified the scope of the Subpoena, the petitioner later met again with the government, urging it to withdraw the Subpoena. *Id.* ¶ 15. The government refused. *Id.*

The next day, the petitioner filed this action, seeking to quash the Subpoena. ECF No. 1. The district judge referred the motion to quash to the undersigned. ECF No. 11. After standard

2

JA586

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 3 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 3 of 23

briefing, the government sought to file a surreply, ECF No. 18, which the Court denied. ECF No. 32. A group of states, including Colorado, sought to file a brief as *amici*. ECF No. 25. The Court granted that unopposed request. ECF No. 33.

## ANALYSIS

"Administrative agencies wield broad power to gather information through the issuance of subpoenas." *Resol. Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994). These agencies are part of the government's Executive Branch and include the Department of Justice. *See United States v. Markwood*, 48 F.3d 969, 975 (6th Cir. 1995) (citing 5 U.S.C. §§ 101, 105, 500, 551). But that power is not unlimited. Because "[a]n administrative agency's authority to issue subpoenas 'is created solely by statute,'" the terms of the relevant statute impose specific limitations on the corresponding subpoena authority. *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (quoting *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988)). The Fourth Amendment's guarantee that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV, also cabins administrative-subpoena use more generally. *See v. City of Seattle*, 387 U.S. 541, 544 (1967).

These twin limitations engender corresponding obligations for district courts faced with whether to enforce an administrative subpoena. "A district court's first task" in this inquiry "is to decide whether the agency has met the statutory requirements pertaining to the issuance and enforcement of the subpoena." *Markwood*, 48 F.3d at 976–77. "Next, the court must consider whether the agency has satisfied or complied with the judicially-created standards for enforcement of the subpoena." *Id.* at 977. In this Circuit, for non-tax subpoenas, these inquires are subsumed into "the 'reasonable relevance' standard," under which "administrative subpoenas

3

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 4 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 4 of 23

will generally be enforced if 'the inquiry is within the [statutory] authority of the agency,'" *United States v. Wilson*, 98 F.4th 1204, 1221 (10th Cir. 2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)), "and if the subpoena is 'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Id.* (quoting *Becker v. Kroll*, 494 F.3d 904, 916 (10th Cir. 2007)). The government bears the initial burden of "mak[ing] a prima facie showing" of reasonable relevance. *Id.*

If the government carries its burden, the subpoena's recipient can still attempt to "demonstrat[e] that the government has not met this standard," *id.*, or "that judicial enforcement 'would amount to an abuse of the court's process,'" *United States v. Whispering Oaks Residential Care Facility*, 673 F.3d 813, 817 (8th Cir. 2012) (quoting *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 931 (8th Cir. 1985)). The recipient "bears a heavy burden" in these endeavors, *id.* at 817; *accord Standing Akimbo, LLC v. U.S. through IRS*, 955 F.3d 1146, 1155 (10th Cir. 2020), compared with the government's "slight" initial burden. *ICE v. Gomez*, 445 F. Supp. 3d 1213, 1216 (D. Colo. 2020).

In analyzing the Subpoena, the Court does not write on a pristine page. Several courts have ruled on similar subpoenas sent to providers of gender-related care around the country. "[N]o reported federal decision has ruled in the government's favor." *In re: 2025 UPMC Subpoena*, No. 2:25-mc-01069-CB, 2025 WL 3724705, at *1 (W.D. Pa. Dec. 24, 2025).

The Court joins the chorus. Notwithstanding the government's relatively light burden, the government's meager attempt to carry it falls short. In all events, the petitioner's evidence of abuse of the court's process abounds.

4

JA588

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 5 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 5 of 23

## I.     Prima Facie Case

### A.  Statutory Authority

The statute authorizing the Subpoena permits "the Attorney General" to "issue in writing and cause to be served a subpoena requiring . . . the production of any records or other things relevant to the investigation" in "any investigation of . . . a Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I), (a)(1)(A)(iii), (a)(1)(B)(i). The "Attorney General" includes her "designee," *Whispering Oaks*, 673 F.3d at 817; *see* 28 U.S.C. § 510 (permitting the Attorney General to authorize an "officer, employee, or agency of the Department of Justice" to perform her functions), and "a Federal health care offense" includes violations of "section 301 of the Federal Food, Drug, and Cosmetic Act [the "FDCA"] (21 U.S.C. [§] 331)." 18 U.S.C. § 24(a).

The government indicates, by way of declaration, that the Attorney General has authorized the Assistant Attorney General for the Civil Division (the "AAG-Civil") to wield her section 3486 authority "to investigate violations of the FDCA that relate to a health care benefit program" and that the government is investigating potential FDCA violations by "off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors." ECF No. 10-1 ¶¶ 5–6. The AAG-Civil, it says, issued the Subpoena in connection with that investigation. *Id.* ¶ 7; *see* ECF No. 1-4 at 2. No more is necessary to show compliance with the statutory requirements for authorization of the Subpoena. *See In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC, 2025 WL 3562151, at *5 (W.D. Wash. Sept. 3, 2025) ("*Seattle Children's*").

