**No. 26-1104**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

PARENT AA, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

On Appeal from the United States District Court
for the District of Maryland

## BRIEF FOR APPELLEES

EVE L. HILL
Brown Goldstein & Levy LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202

JOSHUA D. ROVENGER
DONOVAN C. BENDANA
GLBTQ Legal Advocates & Defenders
18 Tremont St., Suite 950
Boston, MA 02108

*Attorneys for Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION................................................. 5

STATEMENT OF THE ISSUES................................................... 5

STATEMENT OF THE CASE ...................................................6

    A.    The Executive Branch Declared That the Care Reflected in These Records "Must End".........................................................6

    B.    DOJ Demanded Appellees' Identities and Medical Records......8

    C.    The District Court Quashed DOJ's Demands for Patient Records....................................................................................9

SUMMARY OF ARGUMENT ...................................................... 12

STANDARD OF REVIEW ........................................................... 14

ARGUMENT............................................................................... 14

I.    Appellees May Challenge Demands for Their Own Medical Records ...................................................................................... 14

    A.    Forced Disclosure of Appellees' Identities and Medical Records is a Concrete, Imminent Injury. ................................15

    B.    Section 3486 Does Not Strip Patients of the Right to Protect Their Medical Records. ............................................... 18

    C.    Appellees' Motion Was Timely and Filed in the Proper Venue....................................................................................22

II.    The District Court Correctly Quashed the Patient-Record Demands. ...................................................................................24

    A.    The District Court Applied the Correct Fourth Amendment Standard. ...................................................................25

B. DOJ Failed to Articulate Any Basis to Suspect CNH of a FDCA Violation. .......................................................... 27

C. DOJ's Patient-Record Demands Have Nothing To Do With the FDCA. ....................................................... 29

D. DOJ's "Lead" and "Witness" Theories Have No Limiting Principle. ................................................................ 37

E. *Bailey* Supports Affirmance. ............................................... 38

F. The Subpoena is Overbroad and Oppressive ........................... 40

III. The Record Supports the District Court's Finding That Requests 11-13 Were Issued for an Improper Purpose ..................................... 42

A. Courts May Quash Subpoenas Issued for Harassment, Pressure, Retaliation, or Bad Faith ............................................ 42

B. The District Court's Improper-Purpose Finding Follows From Objective Evidence .......................................................... 45

C. DOJ's Prosecutorial-Discretion Cases Do Not Apply. ............. 47

IV. Appellees' Constitutional Privacy Interests Independently Support Affirmance .......................................................................... 48

A. Appellees Have a Reasonable Expectation of Privacy in the Requested Records. ............................................................... 49

B. Even if DOJ Had Shown a Compelling Interest, the Balancing Factors Strongly Favor Appellees. ........................... 52

V. The District Court's Tailored Remedy Should Be Affirmed. ............... 61

CONCLUSION ................................................................................... 62

CERTIFICATE OF COMPLIANCE ................................................... 63

CERTIFICATE OF SERVICE .............................................................. 64

# TABLE OF AUTHORITIES

**Cases**

*Alphin v. United States*,
809 F.2d 236 (4th Cir. 1987) ................................................................. 14

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ............................................................................. 55

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ............................................................................. 16

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531 (6th Cir. 2021) ................................................................ 31

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) ............................................................................. 21

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ............................................................................. 22

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ..................................................................... 2, 29, 30

*Chatrie v. United States*,
No. 25-112, 2026 WL 1855568 (U.S. June 29, 2026) ........................... 51

*Coe v. Blanche*,
No. 1:26-cv-04641 (S.D.N.Y. June 24, 2026) ........................... 52, 57, 58

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ............................................................................. 60

*Dep't of State v. Ray*,
502 U.S. 164 (1991) ............................................................................. 15

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ............................................................................. 45

*Doe v. Broderick*,
225 F.3d 440 (4th Cir. 2000) ........................................................... 15, 49

*Doe v. City of New York,*
  15 F.3d 264 (2d Cir. 1994)......................................................................50

*Donovan v. Lone Steer, Inc.,*
  464 U.S. 408 (1984)..............................................................................26

*EEOC v. Lockheed Martin Corp.,*
  116 F.3d 110 (4th Cir. 1997)................................................................26

*EEOC v. Maryland Cup Corp.,*
  785 F.2d 471 (4th Cir. 1986) ..............................................................26

*EEOC v. Shell Oil Co.,*
  466 U.S. 54 (1984) ...............................................................................26

*Endocrine Society v. FTC,*
  No. 1:26-cv-00512, 2026 WL 1257289 (D.D.C. May 7, 2026) .................44

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
  264 U.S. 298 (1924) .............................................................................24

*Ferguson v. City of Charleston,*
  532 U.S. 67 (2001) ........................................................................15, 41

*First Choice Women's Resource Centers, Inc. v. Davenport,*
  146 S. Ct. 1114 (Apr. 29, 2026).............................................................16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S. 167 (2000)..............................................................................17

*GenBioPro, Inc. v. Raynes,*
  144 F.4th 258 (4th Cir. 2025) .............................................................34

*Gilmore v. Jones,*
  339 F.R.D. 111 (W.D. Va. 2021)............................................................41

*Goldstein v. Hindle,*
  Civ. No. CJC-21-3124, 2025 WL 1928048 (D. Md. July 14, 2025) ..........21

*Hale v. Henkel,*
  201 U.S. 43 (1906) ...............................................................................25

*In re 2025 UPMC Subpoena*,
  No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24,
  2025), *appeal filed*, No. 26-1401 (3d Cir. Mar. 4, 2026) ................3, 19, 46

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*,
  No. 1:26-mc-0007, 2026 WL 1392565 (D.R.I. May 14, 2026),
  *appeal filed*, No. 26-1568 (1st Cir. May 18, 2026) ...............3, 4, 24, 46-47

*In re Admin. Subpoena 25-1431-032*,
  No. 4:26-mc-00006, 2026 WL 1204327 (N.D. Tex.
  Apr. 30, 2026).................................................................................3—4

*In re Admin. Subpoena No. 25-1431-019*,
  800 F. Supp. 3d 229 (D. Mass. 2025)...........................................3, 32, 46

*In re Admin. Subpoenas to Children's Hospitals*,
  No. 8:26-cv-01834, 2026 WL 1660098 (D. Md. June 9, 2026) ...............5

*In re Dep't of Justice Admin. Subpoena No. 25-1431-030*,
  No. 25-mc-00063, 2026 WL 33398 (D. Colo. Jan. 5, 2026) .........3, 32, 46

*In re Grand Jury Subpoena*,
  829 F.2d 1291 (4th Cir. 1987) ...............................................................21

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
  823 F. Supp. 3d 1 (D.D.C. 2026)...........................................................43

*In re Grand Jury Subpoenas Nos. 2022R00519-A et al.*,
  No. 26-mc-43, 2026 WL 1783899 (D. Minn. June 22, 2026) ................43

*In re Grand Jury*,
  111 F.3d 1066 (3d Cir. 1997)............................................................17, 18

*In re Motorsports Merch. Antitrust Litig.*,
  186 F.R.D. 344 (W.D. Va. 1999)............................................................23

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) .................................................................31

*In re Subpoena Duces Tecum No. 25-1431-016*,
  No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash.
  Sept. 3, 2025).............................................................................3, 37, 38

*In re Subpoena No. 25-1431-014,*
810 F. Supp. 3d 555 (E.D. Pa. 2025) ................................................ *passim*

*In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002,*
*A99-0003 & A99-0004,*
51 F. Supp. 2d 726 (W.D. Va. 1999) ........................................ 53

*M.R. v. Tajdar,*
Civ. No. TDC-17-3836, 2019 WL 3323207 (D. Md. July 24, 2019) ......... 18

*McLane Co. v. EEOC,*
581 U.S. 72 (2017) ................................................... 2, 14

*Mezu v. Morgan State Univ.,*
No. WMN-09-2855, 2011 WL 5110269 (D. Md. Oct. 25, 2011),
*aff'd,* 495 F. App'x 286 (4th Cir. 2012) ................................ 18

*Muth v. United States,*
1 F.3d 246 (4th Cir. 1993). ........................................ 23

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958) ................................................ 55

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) ................................................ 55

*Northwestern Mem'l Hosp. v. Ashcroft,*
362 F.3d 923 (7th Cir. 2004) ............................... 41, 55, 58—59

*Oklahoma Press Pub. Co. v. Walling,*
327 U.S. 186 (1946) ................................................ 25

*Olszewski v. Bloomberg L.P.,*
No. 96 Civ. 3393, 2000 WL 1843236 (S.D.N.Y. Dec. 13, 2000) ............. 23

*Patients of Dr. Solomon v. Bd. of Physician Quality Assurance,*
85 F. Supp. 2d 545 (D. Md. 1999) ........................................ 53

*Payne v. Taslimi,*
998 F.3d 648 (4th Cir. 2021) ............................... 49, 52, 60

*Polselli v. Internal Revenue Serv.,*
598 U.S. 432 (2023) ................................................ 21

*Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.,*
 190 F.R.D. 372 (D. Md. 1999) ................................................................. 22

*QueerDoc, PLLC v. U.S. Dep't of Justice,*
 807 F. Supp. 3d 1295 (W.D. Wash. 2025).............................. 3, 32, 45—46

*Reisman v. Caplin,*
 375 U.S. 440 (1964) ............................................................................. 17, 18

*Rotkiske v. Klemm,*
 589 U.S. 8 (2019) ...................................................................................... 21

*Solis v. Food Emps. Lab. Rels. Ass'n,*
 644 F.3d 221 (4th Cir. 2011) ................................................ 11, 14, 26, 42

*Stuart v. Camnitz,*
 774 F.3d 238 (4th Cir. 2014)................................................................... 55

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021)...................................................................................15

*Tucson Woman's Clinic v. Eden,*
 379 F.3d 531 (9th Cir. 2004).................................................................... 56

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.,*
 707 F.3d 451 (4th Cir. 2013) ...............................................................2, 30

*United States ex rel. Polansky v. Pfizer, Inc.,*
 822 F.3d 613 (2d Cir. 2016) .................................................................... 31