The petitioner protests. The government's own Justice Manual, it notes, lists only United States Attorneys and the Assistant Attorney General for the Criminal Division as the Attorney General's designees for section 3486 authority, not the AAG-Civil. ECF No. 17; *see* U.S. Dep't of Justice, Justice Manual § 9-44.201. That is true. But the petitioner "does not show that this

JA589

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 6 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 6 of 23

provision of the Justice Manual is an exclusive list of individuals to whom the Attorney General has delegated such authority" and therefore provides no reason to disbelieve the government's declaration on this point, especially when the government's burden here is only "slight." *Seattle Children's*, 2025 WL 3562151, at *5.

The government meets its burden as to statutory authority.

### B. Limited In Scope

Regarding the Subpoena's substantive justifications, though, the government's perfunctory efforts fall short. It pays lip service, for example, to the requirement that its requests be limited in scope. ECF No. 10 at 2. But neither its supporting declaration nor its response to the petitioner's motion even attempt to explain the propriety of the Subpoena's scope. The declaration never deigns to explain the government's investigation, let alone how the Subpoena is right-sized for it. *See* ECF No. 10-1 at 3. And although the motion response mentions "scope" once when acknowledging the Tenth Circuit's requirements, the word makes no repeat appearance thereafter. *See* ECF No. 10. The prima facie burden is not a heavy one — even "a simple affidavit of an agent involved in the investigation" will do, *Wilson*, 98 F.4th at 1221 — but mere handwaving over the Fourth Amendment's requirements cannot carry even that slight burden. *Seattle Children's*, 2025 WL 3562151, at *8–9. After all, while the "review" of an administrative subpoena "is narrow, it is not without content." *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 691.

Even ignoring the government's inattention to this requirement, an attempt at a self-guided tour through the Subpoena's scope fares no better. Rather than limiting its request for patient data to some criteria relevant to an ostensible investigation into misbranded labeling, for instance, *compare Wilson*, 98 F.4th at 1222 (justifying subpoena based on narrowing of request for patient data to "only documents and records that are relevant to conditions for which a

JA590

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 7 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 7 of 23

controlled substance was prescribed"), Requests 11 to 13 create a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy. ECF No. 1-4 at 9; *see In re Admin. Subpoena No. 25-1431-019*, --- F. Supp. 3d ----, 2025 WL 2607784, at *6 (D. Mass. Sept. 9, 2025) ("*Boston Children's*") (noting "astonishingly broad" request for "all medical records and personal information of patients"). Likewise, "Request Numbers 7–9 are facially overbroad, as they seek [the petitioner's] communications with manufacturers, sales representatives, marketing departments, and medical science liaisons regarding the treatment of gender dysphoria and the use of puberty blockers or hormones generally, not just those used 'off-label.'" *QueerDoc, PLLC v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, 2025 WL 3013568, at *6 (W.D. Wash. Oct. 27, 2025); *accord Boston Children's*, 2025 WL 2607784, at *6.

In short, the Subpoena never attempts to satisfy its burden as to limited scope, and the Subpoena evinces itself little effort to cabin itself appropriately.

### C. Relevant in Purpose

The Subpoena fares little better when measured for relevance.

In theory, the government is investigating violations of the FDCA. That law "outlaws drug misbranding." *United States v. Williams*, 549 F. App'x 813, 816 (10th Cir. 2013). In particular, "[u]nder 21 U.S.C. § 331, it is unlawful to introduce, deliver, or receive in interstate commerce misbranded drugs." *Id.* Accordingly, "[t]he FDCA creates both civil and criminal penalties for drug manufacturers that promote the use of approved drugs for unapproved uses (referred to here as "off-label" uses)." *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 5 (1st Cir. 2019). "The FDCA, however, does not prohibit doctors from prescribing drugs for off-label uses." *Id.*; *accord UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 127 (2d Cir. 2010) ("While off-label prescriptions are permitted within a physician's discretion, drug manufacturers are prohibited from promoting off-label uses in marketing a drug."); *In re*

JA591

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 8 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 8 of 23

*Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012) ("[T]here is a certain 'asymmetry' in the regulation of off-label uses: while physicians may lawfully prescribe drugs for off-label uses, the FDCA generally prohibits manufacturers from marketing these uses to physicians.").

Given that misbranding in the stream of commerce is the FDCA's focus, Requests 11 to 13, which seek personal health data, "have little to do with investigating violations of FDCA." *QueerDoc*, 2025 WL 3013568, at *6. "These requests concern how clinicians treated individual children and intimate clinical details shedding no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the [FDCA] and Section 331." *In re Subpoena No. 25-1431-014*, --- F. Supp. 3d ----, 2025 WL 3252648, at *14 (E.D. Pa. Nov. 21, 2025) ("*Children's Hosp. of Phila.*"). They are not, therefore, relevant in purpose to an FDCA investigation.