*United States v. Am. Target Advert., Inc.,*
 257 F.3d 348 (4th Cir. 2001)................................................. 11, *26, 41, 48*

*United States v. Armstrong,*
 517 U.S. 456 (1996) ................................................................................. 47

*United States v. Bailey (In re Subpoena Duces Tecum),*
 228 F.3d 341 (4th Cir. 2000) ........................................................ *passim*

*United States v. Cephalon, Inc.,*
 No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008)............................................... 33

*United States v. Doe,*
 457 F.2d 895 (2d Cir. 1972) .................................................................... 21

*United States v. Facteau,*
  89 F.4th 1 (1st Cir. 2023), *cert. denied,* 145 S. Ct. 137 (2024) ................. 31

*United States v. Fitzgerald,*
  416 F. App'x. 238 (4th Cir. 2011) .......................................................... 21

*United States v. Idema,*
  118 F. App'x 740 (4th Cir. 2005)........................................................18, 21

*United States v. Jackson,*
  126 F.4th 847 (4th Cir. 2025) ......................................................... 30, 31

*United States v. LaSalle Nat'l Bank,*
  437 U.S. 298 (1978) ........................................................................11, 42

*United States v. Lazar,*
  No. 04-20017, 2006 WL 3761803 (W.D. Tenn. Dec. 20, 2006).............. 19

*United States v. Marschall,*
  82 F.4th 774 (9th Cir. 2023) ................................................................33

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) ...........................................................11, 13, 25, 28

*United States v. Powell,*
  379 U.S. 48 (1964) ...............................................................11, 25, 42, 61

*United States v. Raineri,*
  670 F.2d 702 (7th Cir. 1982)................................................................ 18

*United States v. Stanchich,*
  550 F.2d 1294 (2d Cir. 1977)................................................................45

*United States v. Stuart,*
  489 U.S. 353 (1989) ............................................................................ 14

*United States v. Texas,*
  599 U.S. 670 (2023)............................................................................ 47

*United States v. Theodore,*
  479 F.2d 749 (4th Cir. 1973) ...............................................................29

*United States v. Westinghouse Elec. Corp.,*
  638 F.2d 570 (3d Cir. 1980)..................................................................53

*Va. Dep't of Corr. v. Jordan,*
  921 F.3d 180 (4th Cir. 2019) ........................................................ 20, 21

*Walls v. City of Petersburg,*
  895 F.2d 188 (4th Cir. 1990)........................................48—49, 52

*Watson v. Lowcountry Red Cross,*
  974 F.2d 482 (4th Cir, 1992).................................................50

*Wayte v. United States,*
  470 U.S. 598 (1985) ........................................................ 47

*Webster v. Doe,*
  486 U.S. 592 (1988) ........................................................ 22

*Wikimedia Found. v. Nat'l Sec. Agency,*
  857 F.3d 193 (4th Cir. 2017) ........................................ 14

*WPATH v. FTC,*
  No. 1:26-cv-00532, 2026 WL 1257321 (D.D.C. May 7, 2026) ................ 44

*Z.A. v. Lucile Salter Packard Children's Hosp. at Stanford,*
  No. 5:26-cv-04998 (N.D. Cal. June 3, 2026).........................................58

**Statutes**

18 U.S.C. § 24 ........................................................................8

18 U.S.C. § 3486 ........................................................ *passim*

21 U.S.C. § 353.................................................................33

21 U.S.C. § 396 ........................................................29—30

28 U.S.C. § 1291.................................................................5

5 U.S.C. § 552 ........................................................56—57

**Rules**

Fed. R. App. P. 4.................................................................5

Fed. R. Civ. P. 45 ........................................ 12, 19-20, 21, 61

**Regulations**

21 C.F.R. § 201.128 ................................................................. 32

45 C.F.R. § 164.512 ..................................................................51

**Other Authorities**

Steven A. Engel, *Whether the Food & Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81 (2019) ......................................................... 31

## INTRODUCTION

In January 2025, the President announced that transgender health care for minors—care that is lawful in Maryland—"must end." JA9-10. The Attorney General issued a memorandum directing the Department of Justice ("DOJ") to "effectuate" that directive, JA11, and DOJ then served identical administrative subpoenas on at least 20 hospitals, including Children's National Hospital ("CNH"), demanding the identities and confidential medical records of transgender minors and their families who received such care. JA13.

Appellees—families whose children received this healthcare at CNH and whose records were at risk of being disclosed to the federal government—moved to quash a portion of the requests (Requests 11-13) in this subpoena. Their case—and this appeal—is not about whether DOJ may investigate genuine violations of federal health care law. It may. The question is whether DOJ may use 18 U.S.C. § 3486 to compel a hospital to produce the most intimate medical files of transgender minors and their families in the absence of any legitimate investigation of a federal healthcare offense. The district court correctly answered no.

The district court found that DOJ offered "no articulated basis to suspect" CNH of any federal health care offense; that the demand for

patient identities and records bore a "patent disassociation" from any legitimate health care fraud theory; and that the subpoena had "no purpose other than to intimidate and harass" patients and families and to secure, through "compliance born of fear," the Executive's announced objective of ending this care. JA20-24. Those findings of purpose and pretext are well supported by the record, and DOJ comes nowhere close to showing clear error, let alone abuse of discretion. *McLane Co. v. EEOC*, 581 U.S. 72, 81 (2017).

To justify the subpoena, DOJ invoked the Food, Drug, and Cosmetic Act ("FDCA"). But its FDCA theory does not fit what the subpoena demands. The FDCA regulates drugs, labeling, promotion, interstate distribution, and commerce; it does not regulate the practice of medicine, and it does not prohibit physicians from prescribing approved medications for off-label uses. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001); *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 454 n.2 (4th Cir. 2013). The requests at issue in this case do not ask what a manufacturer said, how a drug was labeled, how it moved in interstate commerce, or whether CNH received unlawful promotional materials. Requests 11-13 ask who the minor patients are, who their parents are, what their clinicians diagnosed, what their clinicians assessed, what

risks were discussed, and what decisions families made. JA14. Unlike manufacturer communications, labeling materials, promotional records, distribution documents, sales-representative communications, contracts, or other records bearing on legitimate FDCA issues, the records demanded in Requests 11-13 do not, and could not plausibly show, whether a manufacturer or pharmaceutical company mislabeled a drug or promoted it improperly.

The district court saw the mismatch clearly, as has every other court to have considered challenges to identical demands issued to hospitals across the country.[1] DOJ offered "no articulated basis to suspect" CNH of

---

[1] *See In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151, at *8-13 (W.D. Wash. Sept. 3, 2025), *motion to alter or amend judgment denied*, 2026 WL 1102159 (W.D. Wash. Apr. 23, 2026), *appeal filed*, No. 26-4009 (9th Cir. June 23, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578-82, 604-05 (E.D. Pa. 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238-39 (D. Mass. 2025), *appeal filed*, No. 25-2092 (1st Cir. Nov. 14, 2025); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, No. 25-mc-00063, 2026 WL 33398, at *6-7 (D. Colo. Jan. 5, 2026); *QueerDoc, PLLC v. U.S. Dep't of Justice*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025), *appeal argued*, No. 25-7384 (9th Cir. Mar. 6, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025), *appeal filed*, No. 26-1401 (3d Cir. Mar. 4, 2026); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-0007, 2026 WL 1392565, at *8-10 (D.R.I. May 14, 2026), *appeal filed*, No. 26-1568 (1st Cir. May 18, 2026). The Northern District of Texas's *ex parte* enforcement order in the Rhode Island Hospital matter is not contrary authority: that order was entered within hours of DOJ's petition, without notice to the hospital, and minors' constitutional privacy claims "were neither raised nor considered in Texas and could not have been, as the affected parties were absent." *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006, 2026 WL 1204327, at

violating the FDCA, "and surely none that would call for disclosure of any Movant's records." JA20. It offered "no affidavit (or complaint or whistleblower statement)" attesting to grounds for an investigation of CNH. JA20-21. Instead, DOJ relied on generalized assertions about national prescribing practices and debates over the safety and efficacy of pediatric transgender health care. JA21-22. The court properly held that such generalized commentary was "too indefinite" to justify compelled production of adolescent patient medical records. JA22. As the court explained, "The Government seeks to investigate how CNH treats its patients; specifically, in the context of gender-affirming patient care. But the FDCA regulates commerce, not patient care." JA22.

That alone is enough to affirm. Administrative subpoenas are broad, but they are not self-validating. The district court applied the Fourth Circuit's settled standard and held that DOJ's patient-record demands were not issued for a legitimate governmental purpose, were not limited to any legitimate purpose, and were oppressive in breadth. JA22; *United States v. Bailey (In re Subpoena Duces Tecum)*, 228 F.3d 341, 349 (4th Cir. 2000).

---

*1 (N.D. Tex. Apr. 30, 2026) (ECF 2); Text Order, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007 (D.R.I. May 7, 2026).

DOJ's arguments to the contrary on appeal lack merit. This Court should affirm.[2]

## STATEMENT OF JURISDICTION

The district court granted Appellees' motion to quash on January 21, 2026. JA9-26. The government filed a notice of appeal on January 28, 2026. JA611; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether minor patients and their parents may seek judicial relief from a Section 3486 subpoena demanding their identities and confidential medical records, when disclosure would invade their personal privacy interests and where they have no other mechanism to challenge the privacy invasion.

2.      Whether the district court abused its discretion in quashing Requests 11-13 when it found no articulated basis to suspect CNH of an FDCA violation and no credible connection between the patient-record demands and any statutory violation.

---

[2] In a related case not before this Court, the district court later expanded quashal beyond the original movants. *See In re Admin. Subpoenas to Children's Hospitals*, No. 8:26-cv-01834, 2026 WL 1660098, at *11 (D. Md. June 9, 2026). That later order is not on appeal here.

**3.**     Whether the district court clearly erred in finding Requests 11-13 were issued for an improper purpose to intimidate and harass medical providers, patients, and their families—not to investigate any FDCA violation—given the "patent disassociation" between DOJ's demands for patient identities and medical files and any legitimate enforcement theory, against the backdrop of Executive directives to end the care those records reflect.