Nor does the government seriously contend otherwise. Instead, invoking the maxim that relevance is broadly construed for administrative subpoenas, it points to the petitioner's position as a prominent provider of puberty blockers and hormone therapy and concludes that all records related to that function must be relevant. ECF No. 10 at 10.

"To be sure, Congress . . . may permissibly grant broad investigative authority to regulatory agencies." *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (citing *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 204–05 (1946)). And where Congress gives the agency broad latitude, courts must construe relevance accordingly. *See, e.g.*, *United States v. Balanced Fin. Mgmt.*, 769 F.2d 1440, 1443 (10th Cir. 1985). But while the petitioner is "the leading provider of pediatric healthcare across the Rocky Mountain region." ECF No. 1-15 ¶ 5, "[m]ore patients," even patients who seek gender-affirming care, "do[es] not" itself "mean

8

JA592

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 9 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 9 of 23

there could be more fraud." *Children's Hosp. of Phila.*, 2025 WL 3252648, at *16. The government also surmises that the minors' patient information could aid them in finding potential witnesses to FDCA violations. ECF No. 10 at 10. But its "reliance on children's identities, social security numbers, and addresses as 'investigative leads'" only "underscores the speculative nature of" the patient data requests. *Children's Hosp. of Phila.*, 2025 WL 3252648, at *14. In the end, "Congress in Section 3486 authorizes the Department of Justice to compel documents *relevant* to an investigation—not to conduct open-ended discovery in search of witnesses or narratives to support a theory." *Id.* Where the government "offers no basis for compelling disclosure of child-patient identities and intimate medical records," it fails to show compliance with that statutory mandate. *Id.* at *18. This is not, for instance, a subpoena directed to an investigative target itself suspected of submitting fraudulent medical reimbursement claims. *See In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000). The Subpoena's relevance is far more lacking.

At the very least, then, Requests 11 through 13 fail the relevance test. Given the government's failure to meet its burden on two of the prongs of the reasonable-relevance test, there is little reason to analyze whether the Subpoena is also unduly burdensome. The short of it is that the government never attempts to explain how the Subpoena is limited in scope, and its theory of relevance is too attenuated at least to Requests 11 to 13 to satisfy its prima facie burden, making it appropriate to quash the Subpoena.

## II.    Abuse of the Court's Process

The Subpoena is unenforceable for an additional reason: it abuses the Court's enforcement process. "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *United States v. Powell*, 379 U.S. 48, 58 (1964). "[A] court's process is abused where the subpoena is 'issued for an improper

JA593

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 10 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 10 of 23

purpose, such as to harass the [investigation's target] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" *Doe v. United States*, 253 F.3d 256, 271–72 (6th Cir. 2001) (quoting *Powell*, 379 U.S. at 58); *see McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017) (teaching that a subpoena "issued for an 'illegitimate purpose'" should not be enforced (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984))). The assertion of court-process abuse "must not be based on the improper motives of an individual agency employee, but instead must be founded upon evidence that the agency itself, in an institutional sense, acted in bad faith when it served the subpoena." *Doe*, 253 F.3d at 272 (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 314–16 (1978)). The petitioner builds a solid foundation of such evidence here.

To begin, upon taking office in January 2025, the President issued Executive Order 14168 ("EO 14168"), "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8615 (Jan. 20, 2025). It declared that "the policy of the United States" was "to recognize two sexes," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* at 8615. It directed "the Executive Branch" to "enforce all sex-protective laws to promote this reality" and labeled the idea "that males can identify as and thus become women and vice versa" a "false claim." *Id.*

Eight days later, the President issued Executive Order 14187 ("EO 14187"), "Protecting Children from Chemical and Surgical Mutilation." 90 Fed. Reg. 8771 (Jan. 28, 2025). It characterized "the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions" as a "dangerous trend" that "will be a stain on our Nation's history" that "must end." *Id.* at 8771. It restyled "gender-affirming care" — which the petitioner defines as "care designed to support and affirm an individual's gender identity" that "can include

10

JA594

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 11 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 11 of 23

social, psychological, behavioral, or medical interventions, or any combination of such care," ECF No. 1-15 ¶ 13 — as "chemical and surgical mutilation," focusing on the aspects of gender-affirming care that employ "puberty blockers . . . sex hormones . . . and surgical procedures." 90 Fed. Reg. at 8771. EO 14187 further directed the head of each executive agency that provided grants to medical institutions to "take appropriate steps to ensure" the end of gender-affirming care. *Id.* at 8772. As for the Department of Justice, EO 14187 directed the Attorney General to "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.*

The Attorney General obliged. Less than three months later, "[p]ursuant to the President's directive" in EO 14187, she "direct[ed] the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Pamela Bondi, Attorney General, to Select Component Heads, *Preventing the Mutilation of American Children* 3, 4 (Apr. 22, 2025), ECF No. 1-11 (the "Bondi Memo"). This was part of a strategy to "investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations." *Id.* at 4. That strategy also included a directive to "the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation," such as "physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate

11

JA595

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 12 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 12 of 23

purpose (*i.e.*, early onset puberty) to the Centers for Medicare & Medicaid Services." *Id.* The Attorney General pledged to use the Department of Justice to bring "the unconscionable ideology behind 'gender-affirming care,'" — which she described as "a radical ideological agenda" used "to justify the barbaric practice of surgically and chemically maiming and sterilizing children" — "to an end." *Id.* at 1, 6.