**4.**     Whether Appellees' constitutional privacy interests in their most sensitive medical records outweigh DOJ's need for those records when DOJ has shown no legitimate investigative purpose.

## STATEMENT OF THE CASE

### A.     The Executive Branch Declared That the Care Reflected in These Records "Must End"

On January 28, 2025, the President issued Executive Order 14187, declaring transgender health care for minors—care that is lawful in Maryland—"must end." JA9-10. It directed the Attorney General to "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act" by entities allegedly misleading the public about long-term side effects. JA10. The Administration quickly celebrated the Executive Order's coercive effect, announcing that the Order was "already having its intended effect"

as hospitals were "taking action to downsize or eliminate" pediatric transgender-healthcare programs. JA39-40. It specifically identified CNH as among the hospitals it celebrated that had "paused" prescribing puberty blockers and hormone therapies for minors. JA40.

In April 2025, the Attorney General issued a memorandum whose stated purpose was to "effectuate" the Executive Order's directive that this care "must end." JA10-11. It directed the Civil Division to investigate FDCA violations by "manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" JA11. And it announced an "Attorney General's Coalition Against Child Mutilation" to partner with state attorneys general to "identify leads, share intelligence, and build cases against hospitals and practitioners." JA12.

On June 11, 2025, Assistant Attorney General Shumate issued a memorandum titled "Civil Division Enforcement Priorities" to all Civil Division employees.[3] JA12. The memorandum stated that the Division would use "all available resources" to prioritize investigations of "doctors,

---

[3] The memorandum identified possible FDCA investigations involving "pharmaceutical companies that manufacture drugs" and "dealers such as online pharmacies." JA13.

hospitals, pharmaceutical companies, and other appropriate entities" consistent with the President's and Attorney General's directives. JA12-13.

### B. DOJ Demanded Appellees' Identities and Medical Records.

In July 2025, DOJ issued a subpoena to CNH demanding disclosure of Appellees' identities and medical records concerning transgender health care received through CNH's Gender Development Program. JA13. DOJ confirmed to Appellees' counsel that the CNH subpoena was "substantively identical" to other challenged administrative subpoenas, made public only through litigation, seeking pediatric medical records served on medical providers across the country. JA13 n.12. The subpoenas were purportedly issued under Section 3486, which authorizes the Attorney General "[i]n any investigation of . . . a Federal health care offense," to issue subpoenas requiring production of records "relevant to the investigation." 18 U.S.C. § 3486(a)(1)(A)(i)(I), (a)(1)(B)(i). The term "Federal health care offense" includes certain FDCA violations "relating to a health care benefit program." 18 U.S.C. § 24(a).

The CNH subpoena contained 15 "Requests", including:

- Request 11, demanding "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number,

address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy." JA14.

- Request 12, demanding "[f]or each patient identified in Subpoena [Request 11], documents relating to clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy." JA14.

- Request 13, demanding "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks." JA14.

Appellees are eight families whose children received transgender health care through CNH during the relevant period. JA13. They moved to quash Requests 11-13, and any other requests calling for production of Appellees' identities and medical records. JA13-14.

### C. The District Court Quashed DOJ's Demands for Patient Records.

DOJ opposed Appellees' motion to quash on five grounds: lack of standing, sovereign immunity, timeliness, Fourth Amendment

reasonableness under the FDCA, and the supposed "collapse" of Appellees' Fifth Amendment privacy claim under Fourth Circuit law. JA14.

The district court rejected DOJ's threshold objections. It held that nothing in Section 3486 prohibits nonrecipients from moving to quash, and that Section 3486(a)(7) incorporates Rule 45's safeguards against compelled disclosure of protected matter and undue burden. JA15-16. It further held that Appellees—whose own medical records are the target of the Requests—have Article III standing: the subpoena threatened immediate injury to their "concrete right to maintain the privacy of their medical records." JA16-17.

The district court rebuffed DOJ's sovereign-immunity argument because Appellees sought only equitable relief from government action, falling within the Administrative Procedure Act's ("APA") waiver for suits seeking relief "other than money damages." JA17. The court also found no adequate alternative remedy was available. JA17-18. And it dismissed DOJ's timeliness argument as "disingenuous": Appellees were not the subpoena recipients, and DOJ offered no plausible basis to conclude they had proper notice before the response deadline. JA18-19.

On the merits, the district court followed the Fourth Amendment administrative-subpoena framework established by the Supreme Court and

this Court. As this Court explained in *Bailey*, Section 3486 subpoenas are subject to the ordinary Fourth Amendment limits governing administrative subpoenas. 228 F.3d at 349. A subpoena must serve a legitimate governmental purpose; its scope must reasonably relate to that purpose; it must be specific; and it must not be so broad or oppressive that enforcement would be unreasonable. *Id.* Those requirements implement longstanding Fourth Amendment and abuse-of-process principles. *See United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950) (administrative demand must not be "too indefinite" and the information sought must be "reasonably relevant"); *United States v. Powell*, 379 U.S. 48, 58 (1964) (summons may not be used "to harass," "to put pressure" on the target, or for "any other purpose reflecting on the good faith of the particular investigation"); *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316-17 (1978) (summons authority depends on good-faith pursuit of congressionally authorized purposes); *United States v. Am. Target Advert., Inc.*, 257 F.3d 348, 355 (4th Cir. 2001) (subpoena must be within statutory authority, reasonably relevant, and not unduly burdensome); *Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011) (same).

Applying that framework, the district court held the subpoena was "of such a sweeping nature" and unrelated to any proper inquiry that it

exceeded investigatory power. As the court stated: "The Government seeks to investigate how CNH treats its patients; specifically, in the context of gender-affirming patient care. But the FDCA regulates commerce, not patient care . . . [The subpoena] was not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth." JA22.

Finally, the court held that Appellees' constitutional privacy interests in these records outweigh DOJ's demand. JA24. The court quashed Requests 11-13 and barred DOJ from accessing any information already produced about Appellees. JA24-26.

## SUMMARY OF ARGUMENT

DOJ's threshold arguments fail. Appellees may move to quash a subpoena demanding their own confidential records—the alternative would leave patients' privacy at the mercy of third parties. Standing is straightforward: forced disclosure of Appellees' names, Social Security numbers, addresses, parent information, diagnoses, assessments, and treatment records is a concrete injury, caused by DOJ, and redressable by quashal. Section 3486(a)(7) confirms that these subpoenas remain subject to Rule 45's protections for privileged matter and against undue burden. JA15-16.

On the merits, the district court applied *Morton Salt* and *Bailey* and made factual findings reviewable only for clear error. It found no articulated basis to suspect CNH of an FDCA violation, no connection between patient records and any legitimate investigation, and a "patent disassociation" between DOJ's theory and its demands. JA20-22. The FDCA regulates interstate commerce, not patient care. Requests 11-13 were not issued for a legitimate governmental purpose. JA22.

The district court also found improper purpose. The mismatch between DOJ's FDCA theory and the subpoena's patient-record demands, viewed against Executive Branch directives to end this lawful care and DOJ memoranda seeking to effectuate that policy, permitted the court to infer pretext. JA22-24. The court concluded that the subpoena bore "no credible connection" to any statutory violation by CNH and appeared designed "to intimidate and harass" through "compliance born of fear." JA23-24.

Appellees' constitutional privacy interests independently support affirmance. They have a constitutionally protected expectation of privacy in their most sensitive medical records. DOJ, having shown no legitimate purpose, cannot demonstrate a compelling interest to override those privacy rights. JA24.

Finally, the remedy is appropriately narrow. The district court did not disable lawful FDCA enforcement—it quashed only the demands for Appellees' identities and medical records. This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a district court's decision to quash or enforce an administrative subpoena for abuse of discretion, reviewing legal conclusions de novo and factual findings for clear error. *See McLane Co. v. EEOC*, 581 U.S. 72, 81 (2017); *Solis*, 644 F.3d at 226. Whether Appellees have standing is reviewed de novo. *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017).

Factual findings concerning purpose and pretext —such as the findings made here regarding the fit between the information demanded and the claimed investigation—are reviewed for clear error. *See United States v. Stuart*, 489 U.S. 353, 359-60 (1989); *Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987).

## ARGUMENT

### I. Appellees May Challenge Demands for Their Own Medical Records

DOJ's threshold argument would leave Appellees with no forum to protect their own medical records and no mechanism to resist disclosure of

their children's identities, diagnoses, and treatment histories to the government. The district court rightly rejected it.

### A. Forced Disclosure of Appellees' Identities and Medical Records is a Concrete, Imminent Injury.

Requests 11-13 demand Appellees' names, birth dates, Social Security numbers, addresses, and parent information—then link those identifiers to diagnoses, clinical assessments, and treatment histories. JA14. These records expose transgender status, gender-dysphoria diagnoses, mental-health information, family decision-making, and parent-child communications. Handing that information to federal law enforcement is a concrete privacy injury.

The Supreme Court has repeatedly held that disclosure of private information is a concrete harm. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *Dep't of State v. Ray*, 502 U.S. 164, 175 (1991). Medical records occupy an especially protected position; patients reasonably expect that diagnostic results "will not be shared with nonmedical personnel without [their] consent." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001); *see also Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) (recognizing privacy interest in medical records and explaining that "medical records can contain intimate facts of a personal nature").

The injury is imminent, traceable, and redressable. DOJ issued the subpoena and CNH holds the records. Absent quashal, the records will be produced, causing injury. The district court properly held that the subpoena "plainly threatens to cause immediate injury" to Appellees' "concrete right to maintain the privacy of their medical records." JA16-17. That is Article III standing.

The Supreme Court's recent decision in *First Choice Women's Resource Centers, Inc. v. Davenport* confirms that point. There, the Court held that a subpoena demanding private donor information created a present Article III injury, even before any court ordered production. 146 S. Ct. 1114 (Apr. 29, 2026). The Court explained that injury in fact "can also arise when a defendant burdens a plaintiff's constitutional rights," and compelled disclosure demands may inflict injury "not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id*. at 1125. The Court rejected the argument that a "non-self-executing" subpoena creates no injury until a court compels compliance, explaining that "[t]he value of a sword of Damocles is that it hangs—not that it drops." *Id*. at 1127 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting)).