In turn, the AAG-Civil issued a "Civil Division Enforcement Priorities" memorandum on June 11, 2025. ECF No. 1-12 (the "Shumate Memo"). Citing EO 14168, EO 14187, and the Bondi Memo, the Shumate Memo declared that "[t]he Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives." ECF No. 1-12 at 2. "These efforts will include, but will not be limited to, possible violations of the Food, Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs." *Id.* at 2–3. "In addition," the Shumate Memo declared, "the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes." *Id.* at 3.

Three weeks later, the AAG-Civil authorized the Subpoena. *See* ECF No. 1-4 at 2.

That "timeline tells the story." *QueerDoc*, 2025 WL 3013568, at *5. "Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors." *Seattle Children's*, 2025 WL 3562151, at *11. They "detail the Administration's goal of ending" gender-affirming care. *Boston Children's*,

12

JA596

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 13 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 13 of 23

2025 WL 2607784, at *6. "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating" through the Subpoena. *QueerDoc*, 2025 WL 3013568, at *5. After all, the AAG-Civil authorized it mere weeks after the Shumate Memo, which he authored.

There is more. As discussed above, the scope of the Subpoena's Requests bear little relation to its supposed purpose of investigating FDCA violations. They appear determined instead to gather as much information about the TRUE Center, its personnel, and its patients with only "an 'idle hope' of discovering information related to a federal healthcare offense.'" *Seattle Children's*, 2025 WL 3562151, at *9. That overly broad scope further supports a finding that the government's proffered purpose for the Subpoena — investigating potential violations of the FDCA — is pretextual. *See, e.g.*, *United States v. Henry*, 491 F.2d 702, 705 (6th Cir. 1974) (holding that finding of pretextual purpose was "buttressed by . . . portion of the summons" from IRS that "could not apply to . . . civil liability").

The government's reaction to the petitioner's requests to narrow the Subpoena's scope only strengthens that conclusion. None of the government's accommodations corresponded with the FDCA offenses that its investigation supposedly targeted. Indeed, the government made explicit its focus not on the FDCA, but on "care provided to minors experiencing gender-related distress and the treatment and services provided to them." ECF No. 1-5 at 2. Its limits therefore had little to do with off-label drug distribution and everything to do with targeting the TRUE Center. *Id.* The government held fast, for instance, to Request 1's demand for "information related to" the "credentialing, hiring, compensation, and any derogatory information" about any employee at the TRUE Center "involved in the provision of care," regardless of whether the

13

JA597

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 14 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 14 of 23

employee was in any position to witness any off-label use. *Id.* Its revision of scope for Requests 2 and 3 drew similar boundaries. *Id.* at 2–3.

In short, "the Government cannot broadly make inquiry into the provision of [gender-affirming care] generally—any such inquiry must be limited to the healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion." *Boston Children's*, 2025 WL 2607784, at *6. The Requests' scope and the government's response to the petitioner's attempts to narrow that scope show "[t]hat is not the case here." *Id.*

The evidence does not stop there. The government's conduct in this litigation furnishes a firmer foundation to the petitioner. Its supporting declaration was "utterly devoid of specifics." *United States v. Gertner*, 65 F.3d 963, 968 (1st Cir. 1995); *see* ECF No. 10-1 ¶ 6–7 (attesting in conclusory fashion that the Subpoena was part of an FDCA investigation "into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law"). It provided no insight into the identity of any bad actor or the nature of any scheme that might be afoot. Indeed, as noted above, the declaration did not even touch upon all of the elements necessary to sustain a prima facie case in this Circuit. And even a "declaration" that does "touch[] the requisite bases" in a "bareboned" fashion "can come back to haunt the proponent if . . . not . . . supplemented by more hearty fare once the challenger succeeds" in showing pretextual, improper purpose. *Gertner*, 65 F.3d at 968.

Indeed, the government twice made clear that there was no suspicion of any wrongdoing by the petitioner or anyone affiliated with the petitioner. ECF No. 1-3 ¶¶ 4, 6. The government identifies no potential FDCA wrongdoer at all; despite an offhand statement that some unnamed insurance plans may have received claims related to off-label use of puberty blockers or hormones, ECF No. 10 at 1, the government never even "identif[ies] what entities presented

14

JA598

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 15 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 15 of 23

insurance plans with such claims." *Seattle Children's*, 2025 WL 3562151, at *11. Such a dearth of actual suspicion of FDCA wrongdoing, combined with the government's proclamations of its aim to end gender-affirming care, "make" a "conclusion that the [government's] interest lay *only* in" its publicly-stated goal "quite plausible." *Gertner*, 65 F.3d at 970.