The same principle applies here. DOJ's subpoena demands Appellees' constitutionally protected medical records and direct identifiers. The injury is not speculative merely because disclosure had not yet occurred—the demand itself placed Appellees' records at imminent risk.

DOJ suggests that Appellees' injury is speculative because CNH might resist production. That misses the point. Appellees came to court precisely because CNH, as a third-party recipient, might not have moved to quash or risked contempt to protect patients' personal rights. Courts have long recognized that persons whose rights are implicated by third-party subpoenas need a direct route to judicial protection. *See Reisman v. Caplin*, 375 U.S. 440, 445-50 (1964) (recognizing availability of judicial review and intervention to protect third-party interests affected by summons); *In re Grand Jury*, 111 F.3d 1066, 1073-74 (3d Cir. 1997) (recognizing standing to challenge third-party subpoena where disclosure would invade personal privacy interests). Appellees' standing does not hinge on the actions of a third party over which they have no control.

CNH's subsequent motion to limit the subpoena does not defeat Appellees' standing. Standing is assessed when suit is filed. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). CNH's eventual decision to seek its own relief for other patients

cannot retroactively deprive Appellees of standing at the time they acted. A patient's constitutional privacy should not turn on whether, when, and how aggressively a third-party hospital chooses to litigate. *See Reisman*, 375 U.S. at 445-50; *In re Grand Jury*, 111 F.3d at 1073-74.

**B.     Section 3486 Does Not Strip Patients of the Right to Protect Their Medical Records.**

A person may challenge a subpoena issued to a third party when the person asserts a personal right or privilege in the information sought. *See United States v. Idema*, 118 F. App'x 740, 744 (4th Cir. 2005). Other courts agree. *See, e.g.*, *In re Grand Jury*, 111 F.3d at 1073-74 (third-party standing turns on whether subpoena impinges on legitimate interests); *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982) (same).

Appellees assert the strongest possible personal right. The subpoena seeks their *own* medical files and identifying information. Patients thus possess a personal right in the confidentiality of those records and therefore may move to quash subpoenas seeking them. *See M.R. v. Tajdar*, Civ. No. TDC-17-3836, 2019 WL 3323207, at *2 (D. Md. July 24, 2019) (citing *Mezu v. Morgan State Univ.*, No. WMN-09-2855, 2011 WL 5110269, at *2 (D. Md. Oct. 25, 2011), *aff'd*, 495 F. App'x 286 (4th Cir. 2012)) (noting that "it is undisputed that an individual has an interest in the personal information

contained in [their] medical records" sufficient to confer third-party standing for a motion to quash).

Nothing in Section 3486 eliminates that rule.[4] Section 3486(a)(5) states that "[a]t any time before the return date specified in the summons, the person or entity summoned may" move to modify or set aside the summons. 18 U.S.C. § 3486(a)(5). That provision gives recipients an express pre-return-date mechanism. It does not say "only" recipients may object. It does not say that when DOJ subpoenas medical records from a hospital, the patients whose records are at stake become legal nonpersons. The text does not displace ordinary standing rules.

The rest of Section 3486 confirms that Congress did not intend the absurd result DOJ seeks. Section 3486(a)(7) provides that a Section 3486 summons "shall not require the production of anything that would be protected from production under the standards applicable to a subpoena duces tecum issued by a court of the United States." 18 U.S.C. § 3486(a)(7); JA15. Federal subpoena standards include protections for privileged and protected matter, and courts may quash subpoenas that are irrelevant,

---

[4] *See, e.g.*, *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *1 (finding that "the hospital has standing, and so too do the patients" to challenge an identical Section 3486 subpoena); *U.S. v. Lazar*, No. 04-20017, 2006 WL 3761803, at *6 (W.D. Tenn. Dec. 20, 2006) (non-recipient "has standing to challenge whether the government exceeded the scope of § 3486").

overbroad, or unduly burdensome. Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv); *Bailey*, 228 F.3d at 349. Congress thus incorporated judicial protections; it did not abolish them.

The incorporated rules confirm the same point. Rule 81(a)(5) makes the Federal Rules of Civil Procedure applicable to proceedings "to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute." JA15-16. And Rule 45 requires quashal or modification where a subpoena requires disclosure of privileged or protected matter or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv); JA15-16. This Court has emphasized that "burden" under Rule 45 is not limited to the cost of production: "a subpoena may impose a burden by invading privacy or confidentiality interests," and courts may consider the interests of "others who might be affected," because Rule 45 encompasses burdens on "any 'person,' not just the recipient of the subpoena." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189-90 (4th Cir. 2019). If Rule 45 protects "any person" from subpoena burdens, it protects the patients whose medical records are the target of the subpoena.

That is exactly what the district court held. Production by a hospital of private medical records containing highly sensitive treatment and care

information "rises to the level of potential undue burden as well as disclosure of protected materials contemplated by Rule 45." JA16. That reasoning follows from Section 3486(a)(7), Rule 45, *Idema*, and *Jordan*.[5]

DOJ invokes *expressio unius*, but that argument proves too much. Congress often creates express procedures for subpoena recipients because recipients receive the subpoenas, control production, and face compliance obligations. A recipient-focused procedure does not eliminate third-party personal-right objections. Rule 45 itself primarily regulates subpoenas directed to recipients, yet courts still allow persons with personal rights in subpoenaed information to challenge third-party subpoenas. *See Idema*, 118 F. App'x at 744. Section 3486(a)(5) must be read the same way.

DOJ's cases do not help its argument. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003), *Rotkiske v. Klemm*, 589 U.S. 8 (2019), and *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023), are not subpoena standing cases—they are statements of interpretive principles applied to unrelated

---

[5] Regardless of whether Appellees' have standing, a subpoena "remains at all times under the control and supervision of a court." *In re Grand Jury Subpoena*, 829 F.2d 1291, 1297 (4th Cir. 1987) (quoting *United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972)). Courts thus retain inherent authority to quash unlawful subpoenas *sua sponte*, regardless of a party's standing to object. *See, e.g.*, *Goldstein v. Hindle*, Civ. No. CJC-21-3124, 2025 WL 1928048, at *3 (D. Md. July 14, 2025); *United States v. Fitzgerald*, 416 F. App'x. 238, 244-45 (4th Cir. 2011).

statutory schemes. None involved a patient seeking to protect personal medical information from government compulsion.

The statute's timing provision confirms the point. A recipient must move before the return date because the recipient knows the return date. Nonrecipients often will not. DOJ's reading would mean that patients with no notice lose their rights before they even know the government has demanded their medical records. *See Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 380 (D. Md. 1999) ("When a party fails to receive prior notice of the information sought from a non-party, a party is deprived of its greatest safeguard . . . that is, the ability to object to the release of the information prior to disclosure."). Courts do not attribute such a design to Congress without clear evidence. *See Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986) (courts require persuasive evidence before concluding Congress intended to preclude judicial review); *Webster v. Doe*, 486 U.S. 592, 603 (1988) (serious constitutional claims require especially clear indication of congressional intent to preclude review). Here, there is none.

### C. Appellees' Motion Was Timely and Filed in the Proper Venue.

DOJ's timeliness argument fails for the reasons already discussed: Section 3486(a)(5)'s return-date provision governs the summoned party,

not third parties who may never receive notice. The district court found no basis to conclude Appellees knew of the subpoena before the deadline and properly rejected DOJ's argument as "disingenuous." JA18-19. Nevertheless, courts routinely permit untimely objections where good cause exists, particularly when protected information is at stake. *See, e.g.*, *In re Motorsports Merch. Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999); *Olszewski v. Bloomberg L.P.*, No. 96 Civ. 3393, 2000 WL 1843236, at *4 (S.D.N.Y. Dec. 13, 2000). Good cause existed here.

DOJ's venue concerns, to the extent they have not been forfeited, likewise fail.[6] Section 3486(a)(5) ties venue to "the district in which that person or entity does business." 18 U.S.C. § 3486(a)(5). CNH does business in Maryland, provides the care at issue in Maryland, and maintains the records at issue in Maryland. JA13-14. Appellees received care through CNH's Maryland-based Gender Development Program, and the subpoena was directed to CNH. JA13-14. Appellees therefore filed in the forum Congress identified for challenges to subpoenas served on Maryland entities. No additional venue showing is required.[7]

---

[6] To the extent DOJ now intends a freestanding venue objection, that argument is forfeited because DOJ did not raise that issue below. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

[7] DOJ's concern about litigating in distant forums rings hollow. DOJ itself sought to enforce an identical subpoena against Rhode Island Hospital in the

## II. The District Court Correctly Quashed the Patient-Record Demands.

Courts ordinarily afford deference to administrative subpoenas. But that deference is not a blank check. *See Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305-06 (1924) ("Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime."). The Fourth Amendment requires that the subpoena be reasonable.

The district court's analysis closely tracked the governing framework established by the Supreme Court and this Court. Section 3486 does not authorize subpoenas untethered to a legitimate statutory purpose, demands not reasonably relevant to that purpose, or requests so broad and mismatched that they are oppressive. JA19-20. Applying that framework, the court found DOJ failed to supply any CNH-specific predicate, failed to connect patient records to an FDCA investigation, and failed to explain why

Northern District of Texas, leading the District of Rhode Island to find that DOJ had pursued enforcement in "a distant forum that DOJ deems friendly to its political positions." *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 2026 WL 1392565, at *1. DOJ cannot credibly invoke nonrecipient convenience when it has itself sought enforcement thousands of miles from subpoena recipients.

identifying transgender minors and their parents would further any legitimate FDCA inquiry. JA20-24. That was not an abuse of discretion; it was the correct application of controlling precedent.