If more were needed — and, on this record, it is doubtful that any is — the government's self-congratulatory statements cinch matters. Six days after the AAG-Civil authorized the Subpoena, the government issued a press release publicizing its investigation, highlighting the "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children" and including a quote from the Attorney General vowing to hold "accountable" those "[m]edical professionals and organizations that mutilated children in the service of a warped ideology." ECF No. 1-13. Less than three weeks later, the White House crowed about its results in "end[ing] the barbaric, pseudoscientific practice" of gender-affirming care, listing examples of clinics around the country who had abandoned or suspended such services. ECF No. 1-14. Conspicuously absent from any of these statements are any mention of FDCA prosecutions initiated or FDCA-prohibited practices stopped.

Taken together, then, the evidence "carries more than a whiff of ill-intent." *UPMC*, 2025 WL 3724705, at *2. It paints a compelling picture illustrating that the government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless "investigations." Every court to consider the issue agrees. *QueerDoc*, 2025 WL 3013568, at *4–7; *Boston Children's*, 2025 WL 2607784, at *5–7; *Seattle Children's*, 2025 WL 3562151, at *9–13. To countenance such a tactic would be an abuse of the Court's process.

15

JA599

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 16 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 16 of 23

At this point, a court often convenes an evidentiary hearing to delve further into the government's purpose. *Gertner*, 65 F.3d at 967. "But there is no hard-and-fast rule compelling an evidentiary hearing," *id.*, and the government disavows any need for one. ECF No. 10 at 6 n.2. Given that position and the clarity of the record evidence, there is little purpose in requiring an evidentiary hearing here. *Gertner*, 65 F.3d at 969–70; *see Seattle Children's*, 2025 WL 3562151, at *13 n.9.

The government resists the conclusion of its improper purpose with a multi-pronged defense. But its arguments never grapple with the import of the petitioner's evidence, including the Executive Orders, the Bondi Memo, the Shumate Memo, the government's vague justifications for the Subpoena, or its press releases celebrating the curtailing of gender-affirming care.

Instead, they begin by hinting that the Court should disregard the government's public statements. ECF No. 10 at 6 n.3. But these documents are not campaign statements "made before the President took the oath of office" used to color a "facially neutral" proclamation. *Trump v. Hawaii*, 585 U.S. 667, 702 (2018). To the contrary, the documents obviate the need to "speculat[e] about hidden motives" because they comprise "the Administration's explicit agenda." *QueerDoc*, 2025 WL 3013568, at *5. And where the government has a "self-proclaimed practice" at odds with an investigation's purported purpose, it evinces pretext. *Gertner*, 65 F.3d at 969–70.

Next, citing its ability to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *Morton Salt*, 338 U.S. at 642–43, the government urges lenient scrutiny of its motives and its investigation's basis. ECF No. 10 at 5.

16

JA600

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 17 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 17 of 23

The suggestion has little to commend it. Properly understood, that language from *Morton Salt* simply means that what was "previously considered to be administrative 'fishing expeditions' are often permitted." *EEOC v. Univ. of N.M.*, 504 F.2d 1296 (10th Cir. 1974). A generic protest that a subpoena lacks probable cause is therefore futile.

But to say that *Morton Salt* requires more obeisance from a reviewing district court fundamentally misunderstands the role of judicial review in administrative-subpoena enforcement. With the advent of the administrative state, judges expressed concern that if administrative subpoena authority was "freed of all restraint upon inquisitorial activities and . . . allowed uncontrolled discretion . . . under the direction of well meaning but over-zealous officials they may at times become instruments of intolerable oppression and injustice." *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 510 (1943) (Murphy, J., dissenting). Thus, to guard against the fear that such authority "may sometimes result in harsh and overzealous action," and "[t]o protect against mistaken or arbitrary orders, judicial review is provided." *Morton Salt*, 338 U.S. at 640.

Indeed, the "justification" for the broad latitude given to the "proposed intrusion" posed by an administrative subpoena "derives from" the fact that "judicial process is afforded before any intrusion occurs." *In re Subpoena Duces Tecum*, 228 F.3d at 348. It requires a court to "question[] the reasonableness of the subpoena's command." *Id.* That means "[a] subpoena 'will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment.'" *Id.* at 349 (quoting *United States v. Calandra*, 414 U.S. 338, 346 (1974)). And "[t]he requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from 'engag[ing] in arbitrary fishing expeditions' and from 'select[ing] targets of investigation out of malice or an intent to harass.'" *Id.* (quoting *United*

JA601

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 18 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 18 of 23

*States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). Judicial review therefore requires an examination of both the investigation's scope vis-à-vis the subpoena's breadth and an evaluation of the motive behind the subpoena.