### A. The District Court Applied the Correct Fourth Amendment Standard.

The Supreme Court has repeatedly held that investigative subpoenas are subject to meaningful judicial limits. In *Oklahoma Press*, the Court held that a subpoena must be "authorized by law," issued for a purpose Congress may order, and seek documents "relevant to the inquiry." 327 U.S. at 209. In *Morton Salt*, the Court stated that "the gist of the protection is in the requirement . . . that the disclosure sought shall not be unreasonable"—the demand must not be "too indefinite" and the information sought must be "reasonably relevant." 338 U.S. at 652-53. And in *Powell*, the Court held that a summons may not be enforced if issued for an "improper purpose, such as to harass," "to put pressure" on the target, or "for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58.

This Court's *Bailey* decision applies those principles to Section 3486. An administrative subpoena triggers the Fourth Amendment when it "leads to 'the *compulsory* production of private papers.'" 228 F.3d at 348 (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). To be reasonable, a subpoena "must be (1) authorized for a legitimate governmental purpose; (2) limited

in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive . . . ." *Id.* at 349; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984). The district court properly applied that standard. JA19-20.

The Fourth Circuit cases DOJ invokes cut against it. *American Target* held that an administrative subpoena must be within the agency's authority, seek reasonably relevant information, and not be unduly burdensome. 257 F.3d at 355. *Solis* applied the same limits. 644 F.3d at 226. Neither *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 475 (4th Cir. 1986), nor *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 113-14 (4th Cir. 1997) offers a different standard. True, both recognize that courts take a broad view of relevance—but they also emphasize that relevance must be tethered to the statutory charge that supplies authority. The Supreme Court has cautioned that relevance cannot be construed so broadly that statutory limits "cease to be meaningful." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984). Although DOJ may have broad subpoena power, that power does not allow it to ignore the limits set by Congress and the Constitution.

**B. DOJ Failed to Articulate Any Basis to Suspect CNH of a FDCA Violation.**

The district court's finding that DOJ offered no concrete basis to suspect CNH of any FDCA violation, JA20-21, is well supported and reviewed for clear error. The court found DOJ failed to present "any information, record, or evidence supporting or pertaining to investigation of CNH for any 'health care offense.'" JA20. There was simply "no articulated basis" to suspect CNH of FDCA violations—"and surely none that would call for disclosure of any Movant's records." JA20. DOJ offered "no affidavit (or complaint or whistleblower statement) attesting to grounds for an investigation of CNH for FDCA . . . violation." JA20-21.

DOJ relied instead on the declaration of Lisa Hsiao, a Civil Division official, which the district court found did not supply information based on personal knowledge concerning a proper investigation of CNH. Rather, it consisted of generalized assertions about the FDCA's purpose, Section 3486 requirements, legal definitions, mislabeling and misbranding, and general claims about the safety and efficacy debate. JA21. These generalized assertions are not a proper predicate to demand a specific hospital's adolescent patient records. JA22.

DOJ reframes this deficiency as a demand for probable cause. Not so. The district court expressly recognized that administrative subpoenas need

not be supported by probable cause. JA20. But *Bailey* still requires a legitimate governmental purpose and reasonable relevance. 228 F.3d at 349. *Morton Salt* still requires that the demand not be "too indefinite." 338 U.S. at 652-53. DOJ failed that standard when it offered only a broad national grievance about a category of medical care and then demanded patient identities and records from a specific hospital without articulating any basis to suspect that hospital of an FDCA violation.

DOJ conflates the standard for *opening* an investigation with the standard for *compelling production* of privacy-invasive records. It is true that an agency may investigate "even just because it wants assurance" that the law is not being violated. *Morton Salt*, 338 U.S. at 642-43. But that principle governs whether DOJ may investigate at all—not whether every document demanded within that investigation satisfies the Fourth Amendment. *Morton Salt* made clear that even when an investigation is properly opened, the "gist of the protection" remains "in the requirement . . . that the disclosure sought shall not be unreasonable." *Id*. at 652-53. Even if DOJ's general authority to investigate is not in question, the Fourth Amendment still requires that *these specific requests* be reasonably relevant to that investigation. The district court correctly found they are not. JA19-23.

When a subpoena request implicates constitutionally protected privacy interests, the relevance showing cannot rest on speculation. *See United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (judicial protection against sweeping or irrelevant demands is "*particularly appropriate in matters where the demand for records is directed not to the [investigation's target] but to a third-party who may have had some dealing with the person under investigation*"). Here, the children whose records DOJ demands are not under investigation; they are third parties whose privacy is being invaded in pursuit of a theory that has no articulated connection to them. DOJ need not prove wrongdoing to investigate, but that does not mean it may demand anyone's medical records on the hope that something useful might turn up.

### C.    DOJ's Patient-Record Demands Have Nothing To Do With the FDCA.

The district court's second key merits finding was that DOJ's stated FDCA purpose is "at odds" with Requests 11-13. JA22. That finding is correct and, again, reviewed for clear error.

The FDCA regulates drugs, labeling, promotion, interstate distribution, and commerce, not medical practice. Nor does it prohibit physicians from prescribing approved drugs for off-label uses. *See Buckman*, 531 U.S. at 350. Section 396 of the FDCA expressly provides that

"[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 U.S.C. § 396. The Fourth Circuit has said so directly: "physicians are permitted to prescribe drugs for off-label uses," although pharmaceutical companies may not promote drugs for unapproved uses. *Nathan*, 707 F.3d at 454 n.2 (4th Cir. 2013).

This Court's decision in *United States v. Jackson* is controlling. There, this Court carefully distinguished between conduct the FDCA reaches and conduct it does not. The Court affirmed an FDCA conviction, but only after explaining that the case "d[id] not suggest that mere off-label use . . . was a per se basis" for liability. 126 F.4th 847, 861 (4th Cir. 2025). The conviction rested on the defendant's "holding for sale of an adulterated device"—not on lawful off-label medical judgment. *Id.* at 860. The Court expressly recognized that Section 396 "protects only physicians who 'prescribe or administer any *legally marketed* device,'" and that "off-label use is 'an accepted and necessary corollary of the [FDA]'s mission to regulate in this area without directly interfering with the practice of medicine.'" *Id.* (quoting *Buckman*, 531 U.S. at 350). The drugs at issue here—puberty blockers and hormone therapies—are FDA-approved and

legally marketed. CNH physicians prescribe them in the exercise of professional medical judgment. That is precisely the conduct *Jackson* held the FDCA does not reach.

Multiple other circuits have said the same.[8] And even DOJ's own Office of Legal Counsel agrees, concluding the "FDA does not regulate the practice of medicine, which includes 'off-label' prescribing," and that "physicians may, with limited exceptions, prescribe and administer FDA-approved drugs and devices for unapproved uses." *See* Steven A. Engel, *Whether the Food & Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (2019).

Requests 11-13 do not seek evidence of misbranding, labeling, manufacturer promotion, or distribution in interstate commerce. Request 11 demands the identities of children and their families. JA14. Request 12 demands each patient's clinical information. JA14. Request 13 demands informed-consent, intake, and parent authorization materials. JA14. None of this information is related to labeling. Nor manufacturer promotion. Nor sales-representative communication. Nor evidence of interstate

---

[8] *See, e.g.*, *United States v. Facteau*, 89 F.4th 1, 15 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 137 (2024); *United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 615 (2d Cir. 2016); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012); *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 535 (6th Cir. 2021).

distribution. They are patient records that could not plausibly say anything about the elements of the FDCA. This is why multiple courts considering materially similar subpoenas have reached the same conclusion. *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 580-82 (E.D. Pa. 2025) (Requests 11-13 exceeded Section 3486 authority because they sought children's identities and clinical files, not evidence of misbranding or distribution); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238-39 (D. Mass. 2025) (quashing materially similar subpoena where DOJ failed to articulate "an iota of suspicion" that the hospital engaged in off-label promotion); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *6-7 (Requests 11-13 had "little to do" with an FDCA investigation and appeared to be a "smokescreen"); *QueerDoc, PLLC v. U.S. Dep't of Justice*, 807 F. Supp. 3d 1295, 1303-04 (W.D. Wash. 2025) (DOJ "issued the subpoena first and searched for a justification second").

Moreover, the FDCA's "intended use" regulation, 21 C.F.R. § 201.128, defines "intended use" by reference to "the persons legally responsible for the labeling of an article"—manufacturers and distributors, not treating physicians. A hospital administering a prescription for an individual patient is delivering medical care, not distributing drugs commercially. Every FDCA enforcement case DOJ cites involved promotional conduct—sales

outreach, promotional materials, or direct-to-consumer marketing—by parties who introduced drugs into commerce. *See, e.g.*, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008) (conviction of manufacturer for promoting off-label uses); *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (upholding misbranding conviction for shipping drugs with false informational sheets). None involved a physician or hospital exercising clinical judgment. DOJ cites no case—and Appellees are aware of none—extending FDCA liability to a hospital or provider for the act of prescribing.

The FDCA itself confirms this distinction. Section 353(b)(2) exempts any drug "dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug" from Section 352's labeling requirements. 21 U.S.C. § 353(b)(2). That prescription exemption reflects Congress's understanding that the FDCA regulates the introduction, labeling, and distribution of drugs in interstate commerce—not how physicians diagnose patients, obtain consent, document treatment, or communicate with them.

The district court here, too, captured the mismatch: "The Government seeks to investigate how CNH treats its patients; specifically, in the context of gender-affirming patient care. But the FDCA regulates

33

commerce, not patient care." JA22. Even crediting DOJ's stated FDCA purpose, the court found it "utterly unclear" why DOJ needs "adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms." JA22. Nothing DOJ submits "plausibly explains the purported connection between the documents it demands and suspected Hospital FDCA violations." JA22.[9]

DOJ's attempt to invoke "false billing" or "miscoding" of precocious puberty diagnoses does not save Requests 11-13. Rather, it shows that DOJ is trying to blur distinct theories. The district court expressly noted that DOJ "mounts no argument that the Subpoena was issued in furtherance of an investigation of the Hospital for suspected violation of the False Claims Act," and instead "limits its argument to DOJ's interest in purported violations of the FDCA." JA20 n.15. That limitation matters. The FDCA theory DOJ defended concerns drug labeling, promotion, and distribution into interstate commerce. A theory that providers miscoded claims or submitted false bills is a different theory, governed by different legal

---

[9] That mismatch was especially probative because DOJ's asserted FDCA theory would transform federal drug regulation into precisely what this Court has warned against: "an unprecedented federal intrusion into the regulation of medical practice—an area long reserved to the states." *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 276 (4th Cir. 2025).

standards and different evidence. DOJ cannot make patient clinical files relevant to an FDCA investigation by relabeling a billing-fraud theory as FDCA "context."