To be sure, "an enforcement proceeding" is not "an opportunity to test the strength of the underlying complaint." *McLane*, 581 U.S. at 76. And the inquiry into motives is not a plenary one: there is no obligation for the government "to justify its administrative subpoenas by revealing . . . the motives behind a lawful investigation" by providing discovery on the issue. *Whispering Oaks*, 673 F.3d at 818; *see Balanced Fin. Mgmt.*, 769 F.2d at 1445 (teaching that "a substantial preliminary showing" is needed before discovery into motives will be allowed). But none of that "mean[s] that under no circumstances may the court inquire into the underlying reasons for the examination." *Powell*, 379 U.S. at 58. After all, a court must ensure that the subpoena is not "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Morton Salt*, 338 U.S. at 652. While the government need not affirmatively offer a play-by-play accounting of its investigation or a justification of its motives, ECF No. 10 at 5, where it provides public evidence of its own improper purpose and fails to connect its subpoena to a legitimate investigatory purpose, nothing prevents a court from weighing the import of those facts.

The government pivots. Any examination of its motives, it emphasizes, engenders a "heavy" burden for the petitioner. ECF No. 10 at 6. That is true as far as it goes, but it does not take the government very far.

There is a reason that the burden is often heavy: most of the Department of Justice's investigative work "involves non-public, sensitive matters." Justice Manual § 1-7.100. And the Department of Justice "ordinarily does not confirm or deny the existence of an investigation," *id.*

18

JA602

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 19 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 19 of 23

§ 1-7.410, let alone tip its hand as to its motives. Indeed, ethical obligations sharply curtail prosecutors' ability to speak publicly about their actions without "a legitimate law enforcement purpose" for doing so. Criminal Justice Standard 3-1.10(c) (A.B.A. 2017). A subpoena recipient who suspects ulterior motives is therefore often left only with his suspicions to ground his attack on the subpoena's purpose. Such musings do not suffice even to get discovery, let alone to carry a burden of showing impropriety. *See SEC v. McGoff*, 647 F. 2d 185, 193–94 (D.C. Cir. 1981). But here, the government itself lightened the petitioner's load, supplying its own public statements and listless defense of its investigation as the lever needed to lift that load. *See Gertner*, 65 F.3d at 970. With that assistance provided, the ordinary weight of a petitioner's burden does little to aid the government's cause.

The government has another shot in its sling. Cases declining to find an improper purpose have, it says, cited the lack of an "unstated, nefarious, legally inappropriate reason," *Gomez*, 445 F. Supp. 3d at 1216, but the petitioner points to no such undisclosed reason. ECF No. 10 at 6. The argument exalts hope over reason. For one thing, "such reasons are examples of an improper purpose" in *Gomez*; "the list is not exclusive." *Seattle Children's*, 2025 WL 3562151, at *12. For another, there are no bonus points for "say[ing] the 'quiet parts' out loud." *UPMC*, 2025 WL 3724705, at *2. That the government chose to highlight its improper purpose for public consumption rather than to hide it makes it no less improper.

No matter, the government says. Regardless of any improper purpose present in the evidence, the Attorney General has authorized only "appropriate" investigations, allaying fears of overreach. ECF No. 10 at 6–7.

That is cold comfort. "This logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to

19

JA603

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 20 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 20 of 23

quash." *Boston Children's*, 2025 WL 2607784, at *5. By that logic, an enterprising Executive could announce the compilation of a national gun-owner registry and deploy drug-crime administrative subpoenas indiscriminately for that purpose, *see* 21 U.S.C. § 876, covering its true purpose with the well-worn principle that "firearms" are "tools of the trade . . . for the distribution of illegal drugs," *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991), and with the caveat that issued subpoenas be "appropriate." Or the Executive Branch could announce an environmental campaign against carbon-producing industries, but try to cover it with the garb of a consumer-protection investigation, *see* 15 U.S.C. § 57b-1, and that same caveat. "This is," of course, "no logic at all." *Boston Children's*, 2025 WL 2607784, at *5. "[A] district court is not a 'rubber stamp' for agency demands for the production of information," *Markwood*, 48 F.3d at 979, and the "*ipse dixit* reasoning" of the government's argument, *QueerDoc*, 2025 WL 3013568, at *5, seeks to transform the Court into exactly that.

In a last-ditch effort to change the trajectory of the debate, the government attempts to reframe the argument as a political one. It characterizes the petitioner's argument as depending on a belief that gender-affirming care should be legal but, because it may "make[] good sense to chart a different course," *United States v. Skrmetti*, 605 U.S. 495, 546 (2025) (Thomas, J., concurring), investigating such care should be deemed "legitimate." ECF No. 10 at 8–9.

As a threshold matter, this misstates the petitioner's position. The petitioner's improper-purpose attack does not depend on an argument that gender-affirming care should be legal; it notes instead that the practice is legal in Colorado, undermining the relevance of investigating fraudulent billing or coding because providers would have no reason to do so. *See* ECF No. 1 at 3, 10–11; *see also* Colo. Rev. Stat. § 10-16-104(3)(b) (requiring "all health benefit plans" to "provide coverage for gender-affirming health care").