The court reviewing the materially identical subpoena issued to the Children's Hospital of Philadelphia ("CHOP") rejected precisely this move. DOJ argued there that patient files were relevant because "[l]inking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded," and because patient records might reveal "masking codes" or "fraudulent informed consent documents." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 578-79 (E.D. Pa. 2025). The court held those explanations did "not withstand scrutiny." *Id.* at 579. "Congress, through the Act, regulates the introduction, labeling, and distribution of drugs in interstate commerce; it does not govern how physicians diagnose patients, obtain consent, document treatment, or communicate with them." *Id.* And the "conduct the Department of Justice describes—miscoded diagnoses, allegedly incomplete disclosures, or purportedly misleading consent forms—concerns how drugs are used in practice, not how they are labeled, promoted, or distributed in commerce." *Id.*

Even if DOJ were pursuing a preserved billing or miscoding theory, Requests 11-13 would still be the wrong tool. As the CHOP court explained, "[l]inking individualized clinical narratives to billing data does not transform clinical narratives into statutorily relevant material." *Id.* If DOJ suspects coding inaccuracies or billing irregularities, "the relevant evidence lies in the Hospital's coding guidance, claim forms, insurer correspondence, and internal communications"—the very types of records sought in other subpoena requests that Appellees did not challenge. *Id.* The same is true here. At most, DOJ's billing argument shows it is trying to use an unpreserved and distinct fraud theory to prop up an FDCA subpoena that otherwise lacks statutory fit.

DOJ's suggestion that CNH could face conspiracy liability for misbranding fares no better. The Hsiao declaration identified no communication, agreement, or conduct connecting CNH to coordinated unlawful activity with any manufacturer. Without some factual predicate linking CNH to manufacturer misconduct, the conspiracy theory is speculation, and speculation does not justify demanding the identities and medical records of children.

Finally, DOJ's claim that it obtained relevant evidence from other hospitals does not change the analysis. The district court reviewed the

record before it, and post-order assertions about other productions cannot show clear error in the court's record-based findings about this subpoena. Nor do generic assertions about records obtained elsewhere create a CNH-specific predicate. If that were enough, Section 3486 would permit DOJ to demand patient files from any hospital that ever prescribed the drugs at issue. A theory that some records somewhere may contain something useful is not reasonable relevance; it is instead an "idle hope" that cannot provide a reasonable basis to categorically demand patient medical records. *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *8-9 (quotation omitted).

### D. DOJ's "Lead" and "Witness" Theories Have No Limiting Principle.

On appeal, DOJ recasts Requests 11-13 as a search for leads or witnesses.[10] But a witness theory would justify requests for what CNH knows about manufacturers: communications with manufacturers, promotional materials, sales-representative contacts, speaking or consulting arrangements, contracts, distribution records, and safety communications. Those are precisely the categories covered by Requests 7-

---

[10] DOJ's "lead" and "witness" theories are forfeited to the extent they materially differ from the theory DOJ presented below. But even considered on the merits, they fail.

10, which Appellees did not challenge. It does not justify demanding patient identities, diagnoses, assessments, intake records, informed-consent materials, or parent authorization documents. A patient's intake form does not show what a sales representative told a physician. A parent authorization form does not show how a manufacturer labeled a drug. A diagnosis does not show off-label promotion. And a clinical assessment does not show distribution in interstate commerce.

If DOJ's theory were correct, every manufacturer-misbranding investigation could demand the identities and medical files of every patient nationwide who received the drug. *Bailey* forbids just that. The Seattle Children's court rejected the same theory as "rife with speculation," holding DOJ could not justify demanding patient records on the theory that the hospital might simply be "'a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use.'" *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *11. Requests 11-13 are no more justified here.

### E.    *Bailey* Supports Affirmance.

DOJ treats *Bailey* as though it held that Section 3486 always permits patient-record subpoenas. Not so. *Bailey* enforced subpoenas in a concrete investigation into a particular physician and practice suspected of federal

health-care offenses. 228 F.3d at 344-45. The subpoena sought patient files alongside billing records, purchase records, controlled-substance records, accounting records, and health-plan documents. *Id.* The district court also required a staged process: the government would notify the movants if it later determined it needed to review particular patient files. *Id.* at 345. This Court affirmed because the subpoenas were tied to a legitimate investigation, reasonably limited, specific, and not oppressive. *Id.* at 349-50.

Here, the essential premise of *Bailey* is missing: DOJ did not identify a CNH-specific FDCA violation. It did not show that Appellees' records would prove misbranding, manufacturer promotion, or any other FDCA offense. It did not offer the kind of concrete evidence of a legitimate investigation that justified the subpoenas in *Bailey*. Instead, it demanded direct identifiers and full clinical files for a vulnerable group of minors against a backdrop of official hostility toward the care those files reflect.

*Bailey* also reinforces the district court's privacy analysis. This Court did not say patient records have no privacy protection. It balanced privacy against the government's "compelling interest" in identifying illegal activity in a valid investigation. *Id.* at 350. Where the government's need is concrete and compelling, privacy may yield under appropriate safeguards. Where the

government's need is unsupported and pretextual, as here, the balance shifts. *Bailey* therefore supports the district court's approach: evaluate the subpoena's purpose, relevance, scope, and privacy impact.

Finally, DOJ suggests the district court erred by quashing Requests 11-13 without first requiring Appellees to seek accommodation with the government. *See Bailey*, 228 F.3d at 351. But *Bailey*'s accommodation discussion arose in the context of a subpoena recipient negotiating production terms, not nonrecipient patients whose identities and medical files are the objects of the subpoena. Appellees have no obligation to negotiate away their own privacy rights on CNH's behalf. Moreover, the district court found the subpoena's demands "patently disassociated" from any legitimate investigative purpose—a defect that narrowing could not cure. JA22-23. DOJ's belated offers in other proceedings to accept anonymized records only confirms that patient-identifying information was never necessary. If de-identified data could serve DOJ's stated purposes, the original demand for names, Social Security numbers, and addresses was unjustified from the start.

### F.    The Subpoena is Overbroad and Oppressive

Even if DOJ had identified a legitimate investigation (it has not), Requests 11-13 are far broader than any such investigation could justify.

They demand identities and medical records for *every* minor prescribed puberty blockers or hormones over a multi-year period. JA14. They are not limited to patients whose care involved a particular drug, manufacturer, communication, distribution issue, adverse event, or alleged misrepresentation. They are a dragnet. *See Gilmore v. Jones*, 339 F.R.D. 111, 124 (W.D. Va. 2021) ("The sheer breadth of the subpoenas shows that [the requestor] has embarked on a fishing expedition[.]'").

The breadth is especially oppressive because of the nature of the records and the population targeted. The records reveal transgender status and gender-dysphoria-related care for minors. Public disclosure or government dissemination could expose minors and families to stigma, harassment, discrimination, and fear. Even disclosure to law enforcement can chill care and candor in the physician-patient relationship. *See Ferguson*, 532 U.S. at 78; *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (recognizing serious privacy burden from compelled disclosure of sensitive reproductive-health records even with redaction).

Administrative subpoenas cannot be enforced when their breadth is disproportionate to the legitimate inquiry. *See Am. Target*, 257 F.3d at 355;

*Solis*, 644 F.3d at 226; *Bailey*, 228 F.3d at 349. Requests 11-13 fail that test independent of their illegitimate purpose.

## III. The Record Supports the District Court's Finding That Requests 11-13 Were Issued for an Improper Purpose.

DOJ argues that the district court impermissibly evaluated the Administration's policy objectives. That misstates the ruling. The court correctly held that DOJ invoked the FDCA without connecting Requests 11-13 to any violation, and that the mismatch, combined with the Administration's stated objective to end the care, showed the FDCA rationale was pretextual. On clear error review, DOJ has not shown any basis to disturb those findings.

### A. Courts May Quash Subpoenas Issued for Harassment, Pressure, Retaliation, or Bad Faith.

Improper-purpose review is an ordinary limit on investigative power. *See Powell*, 379 U.S. at 58 (holding a summons may not be enforced if issued "for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation"); *LaSalle*, 437 U.S. at 316-17 (summons authority depends on "good-faith pursuit of the congressionally authorized purposes"). *Bailey* applied the same principle to Section 3486, holding the legitimate-purpose requirement "prohibits the government from engaging in arbitrary fishing expeditions and from

selecting targets of investigation out of malice or an intent to harass." 228 F.3d at 349.

Recent decisions outside of this specific subpoena campaign for pediatric transgender medical records underscore that these ordinary rules limit the government's ability to simply subpoena however it wishes. *See, e.g.*, *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]* 823 F. Supp. 3d 1, 4, 8 (D.D.C. 2026) (quashing grand-jury subpoenas after finding "abundant evidence" their "dominant (if not sole) purpose" was "to harass and pressure" the Federal Reserve Chair "either to yield to the President or to resign," while the government offered "no evidence whatsoever" of a crime "other than displeasing the President" and that "a unanimous chorus of sister circuits agrees that courts may quash subpoenas that the Government issued for an improper purpose"); *In re Grand Jury Subpoenas Nos. 2022R00519-A et al.*, No. 26-mc-43, 2026 WL 1783899, at *5, 10 (D. Minn. June 22, 2026) (quashing grand-jury subpoenas served on state and local officials concerning immigration enforcement because their "dominant purpose" was "to coerce Minnesota officials into assisting the federal government" and "to harass and retaliate against them for failing to do so").