JA604

Case No. 1:25-mc-00063-SKC-CYC     Document 35     filed 01/05/26     USDC Colorado
pg 21 of 23
Case 1:25-cv-03780-JRR     Document 22-1     Filed 01/06/26     Page 21 of 23

The government's argument, in all events, is fishing in an empty stream. This is not a case about transgender rights. *See Children's Hosp. of Phila.*, 2025 WL 3252648, at \*10 (noting that the "task is not to evaluate whether Attorney General Bondi's view . . . is good for our Nation or a fair policy"). Gender-affirming care may be a great idea. *See* Colo. Rev. Stat. § 10-16-104(3)(b). It may be a bad one. *See Skrmetti*, 605 U.S. at 546. But the merits of that debate have nothing to do with the enforcement of an administrative subpoena.

That is because a district court's evaluation of purpose is determining whether the subpoena in question was issued "for a lawfully authorized purpose, within the power of Congress to command." *Walling*, 327 U.S. at 209. Administrative subpoenas are entirely creatures of statute, which Congress creates. *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 690. Thus, "an order of court" compelling compliance with such a subpoena must be "made pursuant to and in exact compliance with authority granted by Congress." *Walling*, 327 U.S. at 196. And the only Congressional authority the government invokes here is its authority to investigate violations of the FDCA. *See* 18 U.S.C. § 3486. Congress has granted no authority to use administrative subpoenas to investigate gender-affirming care, let alone to attempt to end such care through the use of such subpoenas. That — not any political disagreement — is what invalidates the Subpoena.

For that same reason, the government's submission that the Secretary of Health and Human Services also disfavors gender-affirming care, ECF No. 31, is also a non-sequitur. Adding one, two, or a gaggle of Executive Branch officials to the fray makes no difference — it is simply the wrong branch. "All legislative Powers . . . shall be vested in a Congress of the United States," U.S. Const. art I., § 1, including the power to create statutes that vest subpoena authority in executive agencies. The Executive Branch, on the other hand, "shall take Care that

21

JA605

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 22 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 22 of 23

the Laws be faithfully executed." U.S. Const. art. II, § 3. Put more simply, Congress's job is "[p]assin' laws and juggling bills" that could authorize the sort of investigation the government wants to do here; the Executive Branch is "here to see that the laws get done." *Schoolhouse Rock!: Three-Ring Government* (ABC television broadcast Mar. 13, 1979), http://www.youtube.com/watch?v=pKSGyiT-o3o. Proper "law enforcement" by the Department of Justice, then, requires a "law" justifying its actions.

The short of it is that "the government ought to turn square corners when dealing with its citizens." *Howbert v. Penrose*, 38 F.2d 577, 581 (10th Cir. 1930). Congress has made no law authorizing an investigation of gender-affirming care, let alone one aimed at ending such care. Such an investigation, then, is no faithful execution of any law. Indeed, Colorado law makes such care legal, and "an investigation predicated solely upon legal activity does not pass muster under *any* standard." *Major League Baseball*, 331 F.3d at 1188. The Executive Branch cannot engage in new lawmaking on its own and, thus, until and unless Congress creates a statute justifying it, a purpose of investigating the legal activity of gender-affirming care — let alone ending it — cannot ground a legitimate investigation. The Subpoena must therefore be quashed.

## CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS**[1] that the petitioner's Motion to Quash Subpoena, ECF No. 1, be **GRANTED**.

---

[1] Be advised that all parties shall have fourteen days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive, or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676–83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and

JA606

Case No. 1:25-mc-00063-SKC-CYC    Document 35    filed 01/05/26    USDC Colorado
pg 23 of 23
Case 1:25-cv-03780-JRR    Document 22-1    Filed 01/06/26    Page 23 of 23

Respectfully submitted this 5th day of January, 2026, at Denver, Colorado.

BY THE COURT:

Cyrus Y. Chung
United States Magistrate Judge

---

recommendations within fourteen days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). <u>Finally, all parties must consult and comply with the District Judge's practice standards for any specific requirements concerning the filing and briefing of objections.</u>

23

JA607

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| In Re. 2025 Subpoena to Children's National Hospital | Case No. 1:25-cv-03780 |

## PARTIES' JOINT REPORT

Pursuant to the Court's January 21, 2026 Order (ECF No. 24), the Parties met and conferred regarding appropriate prophylactic measures to be taken to effectuate the terms of the Court's Order. The Parties were unable to reach an agreement and, therefore, submit instead this Joint Report setting forth their positions.

### I.      The Government's Proposal

The United States maintains that no prophylactic measures are required to address prior production or use of documents subject to the Court's order, because no documents subject to the order have been produced to the Government by Children's National Hospital. Because no documents subject to the order have been produced, such retrospective prophylactic measures (e.g., segregation, deletion, or other taint-remediation) are not necessary.

To the extent the Court contemplated prophylactic measures going forward to prevent the production under the HIPAA subpoena of documents subject to the order, the United States' preferred procedure is for Plaintiffs to identify themselves to Children's National Hospital through an appropriate, confidential mechanism so the hospital can withhold any such records from future production. Due to concerns raised by Plaintiffs' counsel, the United States also has agreed that Children's National should at all times keep the identities of the plaintiffs confidential and that it need not produce any document that would identify the plaintiffs to the Government.