Courts have recently applied the same principle to civil investigative demands ("CID"). *See, e.g.*, *Endocrine Society v. FTC*, No. 1:26-cv-00512, 2026 WL 1257289, at *12, 14 (D.D.C. May 7, 2026) (preliminarily enjoining a FTC CID after finding that its targeting of the Society's work on transgender-health issues "reasonably appears to be one more step in a multiagency campaign to stamp out dissenters," and that the CID's focus on academic and medical speech, combined with the FTC's "paucity of logic or evidence pointing to a genuine investigation," likely showed retaliatory purpose);  *WPATH v. FTC*, No. 1:26-cv-00532, 2026 WL 1257321, at *3 (D.D.C. May 7, 2026) (quoting *Endocrine Society*, 2026 WL 1257289, at *14 (internal quotations omitted)) (enjoining CID where the "'pattern of litigation and information demands'" and "articulated hostility" toward proponents of transgender health care supported a finding that retaliation for protected speech motivated the agency's demand).

These decisions illustrate a settled principle: when the record shows an investigative demand is being used to punish, pressure, harass, or coerce, judicial relief is appropriate even when the government invokes its investigative authority.

### B. The District Court's Improper-Purpose Finding Follows From Objective Evidence.

The district court relied on objective evidence in finding the subpoena was issued for an improper purpose. The Executive Order said the care "must end." JA9-10. The Attorney General described providers as advancing a "radical ideological agenda," "barbaric" conduct, and "ruining . . . children's lives." JA10-11. DOJ memoranda directed investigations of doctors, hospitals, pharmaceutical companies, and others associated with the care. JA11-13. DOJ then demanded children's identities and medical records. JA14. DOJ failed to offer a CNH-specific factual predicate. JA20-21. And the subpoena's patient-record demands did not fit DOJ's asserted FDCA rationale. JA22.

That is a proper basis for finding pretext. *See Department of Commerce v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) ("[W]e are 'not required to exhibit a naiveté from which ordinary citizens are free.'")). The district court did not probe hidden motives. It compared DOJ's stated FDCA rationale to the records demanded and found a "patent disassociation" between the two. JA22-23.

Courts reviewing materially identical subpoenas reached the same conclusion on the same record. *QueerDoc* held that the record did not

45

require "speculation about hidden motives" because "it is the Administration's explicit agenda," and concluded that DOJ "issued the subpoena first and searched for a justification second." 807 F. Supp. 3d at 1303-04. The District of Colorado found that the evidence "paints a compelling picture" that DOJ's aim was "not actually to investigate FDCA violations," but to use the FDCA as a "smokescreen" for pressuring pediatric hospitals to end pediatric transgender health care through "vague, suspicionless 'investigations.'" *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at \*7. The District of Massachusetts found it "abundantly clear" that the subpoena's true purpose was "to harass and intimidate" Boston Children's Hospital and "to dissuade patients from seeking such care." *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025). The Western District of Pennsylvania likewise found that DOJ's "demand for deeply private and personal patient information carries more than a whiff of ill-intent." *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at \*2.

The District of Rhode Island later put the point in a way that answers DOJ's appeal here. DOJ argued there, as here, that a nominal FDCA purpose defeated improper-purpose review. The court rejected that view: "this would require a genuine legitimate investigative purpose, not merely a

legal theory." *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 2026 WL 1392565, at *8. Otherwise, DOJ could "immunize any coercive investigation from the improper purpose doctrine simply by appending an untenable legal theory to it." *Id.*

That is exactly the concern here. DOJ's asserted FDCA theory does not explain why it needs patient identifiers and clinical files. The district court was entitled to consider the surrounding record, and it reasonably found that the subpoena bore "no credible connection" to any statutory violation by CNH and appeared to have "no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated." JA23-24.

## C. DOJ's Prosecutorial-Discretion Cases Do Not Apply.

DOJ's prosecutorial-discretion cases do not insulate subpoenas from review. *See United States v. Armstrong*, 517 U.S. 456 (1996) (discovery in a selective-prosecution claim); *Wayte v. United States*, 470 U.S. 598 (1985) (selective-prosecution defense to criminal charges); *United States v. Texas*, 599 U.S. 670 (2023) (state's attempt to compel immigration arrests and prosecutions). None involved a motion to quash an administrative subpoena for lack of statutory authority, relevance, and legitimate purpose.

Nor does *American Target* help DOJ. That case held that an administrative subpoena fell within the agency's statutory authority where the asserted basis was not "obviously apocryphal" and the requests were reasonably relevant to an investigation the agency was authorized to conduct. 257 F.3d at 351, 355. Unlike here, there were no district-court factual findings that the subpoena bore "no credible connection" to the statute invoked, or that it was "not limited in scope to any legitimate purpose," and appeared designed to intimidate and harass. JA22-24.

The district court did not intrude on enforcement discretion or prohibit DOJ from investigating legitimate FDCA violations. It simply refused to permit DOJ to obtain Appellees' medical records because DOJ failed to show those records were relevant to the FDCA investigation it claimed to be pursuing and because the record showed pretext. That is ordinary subpoena review.

## IV. Appellees' Constitutional Privacy Interests Independently Support Affirmance.

The district court's constitutional informational privacy analysis provides an independent basis for affirmance. This Court applies a two-step Fifth Amendment privacy framework.  It asks first whether the information sought falls within the individual's reasonable expectation of privacy, and second whether a *compelling* governmental interest in disclosure

outweighs that privacy interest. *Walls v. City of Petersburg*, 895 F.2d 188, 192-93 (4th Cir. 1990); *Payne v. Taslimi*, 998 F.3d 648, 655-57 (4th Cir. 2021). The district court correctly resolved both steps in Appellees' favor: it held that "[t]here can be no question" that Appellees have a constitutionally reasonable expectation of privacy in their medical records, JA24, and that DOJ could not show a compelling interest that could overcome Appellees' privacy interests because it had shown no legitimate purpose for the subpoena, JA24.

### A. Appellees Have a Reasonable Expectation of Privacy in the Requested Records.

The first step is straightforward. Patients and their parents undoubtedly have a reasonable expectation of privacy in their medical records because "medical treatment records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000)

The records at issue here are among the most intimate a person can possess. *See Walls*, 895 F.2d at 192 (4th Cir. 1990) ("The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny."). The subpoena demands records

sufficient to identify each minor patient by name, birth date, Social Security number, address, and parent information, and then links those identifiers to diagnoses, clinical indications, and assessments. JA14. These records reveal transgender status, gender-dysphoria-related clinical information, mental health concerns, treatment decisions, family decision-making, and other intimate details of minors' and their families' lives.

The district court's ruling on Plaintiffs' motion for leave to proceed under pseudonyms reinforces the point. The court found that this case concerns "information of an incredibly sensitive and personal nature— information regarding individuals' transgender status and related medical treatment," and that revealing such information would risk exposing minors and families to "harm, including harassment and discrimination." JA9. Privacy interests are heightened when they involve medical records relating to stigmatized health conditions, particularly when disclosure could subject patients to "discrimination and intolerance." *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994); *see also Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487 (4th Cir, 1992).

DOJ's reliance on hospital privacy notices does not defeat that expectation. Patients may understand that hospitals disclose information for treatment, payment, and legally valid process. But HIPAA's structure

recognizes and strengthens, rather than eliminates, patients' privacy interests. When law-enforcement process is properly issued, HIPAA permits disclosure only within defined limits; it does not require disclosure, and for administrative subpoenas it permits disclosure only where the information sought is "relevant and material," "specific and limited in scope," and not reasonably available in de-identified form. 45 C.F.R. § 164.512(f)(1)(ii). Patients do not—and could not — reasonably expect their *direct* identifiers and *complete* gender-related medical files to be turned over to federal law enforcement pursuant to a subpoena untethered to any legitimate investigation.

The Supreme Court's recent decision in *Chatrie v. United States* confirms the point. There, the government argued that users lost any reasonable expectation of privacy because they had enabled Location History after receiving Google prompts and notices. The Court rejected that theory, emphasizing that the prompts did not disclose "how frequently" location would be recorded, "how precise" the data would be, or how it might be given to the government. No. 25-112, 2026 WL 1855568, at *15 (U.S. June 29, 2026). The Court likewise rejected an approach under which ordinary use of a service becomes wholesale consent to government access. *Id.* at *16. So too here: recognizing that medical information may be

disclosed in lawful circumstances is not consent to unbridled law-enforcement access for an illegitimate and improper purpose. Patients reasonably expect that any law-enforcement access to their most sensitive medical records will be legally authorized, properly tailored, and consistent with constitutional limits.[11]

### B. Even if DOJ Had Shown a Compelling Interest, the Balancing Factors Strongly Favor Appellees.

Once a reasonable expectation of privacy exists, the government must show that a *compelling* interest in disclosure outweighs the individual's privacy interest. *Walls*, 895 F.2d at 192; *Payne*, 998 F.3d at 655. DOJ can not make that showing here.

As explained above, the district court found no relevant connection between DOJ's patient records demands and any credible FDCA offense.

---

[11] Another court recently reached the same conclusion in granting a TRO against DOJ's substantially similar effort to obtain transgender patients' identifying and sensitive medical records through criminal grand-jury subpoenas issued from the Northern District of Texas. *See* Tr. of TRO Decision at 24:13-27:11, *Coe v. Blanche*, No. 1:26-cv-04641, (S.D.N.Y. June 24, 2026). The court held that plaintiffs had "an objectively reasonable expectation of privacy in the sensitive medical records" sought by DOJ, that "federal and state law, including HIPAA" enshrined that privacy right, that disclosure of the information to physicians "does not constitute a waiver of their privacy rights," and that "six years of aggregated treatment history, diagnoses, family information, and intimate personal detail" were "precisely the kinds of privacies of life" in which the law recognizes a reasonable expectation of privacy. *Id.* at 24:20-27:11.

JA20-22. Those findings defeat DOJ's claim that a compelling government interest overcomes Appellees' privacy interest. "No proper (never mind compelling) governmental purpose ha[d] been demonstrated." JA23. The district court therefore had no need to proceed through a full factor-by-factor balance. JA24. But even assuming that DOJ had shown a compelling interest in obtaining identifiable patient records (it has not), the record shows why the balancing test favors Appellees.