JA608

## II.    Movants' Proposal

Movants respectfully submit that the only workable prophylactic measure to effectuate the Court's Order would be for the Government to refrain completely from seeking responses to Requests 11, 12 and 13 from Children's National Hospital. The Hospital is not a party to this litigation, and Movants have no authority to obtain or enforce any agreement from the Hospital. Thus, any response the Hospital might make to Requests 11, 12, or 13 presents a substantial and probable risk that records will be disclosed in violation of the Court's Order. Moreover, such prophylaxis tracks what the Government agreed to in a settlement concerning a substantively identical subpoena issued to Children's Hospital Los Angeles.[1]

Dated: January 28, 2026

| | |
|---|---|
| BRETT A. SHUMATE<br>Assistant Attorney General<br><br>JORDAN C. CAMPBELL<br>Deputy Assistant Attorney General<br><br>LISA K. HSIAO<br>Acting Director<br><br>_/s/ Ross S. Goldstein_<br>ROSS S. GOLDSTEIN (Bar No. 15700)<br>PATRICK R. RUNKLE<br>Assistant Directors<br>*(signature authorized by Ross S. Goldstein)*<br><br>SCOTT B. DAHLQUIST<br>STEVEN R. SCOTT<br>Trial Attorneys<br><br><br>United States Department of Justice | _/s/ Eve L. Hill_<br>Eve L. Hill (Bar No. 11938)<br>BROWN GOLDSTEIN & LEVY, LLP<br>120 E. Baltimore St., Suite 2500<br>Baltimore, MD 21202<br>Tel: (410) 962-1030<br>Fax: (410) 385-0869<br>ehill@browngold.com<br><br>Jennifer L. Levi (*pro hac vice*)<br>Donovan C. Bendana (*pro hac vice*)<br>GLBTQ LEGAL ADVOCATES &<br>DEFENDERS<br>18 Tremont Street, Suite 950<br>Boston, MA 02108<br>(617) 426-1350<br>jlevi@gladlaw.org<br>dbendana@gladlaw.org<br><br>*Attorneys for Movants* |

---

[1] *See In re 2025 Children's Hospital of Los Angeles Subpoena*, Case No. 2:25-cv-11183, Dkt. No. 25-1 at 2 (C.D. Cal. Jan. 22, 2026) (On December 8, 2025, the Government agreed to withdraw "Subpoena Requests 11, 12, and 13 in their entirety" based on CHLA's representation that the subpoenaed entity was not the appropriate entity to produce patient records (*See* Dkt. No. 25-1 at 35)).

JA609

Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:    (202) 353-4218
Fax:    (202) 514-8742
ross.goldstein@usdoj.gov

*Attorneys for the United States of America*

JA610

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL | Civil No. 1:25-cv-03780-JRR |

**GOVERNMENT'S NOTICE OF APPEAL**

Notice is hereby given that the United States of America, the respondent in the above-captioned case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the order of this Court entered on January 21, 2026 (ECF 24).

Dated this 28th day of January, 2026.

Respectfully submitted,

**FOR THE UNITED STATES OF
    AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 /s/ Ross S. Goldstein
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

JA611

United States Department of Justice
Enforcement & Affirmative Litigation
  Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
ross.goldstein@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td>IN RE 2025 SUBPOENA TO<br>CHILDREN'S NATIONAL HOSPITAL</td><td>Civil No.: 1:25-cv-03780-JRR</td></tr>
</table>

## <u>ORDER</u>

The court has reviewed the Parties' Joint Report at ECF No. 25.  By Tuesday, February 3, 2026, the Government shall advise by written filing: 1) whether it has initiated or pursued proceedings, motions practice, or the like to secure Subpoena compliance by the Hospital;[1] and 2) if not, whether it intends or plans to do so.  Further, to the extent the parties have not already done so, the parties shall promptly transmit a copy of the court's memorandum opinion and order (ECF Nos. 23 and 24) to the Hospital.

**IT SO ORDERED**.

/S/

_____
Julie R. Rubin
United States District Judge

January 29, 2026

---

[1] The court uses the defined terms set forth in its memorandum opinion at ECF No. 23.

JA613

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN RE 2025 SUBPOENA TO
CHILDREN'S NATIONAL
HOSPITAL

Case No. 25-cv-03780-JRR

### GOVERNMENT'S RESPONSE TO THE COURT'S JANUARY 29 ORDER

The United States of America respectfully submits this response to the Court's January 29 order (ECF 28). As to the Court's first inquiry, "whether [the Government] has initiated or pursued proceedings, motions practice, or the like to secure Subpoena compliance by the Hospital," the Government states that it has not. As to the Court's second inquiry, "if not, whether [the Government] intends or plans to do so," the Government states that, it has no current plan or intention to do so. The United States further states that it transmitted a copy of the Court's memorandum opinion and order (ECF 23 and 24) to counsel for the subpoena recipient on January 30, 2026.

Dated this 3rd day of February 2026.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation
    Branch

JA614

 */s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

United States Department of Justice
Enforcement & Affirmative Litigation
    Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov

JA615