Courts weighing medical privacy against government access consider: (1) the type of record requested; (2) the information it contains or may contain; (3) the potential harm from nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards against unauthorized disclosure; (6) the degree of need for access; and (7) whether an express statutory mandate, articulated public policy, or other recognizable public interest favors access. *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980); *see also Patients of Dr. Solomon v. Bd. of Physician Quality Assurance*, 85 F. Supp. 2d 545, 547 (D. Md. 1999) (applying *Westinghouse* factors to medical-record subpoena); *In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 & A99-0004*, 51 F. Supp. 2d 726, 738 (W.D. Va. 1999) (same).

The **first two** factors—the type of records and the information they contain—strongly favor Appellees. DOJ seeks pediatric medical records concerning gender-related care. As discussed above, the requests disclose intimate, confidential details about minor patients and their parents, *see* JA14, which places the information at the core of constitutional privacy.

The **third** factor—the potential harm from nonconsensual disclosure—also strongly favors Appellees. Disclosure would strip minors and families of control over intensely personal information and place that information in the hands of federal officials who have publicly condemned their care. The harm is not limited to public leaks. It includes the loss of privacy inherent in compelled law-enforcement access, the risk of internal dissemination, and the fear that patients or parents may be contacted, scrutinized, or drawn into an investigation concerning their own medical care. The district court recognized that disclosure of transgender status and related treatment information risks exposing minors and families to "harm, including harassment and discrimination." JA9 n.1.

The **fourth** factor—the injury to the relationship in which the records were generated—likewise favors Appellees. These records were created in confidential relationships among minors, parents, and medical providers. Those relationships depend on candor about a host of sensitive topics. If

families know such records may be turned over to federal officials who explicitly oppose the care, candor will suffer. So will trust in pediatric care more broadly, including for other sensitive conditions. *See Nw. Mem'l Hosp.*, 362 F.3d at 929 ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients' records from disclosure in judicial proceedings, . . . the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment."). Any such undermining of patients' trust in their healthcare providers "might prevent people from seeking help when needed." *Id.*[12]

The **fifth** factor—the adequacy of safeguards—does not rescue DOJ. Section 3486(e) limits certain uses of health information, but it can be

---

[12] That chilling effect also has a First Amendment dimension. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018) ("Throughout history, governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities."). Compelled disclosure of the identities of those who have engaged in disfavored but lawful activity has long drawn exacting scrutiny, because it induces self-censorship and exposes those identified to threats, harassment, and reprisal. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606-07 (2021). These cases underscore the constitutional principle at issue here: compelled disclosure will "threaten[] harm to the patient's psychological health, interfere[] with the physician's professional judgment, and compromis[e] the doctor-patient relationship." *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014).

overcome by a court order, 18 U.S.C. § 3486(e)(1), and does not prevent the initial disclosure to DOJ, internal review, or the chilling effect caused by government possession of identifiable records. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551-52 (9th Cir. 2004) ("Even if a law adequately protects against public disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information."). Statutory safeguards mattered in *Bailey* because the government had legitimate reasons to obtain the information. They do not transform an illegitimate demand into a constitutional one.

Moreover, DOJ employees are not the extent of the disclosure. DOJ has announced that it will "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners" under federal and state law. JA12. The Attorney General also directed "all U.S. Attorneys to investigate all suspected cases" of pediatric transgender medical interventions and to prosecute such care "to the fullest extent possible." JA10-11. Section 3486(e)(1) does not categorically prohibit DOJ from sharing information obtained through a subpoena with state law-enforcement officials, and the Privacy Act separately permits disclosures to law enforcement in specified circumstances. *See* 18 U.S.C. § 3486(e)(1); 5

U.S.C. § 552a(b)(7). The possibility that their private information will be shared with local, state, and U.S. Attorney law enforcement is particularly concerning for parents who sought medically recommended and lawful care for their children that DOJ has subsequently characterized as child abuse. JA9-12; *see, e.g.*, *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 603 (finding factor weighs against the government as DOJ "offers nothing to mitigate a concern for these children and their families given these pronouncements"); Tr. of TRO Decision at 21:14-22:3, 28:11-29:5, *Coe v. Blanche*, No. 1:26-cv-04641 (S.D.N.Y. June 24, 2026) (rejecting the notion that grand-jury secrecy defeats the privacy harm, explaining that Rule 6(e) contains "numerous exceptions permitting inter and intra governmental dissemination" and that DOJ offered "few assurances" that the requested records would not be used to harm the patients or their families).

Nor would anonymization or redaction provide an adequate safeguard. To begin, it would not cure the subpoena's threshold defect. The district court correctly held that because the subpoena "lacks a legitimate purpose," that defect "cannot be ameliorated by providing patient records in redacted form." JA25. Redaction also does not change the fact that the detailed intimate information DOJ seeks falls outside the FDCA's regulation of labeling, promotion, distribution, or commerce. And as a

practical matter, redaction cannot reliably protect privacy in detailed medical files like these.

The CHOP court found redaction inadequate because the records contain intimate, individualized details that can identify children and families even without names, including information about mental health, family dynamics, trauma, self-harm, bullying, and other uniquely identifying circumstances. *In re Subpoena No. 25-1431-014,* 810 F. Supp. 3d at 599-601. *Northwestern Memorial* likewise rejected compelled disclosure of redacted reproductive-health records because redaction did not eliminate the risk of identification or the chilling effect on care. 362 F.3d at 929-30. A safeguard that leaves children's detailed medical histories in DOJ's hands—and leaves open later deanonymization—is no safeguard at all.[13] "Even if there were no possibility that a patient's identity might be

---

[13] The later criminal grand-jury proceedings illustrate the point. In litigation involving an effort to obtain patient records from Stanford, Lucille Packard Children's Hospital represented that it was in negotiations with DOJ to accept anonymized patient records only "in the first instance," while expressly reserving "the right to request unmasked patient records." Def.'s Resp. to Mot. for TRO at 5, *Z.A. v. Lucile Salter Packard Children's Hosp. at Stanford*, No. 5:26-cv-04998 (N.D. Cal. June 3, 2026) (ECF No. 31). *Coe* reflects the same concern: NYU Langone's counsel was attempting redactions, but with "the specter of a later government request for deanonymization always in the background," and could not guarantee anonymization given "artificial intelligence and multiple points of data" in complex medical records. Tr. of TRO Decision at 5:23-6:8, *Coe v. Blanche*, No. 1:26-cv-04641 (S.D.N.Y. June 24, 2026).

learned from a redacted medical record, there would be an invasion of privacy." *Id.* at 929.

The **sixth** factor—the degree of need for access—is dispositive. DOJ has not shown any need for patients' identities and medical records. The district court found it "utterly unclear" why an FDCA investigation would require names, birth dates, Social Security numbers, parent information, clinical indications, diagnoses, or parent authorization forms. JA22. DOJ can pursue any genuine inquiry without forcing hospitals to disclose a registry of transgender minors and a detailing of the individualized care they received.

The **final** factor—whether a statutory mandate, public policy, or other public interest favors access—also favors Appellees. Section 3486 authorizes subpoenas only for records relevant to investigations of federal health-care offenses; it does not announce a public policy favoring disclosure of minors' medical records untethered to any legitimate investigation. Nor does the FDCA supply such a policy. It regulates drugs, labeling, promotion, and distribution into interstate commerce—not the patient care reflected in Requests 11-13. JA22. The public interest is therefore not served by enforcing a subpoena that the district court found lacked a legitimate purpose, bore "no credible connection" to any statutory

violation by CNH, and appeared designed to obtain "compliance born of fear." JA22-24. It is served by protecting constitutional rights, preserving trust in confidential medical care, and ensuring that federal subpoena power is not used to intimidate patients, families, or providers.

DOJ's cited cases do not compel a different conclusion. As discussed above, *Bailey*, in contrast to this case, applied the balancing test to a concrete investigation of suspected health care offenses by a physician and practice. 228 F.3d at 350. And *Payne* involved an incarcerated plaintiff's disclosure claim in a prison medical setting. 998 F.3d at 656-57. This Court emphasized the plaintiff's diminished privacy expectations in prison and the particular circumstances of the disclosure. Appellees, by contrast, are minors and families receiving care in a civilian children's hospital. They did not surrender privacy rights by seeking medical treatment.

The district court's privacy ruling should be affirmed. At minimum, if this Court concludes DOJ has shown a compelling interest sufficient to require balancing, it should remand for the district court to conduct that balancing in the first instance. *See Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) (appellate courts are "courts of review, not of first view").

**V.     The District Court's Tailored Remedy Should Be Affirmed.**

The scope of a quashal remedy is reviewed for abuse of discretion. The district court's tailored approach of quashing only the patient-record demands while leaving the rest of the subpoena intact was well within its discretion.

The district court's remedy tracks the violation. Rule 45 standards, incorporated through Section 3486(a)(7), authorize courts to quash or modify subpoenas seeking protected matter or imposing undue burden. Fed. R. Civ. P. 45(d)(3)(A); 18 U.S.C. § 3486(a)(7). *Bailey* authorizes courts to deny enforcement where a subpoena lacks a legitimate purpose, is not reasonably related to that purpose, or is oppressive. 228 F.3d at 349. *Powell* authorizes courts to refuse enforcement where an improper summons would abuse the court's process. 379 U.S. at 58. The district court applied those principles and granted relief no broader than necessary to protect Appellees' rights.

DOJ frames this appeal as an attack on its investigative authority. It is not. The court left DOJ free to pursue its FDCA investigation through the unchallenged requests. What DOJ cannot do is demand the identities of every minor who received a disfavored form of care without connecting that demand to a legitimate investigative need.

# CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,

*Eve L. Hill*
EVE L. HILL
Brown Goldstein & Levy LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
(410) 962-1030
ehill@browngold.com

JOSHUA D. ROVENGER
DONOVAN C. BENDANA
GLBTQ Legal Advocates & Defenders
18 Tremont St., Suite 950
Boston, MA 02108
(617) 426-1350
jrovenger@gladlaw.org
dbendana@gladlaw.org

*Attorneys for Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,695 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*Eve L. Hill*
EVE L. HILL

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.

*Eve L. Hill*

EVE L. HILL